# United States Court of Appeals
# for the Federal Circuit

SAMSUNG ELECTRONICS CO., LTD.,
SAMSUNG ELECTRONICS AMERICA, INC.,

*Appellants*

v.

RESONANT SYSTEMS, INC.,

*Cross-Appellant*

Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in Nos. IPR2023-00992, IPR2023-00993

## BRIEF OF APPELLANTS SAMSUNG ELECTRONICS CO., LTD. AND SAMSUNG ELECTRONICS AMERICA, INC.

Jeffrey A. Miller
ARNOLD & PORTER
  KAYE SCHOLER LLP
Five Palo Alto Square, Suite 500
3000 El Camino Real
Palo Alto, CA 94306
(650) 319-4500

Ali R. Sharifahmadian
Jin-Suk Park
ARNOLD & PORTER
  KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001
(202) 942-5000

*Attorneys for Appellants*
*Samsung Electronics Co., Ltd. and*
*Samsung Electronics America, Inc.*

**June 27, 2025**

# EXEMPLARY CLAIMS

**U.S. Patent No. 9,369,081**

**1.** [1pre] A linear vibration module comprising:

    [1A]   a housing;

    [1B]   a moveable component;

    [1C]   a power supply;

    [1D]   user-input features;

    [1E]   a driving component that drives the moveable component in each of two opposite directions within the housing; and

    [1F]   a control component that controls supply of power from the power supply to the driving component to cause the moveable component to oscillate at a frequency and an amplitude specified by user input received from the user-input features.

**2.** [2pre] The linear vibration module of claim 1 wherein the control component is one of:

    [2A]   an variable oscillator circuit with additional control circuitry; and

    [2Bi]  a control component that includes a microprocessor,

    [2Bii]  a control program, stored in an electronic memory within, or separate from, the microprocessor, the control program executed by the microprocessor to control supply of power from the power supply to the driving component to cause the moveable component to oscillate at a frequency and an amplitude specified by user input received from the user-input features.

**3.** The linear vibration module of claim 1 wherein the control component receives output signals from sensors within the linear vibration module during operation of the linear vibration module and adjusts one or more operational control outputs of the control component according to the received output signals from the sensors.

**4.** The linear vibration module of claim 1 wherein the control component adjusts the one or more operational control outputs of the control component according to the received output signals from the sensors in order that subsequent operation of the linear vibration module produces desired outputs from the one or more sensors corresponding to one or more operational control parameters.

**5.** [5A]  The linear vibration module of claim 4 wherein the one or more operational control parameters is a strength of vibration produced by the linear oscillation of the moveable component; and

    [5B]  wherein the one or more operational control outputs is a frequency at which the control component drives the moveable component to linearly oscillate, the control component dynamically adjusting the power supplied to the driving component to produce linear oscillation of the movable component at a resonant frequency for the linear vibration module.

**6.** [6A]  The linear vibration module of claim 4 wherein the one or more operational control parameters include both a strength of vibration produced by the linear oscillation of the moveable component and a current operational mode; and

    [6B]  wherein the one or more operational control outputs is a control output that determines a current supplied by the power supply to the driving component and a frequency at which the control component drives the moveable component to linearly oscillate.

**7.** The linear vibration module of claim 1 wherein the driving component comprises one or more electromagnetic coils that generate magnetic fields parallel to the directions in which the moveable component is driven by the driving component.

**8.** [8A]  The linear vibration module of claim 1 wherein the housing is a linear tube, capped at both ends by movable-component-repelling components selected from one of mechanical springs and magnets;

    [8B]  wherein the movable component is a magnet shaped to slide within the linear tube; and

    [8C]  wherein the driving component is an electromagnetic coil.

**9.** [9A] The linear vibration module of claim 1 wherein the housing is a linear tube, capped at both ends by movable-component-repelling components; and

[9B] wherein the moveable component includes an electromagnetic-coil driving component and microprocessor.

**11.** The linear vibration module of claim 1 wherein the linear vibration module further includes two or more driving components, each, when activated, driving the moveable component to linearly oscillate with an amplitude particular to the activated driving component.

**14.** The linear vibration module of claim 1 further including flux paths comprising a paramagnetic material that is shaped and positioned to reduce the reluctance of one or more magnetic circuits within the linear vibration module.

**15.** The linear vibration module of claim 1 wherein the control component drives simultaneous oscillation of the moveable component at two or more frequencies to generate complex vibration modes.[1]

**16.** The linear vibration module of claim 15 wherein the complex vibration modes include:
a primary oscillation frequency modulated by a modulating oscillation frequency;
a beat frequency; and
an aperiodic oscillation waveform.[2]

**17.** The linear vibration module of claim 1 wherein the control component controls supply of power from the power supply to the driving component to cause the moveable component to oscillate at a frequency and an amplitude that are independently specified by user input received from the user-input features.

**U.S. Patent No. 9,941,830**

---

[1] Resonant statutorily disclaimed this claim during the pendency of the '992 IPR. Appx3166; Appx3168.

[2] Resonant statutorily disclaimed this claim during the pendency of the '992 IPR. Appx3166; Appx3168.

1. [1pre] A vibration module comprising:

   [1A]  a housing;

   [1B]  a moveable component;

   [1C]  a power supply;

   [1D]  user-input features;

   [1E]  a driving component that drives the moveable component to oscillate within the housing; and

   [1F]  a control component that controls supply of power from the power supply to the driving component to cause the moveable component to oscillate at a frequency and an amplitude specified by one or more stored values.

2. [2pre] The vibration module of claim 1 wherein the control component is one of:

   [2A]  an variable oscillator circuit with additional control circuitry; and

   [2Bi]  a control component that includes a microprocessor,

   [2Bii]  a control program, stored in an electronic memory within, or separate from, the microprocessor, the control program executed by the microprocessor to control supply of power from the power supply to the driving component to cause the moveable component to oscillate at a frequency and an amplitude specified by the one or more stored values.

3. The vibration module of claim 1 wherein the control component receives output signals from sensors within the vibration module during operation of the vibration module and adjusts one or more operational control outputs of the control component according to the received output signals from the sensors.

4. The vibration module of claim 1 wherein the control component adjusts the one or more operational control outputs of the control component according to the received output signals from the sensors in order that subsequent operation of the vibration module produces desired outputs

from the one or more sensors corresponding to one or more operational control parameters.

5. [5A] The vibration module of claim 4 wherein the one or more operational control parameters is a strength of vibration produced by the oscillation of the moveable component; and

   [5B] wherein the one or more operational control outputs is a frequency at which the control component drives the moveable component to oscillate, the control component dynamically adjusting the power supplied to the driving component to produce oscillation of the movable component at a resonant frequency for the vibration module.

6. [6A] The linear vibration module of claim 4 wherein the one or more operational control parameters include both a strength of vibration produced by the oscillation of the moveable component and a current operational mode; and

   [6B] wherein the one or more operational control outputs is a control output that determines a current supplied by the power supply to the driving component and a frequency at which the control component drives the moveable component to oscillate.

7. The vibration module of claim 1 wherein the driving component comprises one or more electromagnetic coils that generate magnetic fields parallel to the directions in which the moveable component is driven by the driving component.

8. [8A] The vibration module of claim 1 wherein the housing is a tube, capped at both ends by movable-component-repelling components selected from one of mechanical springs and magnets;

   [8B] wherein the movable component is a magnet shaped to slide within the tube; and

   [8C] wherein the driving component is an electromagnetic coil.

9. [9A] The linear vibration module of claim 1 wherein the housing is a tube, capped at both ends by movable-component-repelling components; and

[9B]  wherein the moveable component includes an electromagnetic-coil driving component and microprocessor.

**11.** The vibration module of claim 1 wherein the vibration module further includes two or more driving components, each, when activated, driving the moveable component to oscillate with an amplitude particular to the activated driving component.

**14.** The vibration module of claim 1 further including flux paths comprising a paramagnetic material that is shaped and positioned to reduce the reluctance of one or more magnetic circuits within the vibration module.

**15.** The vibration module of claim 1 wherein the control component drives simultaneous oscillation of the moveable component at two or more frequencies to generate complex vibration modes.

**16.** The vibration module of claim 15 wherein the complex vibration modes include:
a primary oscillation frequency modulated by a modulating oscillation frequency;
a beat frequency; and
an aperiodic oscillation waveform.

**17.** The vibration module of claim 1 wherein the control component controls supply of power from the power supply to the driving component to cause the moveable component to oscillate at a frequency and an amplitude that are independently specified by user input received from the user-input features.

**19.** [19pre] A vibration module comprising:

[19A]  a housing;

[19B]  a moveable component;

[19C]  a power supply;

[19D] user-input features;

[19E]  a driving component that drives the moveable component to oscillate within the housing; and

[19F]  a control component that controls supply of power from the power supply to the driving component to cause the moveable component

to oscillate at a frequency and an amplitude specified by one or more stored values; and

[19G] flux paths comprising a paramagnetic material that is shaped and positioned to reduce the reluctance of one or more magnetic circuits within the vibration module.

20. [20pre] A vibration module comprising:

[20A] a housing;

[20B] a moveable component;

[20C] a power supply;

[20D] user-input features;

[20E] a driving component that drives the moveable component to oscillate within the housing; and

[20F] a control component that controls supply of power from the power supply to the driving component to cause the moveable component to oscillate at a frequency and an amplitude specified by one or more stored values,

[20G] wherein the control component drives simultaneous oscillation of the moveable component at two or more frequencies to generate complex vibration modes.

# <u>CERTIFICATE OF INTEREST</u>

Pursuant to Federal Circuit Rule 47.4, undersigned counsel for Appellants Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc., certify the following:

1.     The full name of every party represented by me is:

        Samsung Electronics Co., Ltd.
        Samsung Electronics America, Inc.

2.     The full names of the real parties in interest, if different from the parties named above, are:

        None

3.     The full names of all parent corporations and all publicly held companies that own 10% or more of the stock of the parties represented by me are:

        No Publicly Held Company owns 10% or more of the stock of Samsung Electronics Co., Ltd.

        Samsung Electronics America, Inc. is a wholly owned subsidiary of Samsung Electronics Co., Ltd.

4.     The names of all law firms, partners, and associates that appeared for the parties represented by me in the originating agency or are expected to appear in this court for the parties represented by me (and who have not entered an appearance in this case) are:

        Jessica Kaiser, Christopher Marando, Tyler Knox, Kevin Cosgrove, Jonah B. Heemstra

5.     The case title, case number, and originating tribunal of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal:

        *Resonant Systems Inc. d/b/a RevelHMI v. Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc.*, No. 2:22-cv-00423 (E.D. Tex.)

6.    Information required under Federal Rules of Appellate Procedure 26.1(b) and 26.1(c):

        Not Applicable


Date: <u>June 27, 2025</u>                    Signature:    <u>*/s/ Jeffrey A. Miller*</u>

                                         Name:        <u>Jeffrey A. Miller</u>

# TABLE OF CONTENTS

STATEMENT OF RELATED CASES ............................................................1

STATEMENT OF JURISDICTION ..........................................................2

STATEMENT OF THE ISSUES..............................................................3

STATEMENT OF THE CASE ................................................................5

I.   The Challenged Patents ............................................................10

II.  The Prior Art.......................................................................11

    A.   Fukumoto.................................................................11

    B.   Ogusu......................................................................13

    C.   Ueda .......................................................................15

    D.   Dong .......................................................................17

III. The IPR Proceedings ..............................................................17

    A.   The Board Identified a "Control Component" in Both
        Fukumoto and Ogusu in Combination with Fukumoto and
        Thus Correctly Found Claim 1 of Both Challenged Patents
        Unpatentable........................................................17

    B.   The Board Found Claim 3 Not Unpatentable Based on its
        Interpretation of Ueda's Disclosure, Not the Combined
        Disclosure of the Combinations Involving Ueda. .....................20

        1.   Samsung's Petitions Relied on the Same "Control
            Component" for Claim 3 and Claim Limitation 1[f].....................20

        2.   The Combinations in Samsung's Petitions Rendered
            Obvious Integer Conversion and Comparison. ............................28

    C.   The Board Found No Motivation to Combine Fukumoto's
        Figure 3 with Fukumoto's Figure 83 Despite Figure 83

Being Expressly Described as a Modification of the Other
Embodiments. ...................................................................30

D.     The Board Found No Motivation to Combine Fukumoto
with Dong and Ogusu Based on Ogusu's Disclosure,
Suggesting the Prior Art Must Disclose a Benefit Gained
Through the Combination..............................................33

SUMMARY OF THE ARGUMENT ....................................................37

STANDARD OF REVIEW ....................................................................39

ARGUMENT ..........................................................................................40

I.    The Board's Overemphasis on Ueda in the Fukumoto-Based
Ground Challenging Claims 3-6 Was Legal Error. ..................40

A.     The Petitions Presented a Combination: Fukumoto's Linear
Oscillatory Actuator Using Ueda's Output and Position
Detection Sensors. .........................................................41

B.     The Petitions Relied on Fukumoto's "Control Component"
Not Ueda's Alleged "Processor". ...................................42

1.    Fukumoto's "control component" was identified in
limitation 1[f] as Fukumoto's CPU 113. ............42

2.    In the Fukumoto-Ueda combination, Samsung
Always Argued that Fukumoto's control component
receives sensor data from Ueda's sensors. ...........45

C.     The Board's Rigid Interpretation of the Petitions Ignored
the Combination, and Rejected Obviousness Based on
Ueda Alone. ...................................................................46

II.   The Board Failed to Consider the Petition's Argument That the
Ogusu-Fukumoto-Ueda Combination Expressly Relied on
Ogusu's Control Component. ...................................................48

A.     Samsung's Second Ground Relied on Ogusu's or Ogusu-
Fukumoto's Control Component, Not Ueda's Processor........49

1. The "control component" of the Ogusu-based combinations is a digital CPU. ...........................................49

2. The Ogusu-Fukumoto control component would have received sensor data from Ueda's sensors. ...........................51

B. The Board Committed Reversible Error by Failing to Consider the Differences Between Ogusu's Control Component and Ueda's Processor. ...........................................51

III. The Board's Final Written Decisions Do Not Consider the Prior Art from a POSITA's Perspective. ...........................................53

A. The Challenged Patents are Directed to Microprocessor Controlled Linear Actuators, Requiring Digitization of Analog Sensor Data. ...........................................54

B. Fukumoto's and Ogusu-Fukumoto's Processors Would Have Also Required Digitization of Sensor Data. ...........................................56

C. Digitization Requires Conversion to a Processor-Compatible Format: Integers. ...........................................57

IV. The Board Wrongly Disregarded the Arguments in Samsung's Replies by Incorrectly Finding that Samsung's Arguments Made in Response to the POR Were "New". ...........................................60

A. Reply Arguments Responsive to Issues Raised in the Patent Owner Response are Properly Considered. ...........................................60

B. Even if Samsung's Arguments Were Not "Responsive," They Were a Permissible Expansion on the Same Arguments Made in the Petitions. ...........................................64

V. The Board Wrongly Found No Motivation to Combine Fukumoto's Figures 3 and 83 Even Though Fukumoto Expressly Provides It and the Combination of These Figures Renders Claim 9 Obvious. ...........................................66

VI. The Board Improperly Required a Showing of the "Benefit" Gained by the Combination of Fukumoto, Dong, and Ogusu as a Prerequisite for the Motivation to Combine These References and Find Claims 14 and 19 Unpatentable. ...........................................67

CONCLUSION AND STATEMENT OF RELIEF SOUGHT...................................69

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Anacor Pharm., Inc. v. Iancu,*
   889 F.3d 1372 (Fed. Cir. 2018) .................................................................. 61

*Apple Inc. v. Andrea Elecs. Corp.,*
   949 F.3d 697 (Fed. Cir. 2020) ............................................................. *passim*

*Ariosa Diagnostics v. Verinata Health, Inc.,*
   805 F.3d 1359 (Fed. Cir. 2015) ......................................................... 39, 65

*Axonics, Inc. v. Medtronic, Inc.,*
   75 F.4th 1374 (Fed. Cir. 2023) ................................................................. 40

*Bradium Techs. LLC v. Iancu,*
   923 F.3d 1032 (Fed. Cir. 2019) ................................................................ 46

*Corephotonics, Ltd. v. Apple Inc.,*
   84 F.4th 990 (Fed. Cir. 2023) ........................................................... 52, 65

*Dann v. Johnston,*
   425 U.S. 219 ....................................................................................... 54, 60

*E.I. DuPont de Nemours & Co. v. Synvina C.V.,*
   904 F.3d 996 (Fed. Cir. 2018) .................................................................. 39

*Ericsson Inc. v. Intellectual Ventures I LLC,*
   901 F.3d 1374 (Fed. Cir. 2018) ..................................................... 40, 64, 65

*Game & Tech. Co. v. Wargaming Grp. Ltd.,*
   942 F.3d 1343 (Fed. Cir. 2019) ................................................................ 41

*Genzyme Therapeutic Prods. Ltd. P'ship v. Biomarin Pharm. Inc.,*
   825 F.3d 1360 (Fed. Cir. 2016) ................................................................ 61

*Gottschalk v. Benson,*
   409 U.S. 63 (1972) ........................................................................... 55, 57

*Graham v. John Deere Co. of Kansas City,*
   383 U.S. 1 (1966) ............................................................................. 53, 54

*Immunex Corp. v. Sandoz Inc.*,
    964 F.3d 1049 (Fed. Cir. 2020) ........................................................55

*In re Google LLC*,
    56 F.4th 1363 (Fed. Cir. 2023) ........................................................39

*In re Magnum Oil Tools Int'l, Ltd.*,
    829 F.3d 1364 (Fed. Cir. 2016) ........................................................52

*In re NuVasive, Inc.*,
    841 F.3d 966 (Fed. Cir. 2016) ........................................................40

*Innovention Toys, LLC v. MGA Ent., Inc.*,
    637 F.3d 1314 (Fed. Cir. 2011) ........................................................60

*Intel Corp. v. PACT XPP Schweiz AG*,
    61 F.4th 1373 (Fed. Cir. 2023) ................................................ 39, 68

*Intelligent Bio-Systems, Inc. v. Illumina Cambridge Ltd.*,
    821 F.3d 1359 (Fed. Cir. 2016) ........................................................65

*Koninklijke Philips N.V. v. Google LLC*,
    948 F.3d 1330 (Fed. Cir. 2020) ........................................................52

*KSR Int'l Co. v. Teleflex Inc.*,
    550 U.S. 398 (2007) ......................................................53, 54, 60

*Netflix, Inc. v. DivX, LLC*,
    No. 2022-1043, 2023 WL 3115576 (Fed. Cir. Apr. 27, 2023) ............ 47, 53

*Palo Alto Networks, Inc. v. Centripetal Networks, LLC*,
    122 F.4th 1378 (Fed. Cir. 2024) .................................................*passim*

*Rembrandt Diagnostics, LP v. Alere, Inc.*,
    76 F.4th 1376 (Fed. Cir. 2023) ........................................................65

*SAS Inst., Inc. v. Iancu*,
    584 U.S. 357 (2018) ........................................................52

*Uniloc 2017 LLC v. Facebook, Inc.*,
    No. 2019-2159, 2021 WL 5370480 (Fed. Cir. Nov. 18, 2021) ............ 48, 53

*ZyXEL Comm'ns Corp. v. UNM Rainforest Innovations*,
    107 F.4th 1368 (Fed. Cir. 2024) ........................................................68

**Statutes**

35 U.S.C. § 103................................................................................54

35 U.S.C. § 112(f) ...........................................................................21

**Other Authorities**

37 C.F.R. § 42.23(b) ........................................................................60

# TABLE OF ABBREVIATIONS

| Abbreviation | Description |
|---|---|
| '081 patent | U.S. Patent. No. 9,369,081 |
| '830 patent | U.S. Patent No. 9,941,830 |
| '992 IPR | IPR2023-00992 |
| '993 IPR | IPR2023-00993 |
| Barton | U.S. Patent Application Publication 2006/0248183A1 |
| Board | The Patent Trial and Appeal Board |
| Fukumoto | U.S. Patent 7,292,227 B2 |
| FWD | Final Written Decision |
| Grant | U.S. Patent Application Publication 2006/0284849A1 |
| IPR | *Inter Partes* Review |
| MPF | Means-plus-function |
| Ogusu | Japan Patent Application Publication JPH08196053A |
| POPR | Patent Owner Preliminary Response |
| POR | Patent Owner Response |
| POSITA | Person of Ordinary Skill in the Art |
| Resonant | Cross-Appellant Resonant Systems, Inc. |
| Samsung | Appellants Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc. |

| Ueda | U.S. Patent Application Publication 2004/0169480A1 |

***All emphases added unless indicated.***

# STATEMENT OF RELATED CASES

No appeal in or from the same IPR proceedings has previously been before this Court or any other appellate court.

This consolidated appeal relates to U.S. Patent Nos. 9,369,081 (the "'081 patent") and 9,941,830 (the "'830 patent") (collectively, the "Challenged Patents"). Resonant has asserted (and continues to assert) certain claims of the Challenged Patents against Samsung in *Resonant Systems Inc. d/b/a RevelHMI v. Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc.*, No. 2:22-cv-00423 (E.D. Tex.), which may be affected by this Court's decision on appeal.

# STATEMENT OF JURISDICTION

This is an appeal from a final written decision of the Patent Trial and Appeal Board of the United States Patent and Trademark Office. This Court has jurisdiction over this appeal under 35 U.S.C. §§ 141(c) and 319 and 28 U.S.C. § 1295(a)(4)(A).

# STATEMENT OF THE ISSUES

1.    Whether the Board's decisions that Fukumoto in combination with Ueda does not render obvious claims 3-6 of each Challenged Patent was supported by substantial evidence where the Petitions relied on Fukumoto's control component while the Board instead relied on Ueda.

2.    Whether the Board's decisions that Ogusu-Fukumoto in combination with Ueda does not render obvious claims 3-6 of each Challenged Patent was supported by substantial evidence where the Petitions relied on the control component disclosed in Ogusu as modified by Fukumoto while the Board instead relied on Ueda.

3.    Whether the Board erred in determining claims 3-6 of the Challenged Patents were not shown to be unpatentable where the Board did not consider the cited prior art references from the perspective of a person of ordinary skill in the art.

4.    Whether the Board abused its discretion by disregarding certain of Samsung's arguments and evidence properly presented in its Replies, given that those arguments and evidence addressed the same grounds set forth in the Petitions.

5.    Whether the Board's conclusion that claim 9 is not unpatentable is supported by substantial evidence where it required a motivation to combine analysis between two embodiments in a reference where that reference already describes one embodiment as a "modification" of the other embodiment.

6.      Whether the Board's conclusion that claim 14 of both Challenged Patents and claim 19 of the '830 patent are not unpatentable is supported by substantially evidence where the Board required an express disclosure of a benefit to be gained through combination in the prior art to find motivation to combine references.

# STATEMENT OF THE CASE

This appeal concerns an *inter partes* review challenging the claims of U.S. Patent Nos. 9,369,081 ("the '081 patent") and 9,941,830 ("the '830 patent," together with the '081 patent, "the Challenged Patents"), both titled "Linear Vibration Modules and Linear-Resonant Vibration Modules." Appellants Samsung Electronics America, Inc. and Samsung Electronics Co., Ltd. (collectively, "Samsung") petitioned for *inter partes* review ("IPR") of claims 1-9, 11, and 14-17 the '081 patent and claims 1-9, 11, 14-17, 19, and 20 of the '830 patent after Cross-Appellant Resonant Systems, Inc. ("Resonant") sued Samsung for infringement of the Challenged Patents in the United States District Court for the Eastern District of Texas.

The Challenged Patents are directed to vibration modules that produce vibrational force by linear oscillation of a weight or member by rapidly alternating the polarity of one or more driving electromagnets. Appx240 (3:7-21).[3] When electrical current is supplied to the driving electromagnets, a magnetic force is created which moves the weight in the direction of the magnetic force. Appx241 (5:6-34). Then, the direction of the current switches creating a magnetic force in the opposite direction. *Id.* By rapidly alternating the direction of the magnetic force, the weight oscillates and produces a vibrational force. *Id.*

---

[3] The Challenged Patents share a common specification. All citations are to the '081 patent unless otherwise noted.

The Challenged Patents further describe using feedback control to maintain the frequency of oscillation at or near the resonant frequency for the vibration module. Appx240 (3:7-21). According to the patentee, operating close to the resonant frequency "results in optimal power consumption with respect to the amplitude and frequency of vibration produced by the LRVM [or linear resonant vibration module]." Appx240 (4:36-41). The patents further explain that linear-resonant vibration modules can be designed to produce a wide range of vibrational amplitude/frequency combinations. *Id.*; *see also* Appx241 (5:35-45 (explaining that amplitude depends on the length of the chamber, the mass of the weight and module as a whole, and the amount of current provided, while frequency depends on "the frequency at which the direction of the current applied to the coil is changed")).

In the '992 IPR, the Board found that "Petitioner has shown by a preponderance of the evidence that claims 1, 2, 7, 8, 11, and 17 [of the '081 patent] are unpatentable but has not shown by a preponderance of the evidence that claims 3-6, 9, and 14 are unpatentable." Appx2.[4] In the '993 IPR, the Board found that "Petitioner has shown by a preponderance of the evidence that claims 1, 2, 7, 8, 11, 15-17, and 20 of the '830 patent are unpatentable, and has not shown by a preponderance of the evidence that claims 3-6, 9, 14, and 19 of the '830 patent are

---

[4] Resonant statutorily disclaimed claims 15 and 16 of the '081 patent during the pendency of the '992 IPR. Appx3166; Appx3168.

unpatentable." Appx147. The Board's determinations that claims 3-6, 9, and 14 of the Challenged Patents and claim 19 of the '830 patent are not unpatentable were based, however, on a series of legal errors that warrant reversal.

First, the Board failed to properly consider Samsung's argument that claims 3-6 of both Challenged Patents are obvious over various combinations of references articulated in the Petitions. While the Petitions described using Fukumoto's processor in combination with Ueda's sensors, the Board ignored this combination based on four words in the Petitions: "Ueda teaches a processor." But the contextual evidence shows Samsung was not departing from its combination and instead continued to rely on the combination as presented, i.e., Fukumoto's processor used in combination with Ueda's sensors. The Board's narrow focus on Ueda as opposed to the combination as a whole constitutes reversible error.

Second, even if the Board's misreading of the words "Ueda teaches a processor" in context was proper for the Fukumoto-based grounds, the Board's impartation of this analysis onto Samsung's separate grounds based on Ogusu combined with Fukumoto was not supported by substantial evidence. Samsung's Petitions expressly relied on "the control component in the Ogusu-Fukumoto combination" in combination with Ueda's sensors for claims 3-6, not Ueda's alleged processor as held by the Board. The Board's failure to consider the combination presented, i.e., Ogusu as modified by Fukumoto, also constitutes reversible error.

Third, the Board failed to consider the art presented in the Petitions from a POSITA's viewpoint. In this case, such a person would have understood that digital processors, such as Fukumoto's CPU 113 and Ogusu's processor, cannot process analog signals output from a sensor. Instead, analog signals would need to be converted to digital signals. The undisputed and **only** evidence before the Board concerning the conversion of analog to digital signals demonstrated that this conversion would have resulted in an integer. The Board adopted a construction of claim 3 that requires conversion to an integer, but failed to acknowledge that POSITAs would have understood that conversion to an integer would have been necessary in the combined systems. The Board's failure to view the combinations and evidence from a POSITA's viewpoint was an abuse of discretion not supported by substantial evidence.

Fourth, the Board abused its discretion by refusing to consider responsive evidence properly submitted in Samsung's Replies showing that Resonant mischaracterized the grounds challenging claims 3-6 in its PORs. Specifically, Resonant portrayed the grounds as relying on the Ueda processor instead of the actual combinations presented which used Fukumoto's CPU 113 and/or Ogusu's processor. Samsung's Replies responded to this mischaracterization, showing how the Petitions' claim 3 analyses relied on the combination of a general-purpose processor, such as Fukumoto's CPU 113 or Ogusu's processor, with Ueda's sensors. Resonant did not seek to exclude this evidence, nor did it move to strike any arguments. Insofar as the

Board viewed Samsung's explanation to be an expansion of the analyses in the Petitions, it addressed the same *grounds*, using the same *prior art*, in the same *combinations*, in responding to the issues raised in Resonant's PORs. Samsung's Reply arguments and evidence should have been considered, and the Board's treatment of such evidence as untimely was an abuse of discretion.

Fifth, the Board's conclusion that claim 9 is not unpatentable based on a misreading of Fukumoto is not supported by substantial evidence. The Board seemingly ignored that the combination proposed in the Petitions, i.e., combining Fukumoto's Figures 3 and 83, is explicitly contemplated by Fukumoto itself. Fukumoto explains that Figure 83 is a "modification" to the other embodiments described therein, including Figure 3. The Board's rejection of the combination of these two Figures is contrary to Fukumoto's teachings.

Lastly, the Board's conclusion that claim 14 of both Challenged Patents and claim 19 of the '830 patent are not unpatentable is not supported by substantial evidence. The Board found there was insufficient motivation to combine Fukumoto, Dong, and Ogusu. But both parties' experts agreed that the placement of Dong's paramagnetic counterweight would beneficially improve vibration motors, which is reason enough to find POSITAs would have been motivated to combine these references. The Board's conclusion opposite to the testimony of both parties' experts is not supported by substantial evidence, and should be reversed.

## I.    The Challenged Patents

The '830 patent is a continuation from the '081 patent.  Appx270 ('830 patent, 1:7-12).  Both the '081 and '830 patents claim the benefit of a provisional patent application filed on May 18, 2009.  *Id.*; Appx239 (1:7-11).  The '081 patent, entitled "Linear Vibration Modules and Linear-Resonant Vibration Modules," issued on June 14, 2016, from an application filed on August 26, 2014.  Appx217.  The '830 patent, also entitled "Linear Vibration Modules and Linear-Resonant Vibration Modules," issued on April 10, 2018, from an application filed on June 13, 2016.  Appx248 ('830 patent).

Relevant to this appeal, the Challenged Patents purport to describe a system for "[c]ombining a linearly oscillating vibration-inducing mechanism with feedback control, so that the frequency of vibration falls close to the resonant frequency of the LRVM . . . ."  Appx240 (4:36-41).  To accomplish feedback control, the Challenged Patents provide a control program which receives output signals from sensors measuring the strength of vibration, converts those signals to an integer, compares that integer value to the value of the previous measurement, and adjusts the frequency of oscillation based on the comparison.  Appx242 (7:32-8:9); *see also* Appx227 (Fig. 7B).

## II.    The Prior Art

In the proceeding below, the Board considered various grounds involving ten references: Fukumoto, Ueda, Ogusu, Dong, Grant, Barton, Erixon, Fuller, Saiki, and Masahiko.  Appx298-299; Appx1945-1946.[5]

### A.    Fukumoto

Fukumoto, which is entitled, "Electronic device, vibration generator, vibration-type reporting method, and report control method," is directed to "[a]n electronic device that drives an oscillatory actuator to cause generation of vibration when it is detected that an operation input to a touch panel or operation key has been received." Appx748 (Title, Abstract), Appx803 (2:1-12).  Figure 2, reproduced below, depicts a block diagram of the hardware of Fukumoto's device 10.

---

[5] Because Grant, Barton, Erixon, Fuller, Saiki, and Masahiko are not pertinent to the issues presented in this appeal, Samsung does not discuss them herein.



FIG. 2

Appx750 (Fig. 2), Appx809 (13:54-14:26).

Fukumoto's "oscillatory actuator," shown in Figure 3 (reproduced below), has "a mechanism for imparting a magnetic force or electrostatic force to cause reciprocal movement of the weight." Appx748 (Abstract), Appx803-807 (2:1-12, 5:5-18, 9:25-36). Fukumoto explains "[t]he drive signal generation circuit 114 generates a drive signal for driving the oscillatory actuator 115 in accordance with waveform data supplied from the CPU 113" and "in accordance with instructions from the CPU 113." Appx809 (14:14-19).

## FIG. 3



Appx751 (Fig. 3).

### B.    Ogusu

Ogusu is directed to "moving magnet-type vibration actuator, and more particularly to a moving magnet-type vibration actuator having low loss and high efficiency." Appx1046 ([0001]). Ogusu, like the Challenged Patents, explains that there are problems with unbalanced weight vibration generation means. Appx1046-1047 ([0005]-[0009]); *see also* Appx239 (2:12-63). To remedy these problems, Ogusu incorporates two "magnetic circuits" each using a magnet opposing a coil. Appx1047-1048 ([0012]-[0016]). These magnets and coils are depicted in Figures 1-3:



Appx1051 (Figs. 1-3), Appx1048 ([0023]).

"[W]hen an alternating current is sent to the first coil 2b and the second coil 3b, the movable elements generate vibration according to a current waveform." Appx1049 ([0032]). "[B]y sending an alternating current of an audible frequency of about 3000 Hz to the first coil 2b and the second coil 3b, the yokes 8a and 8b and the holder 6 act as a speaker diaphragm to generate sound. In this case, various sounds can be generated by changing the frequency and an amplitude thereof, or by generating sound intermittently." *Id.* ([0033]). Utilizing this type of alternative current control, Ogusu's vibration actuator generates several types of waveforms depicted in Figures 4(a)-4(e), reproduced below. *Id.* ([0036]-[0037]).

[FIG. 4]



Appx1052 (Fig. 4). These "various vibrations can be switched at the user's choice by a selection in the pager's control unit" and "can also be configured to be selected arbitrarily according to settings from the caller side." Appx1049 ([0043]).

### C. Ueda

Ueda discloses a "motor driving apparatus for driving a linear vibration motor." Appx866 (Abstract); Appx884 ([0058]), Appx889 ([0140]). The motor driving apparatus 104 includes various detectors and determining units, including output detector 4, order output determining unit 3, position detector 5, and resonance frequency determining unit 6. Appx889-890 ([0141]-[0142]). The control apparatus, including the detectors and determining units, can be seen in Figure 4(a), reproduced below.

**Fig.4 (a)**



Appx869.

Ueda's control apparatus uses feedback from these detectors and determining units as inputs to two "determining units." Appx889-890 ([0141]-[0143], [0149]-[0154]). A driving voltage determining unit 7 "determines an amplitude value of the driving voltage of the linear vibration motor 100 . . . on the basis of a result of comparison between the magnitude of the order output indicated by the output order signal Oop and the magnitude of the detection output indicated by the output detection signal Dop." Appx890 ([0149]). A driving frequency determining unit 2c "sets the driving frequency at the resonance frequency indicated by the resonance frequency signal Dreso when the position of the mover detected by the position detector 5 does not exceed a predetermined reference position." *Id.* ([0153]).

16

### D.    Dong

Dong generally relates to "a vibration motor, and in particular to a flat linear vibration motor used in portable consumer electronic products." Appx928. Relevant to this appeal, Dong discloses a linear vibration motor with a movable component that includes counterweight 15 and a permanent magnet 16 that is driven by an electromagnetic coil 13. *See* Appx930-931; *see also* Appx593-595 (¶¶110-13). Dong further discloses that "counterweight 15 functions to strengthen the vibrating force, making the vibration stronger," and that to best utilize the counterweight, "it is preferable to use a material . . . such as [] tungsten." Appx931. As Dr. Wolfe noted in his declarations, "tungsten was known as a paramagnetic material." Appx693 (¶277).

## III.   The IPR Proceedings

The Board determined that claims 3-6, 9, and 14 in the '081 patent were not unpatentable. Appx144. The Board similarly determined that claims 3-6, 9, 14, and 19 in the '830 patent were not unpatentable. Appx215. The relevant portions of the PTAB proceedings addressing these claims are discussed below.

### A.    The Board Identified a "Control Component" in Both Fukumoto and Ogusu in Combination with Fukumoto and Thus Correctly Found Claim 1 of Both Challenged Patents Unpatentable.

In both Petitions Samsung argued that Fukumoto alone taught all limitations of claim 1. Appx298; Appx1945. The Board found that Resonant made no arguments in its Ground 1 analysis regarding the preamble (Appx51), limitation 1[a] (Appx52), limitation 1[b] (Appx52), limitation 1[c] (Appx53), limitation 1[d] (Appx54), or

limitation 1[e] (Appx54).[6]  The parties disputed whether Fukumoto taught limitation

1[f] reciting a "control component," which the Board ultimately answered in the

affirmative.  Appx59; Appx168-169.

For limitation 1[f], Samsung pointed to Fukumoto's CPU 113.  Appx317

(addressing the means-plus-function ("MPF") construction, explaining that

Fukumoto's "CPU 'reads from the memory 112 the waveform data of the drive signal

to be applied to the oscillatory actuator 115'" and "provides a corresponding output

to the power supply when it 'instructs the drive signal generation circuit 114 to

generate a drive signal.'" (quoting Appx811 (17:7-11, 17:20-26))); Appx1964 (same).

The Board agreed with Samsung that "Fukumoto's CPU 113 performs the function

recited in limitation 1f," and that "Fukumoto's CPU 113 performs the steps in

algorithmic structure according to limitation 1f," rendering this limitation obvious.

Appx60-62; Appx166-168.

Specifically, the Board held that "CPU 113 'set[s] the mode and strength to . . .

values representing selections made by user input to the user input features' according

to algorithmic structure step (a)."  Appx61 (quoting Appx632 (¶189)); Appx168

(recognizing this part of the algorithm was "uncontested").  "When CPU 113 instructs

drive signal generation circuit 114 to generate a drive signal so that drive signal

---

[6] In the '993 IPR, the Board noted Resonant "does not contest" limitations [1pre]-[1b]
and 1[d]-1[e].  Appx163-164.  Limitation 1[c] is not germane to the issues in Samsung's
appeal.

18

generation circuit 114 applies a drive signal to the oscillatory actuator, CPU 113 'provide[s] a corresponding output to the power supply so that the power supply provides a corresponding output to the driving component' according to algorithmic structure step (b)." Appx61-62 (quoting Appx632 (¶189)); Appx166-168. The Board, therefore, found claim 1's "control component" obvious in view of Fukumoto's CPU 113. Appx64; Appx169.

Samsung's Petitions also included a second set of grounds based on Ogusu in combination with Fukumoto. Appx298-299; Appx1945-1946. The Petitions explained how Ogusu's pager would have included a processor to perform the functionality disclosed therein. Appx379 ("a POSITA would have understood that Ogusu uses a processor to choose among the various possible waveforms and to control the supply of power from the power supply to the coils to achieve those waveforms." (citing Appx716-717 (¶¶322-23))); Appx2026 (same, citing Appx2234-2235 (¶¶319-20)). Alternatively, the Petitions explained "a POSITA would have recognized Ogusu lacks certain implementation details that were well known as shown in Fukumoto and would have been motivated to apply those implementation details to Ogusu." Appx372; Appx2019. Specifically, Fukumoto discloses the processor that is not expressly disclosed in Ogusu. Appx379 ("a POSITA would have understood that Ogusu uses a processor . . . . Such a processor is disclosed in Fukumoto (CPU 113)."); Appx2026.

The Board again agreed with Samsung on these second grounds, explaining "[f]or (1) the reasons stated by Petitioner and supported by Dr. Wolfe's testimony and (2) the reasons discussed for the challenge based on Fukumoto alone, we agree with Petitioner that the combined disclosures in Ogusu and Fukumoto teach limitation 1f." Appx129; Appx209-210. Accordingly, the Board found claim 1 of both Challenged Patents unpatentable under Samsung's second set of grounds as well. Appx129, Appx131; Appx210.

In both sets of grounds, Samsung mapped the claimed "control component" to a digital processor, such as Fukumoto's CPU 113 or Ogusu's processor, under a MPF construction of limitation 1[f]. Appx317, Appx379; Appx1964, Appx2026.

## B. The Board Found Claim 3 Not Unpatentable Based on its Interpretation of Ueda's Disclosure, Not the Combined Disclosure of the Combinations Involving Ueda.

### 1. Samsung's Petitions Relied on the Same "Control Component" for Claim 3 and Claim Limitation 1[f].

Claim 3 adds functionality to claim 1's control component. *See* Appx246 (15:62-67 ( "The linear vibration module of claim 1 wherein *the control component* receives . . . and adjusts")); Appx277 ('830 patent, 16:15-20 (same)). Samsung's Petitions challenged claims 3-6 based on (1) Fukumoto alone, (2) Fukumoto in combination with Ueda, and (3) Ogusu in combination with Fukumoto and Ueda.

Appx298-299; Appx1945-1946.[7]  As discussed, the Board located and identified the claimed "control component" in the prior art in both the Fukumoto- and the Ogusu-Fukumoto-based grounds.  Appx60-62, Appx129; Appx166-168, Appx210.  Neither the Petitions nor the Board's analyses of claim 3 revisited the previously identified control component in each combination.

Instead, the Board first found claim 3 subject to 35 U.S.C. § 112(f) and required an algorithm including a step of converting sensor output signals to an integer.  Appx41 (addressing claim 3's function and algorithm, but not the physical structural for "the control component"); Appx159-161.  Without acknowledging that it had already determined what the "control component" was in Fukumoto and Ogusu-Fukumoto, the Board concluded "Ueda does not teach 'convert[ing] the received output signal into an integer'" and thus does not render claim 3 obvious.  Appx90, Appx137 (arriving at the same conclusions for the Ogusu-based grounds); Appx182, Appx210-211 (addressing the Ogusu-based grounds).

The Board focused on Ueda because, in its view, Samsung "did not in the Petition rely on Fukumoto's processor when asserted that the combined disclosure in

---

[7] Samsung also argued that these claims were obvious over combinations including Grant or Barton.  Appx298-299; Appx1945-1946.  Samsung did not rely on the disclosure of Grant or Barton for the substance of claims 3-6.  Appx332-333, Appx339, Appx340, Appx386-387; Appx1979-1980, Appx1986-1987, Appx1987, Appx2034. Because Grant and Barton are not relevant to Samsung's appeal, they are not discussed herein.

the references teach claim 3's limitations under a means-plus-function interpretation." Appx91; Appx183. "Instead, Petitioner contended that 'Ueda teaches a processor programmed with' the algorithmic steps required by claim 3." Appx91 (quoting Appx345-346); Appx183 (quoting Appx1992-1993). Focused on Ueda, the Board reasoned that Ueda does not use the word "integer," and that Ueda's disclosed comparison of magnitude values for Dop and Oop does not utilize integers. Appx90; Appx182. Citing Resonant's declarant, the Board suggested that Ueda's disclosure "involves analog signals, not integers or digital signals" and that a comparison of analog signals could be accomplished with a hard-wired circuit like a comparator. Appx90; Appx182.

The Board arrived at the same conclusion for Samsung's Ogusu-based grounds. Appx137 ("Petitioner does not rely on Ogusu, Grant, or Barton for teaching claim 3's limitations. Petitioner fails to show how Ogusu, Grant, and Barton individually or collectively cure the infirmities in Fukumoto and Ueda with respect to claim 3 for the challenge based on Fukumoto and Ueda." (citation omitted)); Appx210-211 ("Petitioner asserts that such obviousness is premised upon 'the same analysis' presented in the non-Ogusu combinations." (quoting Appx2034)).

### a. For the Fukumoto-Based Grounds Samsung Consistently Pointed to Fukumoto's Control Component in its Analysis of Claim 3.

That the Board erred in finding Samsung relied on Ueda's alleged processor is clear from the Petitions themselves, as they consistently relied on Fukumoto's control

component in analyzing claim 3. For example, Samsung argued that Fukumoto alone teaches claim 3 of both Challenged Patents under a non-MPF construction. Samsung explained how ***Fukumoto's control component***, namely CPU 113, would receive signals from sensors and adjust operational outputs as a result. Appx321-322 (citing Appx815 (25:42-48); Appx639 (¶197)); Appx1968-1969 (same, citing Appx2155 (¶191)).

In introducing the combination of Fukumoto with Ueda (under either a non-MPF or MPF construction), Samsung explained how POSITAs would have used Ueda's sensors in Fukumoto's device. Appx341; Appx1988. Specifically, Samsung explained that POSITAs would have been motivated to use sensors, such as Ueda's output and position detection sensors, ***in Fukumoto's device*** "to provide enhanced feedback control to Fukumoto's linear oscillatory actuator" because doing so would result in more reliable vibrations at a desired amplitude and frequency. Appx341 (citing Appx664-665 (¶238); Appx891 ([0165]-[0166]), Appx903 ([0347])); Appx1988 (same, citing Appx2182 (¶234)).

Under a non-MPF-construction, Samsung again articulated how Ueda's sensors provide outputs to a driving voltage determining unit and driving frequency unit. Appx342-345 (citing Appx889-891 ([0141], [0142], [0157]-[0159]); Appx665-668 (¶¶240-242)); Appx1989-1992 (same, citing Appx2183-2186 (¶¶236-38)). The Petitions explained that, "[i]n the combination, ***Fukumoto's control component*** would receive the output signals from sensors as taught in Ueda and adjust the

23

operational control outputs according to those signals." Appx345 (citing Appx668-669 (¶243)); Appx1992 (citing Appx2186 (¶239)).

Finally, under a MPF construction for claim 3, Samsung stated "***For the reasons discussed above***, Ueda teaches a processor programmed with the additional algorithm steps." Appx345-346; Appx1992-1993. The "reasons discussed above" here referred to the preceding paragraphs of the Petition, where Samsung explained that "[i]n the [Fukumoto-Ueda] combination, ***Fukumoto's control component*** would receive the output signals from sensors as taught in Ueda and adjust the operational control outputs according to those signals." Appx345, Appx341; Appx1992, Appx1988.

In instituting review, the Board found "Petitioner establishes sufficiently that the combined disclosures in Fukumoto and Ueda teach the limitations in claims 3 and 4." Appx2564; Appx2621 ("Ueda is added to teach the additional limitations of claims 3–6, and Petitioner provides an explanation of how the teachings of Ogusu and Fukumoto would be modified." (citing Appx2034)). At the time of institution, therefore, the Board understood Samsung's Petitions as relying on "the combined disclosures in Fukumoto and Ueda" for these claims.

> ### b. For the Ogusu-Based Grounds, Samsung Relied on "the Control Component in Each Ogusu-Based Combination" in its Claim 3 Analysis.

Again, without relying on Ueda's processor, Samsung's Petitions also explained that the combination of Ogusu, Fukumoto, and Ueda would have rendered claims 3-6

obvious.  Appx386-387; Appx2034.  The Petitions explained that "the control component in each Ogusu-based combination would receive the output signals from Ueda's sensors and adjust the operational control outputs according to those signals." Appx386-387 (citing Appx728-729, ¶340); Appx2034 (citing Appx2245-2246 (¶337)). The Board's analysis of claim 3 did not acknowledge that Samsung relied on "the control component in each Ogusu-based combination" in these grounds.  Appx137; Appx210-211.  Instead, the Board suggested "Petitioner does not rely on Ogusu, Grant, or Barton for teaching claim 3's limitations."  Appx137; Appx210-211.  But Samsung did rely on Ogusu, or Ogusu as modified by Fukumoto, as providing the control component to receive output signals and adjust operational control outputs. Appx386-387; Appx2034.

> **c.  Resonant's Patent Owner Responses Mischaracterized Samsung's Combinations, Which Samsung Properly Addressed in its Replies.**

Despite the Board correctly recognizing Samsung's grounds as relying on the combined disclosures at institution (Appx2564; Appx2621), Resonant argued in its PORs that Samsung's grounds failed to teach or suggest the "integer" steps in Samsung's algorithm.  Appx2694-2695; Appx3124-3125.  Specifically, Resonant argued that "Ueda never mentions any integers, nor suggests that any of the values relied on by Samsung is an integer," and that "Samsung's petitions and Dr. Wolfe's declarations never mention integers in the context of Ueda, either, nor do they

provide any evidence that a POSITA would be motivated to modify Ueda's teachings to utilize an integer value." Appx2694-2695, Appx2724; Appx3124-3125, Appx3155. Notably absent from Resonant PORs was any analysis of Fukumoto's or Ogusu-Fukumoto's control components performing the steps of the claimed algorithm. Indeed, Resonant only challenged the disclosure of the proposed grounds for claims 3-6 by challenging Ueda's disclosure of integers. Appx2694-2695, Appx2724-2725; Appx3124-3125, Appx3155-3156. Resonant did not challenge the motivation to combine Ueda with Fukumoto or Ogusu-Fukumoto in the PORs. Appx2694-2695, Appx2724-2725; Appx3124-3125, Appx3155-3156.

In response, Samsung's Replies noted that Resonant and its expert failed to "acknowledge that the asserted ground[s] for unpatentability are the combination of Ueda with Fukumoto and Ogusu-Fukumoto." Appx3210; Appx3412. Indeed, Samsung rebutted Resonant's mischaracterization of the Petitions by reiterating that "the combined Fukumoto-Ueda/Ogusu-Fukumoto-Ueda systems would implement Ueda's algorithm in a general-purpose processor." Appx3210; Appx3412. Samsung cited Dr. Wolfe's original declaration, which explained, in relevant part, that Ueda's algorithm would be implemented into Fukumoto's "corresponding structure for claim 1," i.e., CPU 113. Appx3210 (citing Appx669 (¶245), Appx728 (¶340) ("the control component in the Ogusu-Fukumoto combination would receive the output signals from sensors as taught in Ueda and adjust the operational control outputs according to those signals.")); Appx3412 (citing Appx2186-2187 (¶241), Appx2245-2246 (¶337)).

Samsung also explained that "[Resonant's] argument takes an overly narrow view of Ueda's disclosures." Appx3208-3209; Appx3410-3411. Although "Ueda does not use the word 'integer,'" Samsung explained that "POSITAs would have readily understood" Ueda's disclosure of converting signals to values for comparison as involving converting to and comparing integers. Appx3209; Appx3411. Samsung supported its argument that this conversion would have been known to POSITAs with a supplemental declaration from Dr. Wolfe, who explained that POSITAs would have known that "in the context of converting analog to digital signals, an integer would almost always be the preferred choice." Appx3210 (citing Appx3234 (¶16-17)); Appx3412 (same).

Resonant did not move to strike any argument in the Replies or move to exclude any portion of Dr. Wolfe's supplemental declaration. *See generally* Appx279-284. Instead, in its Sur-Replies, Resonant alleged two issues involving the grounds' disclosure of the algorithmic steps involving converting to and comparing integers. First, Resonant again argued that Ueda fails to disclose converting and comparing integers or digital values. *See* Appx3442 (characterizing Ueda as an analog system and that conversion to a digital value and/or integer is not required); Appx3532. This argument again treated Ueda as a distinct reference as opposed to part of a combination with Fukumoto or Ogusu-Fukumoto.

Second, Resonant's Sur-Replies demonstrated how it misconstrued Samsung's articulation of its grounds in the Petitions and Replies. Specifically, Resonant argued

that implementing Ueda's algorithm "in a general-purpose processor and utiliz[ing] conversion to digital values, based upon combination with Fukumoto or with Ogusu-Fukumoto," was "a new argument." Appx3442-3443; Appx3532-3533. Resonant further argued that the perceived "new ground" implementing Ueda in Fukumoto or Ogusu-Fukumoto "is unsupported" and fails to explain "why a POSITA would have been motivated to implement" such a combination. Appx3442-3443; Appx3532-3533. Samsung's Petitions, however, expressly articulated "us[ing] additional sensors such as Ueda's output and position detection sensors in Fukumoto." Appx341, Appx386-387; Appx1988, Appx2034.

As discussed, the Board ultimately adopted Resonant's argument and found "Petitioner did not in the Petition rely on Fukumoto's processor when asserting that the combined disclosures in the references teach claim 3's limitations under a means-plus-function interpretation." Appx90-91; Appx183.

### 2. The Combinations in Samsung's Petitions Rendered Obvious Integer Conversion and Comparison.

The Board also referenced but disregarded the testimony of Samsung's expert regarding converting Ueda's analog signals into digital signals compatible with Fukumoto's CPU 113 or Ogusu's processor. The Board stated "[a]t best, Dr. Wolfe states that an ordinarily skilled artisan would have understood that 'the raw sensor input from the output detector 4 and the position detector 5 of Ueda must be converted to digital values to be processed and compared' when 'implement[ing]

Ueda's algorithm in a general-purpose processor.'" Appx91 (quoting Appx3233 (¶16)); Appx183 (citing Appx3234 (¶17)).

But the Board disregarded this testimony, asserting that "'[Samsung] did not in the Petition rely on Fukumoto's processor when asserting that the combined disclosures in the references teach claim 3's limitations under a means-plus-function interpretation." Appx91; Appx183  The Board did not acknowledge Dr. Wolfe's testimony that "in the context of converting analog to digital signals, an integer would almost always be the preferred choice." Appx3234 (¶17).[8]  This was the **only** testimony in the record regarding the conversion of analog to digital signals, and it was not disputed by Resonant in its Sur-Replies.  Appx3442-3443; Appx3532-3533.

The Board's disregard of Samsung's Replies also resulted in the omission of Samsung's explanation of how even Ueda renders obvious the comparison of integer values.  Specifically, Samsung explained that "Ueda discloses that the 'magnitude' of Dop is used for comparison against another specific value (i.e., the 'magnitude' of Oop)." Appx3209 (citing Appx890 ([0149])); Appx3411 (same).  As Samsung pointed out, Resonant's expert admitted at his deposition that a magnitude "could happen to fall upon an integer value." Appx3209 (quoting Appx3310-3311 (75:24-76:7),

---

[8] In the '993 IPR, the Board cited this paragraph but only to say "the choice of an integer would be one of a finite number of identified, predictable solutions." Appx183. It did not acknowledge Dr. Wolfe's testimony that an integer would have been the "preferred choice." Appx3234 (¶17).

Appx3319 (84:10-12)); Appx3411 (same).  Thus, these integer-magnitudes would be compared even in Ueda.  "Dr. Goossen does not reckon with Ueda's disclosure that magnitude values, not the signals themselves, are compared."  Appx3210; Appx3412.

By incorrectly finding that Samsung's Replies introduced new evidence, the Board erroneously disregarded both of these arguments.

### C. The Board Found No Motivation to Combine Fukumoto's Figure 3 with Fukumoto's Figure 83 Despite Figure 83 Being Expressly Described as a Modification of the Other Embodiments.

Regarding claim 9's limitation – "wherein the housing is a linear tube, capped at both ends by movable-component-repelling components" – Samsung relied on its analysis related to Fukumoto's disclosure of the same limitation in claim 8.  *See* Appx326 ("As discussed in [the section addressing claim 8], Fukumoto discloses or suggests the limitations of claim 1, as well as 'the housing is a linear tube, capped at both ends by movable-component-repelling components.'"); Appx1973 (same).

Supported by Dr. Wolfe's expert declaration, Samsung argued that "a POSITA would have found it obvious for Fukumoto's case 115a to be 'capped at both ends by movable-component-repelling components selected from one of mechanical springs and magnets.'"  Appx324-325 (citing Appx644-647 (¶202)); Appx1971-1972 (citing Appx2162-2163 (¶197)).  Samsung pointed to Fukumoto's Figure 3, which "depicts one end of case 115a capped by spring 123," and Fukumoto's Figure 83, which "expressly discloses an embodiment using multiple springs, which would dampen the

vibration forces without damaging other components." Appx324-325; Appx1971-1972. These Figures, as produced in the Petitions, are reproduced below.





Appx324-325 (citing Appx751 (Fig. 3), Appx801 (Fig. 83)); Appx1971-1972 (same).

In its PORs, Resonant challenged the motivation to combine Fukumoto's Figure 3 with Fukumoto's Figure 83. Appx2689-2691; Appx3119-3121. Resonant also challenged the motivations provided in the Petitions regarding increasing the force of vibration while decreasing the power requirement. Namely, Resonant

contends there is no reason to expect power requirements will decrease while vibration force increases. Appx2690-2691; Appx3120-3121. Lastly, Resonant contended the source of increased vibrational force is additional driving components, namely electrodes, in Figure 83. Appx2691; Appx3121.

In its Replies, Samsung countered Resonant's arguments that there was no motivation to combine by pointing to express disclosures in Fukumoto itself. Appx3206-3207; Appx3408-3409. As Samsung explained, "[Resonant]'s argument directly conflicts with Fukumoto's express language which explicitly suggests modifying Fukumoto's Figure 3 embodiment (which Fukumoto calls embodiment 1) with its Figure 83 embodiment (which Fukumoto calls modification 5)." Appx3207 (citing Appx823 (48:53-50:13)); Appx3409 (same).

In its Sur-Replies, Resonant challenged Fukumoto's suggestion to modify the Figure 3 embodiment with the Figure 83 embodiment. Appx3440-3441; Appx3530-3531. Despite the language in Fukumoto describing the Figure 83 embodiment as "Modification 5" to the embodiments disclosed elsewhere in Fukumoto, including the embodiment depicted in Figure 3 (Appx823 (48:53-50:20)), Resonant's argued that Fukumoto's disclosure "says nothing about changing the number of springs in the Figure 3 embodiment." Appx3440; Appx3530. Resonant also argued that Fukumoto's Figure 83 is described in relation to an "electrostatic type oscillatory actuator" whereas Figure 3 is an electromagnetic embodiment. Appx3440; Appx3530. In sum, Resonant's Sur-Replies argued that there was no motivation to combine

Fukumoto's Figure 3 with Fukumoto's Figure 83, which together would render obvious the disputed subject matter of claim 9. Appx3440-3441; Appx3530-3531.

The Board sided with Resonant, holding that Samsung "fails to provide an adequate motivation to modify Figure 3's oscillatory actuator in view of Figure 83's oscillatory actuator to yield claim 9's subject matter." Appx76-77; Appx177. The Board rejected the motivation to combine the disclosures of these two figures because (1) it "disagree[d] with Petitioner that Fukumoto includes 'express language' that 'explicitly suggests' modifying Figure 3's oscillatory actuator in view of Figure 83's oscillatory actuator and (2) it reasoned the difference between electromagnetic and electrostatic forces mean the Figures in question have "no relationship," among other reasons not pertinent to this appeal. Appx75 (citing Appx3207); Appx176 (citing Appx3409). The Board based its decision on the suggestion that Fukumoto's "disclosure says nothing about modifying springs in a linear oscillatory actuator." Appx75; Appx176.

### D. The Board Found No Motivation to Combine Fukumoto with Dong and Ogusu Based on Ogusu's Disclosure, Suggesting the Prior Art Must Disclose a Benefit Gained Through the Combination.

In its Petitions, Samsung argued that "Fukumoto in combination with Dong and Ogusu discloses or suggests the additional limitations" of claims 14 of both Challenged Patents and 19 of the '830 patent directed to paramagnetic flux paths. Appx363; Appx2010. Samsung explained how, in this combination, "paramagnetic

33

materials would be incorporated into Fukumoto's vibration actuator to reduce the reluctance of one or more magnetic circuits based on the teachings of Dong and Ogusu." Appx363; Appx2010. In particular, Samsung pointed to Dong's disclosure of using paramagnetic materials (*e.g.*, tungsten) in a vibration module, and that "a POSITA would have understood that adding a paramagnetic material (e.g., tungsten) to Fukumoto's vibration module (as taught in Dong) would reduce reluctance of the magnetic circuits in Fukumoto's vibration actuator." Appx364 (citing Appx693 (¶277)); Appx2011 (citing Appx2210, ¶274).

As further support, Samsung explained that Ogusu teaches "a yoke made of ferromagnetic material or non-ferromagnetic materials mixed with ferromagnetic powders is positioned between the electromagnetic coil and permanent magnet to form a magnetic circuit." Appx364; Appx2011. Samsung explained how "non-magnetic materials mixed with ferromagnetic powders, as disclosed in Ogusu, would have weak magnetic attraction similar to paramagnetic materials and would reduce the reluctance of magnetic circuits in the same way." Appx364-365 (citing Appx693-694 (¶279)); Appx2011-2012 (citing Appx2210-2211 (¶276)). Samsung tied the combination together by explaining that POSITAs would have been motivated to combine Dong's disclosure of using paramagnetic materials with Ogusu's disclosure of shaping and positioning such materials, and modifying Fukumoto's vibration actuator accordingly. Appx364-365 (citing Appx693-694 (¶279)); Appx2011-2012 (citing Appx2210-2211, ¶¶276-77).

In its PORs, Resonant argued that Samsung's Petitions failed to show how the combination of Fukumoto, Ogusu, and Dong disclose or render obvious the claimed paramagnetic flux paths primarily by challenging what POSITAs would have understood. Appx2705-2710; Appx3135-3140. For example, despite acknowledging the rationale provided by Samsung's expert Dr. Wolfe, Resonant argued that "[t]here is no evidence that a POSITA would have had any reason to consider decreasing reluctance in order to increase efficiency." Appx2706; Appx3136.

In its Replies, Samsung reiterated that "POSITAs would have been motivated to combine Fukumoto, Ogusu, and Dong to reduce magnetic reluctance and increase efficiency." Appx3194; Appx3396. For example, Samsung noted that both experts (Dr. Wolfe and Dr. Goossen) testified that "the properties of paramagnetic materials and their usefulness in magnetic circuits were well known to POSITAs before the priority date of the patents." Appx3195; Appx3397. Samsung further noted that, based on POSITAs' understanding of these materials and benefits, POSITAs would have been motivated to incorporate at least Dong's tungsten components into the Fukumoto motor to reduce magnetic reluctance." Appx3195, Appx3196-3200; Appx3397-3398, Appx3399-3402.

In its Sur-Replies, Resonant generally repeated its same arguments from the PORs. For example, Resonant argued that Samsung failed to demonstrate how Dong's "tungsten counterweight would form part of the magnetic circuit or reduce the reluctance of that circuit." Appx3445; Appx3535. Resonant also argued, again,

that Samsung failed to demonstrate a motivation to combine Fukumoto, Dong, and Ogusu.  Appx3446; Appx3536.

The Board sided with Resonant, concluding "[t]he record supports Patent Owner's motivation-to-combine arguments, e.g., that Ogusu's teachings do not support combining Fukumoto and Dong."  Appx117; Appx196.  The Board based its decision on the notion that "Petitioner relies on Ogusu's 'magnetic loop having the shortest path' to provide increased efficiency."  Appx117 (quoting Appx364-365); Appx196 (quoting Appx2012).  The portion of the Petitions quoted by the Board, however, explained how "Ogusu's teachings *further* support the modification discussed above," i.e., the combination of Fukumoto and Dong.  Appx364-365 ("Ogusu *further* supports that a POSITA would have been motivated to incorporate known paramagnetic materials into Fukumoto's oscillatory actuator to reduce the reluctance of the magnetic circuits to improve efficiency."); Appx2011-2012.  In other words, Ogusu's disclosure was secondary support for the combination, yet it was the primary reason the Board found these claims not unpatentable.

The Board also concluded "Petitioner's reliance on Dong to support the proposed combination of Dong's tungsten counterweight with Fukumoto's oscillatory actuator" was insufficient.  Appx118; Appx198-199.  Specifically, the Board concluded, "[t]hat Dong's placement of a tungsten counterweight relative to a permanent magnet and a coil 'would reduce magnetic reluctance,' as Petitioner asserts, does not indicate that Dong teaches any benefit from this arrangement other than

36

providing more mass that 'functions to strengthen the vibrating force.'" Appx118 (citing Appx931); Appx198-199 (same).

Lastly, the Board did not credit the Petitions' and Dr. Wolfe's recitation of the knowledge of POSITAs because, according to the Board, "Petitioner evidences that knowledge with citations to the ['081/'830] patent." Appx119; Appx199. Over the testimony of both experts (Appx3195; Appx3397), the Board suggested "the record does not reflect that an ordinarily skilled artisan would have recognized the advantages of using a paramagnetic material to reduce the reluctance of a magnetic circuit and increase efficiency except by reading the ['081/'830] patent." Appx120; Appx200. Thus, the Board concluded "Petitioner has identified no adequate reason why an ordinarily skilled artisan would have been motivated to increase efficiency by combining Dong's tungsten counterweight with Fukumoto's oscillatory actuator." Appx119-120; Appx199-200.

## SUMMARY OF THE ARGUMENT

For the independent reasons articulated below, the Court should overturn the Board's decision that Samsung failed to establish by a preponderance of the evidence that claims 3-6, 9, 14 of both Challenged Patents, and claim 19 of the '830 patent, are unpatentable.

**I.** The Board's Final Written Decisions do not reflect the combination presented—Fukumoto in combination with Ueda—in addressing the means-plus-

function interpretation of claim 3. The Board's overreliance on Ueda to the exclusion of the Fukumoto-Ueda combination was wrong.

**II.** The Board's Final Written Decisions do not address the Petitions' claim 3 analyses of using Ogusu-Fukumoto's "control component" to receive output signals from Ueda's sensors and adjust operational control outputs. Simply put, by failing to consider "the control component in each Ogusu-based combination," the Board failed to address the actual combination presented for claims 3-6.

**III.** The Board's Final Written Decisions do not address the prior art cited for claims 3-6 from the perspective of POSITAs. The only evidence of record showed that POSITAs would have known that analog signals from Ueda's sensors would be converted to digital signals in order to be used with Fukumoto's or Ogusu's digital processor, and that integers were almost always the preferred variable type when converting analog to digital signals. The Board's failure to recognize this undisputed testimony explaining the knowledge of POSITAs was wrong.

**IV.** Samsung's Replies properly responded to Resonant's Patent Owner Response arguments regarding claims 3, and at most, expanded on the existing positions detailed in the Petitions as permitted by this Court. The Board's statement that Samsung changed its unpatentability theory in its Replies is incorrect, and the Board's disregard of Samsung's Reply evidence was erroneous.

**V.** Fukumoto's Figure 83 is described as a modification to the embodiments disclosed elsewhere in the reference, including the embodiment depicted in, and

described in relation to, Figure 3. The Board's conclusion that no motivation exists to combine these disclosures was wrong. When properly considered, Fukumoto renders claim 9 obvious.

**VI.** The Board improperly required a showing of the "benefit" gained by the combination of Fukumoto, Dong, and Ogusu as a prerequisite for the motivation to combine these references. No explicit benefit is required to be disclosed in the prior art, such that the Board's rejection of the combination which renders claim 14 of both patents and claim 19 of the '830 patent unpatentable was erroneous.

The Board's determination upholding the patentability of claims 3-6, 9, 14 of both patents and claim 19 of the '830 patent should, therefore, be reversed, or at least vacated and remanded.

## STANDARD OF REVIEW

This Court reviews the Board's ultimate obviousness determination *de novo* and underlying factual findings for substantial evidence. *See Ariosa Diagnostics v. Verinata Health, Inc.*, 805 F.3d 1359, 1364 (Fed. Cir. 2015); *E.I. DuPont de Nemours & Co. v. Synvina C.V.*, 904 F.3d 996, 1005 (Fed. Cir. 2018). "What the prior art discloses and whether a person of ordinary skill would have been motivated to combine prior art references are both fact questions that we review for substantial evidence." *Intel Corp. v. PACT XPP Schweiz AG*, 61 F.4th 1373, 1378 (Fed. Cir. 2023).

"Substantial evidence requires the reviewing court to ask whether a reasonable person might find that the evidentiary record supports the agency's conclusion." *In re*

*Google LLC*, 56 F.4th 1363, 1367 (Fed. Cir. 2023) (citation and internal quotation marks omitted).

"Decisions related to compliance with the Board's procedures are reviewed for an abuse of discretion." *Ericsson Inc. v. Intellectual Ventures I LLC*, 901 F.3d 1374, 1379 (Fed. Cir. 2018). Likewise, this Court "review[s] a determination by the Board that, under the Board's own regulations, a party exceeded the scope of a proper reply for abuse of discretion." *Axonics, Inc. v. Medtronic, Inc.*, 75 F.4th 1374, 1380 (Fed. Cir. 2023). Abuse of discretion occurs where a "decision: (1) is clearly unreasonable, arbitrary, or fanciful; (2) is based on an erroneous conclusion of law; (3) rests on clearly erroneous fact finding; or (4) involves a record that contains no evidence on which the Board could rationally base its decision." *Ericsson*, 901 F.3d at 1379. In an IPR, "whether a ground the Board relied on was 'new,' requiring a new opportunity to respond, is a question of law, subject to de novo review." *In re NuVasive, Inc.*, 841 F.3d 966, 970 (Fed. Cir. 2016).

## ARGUMENT

### I. The Board's Overemphasis on Ueda in the Fukumoto-Based Ground Challenging Claims 3-6 Was Legal Error.

"The question in an obviousness inquiry is whether it would have been obvious to a person of ordinary skill in the art to combine the relevant disclosures of the two references, not whether each individual reference discloses all of the necessary elements." *Palo Alto Networks, Inc. v. Centripetal Networks, LLC*, 122 F.4th 1378, 1386

(Fed. Cir. 2024) (quoting *Game & Tech. Co. v. Wargaming Grp. Ltd.*, 942 F.3d 1343, 1352 (Fed. Cir. 2019)).  Despite this directive, the Board in this case treated the teachings of Ueda as distinct from the teachings of Fukumoto.  "This analysis constitutes legal error."  *Id.*

A. **The Petitions Presented a Combination: Fukumoto's Linear Oscillatory Actuator Using Ueda's Output and Position Detection Sensors.**

The Petitions articulated that under a MPF construction of claim 3's "control component," "[a] POSITA would have been motivated to combine Fukumoto's mobile device utilizing a linear oscillatory actuator with Ueda's feedback control." Appx341; Appx1988.  In making this combination, POSITAs would have used "additional sensors such as Ueda's output and position detection sensors in Fukumoto to provide enhanced feedback control to Fukumoto's linear oscillatory actuator."  Appx341 (citing Appx891, [0165]-[0166], Appx903, [0347]; Appx664-665, ¶238); Appx1988 (same, citing Appx2182 (¶234)).  Such a combination "would have amounted to no more than applying a known technique (Ueda's feedback control) to a known device ready for improvement (Fukumoto's mobile device including its linear oscillatory actuator) to yield predictable results (a linear oscillatory actuator using feedback control to achieve the desired vibration output)."  Appx341 (citing Appx664-665, ¶238); Appx1988 (citing Appx2182 (¶234)).

## B. The Petitions Relied on Fukumoto's "Control Component" Not Ueda's Alleged "Processor".

The Board's FWDs relied heavily on Samsung's Petitions' statement that "Ueda teaches a processor." Appx91 (quoting Appx345-346); Appx183 (quoting Appx1992-1993). But Samsung's Petitions qualified the reference to "Ueda teach[ing] a processor" with the language, "[f]or the reasons discussed above." Appx345-346; Appx1992-1993. But nothing "above" this quote in the Petitions discussed Ueda teaching a processor. Indeed, nothing earlier in the Petitions discussed Ueda's alleged "processor." Instead, the earlier discussion of the Fukumoto-based combinations relied exclusively on Fukumoto's CPU 113. *See* Appx341, Appx345; *see also* Appx1988, Appx1992.

### 1. Fukumoto's "control component" was identified in limitation 1[f] as Fukumoto's CPU 113.

Claim 3 of both Challenged Patents recites in part, "[t]he linear vibration module of claim 1 wherein the control component receives output signals from sensors" and "adjusts one or more operation control outputs . . . ." Appx246 (15:62-67). "[T]he control component" of claim 3 refers to the "control component" limitation of claim: limitation 1[f]. Thus, claim 3 adds functionality to the control component recited in claim 1.

In its analysis of limitation 1[f], Samsung relied on Fukumoto's CPU 113 as the claimed "control component." Appx313-314, Appx316-317; Appx1960-1961, Appx1963-1964. The Board agreed, finding Fukumoto's CPU 113 meets all

limitations of the claimed "control component." Appx60 ("Fukumoto's CPU 113 performs the function recited in limitation 1f"), Appx61 ("Further, Fukumoto's CPU 113 performs the steps in algorithmic structure according to limitation 1f"); Appx166-168.

In its claim 3 "control component" analysis under a MPF construction, Samsung explained "*[f]or the reasons discussed above*, Ueda teaches a processor programmed with the additional algorithm steps." Appx345-346; Appx1992-1993. These "reasons discussed above" refer to the earlier sections of the Petitions where Samsung introduced the combination and where Samsung analyzed claim 3 under a MPF construction. Appx341, Appx345; Appx1988, Appx1992. In these sections, Samsung explained how Fukumoto's control component would receive output signals from Ueda's sensors and adjust operational control outputs based on the received signals.

For example, when Samsung introduced the combination of Fukumoto with Ueda (under both MPF and non-MPF constructions), it explained that POSITAs would have simply used "additional sensors such as Ueda's output and position detection sensors in Fukumoto to provide enhanced feedback control to Fukumoto's linear oscillatory actuator . . . ." Appx341 (citing Appx664-665, ¶238); Appx1988 (citing Appx2182 (¶234)). Furthermore, when Samsung analyzed Fukumoto in combination with Ueda under a non-MPF construction, Samsung argued "*Fukumoto's control component* would receive the output signals from sensors as

43

taught in Ueda and adjust the operational control outputs according to those signals."
Appx345; Appx1992. This explanation occurs immediately before, or above, the
argument concerning a MPF construction. Appx345; Appx1992.

Even under a MPF construction, Samsung's Petitions explained, "a POSITA
would have been motivated to use Ueda's feedback control (which includes those
additional steps) with the linear oscillatory actuator of Fukumoto so that Fukumoto's
mobile device more reliably delivers vibrations at the desired frequency and
amplitude." Appx346; Appx1993. Ueda's "feedback control" is not a processor.
Instead, this statement mirrors the same reasoning Samsung provided for why
POSITAs would have "been motivated to use additional sensors such as Ueda's
output and position detection sensors in Fukumoto." Appx341 (addressing the
motivation to combine Fukumoto with Ueda under any construction); Appx1988
(same).

Samsung's Petitions, therefore, relied on the combination of Fukumoto's
control component with Ueda's sensors in the combination presented. The reference
to Ueda's processor in the MPF analysis was to the processor in the systems involving
Ueda, such as Fukumoto's CPU 113, and not to a processor allegedly disclosed in
Ueda. The Board appeared to recognize this in its institution decision, where it
explained "Petitioner establishes sufficiently that the **_combined disclosures_** in
Fukumoto and Ueda teach the limitations in claims 3 and 4." Appx2564; Appx2621-
2622 ("Ueda is added to teach **_the additional limitations of claims 3–6_**, and

44

Petitioner provides an explanation of how the teachings of Ogusu and Fukumoto would be modified." (citing Appx2034)).

Samsung's claim 3 analysis did not reinvent its analysis of the "control component" in Fukumoto-based systems. The "control component" of claim 1, i.e., Fukumoto's CPU 113, was the same control component that Samsung relied on for claim 3 even under the MPF construction adopted by the Board.

## 2. In the Fukumoto-Ueda combination, Samsung Always Argued that Fukumoto's control component receives sensor data from Ueda's sensors.

Similarly, Samsung's consistently relied on Fukumoto's CPU 113 as teaching the subject matter introduced in claim 3, namely receiving sensor signals and adjusting control outputs based on those signals.

For example, when considering Fukumoto on its own, Samsung explained that Fukumoto's CPU 113 "receives output signals from touch panel 102 and touch sensor 411 . . . and causes vibration of either linear oscillator 115a or 115b" based on the sensor output signals. Appx321-322 (citing Appx815, 25:42-48; Appx639, ¶197); Appx1968-1969 (same, citing Appx2155 (¶191)). When introducing the Fukumoto-Ueda combination, Samsung explained that a "POSITA would have also been motivated to use additional sensors such as Ueda's output and position detection sensors in Fukumoto to provide enhanced feedback control to Fukumoto's linear oscillatory actuator." Appx341 (citing Appx891, [0165]-[0166], Appx903, [0347]; Appx664-665, ¶238); Appx1988 (citing Appx2182 (¶234)). Ueda's output and

position detection sensors would be received in Fukumoto's CPU 113, which would carry out any adjustment based on those signals. Appx341, Appx321-22; Appx1988, Appx1968-1969. In the non-MPF construction of claim 3's "control component," Samsung again explained "Fukumoto's control component *would receive* the output signals from sensors as taught in Ueda *and adjust* the operational control outputs according to those signals." Appx345 (citing Appx668-669 (¶243)); Appx1992 (citing Appx2186 (¶239)).

Each of these examples illustrate how throughout the Petitions, Samsung relied on Fukumoto's CPU 113 to perform the receiving and adjusting steps recited in claim 3. Appx321-322, Appx341, Appx345, Appx346; Appx1968-1969, Appx1988, Appx1992, Appx1993.

### C. The Board's Rigid Interpretation of the Petitions Ignored the Combination, and Rejected Obviousness Based on Ueda Alone.

"The question in an obviousness inquiry is whether it would have been obvious to a person of ordinary skill in the art to combine the relevant disclosures of the two references, not whether each individual reference discloses all of the necessary elements." *Palo Alto*, 122 F.4th at 1386. "Where, as here, the grounds for obviousness are based on a specific combination of references, arguments that 'attack the disclosures of the two references individually' lack merit." *Id.* (quoting *Bradium Techs. LLC v. Iancu*, 923 F.3d 1032, 1050 (Fed. Cir. 2019)).

Samsung's grounds are based on the combination of Fukumoto's control component with Ueda's sensors. Appx341; Appx1988. But the Board's FWDs criticized Ueda individually, agreeing with Resonant's argument that Ueda by itself "does not teach convert[ing] the received output signal into an integer." Appx90 (quotation omitted). The Board justified its narrow analysis on four words in the Petitions: "Ueda teaches a processor." Appx91 (quoting Appx345-346); Appx183 (quoting Appx1992-1993). Based on these words, the Board tossed aside the Petitions' entire analysis of the "control component" in the Fukumoto-Ueda combination discussed in Section I.B above. Appx91 ("Petitioner did not in the Petition rely on Fukumoto's processor when asserting that the combined disclosures in the references teach claim 3's limitations under a means-plus-function interpretation."); Appx183 (same).

But the Petitions did rely on Fukumoto's CPU 113 for the claimed "control component" that would perform the limitations of claims 3-6. Appx341, Appx345, Appx346; Appx1988, Appx1992, Appx1993. The Board's heightened focus on a processor allegedly taught by Ueda based on four words in the Petitions—"Ueda teaches a processor"—as opposed to a proper focus on the combination of Fukumoto with Ueda was wrong. *Palo Alto*, 122 F.4th at 1386 ("Specifically, the Board must consider whether the particular combination argued by the Petitioner . . . would meet the claim limitations at issue."); *see also Netflix, Inc. v. DivX, LLC*, No. 2022-1043, 2023 WL 3115576, at *5 (Fed. Cir. Apr. 27, 2023) (vacating a Board's

FWD for "not adequately assessing Netflix's arguments regarding limitation 1[c] based upon a combination of Chen and Grab-333"); *see also Uniloc 2017 LLC v. Facebook, Inc.*, No. 2019-2159, 2021 WL 5370480, at *9 (Fed. Cir. Nov. 18, 2021) ("Failing to appreciate what Facebook had contended, the Board did not determine the correctness of the contention that the HTTP message meets claim 4's requirements.").

The Board's conclusion that claim 3, and claims 4-6 which depend from claim 3, is not unpatentable was based on this legal error and should be vacated. *See Palo Alto*, 122 F.4th at 1386.

## II. The Board Failed to Consider the Petition's Argument That the Ogusu-Fukumoto-Ueda Combination Expressly Relied on Ogusu's Control Component.

Separate from the infirmities with the Board's analysis of Samsung's first grounds based on a combination of Fukumoto and Ueda, the Board committed further legal error in its analysis of Samsung's second obviousness ground in each Petition. In rejecting Samsung's argument for claim 3 in the Ogusu-based ground, the Board wrongly suggested that "[Samsung] does not rely on Ogusu, Grant, or Barton for teaching claim 3's limitations." Appx137; Appx210 ("Petitioner asserts that such obviousness is premised upon the same analysis presented in the non-Ogusu combinations." (quotation omitted)). Unlike the Fukumoto-based grounds, Samsung's second set of grounds explicitly relied on "the control component in each Ogusu-based combination"—and not a processor allegedly taught by Ueda—as the

device that "receive[s] the output signals from Ueda's sensors and adjust[s] the operational control outputs according to those signals." Appx387; Appx2034.

## A. Samsung's Second Ground Relied on Ogusu's or Ogusu-Fukumoto's Control Component, Not Ueda's Processor.

### 1. The "control component" of the Ogusu-based combinations is a digital CPU.

For limitation 1[f], Samsung's Petitions explained POSITAs would have understood that Ogusu uses a processor (despite using the word "control unit" instead of "processor") to enable users to choose between various vibrations. Appx372 (citing Appx1049, [0043]); Appx2019 (same). Ogusu's control unit "appl[ies] alternating current to its two coils . . . according to a waveform of a specific amplitude and frequency" chosen by the user. Appx378 (citing Appx715-716, ¶321); Appx2025-2026 (citing Appx2233 (¶317)). As argued in the Petitions, "a POSITA would have understood that Ogusu uses a processor to choose among the various possible waveforms and to control the supply of power from the power supply to the coils to achieve those waveforms." Appx379 (citing Appx716-717, ¶¶322-23); Appx2026 (citing Appx2234-2235 (¶¶319-21)).

The Petitions also presented an alternative to Ogusu's control unit in case the Board found Ogusu's disclosure insufficient to teach the claimed "control component." Appx379; Appx2026. That alternative was Fukumoto's CPU 113. Appx379; Appx2026; *see also* Appx750, Appx809 (13:54-59). Specifically, the Petitions explained that "Ogusu lacks certain implementation details that were well known as

49

shown in Fukumoto and would have been motivated to apply those implementation details to Ogusu . . . ." Appx372; Appx2019. Indeed, like Ogusu's control unit, Fukumoto's CPU 113 receives user input, reads the corresponding waveform data stored in a waveform data table, and generates and sends a drive signal to the oscillatory actuator to cause it to vibrate at the amplitude and frequency specified by the waveform. Appx313-316 (citing Appx809, 13:54-14:26; Appx817, 29:15-18; Appx826, 48:42-47; Appx624-625, ¶177); Appx1960-63 (same, citing Appx2137-2142 (¶¶172-73)). Accordingly, the Petitions explained, POSITAs would have been motivated to apply Fukumoto's implementation details to Ogusu. Appx372; Appx2019.

The Board's decisions demonstrate that it agreed with Samsung that either Ogusu teaches a processor or Ogusu in combination with Fukumoto does. Appx127-129 ("For (1) the reasons stated by Petitioner and supported by Dr. Wolfe's testimony and (2) the reasons discussed above for the challenge based on Fukumoto alone, we agree with Petitioner that the combined disclosures in Ogusu and Fukumoto teach limitation 1f."); Appx210 ("We further are persuaded by Petitioner's reasons to combine Ogusu and Fukumoto, and that such would have occurred with a reasonable expectation of success."). This processor or CPU was the control component identified for the Ogusu-based combinations.

## 2. The Ogusu-Fukumoto control component would have received sensor data from Ueda's sensors.

Samsung explained that "the control component in each Ogusu-based combination would receive the output signals from Ueda's sensors and adjust the operational control outputs according to those signals." Appx387; Appx2034. Samsung's Petitions expressly relied on Ogusu-Fukumoto's control component as opposed to a processor allegedly taught by Ueda. Appx387; Appx2034. As discussed, "the control component in each Ogusu-based combination" *is* Ogusu's or Ogusu-Fukumoto's control component (e.g., CPU 113). Appx379; Appx2026.

Thus, even if the Board was correct in its overreliance on the purported reference to Ueda's processor with respect to Samsung's Fukumoto-based grounds, and even if the Board wrongly understood Samsung's Fukumoto-based grounds as relying on Ueda's sensor signals being received in Ueda's alleged processor, it wrongly imported this structure into Samsung's Ogusu-based grounds. Samsung's Petitions explained that "the control component in each Ogusu-based combination"—and not the processor allegedly taught by Ueda—would have been the component which "receive[d] the output signals from Ueda's sensors." Appx387; Appx2034.

## B. The Board Committed Reversible Error by Failing to Consider the Differences Between Ogusu's Control Component and Ueda's Processor.

Instead of recognizing this difference between Samsung's Fukumoto-based and Ogusu-Fukumoto-based grounds, the Board wrongly suggested that "Petitioner does

not rely on Ogusu, Grant, or Barton for teaching claim 3's limitations." Appx137; *see also* Appx210 ("Petitioner asserts that such obviousness is premised upon the same analysis presented in the non-Ogusu combinations." (quotation omitted)).

This Court has told the PTAB that it "must consider all evidence and argument properly submitted . . . in connection with the petition." *Corephotonics, Ltd. v. Apple Inc.*, 84 F.4th 990, 1003 (Fed. Cir. 2023) (citing *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1376 (Fed. Cir. 2016)). The Board's failure to appreciate, much less analyze, the distinction between the grounds displays how it failed to consider the full scope of evidence properly presented in Samsung's Petitions. Had it considered the full scope of evidence, it would have seen the Ogusu-based grounds rely on the Ogusu-based control component. The Board's FWDs fall short of the mandate to consider this properly submitted argument and evidence. *Id.*

Similarly, "the Board does not 'enjoy[] a license to depart from the petition and institute a different inter partes review of his own design.'" *Koninklijke Philips N.V. v. Google LLC*, 948 F.3d 1330, 1336 (Fed. Cir. 2020) (quoting *SAS Inst., Inc. v. Iancu*, 584 U.S. 357, 365 (2018)). Despite this restriction, the Board's treatment of Samsung's Ogusu-based grounds as identical to Samsung's Fukumoto-based grounds show how it departed from Samsung's Petitions and analyzed a ground of its own design. *See* Appx210 ("Petitioner asserts that such obviousness is premised upon "the same analysis" presented in the non-Ogusu combinations." (quoting Appx2034)). Notably, the Petitions explained that "[t]he same analysis applies to combining Ueda's feedback

control with [] the Ogusu-Fukumoto . . . combination[] discussed above." Appx2034. The Board in the '993 IPR treated this sentence as suggesting the entire analysis, not just the motivation to combine analysis, was the same across Samsung's grounds. But the next sentence in the Petitions explains "[i]n these combinations, the control component in each Ogusu-based combination would receive the output signals from Ueda's sensors and adjust the operational control outputs according to those signals." *Id.* Thus, while the same combination analysis applied across the grounds, the substance was distinct.

But the two grounds were distinct and should have been treated as such. The failure to do so constituted legal error that this Court should correct by reversing the Board's conclusion regarding claims 3-6. *Palo Alto*, 122 F.4th at 1386; *see also Netflix*, 2023 WL 3115576 at *5; *see also Uniloc*, 2021 WL 5370480 at *9.

## III. The Board's Final Written Decisions Do Not Consider the Prior Art from a POSITA's Perspective.

The Supreme Court has held that the obviousness inquiry in an objective one, to be undertaken from the viewpoint of a person having ordinary skill in the relevant art. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007) (quoting *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17-18 (1966)). "In making the determination of 'obviousness,' it is important to remember that the criterion is measured not in terms of what would be obvious to a layman, but rather what would be obvious to one

'reasonably skilled in (the applicable) art.'" *Dann v. Johnston*, 425 U.S. 219, 229(1976) (quoting *Graham*, 383 U.S. at 37).

In its final written decisions, the Board did not consider the combinations from a POSITA's perspective. The Board ignored Samsung's expert's unrebutted testimony about what POSITAs would have known at the time of the alleged invention, and further ignored Resonant's expert's confirmation that integers would have been compared regardless of the Board's improper focus on Ueda. The Board's failure to recognize the viewpoint of POSITAs in finding claims 3-6 not unpatentable should result in reversal or vacatur. *KSR Int'l*, 550 U.S. at 406 (quoting 35 U.S.C. § 103).

## A. The Challenged Patents are Directed to Microprocessor Controlled Linear Actuators, Requiring Digitization of Analog Sensor Data.

The Challenged Patents are directed to linear vibration modules that are controlled by a microprocessor or CPU. *See* Appx217 (Abstract), Appx225 (CPU 602), Appx241 (6:11-12 ("the [linear resonant vibration module] 600 is controlled by a control program executed by the CPU microprocessor 602")). The Challenged Patents continue to explain,

> The **CPU** [602] receives input 630 from one or more electromechanical sensors 632 that generate a signal corresponding to the strength of vibration currently being produced by the linearly oscillating mass 634.

Appx241 (6:32-39).

The Board correctly noted that Figures 7A-C provide the control program that is executed by this CPU 602. Appx32 (quoting Appx241 (6:43-47)); Appx157. Within this control program, Figure 7B depicts the routine "monitor." Appx242 (7:32-33). In the first step of this "monitor" routine, step 730, the CPU "converts the sensor input to an integer representing the current vibrational force produced by the [linear resonant vibration module] and stores the integer value in the variable lvl1." *Id.* (7:33-36). This is the only provision in the Challenged Patents that discusses the concept of integer conversion, undoubtedly because the concept of converting analog sensor signals to digital signals for a CPU to process was well-known. *See Immunex Corp. v. Sandoz Inc.*, 964 F.3d 1049, 1064 (Fed. Cir. 2020).

Consistent with this disclosure, Dr. Wolfe explained how POSITAs would have understood that raw sensor data, such as the "sensor input" disclosed in the Challenged Patents, "must be converted to digital values to be processed and compared." Appx3233 (¶16). This is because a processor, such as CPU 602 in the Challenged Patents, would not be able to process raw, analog sensor data. *Id.* Instead, CPU 602 would require analog signals to be converted to digital signals for the processor to make use of the sensor input data. *Id.*; *see also Gottschalk v. Benson*, 409 U.S. 63, 65 (1972) ("A digital computer, as distinguished from an analog computer, operates on data expressed in digits . . . .").

### B. Fukumoto's and Ogusu-Fukumoto's Processors Would Have Also Required Digitization of Sensor Data.

As discussed in Sections I and II, both sets of grounds presented in Samsung's Petitions relied on a general-purpose computer, such as Fukumoto's CPU 113 or the processor enabling Ogusu's functionality, to perform the steps of the algorithm required in claim 3. This general purpose computer "would receive the output signals from sensors as taught in Ueda and adjust the operational control outputs according to those signals." Appx345, Appx341 (citing Appx891, [0165]-[0166], Appx903, [0347]; Appx664-665, ¶238), Appx386-387 ("the control component in each Ogusu-based combination would receive the output signals from Ueda's sensors and adjust the operational control outputs according to those signals." (citing Appx728-729, ¶340)); Appx1992, Appx1988, Appx2034. Thus, in the analysis of claim 3, Samsung's Petitions relied on signals from Ueda's sensors being received by a general-purpose computer.

Fukumoto's CPU 113 is similar to the Challenged Patents' CPU 602. *Compare* Appx241 (6:2-10) *with* Appx814 (24:32-40). Indeed, the Board found Fukumoto's CPU 113 teaches every aspect of the "control component" limitation in claim 1 of both patents. Appx60 ("Fukumoto's CPU 113 performs the function recited in limitation 1f"); Appx166-167. Just like CPU 602 in the Challenged Patents, Fukumoto's CPU 113 would require that any sensor signals, including output signals from Ueda's sensors, "must be converted to digital values to be processed and

compared." Appx3233 (¶16); *see also Gottschalk*, 409 U.S. at 65. The same would be true of any processor controlling the operation of Ogusu's pager.

### C. Digitization Requires Conversion to a Processor-Compatible Format: Integers.

Like the sensor signals received by CPU 602 in the Challenged Patents, Ueda's sensor signals received by Fukumoto's or Ogusu-Fukumoto's microprocessor-based control component are analog signals. *See* Appx3313 (78:17-23 (Resonant's expert testifying Ueda's Dop signal is analog because "it would be some sort of sensor output")). But before the microprocessor-based control component could act on the data from Ueda's sensors, the sensor output signal "must be converted to digital values to be processed and compared." Appx3233 (¶16).

In the **uncontested** testimony of Dr. Wolfe, he opined that "the only viable formats for digitally representing the signals from the output detector and the position detector would be either (1) an integer or (2) a fraction." Appx3234 (¶17). Dr. Wolfe also explained how POSITAs would have known that "in the context of converting analog to digital signals, **an integer would almost always be the preferred choice**." Appx3234 (¶17). In his deposition, in response to a question from Resonant's counsel regarding the digital representation of fractions, Dr. Wolfe replied,

> Normally, it would be **indistinguishable from an integer**, right? Normally, you would simply send a number – let's say 14 -- but the software would either interpret that as an ordinary integer, 14, or as some number of pieces of an integer; 14 halves, 14 quarters, 14 eighths, 14 sixteenths.

Appx3467-3468 (13:25-14:17).  Counsel for Resonant recognized that this example would be a "fixed point of binary representation of a fraction."  *Id.*  Dr. Wolfe also explained a floating-point fractional representation before confirming "the pre-selected fraction type, where it's indistinguishable from an integer . . ., **is almost universally used in these kinds of situations**."  Appx3469-3470 (15:5-16:11), Appx3512-3513.

Despite asking Dr. Wolfe about these opinions in his deposition, Resonant did not provide any evidence to rebut Dr. Wolfe's testimony in its Sur-Replies.  *See generally* Appx3441-3443; Appx3531-3533.  Instead of addressing his testimony, Resonant's Sur-Replies attempted to portray Dr. Wolfe's testimony as "unsupported attorney argument" and as "offer[ing] no reasoned argument for why a POSITA would have been motivated to implement Ueda's algorithm in a general-purpose processor."  Appx3442, Appx3443; Appx3532, Appx3533.[9]  Neither argument suggested Dr. Wolfe's testimony incorrectly captured the knowledge of POSITAs, or offered any rebuttal as to what POSITAs would have known at the time of the Challenged Patents.  Thus, the ***only evidence*** before the Board about what POSITAs would have understood in the context of analog to digital conversions necessary to

---

[9] For the reasons discussed in Section IV, Samsung did not change its position in its Reply and instead consistently relied on using a general-purpose processor, such as Fukumoto's CPU or Ogusu-Fukumoto's control component, from its petitions.

use Ueda's sensors with Fukumoto's CPU 113 or Ogusu's processor was Dr. Wolfe's testimony.

Despite having this testimony, the Board improperly disregarded it. Discussing Samsung's Reply arguments, the Board stated "even if an ordinarily skilled artisan would have understood that 'the raw input from the sensors of Ueda must be converted to digital values to be processed and compared,' . . . converting to a 'digital value' does not equate to converting to an 'integer.'" Appx92 (quoting Appx3210); Appx184 ("Petitioner merely states that the input must be converted to digital values, which as its declarant Dr. Wolfe points out, may be non-integers such as fractions"). This again ignores what Dr. Wolfe testified three times to: "in the context of converting analog to digital signals, an integer would **almost always be the preferred choice**" (Appx3234 (¶17)), the digital representation of fractions "would be indistinguishable from integers" (Appx3467-3468 (13:25-14:17)), and "the pre-selected fraction type, where it's indistinguishable from an integer . . . , **is almost universally used in these kinds of situations**" (Appx3469-3470 (15:5-16:11), Appx3512-3513). Even though a digital value *could be* a fraction, this does not make the preferred and near-universal use of integers nonobvious.

Dr. Wolfe's uncontested and unrebutted testimony explained how analog signals, such as signals from Ueda's output and position detectors, would have been converted into an integer to be used within a processor, such as Fukumoto's CPU 113 or Ogusu-Fukumoto's control component. The Board did not consider the evidence

59

presented in the Petitions from a POSITA's viewpoint, and instead rejected Dr.

Wolfe's testimony as "an entirely new theory of *prima facie* obviousness absent from

the petition." Appx183; Appx91-92. But Dr. Wolfe's testimony was not a new

theory. Dr. Wolfe's testimony reflected what POSITAs would have already known

and the viewpoint they would have had when considering the Fukumoto-Ueda or

Ogusu-Fukumoto-Ueda combinations presented in the Petitions. *KSR Int'l*, 550 U.S.

at 406; *Dann*, 425 U.S. at 229. The Board's failure to consider the prior art from the

POSITA's viewpoint requires the final decisions be remanded. *See Innovention Toys,*

*LLC v. MGA Ent., Inc.*, 637 F.3d 1314, 1323 (Fed. Cir. 2011) (remanding a decision

where "the district court failed to properly consider the scope and content of the

relevant prior art as well as the differences between that art and the claimed

invention").

## IV. The Board Wrongly Disregarded the Arguments in Samsung's Replies by Incorrectly Finding that Samsung's Arguments Made in Response to the POR Were "New".

### A. Reply Arguments Responsive to Issues Raised in the Patent Owner Response are Properly Considered.

This Court has regularly held that a reply brief may present arguments that are

responsive to arguments raised "in the corresponding opposition, patent owner

preliminary response, or patent owner response." *Apple Inc. v. Andrea Elecs. Corp.*, 949

F.3d 697, 705 (Fed. Cir. 2020) (quoting 37 C.F.R. § 42.23(b)). "[T]he petitioner in an

inter partes review proceeding may introduce new evidence after the petition stage if

the evidence is a legitimate reply to evidence introduced by the patent owner." *Id.* at 706-707 (quoting *Anacor Pharm., Inc. v. Iancu*, 889 F.3d 1372, 1380-81 (Fed. Cir. 2018)); *see also Genzyme Therapeutic Prods. Ltd. P'ship v. Biomarin Pharm. Inc.*, 825 F.3d 1360, 1366 (Fed. Cir. 2016) ("the introduction of new evidence in the course of the [IPR] trial is to be expected" and "the introduction of such evidence is perfectly permissible under the APA" where "the opposing party is given notice of the evidence and an opportunity to respond"). "Notably, neither the Board nor [Resonant] addressed whether [Samsung's] reply arguments are responsive to those arguments raised in [Resonant's] Patent Owner response." *Andrea Elecs.*, 949 F.3d at 706 n.1.

As discussed throughout this brief, Samsung's Petitions articulated the combination of Fukumoto's control component—i.e., its CPU 113—with Ueda's output signals and feedback control. Appx341 (citing Appx891, [0165]-[0166], Appx903, [0347]; Appx664-665, ¶238), Appx345; Appx1988 (citing Appx2182 (¶234)), Appx1992. Likewise, the Petitions clearly stated that "the control component in each Ogusu-based combination would receive the output signals from Ueda's sensors and adjust the operational control outputs according to those signals." Appx387; Appx2034. Samsung has contended that these combinations render obvious claims 3-6 of the Challenged Patents since it filed its Petitions.

Instead of addressing the combination of Fukumoto or Ogusu-Fukumoto with Ueda, Resonant's PORs focused exclusively on Ueda's failure to disclose integers. Appx2694-2695, Appx2724-2725; 3124-3125, Appx3154-3155. While Resonant's

sentiment was true, Ueda does not expressly disclose integers, it missed the mark in terms of what the Petitions provided.

Samsung's Replies addressed this unforeseen development, namely, that Resonant would focus exclusively on Ueda instead of the combinations actually presented: Ueda in combination with Fukumoto or Ogusu-Fukumoto. Appx3209-3210 (noting Resonant's declarant does not "acknowledge that the asserted grounds for unpatentability are the combination of Ueda with Fukumoto and Ogusu-Fukumoto.)"; Appx3411-3412 (same). Notably, in instituting review, the Board agreed that a skilled artisan "would have had a reason to combine Ueda's teachings with Fukumoto's teachings in the way Petitioner proposes, i.e., to provide 'enhanced feedback control.'" Appx2567-2568 (citing AppxAppx341); Appx2608-2609. Samsung's Replies merely addressed Resonant's departure from the combined teachings of Fukumoto and Ueda presented in the Petitions and recognized at institution. This is precisely the type of rebuttal expressly allowed by this Court. *Andrea Elecs.*, 949 F.3d at 705.

In *Andrea Electronics*, Apple argued that a prior art reference, Martin, disclosed various limitations and evaluated the reference in an example assuming no sub-windows. *Id.* at 703. The patent owner argued in its patent owner's response that Martin did not disclose one of the claimed limitations based on an expert declaration applying Martin in the context of multiple sub-windows. *Id.* With its reply, Apple submitted a supplemental expert declaration "to support its analysis of the Martin

algorithm in the context of multiple sub-windows." *Id.* at 704. "Andrea subsequently deposed Apple's expert witness for a second time but did not request authorization to file a sur-reply or move to strike any portion of Apple's reply briefing." *Id.* This Court found Apple's reply arguments "are not the types of arguments that [this Court] ha[s] previously found to raise a 'new theory of unpatentability'" and reversed so the Board could consider Apple's properly submitted reply arguments. *Id.* at 706-07.

The instant case has a near identical set of facts. Samsung argued that prior art combinations rendered claims 3-6 obvious based on Ueda's sensors providing signals to Fukumoto's CPU 113 or Ogusu-Fukumoto's control component. Appx341; Appx1988. Samsung's Petitions were based on POSITAs being familiar with analog to digital conversion—a concept which is not claimed and barely discussed in the Challenged Patents—and recognizing that such a conversion would be necessary for signals from Ueda's sensors to be processed by Fukumoto's CPU 113 or Ogusu-Fukumoto's processor. Appx3233 (¶16). Resonant filed Patent Owner Responses arguing that Ueda did not render obvious claim 3 based on a failure to disclose integers. With its Replies, Samsung submitted a supplemental expert declaration to support its analysis of Ueda's algorithm in the context of the prior art combinations presented in the Petitions. Resonant then subsequently deposed Samsung's expert for a second time, probed Dr. Wolfe on his supplemental declaration, and filed Sur-Replies where it could have (but did not) sought to rebut Samsung's arguments and

Dr. Wolfe's testimony. Resonant did not move to strike any portion of Samsung's Replies or to exclude any evidence submitted therewith.

The same outcome from the *Andrea Electronics* case should apply to this case; the Court should find "the Board's decision to ignore [Samsung]'s responsive arguments to issued raised by [Resonant] in its Patent Owner Response is not supported as a matter of law" and constitutes an abuse of discretion. *Andrea Elecs.*, 949 F.3d at 707. Like Apple in *Andrea Electronics*, "[Samsung]'s legal ground did not change in its reply—its reply still asserted that claims [3-6] would have been obvious over" the same prior art references used in the same combinations. *Andrea Elecs.*, 949 F.3d at 706.

**B.  Even if Samsung's Arguments Were Not "Responsive," They Were a Permissible Expansion on the Same Arguments Made in the Petitions.**

A reply brief also may "expand[] the same argument made in [the] Petition." *Ericsson*, 901 F.3d at 1381. An expansion of the same invalidity arguments, in response to the patent owner's response, is very different from "identify[ing] a previously unidentified piece of prior art to make a meaningfully distinct contention." *Id.* Even if the Court finds Samsung's Reply arguments were not responsive to issues raised in Resonant's Patent Owner Responses, namely singling out Ueda instead of addressing the combinations presented, Samsung's arguments in its Replies still fall squarely within this expressly permitted expansion of previously submitted invalidity arguments. *Id.*

Indeed, this case, like *Ericsson* and *Andrea Elecs.*, is distinguishable from those where the Court has upheld rejections of reply arguments. Samsung's Replies do not "rel[y] on previously unidentified portions of a prior art reference" or "cit[e] a number of non-patent literature references which were not relied upon to support unpatentability in the Petition." *Id.* at 1380-81 (citing *Ariosa Diagnostics*, 805 F.3d at 1364, 1367-68 and *Intelligent Bio-Systems, Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1366 (Fed. Cir. 2016); *Andrea Elecs.*, 949 F.3d at 706 (same). Samsung's Replies did not present a new rationale for why POSITAs would have been motivated to combine Ueda with the other references because these combinations, and the motivation to make these combinations, was articulated clearly in the Petitions. *Ericsson*, 901 F.3d at 1381 (citing *Intelligent Bio-Systems*, 821 F.3d at 1370).

Samsung's Replies properly presented arguments responsive to Resonant PORs or expanded on arguments made in the Petitions. The Board's disregard of these arguments was an abuse of discretion that requires, at a minimum, vacatur and remand to consider Samsung's properly presented arguments and evidence. *Andrea Elecs.*, 949 F.3d at 705; *Corephotonics*, 84 F.4th at 1003 ("In evaluating whether the petitioner has met its burden, the Board must consider all evidence and argument properly submitted in connection with the petitioner's reply, as well as all that is submitted in connection with the petition." (citation omitted)); *see also Rembrandt Diagnostics, LP v. Alere, Inc.*, 76 F.4th 1376, 1385 (Fed. Cir. 2023).

V.    **The Board Wrongly Found No Motivation to Combine Fukumoto's Figures 3 and 83 Even Though Fukumoto Expressly Provides It and the Combination of These Figures Renders Claim 9 Obvious.**

The Board's FWDs conclude "Petitioner [] fails to provide 'an adequate motivation to modify' Figure 3's oscillatory actuator in view of Figure 83's oscillatory actuator to yield claim 9's subject matter." Appx76-77; Appx177. The Board addressed each of the motivations presented by Samsung (Appx68-71; Appx172-173), but disagreed with Samsung regarding Fukumoto's explicit suggestion to modify Figure 3. Appx75; Appx176-177. The Board's conclusion was not supported by substantial evidence because Fukumoto expressly contemplates the combination of these two Figures. Appx3207; Appx3409.

Fukumoto explains "[i]n the first to twelfth embodiments, the vibration generator is not limited to a linear oscillatory actuator . . . ." Appx826-827 (48:54-49:9). Other vibration generators such as "a piezoelectric element" may be used. *Id.* "Further, in the embodiments other than the second embodiment, the explanation was made of a linear oscillatory actuator using a permanent magnet as a moveable weight." *Id.* But Fukumoto provides various other alternatives, such as fixing a coil in the moveable weight. *Id.* Another such alternative is to use "a so-called electrostatic type oscillatory actuator using electrostatic force." *Id.* (49:10-14). This alternative, depicted in Figures 82 and 83, applied to all embodiments, including Figure 3. *Id.* (48:58-49:9).

The Board disagreed, stating (1) this "disclosure says nothing about modifying springs in a linear oscillatory actuator" and (2) no comparison can be made between Figure 83 and Figure 3, because they have no explicit relationship. Appx75; Appx176. Regarding (2), the Board claimed, "Figure 3's oscillatory actuator generates vibrations using electromagnetic force produced by a coil instead of electrostatic force produced by counter electrodes." Appx75; Appx176. But this was not correct. Fukumoto explained that the electrostatic variation was one possible variation of the first embodiment, i.e., the embodiment shown in Figure 3. Appx826-827 (48:58-49:14).

This fact shows how the Board's conclusion on claim 9 is not supported by substantial evidence. Instead, the Board supplanted Fukumoto's express disclosure with its own reasoning contradicting such disclosure. IPR grounds are based on prior art references read from the perspective of POSITAs, not the Board's flawed read of the underlying references. The Board's decision finding claim 9 of both patents not unpatentable should be vacated.

## VI. The Board Improperly Required a Showing of the "Benefit" Gained by the Combination of Fukumoto, Dong, and Ogusu as a Prerequisite for the Motivation to Combine These References and Find Claims 14 and 19 Unpatentable.

The Board's FWDs heavily suggest that it required Samsung prove the benefits of combining Fukumoto, Dong, and Ueda to find claims 14 of both patents and claim 19 of the '830 patent obvious. Appx118 ("Dong's placement of a tungsten counterweight relative to a permanent magnet and a coil . . . does not indicate that

Dong teaches any **_benefit_** from this arrangement"), Appx120 ("the issue is whether an ordinarily skilled artisan, aware of Dong's paramagnetic counterweight, would have considered it **_beneficial_** to include that counterweight in Fukumoto's oscillatory actuator."); Appx198-200. But "[a] prior art reference does not need to explicitly articulate or express why its teachings are beneficial so long as its teachings are beneficial and a [person of ordinary skill] would recognize that their application was beneficial." *ZyXEL Comm'ns Corp. v. UNM Rainforest Innovations*, 107 F.4th 1368, 1380 (Fed. Cir. 2024).

Even if required, Resonant's declarant expressed an understanding that Dong's paramagnetic counterweight would have had various useful purposes in magnetic circuits, such as Fukumoto's linear actuator. Appx3197 (citing Appx3337-3338, 102:20-103:5); Appx3399 (same). The agreement and acknowledgement that the placement of Dong's paramagnetic counterweight would beneficially improve vibration motors, such as Fukumoto's linear vibration motor, is reason enough to find a motivation to combine these references exists. *Intel Corp.*, 61 F.4th at 1380 ("if there's a known technique to address a known problem using prior art elements according to their established functions, then there is a motivation to combine." (quotation omitted)).

The Board's conclusion that no motivation was presented was, therefore, wrong. Appx117, Appx120-121; Appx196. The Court should vacate the Board's

ruling that claim 14 of both patents and claim 19 of the '830 patent are not

unpatentable.

## CONCLUSION AND STATEMENT OF RELIEF SOUGHT

This Court should reverse or, at minimum, vacate the Boards determinations

that claims 3-6, 9, and 14 of the '081 patent and claims 3-6, 9, 14, and 19 of the '830

patent are not unpatentable.


Dated: June 27, 2025

/s/ *Jeffrey A. Miller*
Jeffrey A. Miller
ARNOLD & PORTER
 KAYE SCHOLER LLP
Five Palo Alto Square, Suite 500
3000 El Camino Real
Palo Alto, CA 94306
(650) 319-4500

Jin-Suk Park
Ali R. Sharifahmadian
ARNOLD & PORTER
 KAYE SCHOLER LLP
601 Massachusetts Avenue, NW
Washington, DC 20001
(202) 942-5000

*Attorneys for Appellants*
*Samsung Electronics Co., Ltd. and*
*Samsung Electronics America, Inc.*

## CERTIFICATE OF COMPLIANCE

This Brief complies with the type-volume limitation of Federal Circuit Rule 28.1(b) and 32(b).  This Brief contains 13,915 words, excluding those portions of the brief exempted by Federal Circuit Rule 32(b)(2).  This Brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 14-point Garamond font.

*/s/ Jeffrey A. Miller*
Jeffrey A. Miller

# ADDENDUM

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

SAMSUNG ELECTRONICS CO., LTD. and
SAMSUNG ELECTRONICS AMERICA, INC.,
Petitioner,

v.

RESONANT SYSTEMS, INC.,
Patent Owner.

———————

IPR2023-00992
Patent 9,369,081 B2

———————

Before JAMES J. MAYBERRY, STEVEN M. AMUNDSON, and
MICHAEL T. CYGAN, *Administrative Patent Judges*.

AMUNDSON, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining Some Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

# I. INTRODUCTION

Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc. (collectively "Petitioner") filed a Petition requesting an *inter partes* review of claims 1–9, 11, and 14–17 in U.S. Patent No. 9,369,081 B2 (Ex. 1001, "the '081 patent") under 35 U.S.C. §§ 311–319. Paper 3 ("Pet."). Resonant Systems, Inc. ("Patent Owner") filed a Preliminary Response. Paper 10. Further, after receiving Board authorization to address issues concerning discretionary denial, Petitioner filed a Preliminary Reply, and Patent Owner filed a Preliminary Sur-reply. *See* Paper 12; Paper 13; Paper 15.

In the Institution Decision, we instituted review based on all challenged claims and all challenges included in the Petition. Paper 16 ("Inst. Dec.").

We have jurisdiction under 35 U.S.C. § 6. We issue this Final Written Decision under 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73. For the reasons explained below, Petitioner has shown by a preponderance of the evidence that claims 1, 2, 7, 8, 11, and 17 are unpatentable but has not shown by a preponderance of the evidence that claims 3–6, 9, and 14 are unpatentable. *See* 35 U.S.C. § 316(e) (2018). We do not address the patentability of claims 15 and 16 because Patent Owner statutorily disclaimed claims 15 and 16 during this proceeding. *See* Paper 27, 1; Ex. 2015.

## II. BACKGROUND

### A. Procedural History

After we instituted review, Patent Owner filed a Response to the Petition. Paper 26 ("Resp."). Petitioner filed a Reply to Patent Owner's

Response.  Paper 37 ("Reply").  Patent Owner filed a Sur-reply to
Petitioner's Reply.  Paper 40 ("Sur-reply").

On October 10, 2024, we held an oral hearing, and the record includes
the hearing transcript.  Paper 46 ("Tr.").

### B.  Real Parties in Interest

Petitioner identifies the following as the real parties in interest:
Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc.
Pet. 95.  Patent Owner identifies itself as the sole real party in interest.
Paper 5, 1.  The parties do not raise any issue about real parties in interest.

### C.  Related Matters

Petitioner and Patent Owner identify the following civil actions as
related matters involving the '081 patent:

- *Resonant Systems, Inc. v. Samsung Electronics Co., Ltd.
  et al.*, No. 2:22-cv-00423 (E.D. Tex. filed Oct. 26, 2022)
  (the "Samsung litigation"); and

- *Resonant Systems, Inc. v. Sony Group Corp. (Japan)
  et al.*, No. 2:22-cv-00424 (E.D. Tex. filed Oct. 26, 2022)
  (the "Sony litigation").

Pet. 95; Paper 5, 1; Paper 22, 1; Paper 28, 1.

Petitioner and Patent Owner identify the following Office proceeding
as a related matter involving the '081 patent: *Sony Interactive Entertainment
Inc. et al. v. Resonant Systems, Inc.*, IPR2024-00568 (PTAB filed Feb. 16,
2024).  Paper 22, 1; Paper 28, 1.

### D.  The '081 Patent (Exhibit 1001)

The '081 patent, titled "Linear Vibration Modules and Linear-
Resonant Vibration Modules," issued on June 14, 2016, from an application
filed on August 26, 2014, as a continuation of an application filed on

January 6, 2012. Ex. 1001, codes (22), (45), (54), (63). The 2012 application is a continuation-in-part of an application filed on May 18, 2010. *Id.* at code (63). The 2010 application claims the benefit of priority to a provisional application filed on May 18, 2009. *Id.* at 1:7–11; *see id.* at code (60).

The '081 patent states that the disclosure relates to "vibration-generating devices and, in particular, to vibration modules that can be incorporated into a wide variety of different types of electromechanical devices and systems to produce vibrations of selected amplitudes and frequencies over a wide range of amplitude/frequency space." Ex. 1001, 1:15–20; *see id.* at 3:7–21, 4:13–17, code (57). The patent discloses various embodiments of linear vibration modules (LVMs), including various types of linear-resonant vibration modules (LRVMs). *See id.* at 4:13–17, code (57). LRVMs employ feedback control to "maintain the vibrational frequency" at or near the module's resonant frequency. *Id.* at 3:13–17, code (57). LVMs and LRVMs "are linear in the sense that the vibrational forces are produced by a linear oscillation of a weight or component within the LVM or LRVM" in contrast to the vibrational forces produced by "currently employed unbalanced electric motors." *Id.* at 4:17–23.

The '081 patent describes problems with "currently employed unbalanced electric motors" used to produce vibrational forces. *See* Ex. 1001, 2:12–63. As an example, "unbalancing the shaft of an electric motor not only produces useful vibrations that can be harnessed for various applications, but also produces destructive, unbalanced forces within the motor that contribute to rapid deterioration of motor parts." *Id.* at 2:16–20. As another example, unbalanced electric motors "are relatively inefficient at

**Appx0004**

producing vibrational motion." *Id.* at 2:32–33. Hence, "many hand-held devices that employ unbalanced electric motors for generating vibrations quickly consume batteries during use." *Id.* at 2:37–39. As yet another example, "only a very limited portion of the total vibrational force/frequency space is accessible to unbalanced electric motors" because the "bulk of energy consumed by an unbalanced electric motor is used to spin the shaft and unbalanced weight and to overcome frictional and inertial forces within the motor." *Id.* at 2:47–51, 2:59–62.

To overcome problems with "currently employed unbalanced electric motors," the '081 patent endeavors to provide "more efficient and capable vibration-generating units for incorporation into many consumer appliances, devices, and systems." Ex. 1001, 2:64–3:3, 4:23–26; *see id.* at 3:7–21, code (57). Among other things, an "oscillating linear motion" in LVMs and LRVMs "does not produce destructive forces that quickly degrade and wear out an unbalanced electric motor." *Id.* at 4:26–28. Moreover, LVMs and LRVMs may "produce vibrational amplitude/frequency combinations throughout a large region of amplitude/frequency space." *Id.* at 3:17–21, code (57); *see id.* at 5:35–42.

The '081 patent's Figure 4A (reproduced below) depicts an embodiment of an LRVM:



FIG. 4A

Figure 4A illustrates LRVM 400 including the following components:

- cylindrical housing or tube 402 forming cylindrical chamber 406;

- cylindrical weight (magnet) 404 that moves linearly within cylindrical chamber 406 and has positive polarity 410 (the "+" sign") on its right end and negative polarity 412 (the "–" sign) on its left end;

- disk-like magnet 414 having negative polarity 419 (the "–" sign) and capping the left end of cylindrical chamber 406;

- disk-like magnet 416 having positive polarity 418 (the "+" sign") and capping the right end of cylindrical chamber 406; and

- a coil of conductive wire 420 encircling cylindrical housing or tube 402 at "approximately the mid-point of the cylindrical housing."

*See* Ex. 1001, 4:44–59, 5:2–4, Fig. 4A.

Disk-like magnets 414 and 416 "are magnetically oriented opposite from the magnetic orientation of" weight (magnet) 404 "so that when the

weight moves to either the extreme left or extreme right sides of the cylindrical chamber, the weight is repelled by one of the disk-like magnets at the left or right ends of the cylindrical chamber." Ex. 1001, 4:59–65. Depending on the direction of an electric current applied to the coil of conductive wire, a magnetic force drives weight (magnet) 404 to the left toward disk-like magnet 414 or to the right toward disk-like magnet 416. *See id.* at 5:5–27, Figs. 4B–4G.

By a combination of (1) "a magnetic field with rapidly reversing polarity, generated by alternating the direction of current applied to the coil," and (2) "the repulsive forces between the weight magnet and the disk-like magnets at each end of the hollow, cylindrical chamber," the weight magnet "linearly oscillates back and forth within the cylindrical housing 402, imparting a directional force at the ends of the cylindrical chamber with each reversal in direction." Ex. 1001, 5:27–34.

The '081 patent's Figure 6 (reproduced below) depicts a block diagram of an LRVM having internal components as depicted in Figure 4A and various electrical components:



FIG. 6

Figure 6 illustrates LRVM 600 including the following components:

- microprocessor (CPU) 602 executing a control program;

- memory chip 604 storing, among other things, the control program;

- user controls 606 that may include "any of various dials, pushbuttons, switches, or other electromechanical-control devices," such as "a dial to select a strength of vibration, which corresponds to the current applied to the coil,"

8

> "a switch to select one of various different operational
> modes," and "a power button";
>
> • power supply 612;
>
> • coil 626;
>
> • weight (magnet) 634;
>
> • H-bridge switch 620 that receives "a control-signal
> input" from microprocessor (CPU) 602 and controls
> the current supplied to coil 626; and
>
> • "one or more electromechanical sensors 632 that generate
> a signal corresponding to the strength of vibration
> currently being produced by the linearly oscillating"
> weight (magnet) 634, such as "accelerometers,
> piezoelectric devices, pressure-sensing devices, or other
> types of sensors that can generate signals corresponding
> to the strength of desired vibrational force."

*See* Ex. 1001, 6:11–42, Fig. 6.

The H-bridge switch "change[s] the direction of current applied to the coil that drives linear oscillation within" the LRVM. Ex. 1001, 5:45–49; *see id.* at 3:36–40, Figs. 5A–5B. The H-bridge switch "is but one example of various different types of electrical and electromechanical switches that can be used to rapidly alternate the direction of current within the coil of an LRVM." *Id.* at 5:61–65.

### E. The Challenged Claims

Petitioner challenges independent apparatus claim 1 and claims 2–9, 11, and 14–17 that depend directly or indirectly from claim 1. Pet. 1, 3–4, 9–93.

Claim 1 exemplifies the challenged claims and reads as follows (with bracketed letters added for reference purposes):[1]

> 1. [pre] A linear vibration module comprising:
>
> [a] a housing;
>
> [b] a moveable component;
>
> [c] a power supply;
>
> [d] user-input features;
>
> [e] a driving component that drives the moveable component in each of two opposite directions within the housing; and
>
> [f] a control component that controls supply of power from the power supply to the driving component to cause the moveable component to oscillate at a frequency and an amplitude specified by user input received from the user-input features.

Ex. 1001, 15:36–48.

### F.  The Asserted References

For its challenges, Petitioner relies on the following references:

| Name | Reference | Exhibit |
|---|---|---|
| Fukumoto | US 7,292,227 B2, issued November 6, 2007 (based on an application filed August 3, 2001) | 1005 |
| Grant | US 2006/0284849 A1, published December 21, 2006 (based on an application filed December 8, 2003) | 1006 |
| Barton | US 2006/0248183 A1, published November 2, 2006 (based on an application filed April 28, 2005) | 1007 |
| Ueda | US 2004/0169480 A1, published September 2, 2004 (based on an application filed July 15, 2003) | 1008 |

---

[1] We use the same reference letters that Petitioner uses to identify the claim language. See Pet. vii (Listing of Challenged Claims).

| Name | Reference | Exhibit |
|---|---|---|
| Erixon | US 2008/0174187 A1, published July 24, 2008 (based on an application filed March 15, 2006) | 1009 |
| Fuller | US 2008/0001484 A1, published January 3, 2008 (based on an application filed July 3, 2006) | 1010 |
| Dong | CN 101488697A, published July 22, 2009 (based on an application filed February 20, 2009) | 1011 |
| Saiki | US 7,006,641 B1, issued February 28, 2006 (based on an application filed April 12, 2000) | 1013 |
| Masahiko | US 8,917,486 B2, issued December 23, 2014 (based on an application filed July 26, 2011) | 1014 |
| Ogusu | JP H8-196053A, published July 30, 1996 (based on an application filed January 12, 1995) | 1015 |

Pet. 2–4, 9–93.

Petitioner asserts that:

(1)     Dong qualifies as prior art under § 102(a);

(2)     Fukumoto, Grant, Barton, Ueda, Fuller, Saiki, and Ogusu qualify as prior art under § 102(b); and

(3)     Erixon and Masahiko qualify as prior art under § 102(e).

Pet. 2; *see* 35 U.S.C. § 102(a), (b), (e) (2006).[2]

Patent Owner does not dispute that each reference qualifies as prior art.  *See, e.g.*, Resp. 18–66; Sur-reply 7–21.

---

[2] The Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29, 125 Stat. 284 (2011), amended 35 U.S.C. § 102 and § 103 effective March 16, 2013.  Because the effective filing date of the challenged claims predates the AIA's amendments to § 102 and § 103, this decision refers to the pre-AIA versions of § 102 and § 103.  But our patentability analysis would not change if the current versions of § 102 and § 103 applied.

*G. The Asserted Challenges to Patentability*

Petitioner asserts the following challenges to patentability:

| Claim(s) Challenged | 35 U.S.C. § | Reference(s)/Basis |
|:---:|:---:|:---:|
| 1–3, 7–9, 15, 17 | 103(a) | Fukumoto |
| 1–3, 7–9, 15, 17 | 103(a) | Fukumoto, Grant |
| 1–3, 7–9, 15, 17 | 103(a) | Fukumoto, Barton |
| 3–6 | 103(a) | Fukumoto, Ueda |
| 3–6 | 103(a) | Fukumoto, Grant, Ueda |
| 3–6 | 103(a) | Fukumoto, Barton, Ueda |
| 7, 8 | 103(a) | Fukumoto, Erixon |
| 7, 8 | 103(a) | Fukumoto, Grant, Erixon |
| 7, 8 | 103(a) | Fukumoto, Barton, Erixon |
| 8 | 103(a) | Fukumoto, Fuller |
| 8 | 103(a) | Fukumoto, Grant, Fuller |
| 8 | 103(a) | Fukumoto, Barton, Fuller |
| 14 | 103(a) | Fukumoto, Dong, Ogusu |
| 14 | 103(a) | Fukumoto, Grant, Dong, Ogusu |
| 14 | 103(a) | Fukumoto, Barton, Dong, Ogusu |
| 15 | 103(a) | Fukumoto, Saiki |
| 15 | 103(a) | Fukumoto, Grant, Saiki |
| 15 | 103(a) | Fukumoto, Barton, Saiki |
| 16 | 103(a) | Fukumoto, Saiki, Masahiko |
| 16 | 103(a) | Fukumoto, Grant, Saiki, Masahiko |
| 16 | 103(a) | Fukumoto, Barton, Saiki, Masahiko |
| 1, 2, 7, 11, 15, 17 | 103(a) | Ogusu, Fukumoto |

Appx0012

| Claim(s) Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 1, 2, 7, 11, 15, 17 | 103(a) | Ogusu, Fukumoto, Grant |
| 1, 2, 7, 11, 15, 17 | 103(a) | Ogusu, Fukumoto, Barton |
| 3–6 | 103(a) | Ogusu, Fukumoto, Ueda |
| 3–6 | 103(a) | Ogusu, Fukumoto, Grant, Ueda |
| 3–6 | 103(a) | Ogusu, Fukumoto, Barton, Ueda |
| 7, 8 | 103(a) | Ogusu, Fukumoto, Erixon |
| 7, 8 | 103(a) | Ogusu, Fukumoto, Grant, Erixon |
| 7, 8 | 103(a) | Ogusu, Fukumoto, Barton, Erixon |

Pet. 3–4, 9–93.

*H. Testimonial Evidence*

To support its challenges, Petitioner relies on the Declaration of Andrew Wolfe, Ph.D. (Exhibit 1003) and the Supplemental Declaration of Andrew Wolfe, Ph.D. (Exhibit 1047). Dr. Wolfe states, "I received the Ph.D. degree in Computer Engineering from Carnegie Mellon University" in 1992 and "have taught at some of the world's leading institutions in the fields of processor technology, computer systems, consumer electronics, software, design tools, data security, cryptography and intellectual property issues." Ex. 1003 ¶¶ 7–8. Dr. Wolfe also states, "I have been retained by [Petitioner] as an independent expert consultant in this proceeding" and "have been asked to consider whether certain references disclose or suggest the features recited in the claims of" the '081 patent. *Id.* ¶¶ 1, 4.

To support its positions, Patent Owner relies on the Declaration of Keith W. Goossen, Ph.D. (Exhibit 2008). Dr. Goossen states, "I received my Ph.D. from Princeton University in 1988," "am a Senior Member of the

Institute of Electrical and Electronic Engineers (IEEE)," and "am the inventor (or co-inventor) on 87 issued U.S. patents." Ex. 2008 ¶¶ 10–11, 13. Dr. Goossen also states, "I have been retained as a technical expert by [Patent Owner] in this proceeding." *Id.* ¶ 1.

Additionally, Petitioner submits Dr. Goossen's deposition testimony, and Patent Owner submits Dr. Wolfe's deposition testimony. *See* Ex. 1048 (July 3, 2024, Goossen Dep. Tr.); Ex. 2010 (Mar. 28, 2024, Wolfe Dep. Tr.); Ex. 2017 (Aug. 21, 2024, Wolfe Dep. Tr.).

## I. Burden

In an *inter partes* review, a petitioner bears the burden of persuasion to prove "unpatentability by a preponderance of the evidence." *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015) (quoting 35 U.S.C. § 316(e)); *see* 37 C.F.R. § 42.1(d) (2024).

## III. PATENTABILITY ANALYSIS

### A. Legal Principles: Obviousness

A patent may not be obtained "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103(a) (2006). An obviousness analysis involves underlying factual inquiries including (1) the scope and content of the prior art; (2) differences between the claimed invention and the prior art; (3) the level of ordinary skill in the art; and (4) where in evidence, objective indicia of nonobviousness, such as commercial success, long-felt but unsolved needs,

and failure of others.[3] *Graham v. John Deere Co.*, 383 U.S. 1, 17–18, 35–36 (1966); *Apple Inc. v. Samsung Elecs. Co.*, 839 F.3d 1034, 1047–48 (Fed. Cir. 2016) (en banc). When evaluating a combination of references, an obviousness analysis should address "whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007).

We analyze the obviousness issues according to these principles.

### B. Level of Ordinary Skill in the Art

Factors pertinent to determining the level of ordinary skill in the art include (1) the educational level of the inventor; (2) the type of problems encountered in the art; (3) prior-art solutions to those problems; (4) the rapidity with which innovations are made; (5) the sophistication of the technology; and (6) the educational level of workers active in the field. *Envtl. Designs, Ltd. v. Union Oil Co.*, 713 F.2d 693, 696–97 (Fed. Cir. 1983). Not all factors may exist in every case, and one or more of these or other factors may predominate in a particular case. *Id.* These factors are not exhaustive, but merely a guide to determining the level of ordinary skill in the art. *Daiichi Sankyo Co. v. Apotex, Inc.*, 501 F.3d 1254, 1256 (Fed. Cir. 2007). Moreover, the prior art itself may reflect an appropriate skill level. *Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001).

Petitioner asserts that a person of ordinary skill in the art at the time of the alleged invention "would have had a bachelor's degree in electrical engineering, mechanical engineering, computer science, or a similar field and two years of experience related to electronic consumer product design."

---

[3] The parties do not provide evidence or argument regarding objective indicia of nonobviousness. *See, e.g.*, Pet. 9–93; Resp. 18–66.

Pet. 6. Petitioner also asserts that an ordinarily skilled artisan "could have also obtained similar knowledge and experience through other means." *Id.* Dr. Wolfe's testimony supports Petitioner's assertions. *See* Ex. 1003 ¶ 30.

Patent Owner asserts that a person of ordinary skill in the art at the time of the alleged invention "would have had (1) a bachelor's degree in electrical engineering, mechanical engineering, or a comparable field of study, and (2) at least two years of professional experience with electro-mechanical control systems, or other similarly relevant industry experience." Resp. 3. Patent Owner also asserts that "[a]dditional relevant industry experience may compensate for lack of formal education or vice versa." *Id.* Dr. Goossen's testimony supports Patent Owner's assertions. *See* Ex. 2008 ¶ 16.

Regarding an ordinarily skilled artisan's educational level, Petitioner and Patent Owner agree on a "bachelor's degree" and the general field of study. *See* Pet. 6; Resp. 3. Regarding an ordinarily skilled artisan's experience level, Patent Owner's description requires more experience ("at least two years") than Petitioner's description ("two years"). *See* Pet. 6; Resp. 3. Regarding the area of experience, Patent Owner's description specifies a somewhat different area ("experience with electro-mechanical control systems") than Petitioner's description ("experience related to electronic consumer product design"). *See* Pet. 6; Resp. 3.

We adopt Petitioner's description of an ordinarily skilled artisan because it comports with the technology and claims in the '081 patent as well as the asserted references. *See, e.g.*, Ex. 1001, 1:15–3:21, 15:36–17:27; *infra* §§ III.D.1, III.F.1, III.H.1, III.I.1–III.I.2. We note that our analysis would not change if we adopted Patent Owner's description of an ordinarily

skilled artisan, which requires more experience ("at least two years") than Petitioner's description ("two years"). *See* Pet. 6; Resp. 3. Someone with a higher skill level will understand the technology at least as well as someone with a lower skill level. *See Innovention Toys, LLC v. MGA Ent., Inc.*, 637 F.3d 1314, 1323 (Fed. Cir. 2011); *Tokai Corp. v. Easton Enters., Inc.*, 632 F.3d 1358, 1369 (Fed. Cir. 2011). Hence, "it is generally easier to establish obviousness under a higher level of ordinary skill." *Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1366 (Fed. Cir. 2012).

## C. *Claim Construction*

### 1. BACKGROUND

We construe claim terms "using the same claim construction standard" that district courts use to construe claim terms in civil actions under 35 U.S.C. § 282(b). *See* 37 C.F.R. § 42.100(b). Under that standard, claim terms "are given their ordinary and customary meaning, which is the meaning the term would have to a person of ordinary skill in the art at the time of the invention." *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 904 F.3d 965, 971 (Fed. Cir. 2018) (citing *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (en banc)). The meaning of claim terms may be determined by "look[ing] principally to the intrinsic evidence of record, examining the claim language itself, the written description, and the prosecution history, if in evidence." *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 469 F.3d 1005, 1014 (Fed. Cir. 2006) (citing *Phillips*, 415 F.3d at 1312–17).

2. MEANS-PLUS-FUNCTION CLAIMING

The patent statute provides that "[a]n element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." 35 U.S.C. § 112 ¶ 6 (2006). The absence of the word "means" in a claim limitation creates a rebuttable presumption that § 112's means-plus-function provision does not apply. *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1348 (Fed. Cir. 2015) (en banc in relevant part).

When a claim limitation lacks the word "means," a party may rebut the presumption that § 112's means-plus-function provision does not apply by demonstrating that "the claim term fails to 'recite[] sufficiently definite structure' or else recites 'function without reciting sufficient structure for performing that function.'" *Williamson*, 792 F.3d at 1348 (alteration by the court) (quoting *Watts v. XL Sys., Inc.*, 232 F.3d 877, 880 (Fed. Cir. 2000)).

Construing a means-plus-function limitation involves two steps: first, identify the claimed function or functions; and second, determine what structure, if any, disclosed in the patent's specification corresponds to the claimed function or functions. *Williamson*, 792 F.3d at 1351; *see Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc.*, 248 F.3d 1303, 1311 (Fed. Cir. 2001). For the second step, a person of ordinary skill in the art must "recognize the structure in the specification and associate it with the corresponding function in the claim." *All-Voice Computing PLC v. Nuance Commc'ns, Inc.*, 504 F.3d 1236, 1241 (Fed. Cir. 2007). The "duty to link or associate structure to function is the *quid pro quo* for the convenience" of

using means-plus-function claiming. *B. Braun Med., Inc., v. Abbott Lab'ys*, 124 F.3d 1419, 1424 (Fed. Cir. 1997).

When a limitation recites two or more functions, the specification "must disclose adequate corresponding structure to perform *all* of the claimed functions." *Media Rights Techs., Inc. v. Capital One Fin. Corp.*, 800 F.3d 1366, 1374 (Fed. Cir. 2015) (emphasis by the court); *see Noah Sys., Inc. v. Intuit Inc.*, 675 F.3d 1302, 1318–19 (Fed. Cir. 2012) (considering means-plus-function limitation specifying two functions).

For a computer-implemented function, the "corresponding structure" for a means-plus-function limitation "may differ from more traditional, mechanical structure." *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1298 (Fed. Cir. 2014), overruled on other grounds by *Williamson*, 792 F.3d at 1349. In particular, "there must be some explanation of how the computer performs the claimed function." *Blackboard, Inc. v. Desire2Learn, Inc.*, 574 F.3d 1371, 1384 (Fed. Cir. 2009). Hence, a patent's specification must disclose more than a general-purpose computer or microprocessor because those devices "can be programmed to perform very different tasks in very different ways," and merely disclosing one of those devices as structure for performing a claimed function does not limit claim scope. *Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008).

For a computer-implemented function, an algorithm "for performing the claimed function" supplies the necessary disclosure. *Williamson*, 792 F.3d at 1352. "Requiring disclosure of an algorithm properly defines the scope of the claim and prevents pure functional claiming." *Ergo Licensing, LLC v. CareFusion 303, Inc.*, 673 F.3d 1361, 1364 (Fed. Cir. 2012). A patent's specification may disclose an algorithm "for

performing the claimed function" as "a mathematical formula, in prose, as a flow chart, or in any other manner that provides sufficient structure." *Williamson*, 792 F.3d at 1352; *see Function Media, L.L.C. v. Google, Inc.*, 708 F.3d 1310, 1318 (Fed. Cir. 2013).

### 3. OVERVIEW OF THE ISSUES

Petitioner contends that § 112's means-plus-function provision applies to the following "component" limitations in claims 1, 3, and 4 even though each limitation lacks the word "means":

(1)  "a moveable component" (limitation 1b);

(2)  "a driving component that drives the moveable component in each of two opposite directions within the housing" (limitation 1e);

(3)  "a control component that controls supply of power from the power supply to the driving component to cause the moveable component to oscillate at a frequency and an amplitude specified by user input received from the user-input features" (limitation 1f);

(4)  "the control component receives output signals from sensors within the linear vibration module during operation of the linear vibration module and adjusts one or more operational control outputs of the control component according to the received output signals from the sensors" (claim 3); and

(5)  "the control component adjusts the one or more operational control outputs of the control component according to the received output signals from the sensors in order that subsequent operation of the linear vibration module produces desired outputs from the one or more sensors corresponding to one or more operational control parameters" (claim 4).

Pet. 6–8 (emphases omitted); *see* Reply 1–6.

Appx0020

Petitioner contends that § 112's means-plus-function provision applies to the "component" limitations in claims 1, 3, and 4 because each limitation "combines a function with the nonce word 'component' and would have been understood" by an ordinarily skilled artisan to "lack sufficiently definite structure." Reply 1–2; *see* Pet. 6 (citing Manual of Patent Examining Procedure § 2181). Further, Petitioner identifies for each limitation the claimed function or functions and the corresponding structure described in the '081 patent's specification. Pet. 7–8 (citing Ex. 1001, 7:10–24, 7:32–8:20, Figs. 4A–4G, 6, 7A–7C, 13).

Patent Owner disagrees with Petitioner that § 112's means-plus-function provision applies to a "moveable component" (limitation 1b). *See* Resp. 7–8; Sur-reply 1–2. Patent Owner agrees with Petitioner that § 112's means-plus-function provision applies to a "driving component" (limitation 1e) and a "control component" (limitation 1f, claim 3, and claim 4). *See* Resp. 7–8; Sur-reply 2–6. But Patent Owner disagrees with Petitioner regarding the corresponding structure described in the '081 patent's specification for the "driving component" and the "control component." *See* Resp. 8–17; Sur-reply 2–6.

4. LIMITATION 1B: "MOVEABLE COMPONENT"

Claim 1 recites "a moveable component." Ex. 1001, 15:38 (limitation 1b).

(a)     Petitioner's Contentions

For limitation 1b, Petitioner contends that "[t]he 'movable component' provides no structural information because essentially any physical component can perform the function of being moved." Reply 2.

According to Petitioner, the '081 patent "discloses embodiments with highly disparate moving components." *Id.* (citing Ex. 1001, Figs. 4A–4G, 14–17).

For limitation 1b, Petitioner identifies the claimed function as "moveable," i.e., "a component that moves." Pet. 7 (emphasis omitted). Petitioner identifies the corresponding structure described in the '081 patent's specification as "[a] moving weight." *Id.* In particular, Petitioner identifies weight 404 in Figures 4A–4G and oscillating mass 634 in Figure 6. *Id.*

(b)    Patent Owner's Contentions

Patent Owner contends that Petitioner attempts to rewrite limitation 1b as "a component that moves." Resp. 7 (quoting Pet. 7); *see* Sur-reply 2. Patent Owner then contends that Petitioner "provides no authority why means-plus-function treatment can or should be decided based on a counterfactual rewriting of the claim, rather than the original claim language which includes no functional phrase." Resp. 7.

Further, Patent Owner asserts that limitation 1b "does not recite a 'moving component' but rather 'moveable component,' reflecting the reality that the moveable component does not move on its own" but instead "is capable of being moved, i.e. being driven within the housing by the driving component." Resp. 7–8 (emphases omitted) (citing Ex. 2008 ¶ 55). Patent Owner also asserts that "the requirement that the component be 'moveable' is fundamentally a requirement of structure, namely that the component be structured so as to be moveable, rather than having a shape that made it immovable or being in some way rigidly fixed to the housing, for example." Sur-reply 1–2.

Additionally, Patent Owner contends that "there is likely no material difference between" (1) an ordinarily skilled artisan's understanding of "the plain and ordinary meaning of 'moveable component' within the context of the patent" and (2) Petitioner's proposed means-plus-function construction as applied in the Petition. Resp. 8 (citing Ex. 2008 ¶ 56). Patent Owner also contends that "none of Patent Owner's merits arguments depend on the construction of this term." *Id.* Therefore, according to Patent Owner, "the Board's construction of 'moveable component' is not necessary to the determination of any dispute between" Patent Owner and Petitioner. *Id.*

(c)    Analysis

We agree that there is no need to determine whether § 112's means-plus-function provision applies to limitation 1b to decide whether Petitioner satisfies the "preponderance of the evidence" standard for proving unpatentability. *See* Resp. 8; *infra* §§ III.D.2(c), III.K.1(c).

5. LIMITATION 1E: "DRIVING COMPONENT"

Claim 1 recites "a driving component that drives the moveable component in each of two opposite directions within the housing." Ex. 1001, 15:41–42 (limitation 1e).

(a)    Petitioner's Contentions

For limitation 1e, Petitioner contends that "[t]he 'driving component' provides no structural information because the claimed function of 'drives the moveable component in each of two opposite directions within the housing' describes only the result to be achieved by the operation of the driving component without any information about the operation or structure of the component." Reply 2.

For limitation 1e, Petitioner identifies the claimed function as "drives the moveable component in each of two opposite directions within the housing." Pet. 7 (emphasis omitted). Petitioner identifies the corresponding structure described in the '081 patent's specification as "[o]ne or more electromagnetic coils." *Id.* In particular, Petitioner identifies coil 420 in Figures 4A–4G, coil 626 in Figure 6, and coils 1302 and 1304 in Figure 13. *Id.*

Regarding a difference between a "coil" and an "electromagnet" as alleged by Patent Owner, Petitioner asserts that the '081 patent discloses a "coil" as the only specific structure for an "electromagnet" even though the patent occasionally refers to "electromagnets" without specifying that they are "coils." Reply 4 (citing Ex. 1001, 9:39–40, Figs. 10, 15–16).

(b)    Patent Owner's Contentions

Patent Owner contends that limitation 1e includes "functional terms without an explicit recitation of structure." Resp. 7; *see* Sur-reply 2. Patent Owner also contends that limitation 1e lacks elements that an ordinarily skilled artisan "would recognize as structures for performing the recited functions." Resp. 7 (citing Ex. 2008 ¶¶ 59, 62).

For limitation 1e, Patent Owner does not dispute Petitioner's identification of the claimed function. *See* Resp. 8–9; Sur-reply 2–3. Patent Owner identifies the corresponding structure described in the '081 patent's specification as "[o]ne or more coils or electromagnets." Resp. 8 (emphasis omitted); *see* Sur-reply 2–3. In particular, Patent Owner identifies coil 420 in Figures 4A–4G, coil 514 in Figure 5A, coil 626 in Figure 6, the electromagnet in Figure 10, the electromagnet in Figure 11, coil 1206 in Figure 12, coils 1302 and 1304 in Figure 13, coils 1412 and 1414 in

Appx0024

Figure 14, coil 1510 in Figures 15 and 16, and the stator coils in Figures 24A, 24B, and 25. Resp. 8–9.

Patent Owner contends that Petitioner's identification of corresponding structure as "[o]ne or more electromagnetic coils" omits "numerous examples of driving components" in the specification and "improperly limits" claim scope to only "electromagnet coils." Resp. 9; *see* Sur-reply 3. Patent Owner also contends that the specification's disclosure of some embodiments that use "coils" is an inadequate reason to exclude from claim scope other embodiments that "refer to the broader class of 'electromagnets.'" Sur-reply 3.

Patent Owner notes that claim 8 specifies that "the driving component is an electromagnetic coil." Resp. 9 (quoting Ex. 1001, 16:40). Patent Owner then contends that construing limitation 1e as limited to "electromagnetic coils" would make the quoted language in claim 8 superfluous. *Id.*

(c)    <u>Analysis</u>

We agree with the parties that § 112's means-plus-function provision applies to limitation 1e. *See* Pet. 6; Resp. 7; Reply 1–2; Sur-reply 2. The presumption that this provision does not apply is overcome because limitation 1e recites "function without reciting sufficient structure for performing that function." *See* Ex. 1001, 15:41–42; *Williamson*, 792 F.3d at 1348. Specifically, as the parties agree, limitation 1e recites the following function without reciting sufficient structure for performing that function: "drives the moveable component in each of two opposite directions within the housing." Ex. 1001, 15:41–42; *see* Pet. 6–7; Resp. 7–9; Reply 1–2.

Regarding the corresponding structure described in the '081 patent's specification for limitation 1e, that structure includes one or more coils, as each party argues. *See* Ex. 1001, 5:2–4, 5:54–59, 6:32–35, 9:28–41, 10:7–9, 10:19–22, Figs. 4A–4G (coil 420), Fig. 5A (coil 514), Fig. 6 (coil 626), Fig. 12 (coil 1206), Fig. 13 (coils 1302 and 1304), Fig. 14 (coils 1412 and 1414), Fig. 15 (coil 1510); Pet. 7; Resp. 8–9. Additionally, the parties agree that we need not decide whether that structure is "[o]ne or more electromagnetic coils" as Petitioner proposes or "[o]ne or more coils or electromagnets" as Patent Owner proposes because the asserted references disclose one or more coils. *See* Reply 3–4; Sur-reply 2. Hence, we decline to construe limitation 1e further than necessary to resolve the dispute.

6. LIMITATION 1F: "CONTROL COMPONENT"

Claim 1 recites "a control component that controls supply of power from the power supply to the driving component to cause the moveable component to oscillate at a frequency and an amplitude specified by user input received from the user-input features." Ex. 1001, 15:44–48 (limitation 1f).

(a) Petitioner's Contentions

For limitation 1f, Petitioner contends that "[t]he 'control component' provides no structural information because the claimed function is disclosed to be implemented by a general-purpose CPU." Reply 2. According to Petitioner, a "general-purpose CPU is insufficient corresponding structure." *Id.* (citing *Aristocrat Techs.*, 521 F.3d at 1333).

For limitation 1f, Petitioner identifies the claimed function as "controls supply of power from the power supply to the driving component to cause the moveable component to oscillate at a frequency and an

amplitude specified by user input received from the user-input features."
Pet. 7 (emphasis omitted); Reply 5. Petitioner identifies the corresponding
structure described in the '081 patent's specification as a "Processor and
H Bridge Switch" where the "processor is programmed with an algorithm to
perform the following steps: (1) set the mode and strength to values
represented by selections made by user input to the user input features,
(2) provide a corresponding output to the power supply, and (3) provide a
corresponding output to the H-bridge switch." Pet. 7, 21. As support,
Petitioner cites the flow charts in Figures 7A and 7C and the related
descriptions in the specification. *Id.* at 7 (citing Ex. 1001, 7:10–24, 8:10–20,
Figs. 7A, 7C); *see* Reply 5–6 (citing Ex. 1001, 7:13–17, 8:10–20, Fig. 7A).

Regarding the identification of a "Processor and H Bridge Switch" as
the corresponding structure, Petitioner asserts that limitation 1f's claimed
function includes controlling both frequency and amplitude and that the
specification "makes clear that controlling the current to the driving
component is insufficient to control both frequency and amplitude."
Reply 5. Petitioner also asserts that the specification discloses:

(1)  controlling amplitude by changing the control output "p"
     for the power supply so that the power supply provides
     "an appropriate current to the coil"; and

(2)  controlling frequency by changing the control output "d"
     for the H-bridge switch.

*Id.* at 5–6 (citing Ex. 1001, 7:13–17, 8:10–20, Fig. 7A).

Therefore, according to Petitioner, the "correct corresponding
structure thus requires an output both to the power supply to control the
current (output 'p') and to the H-bridge to control the frequency (output
'd')." Reply 6.

27

(b)     Patent Owner's Contentions

Patent Owner contends that limitation 1f includes "functional terms without an explicit recitation of structure." Resp. 7; *see* Sur-reply 4–5. Patent Owner also contends that limitation 1f lacks elements that an ordinarily skilled artisan "would recognize as structures for performing the recited functions." Resp. 7 (citing Ex. 2008 ¶¶ 59, 62).

For limitation 1f, Patent Owner does not dispute Petitioner's identification of the claimed function. *See* Resp. 9–16, 18–19, 52; Sur-reply 3–6. Patent Owner identifies the corresponding structure described in the '081 patent's specification as an "oscillator circuit; microcontroller with internal or external memory; processor; CPU; microprocessor; and equivalents thereof." Resp. 10; *see id.* at 19, 52.

Additionally, Patent Owner explains that where "the corresponding structure is a processor, CPU, or microprocessor, the processor/CPU/ microprocessor is programmed with an algorithm" comprising the following steps for limitation 1f: "(a) set the mode and strength to [default values or] values representing selections made by user input to the user input features; and (b) provide a corresponding output to the power supply so that the power supply provides a corresponding output to the driving component." Resp. 10 (bracketed words by Patent Owner) (emphasis omitted).  As support, Patent Owner cites the flow charts in Figures 7A and 7C and the related descriptions in the specification. *Id.* (citing Ex. 1001, 7:10–24, 8:10–20, Figs. 7A, 7C).

Patent Owner contends that Petitioner's identification of a "Processor and H Bridge Switch" as the corresponding structure improperly excludes a preferred embodiment. Resp. 10–11. Patent Owner explains that the

"specification discloses an embodiment with an oscillator circuit that is expressly sufficient to perform the claimed functions." *Id.* at 11 (citing Ex. 1001, 11:43–13:2; Ex. 2008 ¶ 64.) Patent Owner also explains that claim 2 depends from claim 1 and specifies that claim 1's "control component" may comprise a "variable oscillator circuit with additional control circuitry." *Id.* Patent Owner then contends that an "algorithm is not required where the corresponding structure is the oscillator circuit" disclosed in the specification. *Id.* (citing *HTC Corp. v. IPCom GmbH & Co.*, 667 F.3d 1270, 1279–80 (Fed. Cir. 2012)).

Patent Owner also contends the Petitioner's identification of a "Processor and H Bridge Switch" as corresponding structure improperly disregards the specification's disclosure of a "microcontroller" as corresponding structure. Resp. 12. According to Patent Owner, a "microcontroller" differs from a general-purpose computer and provides "more specific functionality sufficient to perform the claimed function" without requiring an algorithm to perform the claimed function. *Id.*

Further, Patent Owner asserts that Petitioner fails to explain why an H-bridge switch "corresponds to any portion" of limitation 1f's claimed function. Resp. 15. For "control[ling] supply of power from the power supply to the driving component" according to limitation 1f, Patent Owner asserts that the specification "discloses that a processor configured with an algorithm can perform that function by outputting a value to the power supply so that the power supply provides a corresponding output (e.g., current) to the driving component." *Id.* (emphasis omitted) (citing Ex. 1001, 8:16–20).

Appx0029

Referencing the H-bridge switch disclosed in the '081 patent's specification, Patent Owner asserts that the H-bridge switch does not form part of the "control component" because the H-bridge switch "receives an output from the control component rather than forming part of the control component." Resp. 15–16. Patent Owner further asserts that the claimed function in limitation 1f requires oscillation at a specified frequency but "does not require that the claimed control component itself control that frequency." Sur-reply 5.

Where the corresponding structure is a processor, CPU, or microprocessor, Patent Owner notes that the parties agree that the algorithm includes the following step: "provide a corresponding output to the power supply." Resp. 13.

Where the corresponding structure is a processor, CPU, or microprocessor, Patent Owner asserts that Petitioner's proposed algorithm includes the following "unnecessary third step": "provide a corresponding output to the H-bridge switch." Resp. 14; *see* Pet. 7. Patent Owner also asserts that its proposed algorithm "omits this unnecessary step but is still sufficient for performing the claimed function." Resp. 14.

(c)     Analysis

We agree with the parties that § 112's means-plus-function provision applies to limitation 1f. *See* Pet. 6; Resp. 7; Reply 1–2; Sur-reply 5. The presumption that this provision does not apply is overcome because limitation 1f recites "function without reciting sufficient structure for performing that function." *See* Ex. 1001, 15:44–48; *Williamson*, 792 F.3d at 1348. Specifically, as the parties agree, limitation 1f recites the following function without reciting sufficient structure for performing that function:

"controls supply of power from the power supply to the driving component to cause the moveable component to oscillate at a frequency and an amplitude specified by user input received from the user-input features." Ex. 1001, 15:44–48; *see* Pet. 6–7; Resp. 7, 9–16, 18–19, 52; Reply 1–2.

Regarding the corresponding structure described in the '081 patent's specification for limitation 1f, we need not decide whether that structure includes an "oscillator circuit" or "microcontroller with internal or external memory" as Patent Owner proposes because Petitioner does not rely on those structures or their equivalents to establish unpatentability. *See* Pet. 18–27, 36–37, 39–44, 46–53, 82–84, 91–92; Resp. 11–12.

Regarding the corresponding structure described in the '081 patent's specification for limitation 1f, we agree with Patent Owner that the structure includes a "processor," "CPU," and "microprocessor." *See* Resp. 10. For example, the specification discloses that a linear-resonant vibration module may include "a central processing unit ('CPU'), generally a small, low-powered microprocessor." Ex. 1001, 6:2–8. The specification also discloses that "a processor or microcontroller within a linear-resonant vibration module allows for a very large number of different processor-controlled vibration patterns and modes to be exhibited by the linear-resonant vibration module." *Id.* at 10:53–57.

We agree with Patent Owner that where "the corresponding structure is a processor, CPU, or microprocessor, the processor/CPU/microprocessor is programmed with an algorithm" comprising the following steps for limitation 1f: "(a) set the mode and strength to [default values or] values representing selections made by user input to the user input features; and (b) provide a corresponding output to the power supply so that the power

31

supply provides a corresponding output to the driving component." *See* Resp. 10; Ex. 2008 ¶¶ 63–64. For the reasons explained below, we adopt these steps as the algorithmic structure required by limitation 1f.

Specifically, the '081 patent includes as Figures 7A–7C "control-flow diagrams" or algorithms that "illustrate the control program, executed by the CPU, that controls operation of an LRVM." Ex. 1001, 3:45–49, 6:43–47, Figs. 7A–7C. Figure 7A "provides a control-flow diagram for the high-level control program." *Id.* at 6:47–48, Fig. 7A. Figure 7B "provides a control-flow diagram for the routine 'monitor,' called in" Figure 7A. *Id.* at 7:32–33, Fig. 7B. Figure 7C "provides a control-flow diagram for the routine 'control,' called in" Figure 7A. *Id.* at 8:10–11, Fig. 7C.

The '081 patent's Figure 7A is reproduced below:



FIG. 7A

Figure 7A illustrates steps 702 through 722 in a "control program" for controlling an LRVM. *See* Ex. 1001, 6:47–7:31, Fig. 7A.

In step 702, the program sets several variables to default values, including (1) the mode variable indicating "the current operational mode of the device," (2) the strength variable indicating "the current user-selected strength of operation" and "the electrical current applied to the coil," (3) the lvl0 variable indicating "a previously sensed vibrational strength" used by

33

Figure 7B's "monitor" routine, (4) the lvl1 variable indicating "a currently
sensed vibrational strength" used by Figure 7B's "monitor" routine, and
(5) the control output "d" for the H-bridge switch. Ex. 1001, 6:50–61,
Figs. 7A–7B.

In step 704, the "program waits for a next event." Ex. 1001, 6:61–62,
Fig. 7A. The "remaining steps represent a continuously executing loop, or
event handler, in which each event that occurs is appropriately handled by
the control program." *Id.* at 6:62–65.

In step 706, the program determines whether a timer (or similar
mechanism for repeatedly measuring time) related to the LRVM's frequency
has expired. Ex. 1001, 7:2–14, 7:17–18, Fig. 7A. If so, in step 708 the
program changes the control output "d" for the H-bridge switch from high to
low or from low to high so that current through the H-bridge switch reverses
direction, thus reversing direction of current through the coil. *Id.* at 5:50–61,
6:32–33, 7:3–4, 7:13–16, Figs. 5A–5B, 7A. After changing the control
output "d" for the H-bridge switch, the program resets the frequency-related
timer to "trigger a next frequency-related event." *Id.* at 7:15–17, Fig. 7A.

In step 710, the program determines whether a timer (or similar
mechanism for repeatedly measuring time) related to the LRVM's interval
for monitoring the vibrational strength or force has expired. Ex. 1001,
7:2–10, 7:19–20, Fig. 7A. If so, in step 712 the program calls a "monitor"
routine with the steps depicted in Figure 7B. *Id.* at 7:20–21, Fig. 7A.

In step 714, the program determines whether "the event corresponds
to a change in the user input through the user interface." Ex. 1001, 7:21–23,
Fig. 7A. If so, in step 716 the program calls a "control" routine with the
steps depicted in Figure 7C. *Id.* at 7:22–24, Fig. 7A.

34

The '081 patent's Figure 7C is reproduced below:



FIG. 7C

Figure 7C illustrates steps 760 through 764 in a "control" routine "invoked when a change in the user controls has occurred." *See* Ex. 1001, 8:10–22, Fig. 7C.

In step 760, the routine sets the mode variable and the strength variable to "the currently selected mode and vibrational strength, represented by the current states of control features in the user interface." Ex. 1001, 8:12–15, Fig. 7C. In step 762, the routine "computes an output value p corresponding to the currently selected strength, stored in the variable strength, and outputs the value p to the power supply so that the power supply outputs an appropriate current to the coil." *Id.* at 8:16–20, Fig. 7C. The power supply receives the control output "p" to "control the current supplied to the H-bridge switch" for "transfer to the coil." *Id.* at 6:33–35.

In step 764, the routine "computes a new monitor timer interval" and resets the monitoring-interval timer. *Id.* at 8:20–22, Fig. 7C.

Thus, the '081 patent's specification links the algorithmic structure in Figures 7A and 7C and the related descriptions to the function recited in limitation 1f. In particular, Figure 7A's steps 702, 714, and 716, Figure 7C's steps 760 and 762, and the related descriptions support the following steps for limitation 1f that Patent Owner proposes and we adopt: "(a) set the mode and strength to [default values or] values representing selections made by user input to the user input features; and (b) provide a corresponding output to the power supply so that the power supply provides a corresponding output to the driving component." Ex. 1001, 6:33–35, 6:50–61, 7:21–24, 8:10–20, Figs. 7A, 7C; *see* Ex. 2008 ¶¶ 63–64; Resp. 10.

We disagree with Petitioner's proposed construction of limitation 1f for several reasons. First, Petitioner's identification of a "Processor and H Bridge Switch" as the corresponding structure excludes a preferred embodiment. *See* Pet. 7, 21; Resp. 10–11. In particular, the '081 patent discloses a preferred embodiment for a lower-cost LRVM with "a simpler oscillator circuit with additional control circuitry" instead of a processor or CPU. Ex. 1001, 11:43–47; *see id.* at 11:47–13:2. For instance, "an oscillator-controlled linear vibration module" may include "a variable-frequency oscillator circuit" that "can be controlled by user input to drive the H switch or other H-switch-like circuit to operate the linear vibration module at different frequencies." *Id.* at 11:59–63. A construction excluding a preferred embodiment is "rarely, if ever correct." *PPC Broadband, Inc. v. Corning Optical Commc'ns RF, LLC*, 815 F.3d 747, 755 (Fed. Cir. 2016);

*see Google LLC v. EcoFactor, Inc.*, 92 F.4th 1049, 1058–59 (Fed. Cir. 2024).

Second, Petitioner's identification of a "Processor and H Bridge Switch" as the corresponding structure renders language in claim 2 "void, meaningless, or superfluous." *See* Pet. 7, 21; Resp. 11. Claim 2 depends from claim 1 and specifies that "the control component is one of" a "variable oscillator circuit with additional control circuitry" and a "microprocessor." Ex. 1001, 15:49–54. Petitioner's identification of a "Processor and H Bridge Switch" as the corresponding structure negates the "variable oscillator circuit" option in claim 2. Preferably, a claim construction does not render claim language "void, meaningless, or superfluous." *Wasica Fin. GmbH v. Cont'l Auto. Sys., Inc.*, 853 F.3d 1272, 1288 n.10 (Fed. Cir. 2017); *see Ortho-McNeil Pharm., Inc. v. Mylan Lab'ys, Inc.*, 520 F.3d 1358, 1362 (Fed. Cir. 2008).

Third, as Patent Owner asserts, the claimed function in limitation 1f requires oscillation at a specified frequency but "does not require that the claimed control component itself control that frequency." *See* Ex. 1001, 15:44–48; Sur-reply 5. In particular, limitation 1f requires the "control component" to "control[] supply of power from the power supply to the driving component to cause the moveable component to oscillate at a frequency and an amplitude specified by user input received from the user-input features." Ex. 1001, 15:44–48. Thus, the "control component" must "control[] supply of power from the power supply to the driving component," i.e., control the voltage or current provided by the power supply for delivery to the "driving component." *Id.* Once the power supply provides the voltage or current for delivery to the "driving component," the

"control component" or another component may then "cause the moveable component to oscillate at a frequency and an amplitude specified by user input received from the user-input features." *Id.* Hence, contrary to Petitioner's contention, the "control component" does not necessarily include the H-bridge switch that receives the control output "d" related to frequency. *See* Reply 5–6 (citing Ex. 1001, 7:13–17, 8:10–20, Fig. 7A).

Consistent with our determination regarding the two-step algorithmic structure required by limitation 1f, the district court in the Sony litigation has construed limitation 1f as requiring the same two-step algorithmic structure where the corresponding hardware structure is a microcontroller, processor, CPU, or microprocessor. Ex. 1054, 15–16. The district court did not include an H-bridge switch as hardware structure according to limitation 1f. *Id.*

But a different district court has construed a limitation similar to limitation 1f as requiring "Steps 706 through 716 in Figure 7A, with reference to all steps shown in Figure 7B other than Step 734 and all steps shown in Figure 7C, or the algorithm described in the corresponding text . . . and equivalents thereof." Ex. 1053, 37. That district court did so, however, based on different arguments by the parties and a different record. *Id.* at 33–37. Nevertheless, that district court did not include an H-bridge switch as hardware structure according to the limitation. *Id.* at 37.

Also, a different Board panel has construed limitation 1f as requiring a two-step algorithmic structure, but those two steps differ somewhat from the two steps that Patent Owner proposes in this proceeding and we adopt. Ex. 1055, 20 (*Sony Interactive Ent. Inc. v. Resonant Systems, Inc.*, IR2024-

00568, Paper 9 (PTAB Aug. 26, 2024)). That panel did so, however, based on different arguments by the parties and a different record. *Id.* at 11–20.

### 7. CLAIM 3: "CONTROL COMPONENT"

Claim 3 reads as follows:

> 3. The linear vibration module of claim 1 wherein the control component receives output signals from sensors within the linear vibration module during operation of the linear vibration module and adjusts one or more operational control outputs of the control component according to the received output signals from the sensors.

Ex. 1001, 15:62–67.

(a)     Petitioner's Contentions

Petitioner contends that claim 3 fails to recite sufficient structure for the reasons that limitation 1f fails to recite sufficient structure. *See* Pet. 6–7; Reply 1–2.

For claim 3, Petitioner identifies the language following the initial recitation of "control component" as the claimed function. Pet. 7–8. Petitioner identifies the corresponding structure described in the '081 patent's specification as follows: "Claim 1 structure with the processor further programmed with an algorithm to perform the following steps: (1) convert the received output signal into an integer, (2) compare that integer to a specific value, (3) adjust one or more operational control outputs based on that comparison." *Id.* As support, Petitioner cites the flow charts in Figures 7A and 7B and the related descriptions in the specification. *Id.* at 8 (citing Ex. 1001, 7:13–18, 7:32–8:9, Figs. 7A–7B).

Petitioner notes that Patent Owner proposes a three-step algorithm for claim 3 including the following first step: "receive the value of an output signal." Reply 6 (emphasis omitted) (quoting Resp. 16). Petitioner then

39

contends that the specification "does not disclose receiving 'the value' of an output signal" but instead "discloses receiving the output signal itself, followed by converting the output signal to an integer suitable for comparison." *Id.* (citing Ex. 1001, 7:33–36).

(b)   Patent Owner's Contentions

Patent Owner contends that claim 3 fails to recite sufficient structure for the reasons that limitation 1f fails to recite sufficient structure. *See* Resp. 7.

For claim 3, Patent Owner does not dispute Petitioner's identification of the claimed function. *See* Resp. 16–17; Sur-reply 6. Patent Owner identifies the corresponding structure described in the '081 patent's specification in the same way for claim 3 as for limitation 1f, i.e., an "oscillator circuit; microcontroller with internal or external memory; processor; CPU; microprocessor; and equivalents thereof." Resp. 10, 16.

Additionally, Patent Owner explains that where "the corresponding structure is a processor, CPU, or microprocessor, the processor/CPU/ microprocessor is programmed with an algorithm" comprising the following steps for claim 3: "(a) receive the value of an output signal; (b) compare that value to a different value, which could be a previous value; and (c) adjust one or more operational control outputs based on that comparison." Resp. 16 (emphases omitted). As support, Patent Owner cites the flow charts in Figures 7A and 7B and the related descriptions in the specification. Ex. 2012, 35–36 (citing Ex. 1001, 7:13–18, 7:32–8:9, Figs. 7A–7B) (cited at Resp. 16).[4]

---

[4] For Exhibit 2012 (Joint Claim Construction Chart), we cite to the header page numbers.

Appx0040

Where the corresponding structure is a processor, CPU, or microprocessor, Patent Owner "agrees that Petitioner's algorithm would be sufficient to perform the claimed function." Resp. 17.

(c) <u>Analysis</u>

We agree with the parties that § 112's means-plus-function provision applies to claim 3. *See* Pet. 6–7; Resp. 7; Reply 1–2. The presumption that this provision does not apply is overcome because claim 3 recites "function without reciting sufficient structure for performing that function." *See* Ex. 1001, 15:62–67; *Williamson*, 792 F.3d at 1348. Specifically, as the parties agree, claim 3 recites the following functions without reciting sufficient structure for performing those functions: "receives output signals from sensors within the linear vibration module during operation of the linear vibration module and adjusts one or more operational control outputs of the control component according to the received output signals from the sensors." Ex. 1001, 15:62–67; *see* Pet. 6–8; Resp. 16–17; Reply 1–2.

Based on Patent Owner's "agree[ment] that Petitioner's algorithm would be sufficient to perform the claimed function" where the corresponding structure is a processor, CPU, or microprocessor, we adopt Petitioner's proposed algorithm as the algorithmic structure required by claim 3. *See* Pet. 7–8; Resp. 17.

8. CLAIM 4: "CONTROL COMPONENT"

Claims 4 reads as follows:

4. The linear vibration module of claim 1 wherein the control component adjusts the one or more operational control outputs of the control component according to the received output signals from the sensors in order that subsequent operation of the linear vibration module produces desired

41

> outputs from the one or more sensors corresponding to one
> or more operational control parameters.

Ex. 1001, 16:1–7.

(a)     Petitioner's Contentions

Petitioner contends that claim 4 fails to recite sufficient structure for the reasons that limitation 1f fails to recite sufficient structure. *See* Pet. 6–7; Reply 1–2.

For claim 4, Petitioner identifies the language following the initial recitation of "control component" as the claimed function. Pet. 8. Petitioner identifies the corresponding structure described in the '081 patent's specification as follows: "Claim 1 structure with the processor further programmed with the same claim 3 algorithm." *Id.*

(b)     Patent Owner's Contentions

Patent Owner contends that claim 4 fails to recite sufficient structure for the reasons that limitation 1f fails to recite sufficient structure. *See* Resp. 7.

For claim 4, Patent Owner does not dispute Petitioner's identification of the claimed function. *See* Resp. 16–17; Sur-reply 6. Patent Owner identifies the corresponding structure described in the '081 patent's specification in the same way for claim 4 as for limitation 1f and claim 3, i.e., an "oscillator circuit; microcontroller with internal or external memory; processor; CPU; microprocessor; and equivalents thereof." Resp. 10, 16. Additionally, Patent Owner explains that where "the corresponding structure is a processor, CPU, or microprocessor, the processor/CPU/microprocessor is programmed with an algorithm" comprising the same steps for claim 4 as for claim 3. *Id.* at 16.

(c)    <u>Analysis</u>

We agree with the parties that § 112's means-plus-function provision applies to claim 4.  *See* Pet. 6–7; Resp. 7; Reply 1–2.  The presumption that this provision does not apply is overcome because claim 4 recites "function without reciting sufficient structure for performing that function." *See* Ex. 1001, 16:1–7; *Williamson*, 792 F.3d at 1348.  Specifically, as the parties agree, claim 4 recites the following function without reciting sufficient structure for performing that function: "adjusts the one or more operational control outputs of the control component according to the received output signals from the sensors in order that subsequent operation of the linear vibration module produces desired outputs from the one or more sensors corresponding to one or more operational control parameters." Ex. 1001, 16:1–7; *see* Pet. 6–8; Resp. 16–17; Reply 1–2.

Additionally, as the parties also agree, the '081 patent describes the same algorithmic structure for claim 4 as for claim 3 when employing a processor, CPU, or microprocessor.  Ex. 1001, 6:36–39, 7:19–21, 7:33–36, 7:50–8:7, Figs. 7A–7B; *see* Pet. 7–8; Resp. 16–17.

9. CLAIM 4: ANTECEDENT-BASIS ISSUE

Although claim 4 depends directly from claim 1, Petitioner notes that claim 1 lacks an antecedent basis for the following terms in claim 4: "the one or more operational control outputs of the control component," "the sensors," and "the one or more sensors." Pet. 8, 51; *see* Ex. 1001, 15:36–48 (claim 1), 16:1–7 (claim 4).  To address the ambiguity in claim 4, Petitioner proposes two alternatives to clarify claim 4. Pet. 8, 51.  First, interpret "the one or more operational control outputs of the control component" as "one or more operational control outputs of the control component" and interpret

"the sensors" as "sensors." *Id.* Second, interpret claim 4 as depending from claim 3 instead of claim 1. *Id.*

Patent Owner contends that claim 4 "contains a clear typographical error" and "should be interpreted as depending from claim 3." Resp. 17–18. Patent Owner explains that claim 3 "introduces limitations of 'sensors' and 'one or more operational control outputs of the control component'" and claim 4 "then refers to 'the sensors' and 'the one or more operational control outputs.'" *Id.* at 17. Patent Owner contends that the "natural conclusion is that these terms in claim 4 are meant to refer to the corresponding terms in claim 3." *Id.* at 18.

During the oral hearing, Petitioner's counsel agreed that we may consider claim 4 as depending from claim 3 for purposes of this proceeding. Tr. 18:4–22. Hence, for purposes of this proceeding, we consider claim 4 as depending from claim 3. We note that two district courts have resolved the same antecedent-basis issue in the same claim or in a similar claim by modifying claim dependency this way. *See* Ex. 1053, 50; Ex. 1054, 22.

10. SUMMARY

"[O]nly those terms need be construed that are in controversy, and only to the extent necessary to resolve the controversy." *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999); *see Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017). Above, we discussed issues concerning the "component" limitations in claims 1, 3, and 4 and an ambiguity in claim 4. *See supra* §§ III.C.4(c), III.C.5(c), III.C.6(c), III.C.7(c), III.C.8(c), III.C.9. We determine that no other claim language requires a discussion of scope or

an explicit construction to decide whether Petitioner satisfies the
"preponderance of the evidence" standard for proving unpatentability.

### D. *Alleged Obviousness over Fukumoto: Claims 1–3, 7–9, and 17*

Petitioner contends that claims 1–3, 7–9, and 17 are unpatentable
under § 103(a) because the claims would have been obvious over Fukumoto.
*See* Pet. 9–35; Reply 16–22.  Patent Owner disputes Petitioner's contentions.
*See* Resp. 18–27; Sur-reply 7–14.

Below, we provide an overview of Fukumoto.  Then, we consider the
obviousness issues.  For the reasons explained below, we agree with
Petitioner that claims 1, 2, 7, and 17 are unpatentable under § 103(a) because
the claims would have been obvious over Fukumoto but disagree that
claims 3, 8, and 9 are unpatentable based on Fukumoto.

### 1. OVERVIEW OF FUKUMOTO (EXHIBIT 1005)

Fukumoto is a U.S. patent titled "Electronic Device, Vibration
Generator, Vibration-Type Reporting Method, and Report Control Method,"
filed on August 3, 2001, and issued on November 6, 2007.  Ex. 1005,
codes (12), (22), (45), (54).  Fukumoto states that the invention "relates to a
user interface and vibration generation mechanism of an electronic device."
*Id.* at 1:8–9; *see id.* at code (57).  As examples of electronic devices,
Fukumoto identifies the following:

- "PDAs (personal digital assistants), personal computers,
  [and] ATMs (automatic teller machines)";

- "a mobile phone, electronic notebook, mobile computer,
  wristwatch, electronic calculator, remote controller of an
  electronic device, and other various types of portable
  electronic devices"; and

- "a stationary type computer or a vending machine, cash
  register, car navigation system, household electric

45

> appliance, or other of various types of electronic devices
> not having portability."

*Id.* at 1:13–14, 32:52–53, 50:50–59.

Fukumoto endeavors to provide "an electronic device, a vibration generator, a vibration-type reporting method, and a report control method enabling a user to easily confirm without viewing a screen receipt of an input operation or a response of the electronic device with respect to an operation input." Ex. 1005, 1:45–50. To achieve those objectives, Fukumoto employs the following:

- "a vibration generator for imparting vibration to a hand-touched portion of the electronic device"; and

- "vibration control means for causing the vibration generator to generate vibration when it is detected that an operation input in the operating unit has been received."

*Id.* at 1:51–58. Hence, "the electronic device reports to a user that an operation input has been received, by causing the hand-touched portion of the electronic device to vibrate." *Id.* at 1:64–67.

46

**Appx0046**

Fukumoto's Figure 1 (reproduced below) depicts an example electronic device, i.e., a PDA:



FIG. 1

Figure 1 illustrates PDA 10 including main case 101, transparent touch panel 102, display panel 103a covering an opening in main case 101, and push-button-type operation keys 104a, 104b, and 104c on the upper surface of main case 101. Ex. 1005, 13:41–51, Fig. 1.

A "user inputs operation instructions to" PDA 10 by (1) "touching the touch panel 102 by his or her fingertip" or (2) "using a pen or other operation tools." Ex. 1005, 13:45–49. A user may also employ operation keys 104a, 104b, and 104c "for inputting operation instructions to" PDA 10, such as "for turning the main power on or off." *Id.* at 13:49–53.

47

Fukumoto's Figure 2 (reproduced below) depicts a hardware configuration for PDA 10 in Figure 1:



Figure 2 illustrates the following hardware components in PDA 10:

- touch panel 102;
- display unit 103;
- key input unit 111;
- memory 112;
- CPU 113;
- drive signal generation circuit 114;
- oscillatory actuator 115; and
- bus 116.

Ex. 1005, 13:54–59, Fig. 2.

In response to a touch operation, touch panel 102 outputs to CPU 113 "a signal showing a touched position on the touch panel 102." Ex. 1005, 13:60–62. Key input unit 111 outputs to CPU 113 "a key operation signal in response to the pressing operation of the operation keys 104a to 104c by the

48

user." *Id.* at 13:65–14:1. Memory 112 stores (1) "programs, data, etc. for controlling" PDA 10 and (2) "waveform data of the drive signal for driving" oscillatory actuator 115. *Id.* at 14:1–4.

CPU 113 executes a "vibration control processing" program. Ex. 1005, 14:7–8; *see id.* at 10:4–6, 16:60–19:3, Fig. 5. For instance, when CPU 113 detects "an operation input from the touch panel 102 or any one of operation keys 104a to 104c," CPU 113 drives oscillatory actuator 115 through drive signal generation circuit 114 "to cause the touch panel 102 or one of the operation keys 104a to 104c to vibrate." *Id.* at 14:8–13. Drive signal generation circuit 114 "generates a drive signal for driving" oscillatory actuator 115 according to waveform data supplied by CPU 113 and then applies the drive signal to oscillatory actuator 115 according to instructions from CPU 113. *Id.* at 14:14–19.

Oscillatory actuator 115 "is a linear oscillatory actuator" that (1) "uses a permanent magnet as a movable weight" and (2) "causes the movable weight to linearly reciprocate by electromagnetic force to cause generation of vibration." Ex. 1005, 14:20–24. Oscillatory actuator 115 "is driven by a drive signal applied from" drive signal generation circuit 114. *Id.* at 14:24–26.

Fukumoto's Figure 3 (reproduced below) is a sectional view of oscillatory actuator 115 relative to main case 101 of PDA 10:

## FIG. 3



Figure 3 illustrates oscillatory actuator 115 including the following components:

- case 115a contacting display panel 103a (with display panel 103a adjacent to touch panel 102);

- "cylindrical coil 121 fixed to the top surface of the case 115a";

- "columnar movable weight 122 made of permanent magnet and having an annular space in which the coil 121 fits"; and

- "spring 123 for supporting the movable weight 122."

Ex. 1005, 14:27–37, Fig. 3.

Spring 123 supports movable weight 122 "in a state where the weight 122 is able to linearly reciprocate in the vertical direction" in Figure 3 "in the space formed inside the case 115a of the oscillatory actuator 115." Ex. 1005, 14:45–48, Fig. 3. Movable weight 122 "linearly reciprocates in the vertical direction" in Figure 3 "by the magnetic force generated from the coil 121 when an AC (alternating) current (drive signal)

Appx0050

is applied to the coil 121." *Id.* at 14:57–60. "By the counter force of the reciprocation of the movable weight 122, vibrational acceleration occurs at the portion of the case 115a to which the spring 123 is connected." *Id.* at 14:60–63.

## 2. INDEPENDENT CLAIM 1

(a)     <u>Preamble 1pre</u>

Claim 1 recites "[a] linear vibration module." Ex. 1001, 15:36.

Petitioner contends that Fukumoto teaches claim 1's preamble because Fukumoto discloses that "[a]n electronic device drives an oscillatory actuator to cause generation of vibration . . . in a direction perpendicular to their respective front surfaces." Pet. 12–13 (alterations by Petitioner) (quoting Ex. 1005, code (57)). Further, Petitioner asserts that "Fukumoto's oscillatory actuator is linear in the same way as the '081 patent." *Id.* at 13 (citing Ex. 1001, 3:9–21; Ex. 1005, 14:20–24, Fig. 3).

Patent Owner makes no arguments specific to claim 1's preamble. *See, e.g.*, Resp. 18–27; Sur-reply 7–14. Nonetheless, the burden remains on Petitioner to demonstrate unpatentability. *See Dynamic Drinkware*, 800 F.3d at 1378.

Generally, a preamble does not limit a claim. *Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1346 (Fed. Cir. 2002). We need not decide whether claim 1's preamble limits the claim because, for the reasons stated by Petitioner and supported by Dr. Wolfe's testimony, we agree with Petitioner that Fukumoto teaches claim 1's preamble. *See* Pet. 12–13; Ex. 1003 ¶¶ 161–164.

(b)     <u>Limitation 1a</u>

Claim 1 recites "a housing." Ex. 1001, 15:37 (limitation 1a).

Petitioner contends that Fukumoto teaches limitation 1a because Fukumoto discloses that "the components of the oscillatory actuator are 'housed inside the case 115a,'" e.g., as depicted in Fukumoto's Figure 3. Pet. 13–14 (quoting Ex. 1005, 15:58–59) (citing Ex. 1003 ¶ 165; Ex. 1005, 15:56–59, Fig. 3). Further, Petitioner asserts that case 115a corresponds to the claimed "housing." *Id.* at 14. Petitioner also asserts that Fukumoto's PDA 10 includes main case 101 and that main case 101 corresponds to the claimed "housing" according to Patent Owner's infringement contentions in the Samsung litigation. *Id.* (citing Ex. 1022, 2–6).

Patent Owner makes no arguments specific to limitation 1a. *See, e.g.*, Resp. 18–27; Sur-reply 7–14.

For the reasons stated by Petitioner and supported by Dr. Wolfe's testimony, we agree with Petitioner that Fukumoto teaches limitation 1a. *See* Pet. 13–14; Ex. 1003 ¶ 165.

(c)     Limitation 1b

Claim 1 recites "a moveable component." Ex. 1001, 15:38 (limitation 1b).

Petitioner contends that Fukumoto teaches limitation 1b because Fukumoto discloses "a 'columnar movable weight 122 made of permanent magnet,'" e.g., as depicted in Fukumoto's Figure 3. Pet. 14–15 (quoting Ex. 1005, 14:34–35) (citing Ex. 1005, 14:32–37, Fig. 3). Further, Petitioner asserts that "movable weight 122 linearly reciprocates in the vertical direction" in Figure 3. *Id.* at 15 (quoting Ex. 1005, 14:57–58).

Except for disputing that § 112's means-plus-function provision applies to limitation 1b, Patent Owner makes no arguments specific to limitation 1b. *See, e.g.*, Resp. 7–8, 18–27; Sur-reply 1–2, 7–14.

For the reasons stated by Petitioner and supported by Dr. Wolfe's testimony, we agree with Petitioner that Fukumoto teaches limitation 1b. *See* Pet. 14–15; Ex. 1003 ¶¶ 166–168.

(d)    Limitation 1c

Claim 1 recites "a power supply."  Ex. 1001, 15:39 (limitation 1c).

Petitioner contends that Fukumoto teaches limitation 1c because Fukumoto discloses that "movable weight 122 linearly reciprocates in the vertical direction in the figure by the magnetic force generated from the coil 121 when an AC (alternating) current (drive signal) is applied to the coil 121."  Pet. 15 (quoting Ex. 1005, 14:57–60).  Petitioner also contends that Fukumoto discloses operating oscillatory actuator 115 at a resonant frequency with a "small drive power" to reduce power consumption.  *Id.* at 15–16 (citing Ex. 1005, 16:44–50); *see* Reply 19–20.  Further, Petitioner asserts that an ordinarily skilled artisan "would have understood and found it obvious that 'small power' is supplied to the coil using a power supply." Pet. 16 (citing Ex. 1003 ¶ 169).

Patent Owner does not dispute that Fukumoto teaches a "power supply" according to limitation 1c.  *See, e.g.*, Resp. 21–25; Sur-reply 7–11. Instead, as explained below, Patent Owner disputes that Fukumoto's power supply receives an output from a "control component" according to limitation 1f.  Resp. 21–25; Sur-reply 7–11; *infra* § III.D.2(g)(ii).

For the reasons stated by Petitioner and supported by Dr. Wolfe's testimony, we agree with Petitioner that Fukumoto teaches limitation 1c. *See* Pet. 15–16; Ex. 1003 ¶ 169.

(e)    Limitation 1d

Claim 1 recites "user-input features."  Ex. 1001, 15:40 (limitation 1d).

Petitioner contends that Fukumoto teaches limitation 1d because Fukumoto's PDA 10 includes touch panel 102 and operation keys 104a, 104b, and 104c. Pet. 16–17 (citing Ex. 1005, 13:40–14:13, 30:48–53, 31:27–29, Figs. 1–2, 41). Petitioner contends that touch panel 102 and operation keys 104a, 104b, and 104c correspond to the claimed "user-input features." *Id.* at 17.

Patent Owner makes no arguments specific to limitation 1d. *See, e.g.*, Resp. 18–27; Sur-reply 7–14.

For the reasons stated by Petitioner and supported by Dr. Wolfe's testimony, we agree with Petitioner that Fukumoto teaches limitation 1d. *See* Pet. 16–17; Ex. 1003 ¶¶ 170–172.

(f)  <u>Limitation 1e</u>

Claim 1 recites "a driving component that drives the moveable component in each of two opposite directions within the housing." Ex. 1001, 15:41–42 (limitation 1e).

Petitioner contends that Fukumoto teaches limitation 1e because Fukumoto discloses that "movable weight 122 linearly reciprocates in the vertical direction in the figure by the magnetic force generated from the coil 121 when an AC (alternating) current (drive signal) is applied to the coil 121." Pet. 17 (quoting Ex. 1005, 14:57–60) (citing Ex. 1003 ¶¶ 170–172). Petitioner identifies coil 121 as the claimed "driving component." *Id.* at 18. According to Petitioner, coil 121 "drives the moveable component in each of two opposite directions within the housing," and therefore performs the claimed function. *Id.*

Patent Owner makes no arguments specific to limitation 1e. *See, e.g.*, Resp. 18–27; Sur-reply 7–14.

For the reasons stated by Petitioner and supported by Dr. Wolfe's testimony, we agree with Petitioner that Fukumoto teaches limitation 1e. *See* Pet. 17–18; Ex. 1003 ¶¶ 173–175.

(g)    Limitation 1f

Claim 1 recites "a control component that controls supply of power from the power supply to the driving component to cause the moveable component to oscillate at a frequency and an amplitude specified by user input received from the user-input features." Ex. 1001, 15:44–48 (limitation 1f).

(i)    Petitioner's Contentions

Depending on whether § 112's means-plus-function provision applies to limitation 1f, Petitioner presents two alternative mappings for Fukumoto's drive signal generation circuit 114 related to limitation 1f. *See* Pet. 20–22; Reply 20–22. If limitation 1f is not a means-plus-function limitation, Petitioner maps drive signal generation circuit 114 to the "control component" required by limitation 1f. *See* Pet. 20; Reply 20–21. If limitation 1f is a means-plus-function limitation, Petitioner maps drive signal generation circuit 114 to the "power supply" required by limitation 1c. *See* Pet. 21–22; Reply 21–22. When mapping drive signal generation circuit 114 to the "power supply" required by limitation 1c, Petitioner explains that (1) the "power supply" produces "drive power" by generating an AC drive signal supplied to a coil and (2) drive signal generation circuit 114 generates an AC drive signal supplied to coil 121. Reply 22 (citing Ex. 1005, 14:14–16, 14:57–60, 16:44–50).

If, as we determine, limitation 1f is a means-plus-function limitation, Petitioner contends that Fukumoto teaches limitation 1f for several related

reasons. *See* Pet. 18–23; Reply 19–22; *supra* § III.C.6(c). First, Petitioner asserts that Fukumoto's CPU 113 executes a program stored in memory for "vibration control processing" and accesses a table containing waveform data for a drive signal applied to oscillatory actuator 115. Pet. 18–20 (citing Ex. 1005, 13:54–14:26, 16:60–19:3, Figs. 5, 33); *see id.* at 23–24. Petitioner asserts that CPU 113 uses the waveform data read from memory to generate a drive signal at drive signal generation circuit 114 and then drive signal generation circuit 114 applies the drive signal to oscillatory actuator 115. *Id.* at 18–20.

Petitioner explains that a user's input produces a CPU-driven sequence of events causing oscillatory actuator 115 to vibrate at a particular amplitude and frequency as follows:

(1)  a user "touches a button or location of the touch panel";

(2)  the CPU "detects the touch location/button";

(3)  the CPU "reads the corresponding waveform data"; and

(4)  the CPU "generates a drive signal sent to the oscillatory actuator to vibrate at the amplitude and frequency specified by the waveform."

Pet. 20–21 (citing Ex. 1003 ¶ 177; Ex. 1005, 13:54–14:25, 29:15–18, 48:42–47). Therefore, according to Petitioner, Fukumoto's CPU 113 performs the function recited in limitation 1f: "controls supply of power from the power supply to the driving component to cause the moveable component to oscillate at a frequency and an amplitude specified by user input received from the user-input features." *Id.* at 21 (citing Ex. 1003 ¶¶ 177–178).

Second, Petitioner asserts that Fukumoto discloses hardware structure according to limitation 1f because Fukumoto's CPU 113 is a "processor."

Pet. 22. Petitioner also asserts that an ordinarily skilled artisan would have recognized well-known "H-bridge switches, oscillator circuits, and inverters" as mechanisms for converting input power, e.g., from "the battery in the electronic device," to an AC drive signal supplied to coil 121. *Id.* (citing Ex. 1003 ¶¶ 180–188; Ex. 1005, 14:57–60).

Third, Petitioner asserts that Fukumoto discloses algorithmic structure according to limitation 1f because "in Fukumoto, when 'at least one of the touch signal or key operation signal has been input,' the CPU 'reads from the memory 112 the waveform data of the drive signal to be applied to the oscillatory actuator 115.'" Pet. 22 (quoting Ex. 1005, 17:8–11). According to Petitioner, "[d]oing so would 'set the mode and strength to values represented by selections made by user input to the user input features.'" *Id.* (citing Ex. 1003 ¶ 189).

Petitioner also asserts that "Fukumoto's CPU provides a corresponding output to the power supply when it 'instructs the drive signal generation circuit 114 to generate a drive signal,' and in response, 'the drive signal generation circuit 114 generates a drive signal using the waveform data supplied from the CPU 113.'" Pet. 22 (quoting Ex. 1005, 17:22–26). Petitioner explains that "providing an output to the drive signal generation circuit effectively provides an output to the power supply." Reply 22.

Petitioner summarizes by asserting that Fukumoto "discloses or suggests" the following:

(1) "a processor";

(2) "circuitry to convert power supplied from, for example, the battery in the electronic device to the AC drive signal (equivalent to the '081 patent's disclosed H-bridge switch)"; and

     (3)    "an algorithm to perform the claimed function with at least equivalent steps to those disclosed in the '081 specification."

Pet. 23 (citing Ex. 1003 ¶¶ 190–191).

     (ii)    <u>Patent Owner's Contentions</u>

Patent Owner disputes that Fukumoto teaches limitation 1f. *See* Resp. 19–25; Sur-reply 7–11. In particular, Patent Owner contends that:

     (1)    the "control component" required by limitation 1f must provide an output to the "power supply" required by limitation 1c; and

     (2)    Petitioner fails to show how Fukumoto's "control component" provides an output Fukumoto's "power supply."

Resp. 21–24; *see* Sur-reply 8–11.

Patent Owner asserts that Fukumoto's Figure 3 shows a personal digital assistant (PDA) and "PDAs of that time indeed used batteries." Resp. 21–22. Patent Owner asserts that Petitioner fails to identify "any prior art battery that would have been capable of receiving an output from a processor." *Id.* at 22.

Regarding Petitioner's two alternative mappings for Fukumoto's drive signal generation circuit 114 depending on whether § 112's means-plus-function provision applies to limitation 1f, Patent Owner contends that the Petition "never identifies" drive signal generation circuit 114 as part of the "power supply" required by limitation 1c. Sur-reply 8. Patent Owner also contends that the Petition "fails to mention any specific component in Fukumoto as the claimed 'power supply.'" *Id.* (citing Pet. 15–16).

Further, Patent Owner asserts that the Petition "makes clear that its theory is that the output to the power supply occurs when the drive signal

generation circuit 114 generates a drive signal, not when the CPU instructs the drive signal generation circuit 114." Sur-reply 9. As support, Patent Owner quotes the following statement in the Petition about CPU 113 and drive signal generation circuit 114: "Fukumoto's CPU provides a corresponding output to the power supply when it 'instructs the drive signal generation circuit 114 to generate a drive signal,' *and in response*, 'the drive signal generation circuit 114 generates a drive signal using the waveform data supplied from the CPU 113.'" *Id.* (emphasis by Patent Owner) (quoting Pet. 22). Patent Owner asserts that if "the Petition really contended that drive signal generation circuit 114 was part of the power supply and that instruction from the CPU to this circuit constituted providing an output to the power supply," then "there would have been no reason to include the second half of the sentence quoted above." *Id.*

Patent Owner notes that the Petition discusses converting "power supplied from, for example, the battery in the electronic device to the AC drive signal." Sur-reply 9–10 (quoting Pet. 23). Patent Owner then contends that "[t]he only natural interpretation of a statement that power is 'supplied' from a battery is that the battery is (at least an example of) the 'power supply' in the Petition's mapping of the claims." *Id.* at 10.

(iii) <u>Analysis</u>

We agree with Petitioner that Fukumoto teaches limitation 1f. *See* Pet. 20–23; Reply 21–22; Ex. 1003 ¶¶ 90–91, 177–191. As discussed above, Petitioner presents two alternative mappings for Fukumoto's drive signal generation circuit 114 depending on whether § 112's means-plus-function provision applies to limitation 1f. *See* Pet. 20–22; Reply 20–22; *supra* § III.D.2(g)(i). As discussed above, we determine that § 112's means-plus-

function provision applies to limitation 1f. *Supra* § III.C.6(c). Hence, our analysis employs Petitioner's means-plus-function mapping for drive signal generation circuit 114 with that circuit as part of the "power supply" required by limitation 1c. *See* Pet. 21–22; Reply 21–22.

In particular, Fukumoto discloses PDA 10 and a hardware configuration for PDA 10 including CPU 113. Ex. 1005, 13:41–59, Figs. 1–2; *see* Ex. 1003 ¶¶ 90–91. As discussed above, the corresponding hardware structure for limitation 1f includes a "processor," "CPU," and "microprocessor." *Supra* § III.C.6(c).

Fukumoto's CPU 113 performs the function recited in limitation 1f: "controls supply of power from the power supply to the driving component to cause the moveable component to oscillate at a frequency and an amplitude specified by user input received from the user-input features." *See* Ex. 1003 ¶¶ 91, 177; Ex. 1005, 13:54–14:26, 17:1–36, 29:15–31, 48:42–47, Fig. 5.

Specifically, as Petitioner explains, a user's input produces a CPU-driven sequence of events causing oscillatory actuator 115 to vibrate at a particular amplitude and frequency as follows:

(1)  a user "touches a button or location of the touch panel";

(2)  the CPU "detects the touch location/button";

(3)  the CPU "reads the corresponding waveform data"; and

(4)  the CPU "generates a drive signal sent to the oscillatory actuator to vibrate at the amplitude and frequency specified by the waveform."

*See* Ex. 1003 ¶¶ 91, 177; Ex. 1005, 13:54–14:26, 17:1–36, 29:15–31, 48:42–47, Fig. 5; Pet. 20–21.

Further, Fukumoto's CPU 113 performs the steps in algorithmic structure according to limitation 1f: "(a) set the mode and strength to [default values or] values representing selections made by user input to the user input features; and (b) provide a corresponding output to the power supply so that the power supply provides a corresponding output to the driving component." *See* Ex. 1003 ¶¶ 91, 179, 189; Ex. 1005, 14:14–19, 17:1–4, 17:7–11, 17:20–26, 17:28–30, 17:32–36, Fig. 5; Pet. 21–2; *supra* § III.C.6(c).

Specifically, CPU 113 "determines whether a touch signal has been input from the touch panel 102 and whether a key operation signal has been input from the key input unit 111." Ex. 1005, 17:1–4, Fig. 5 (step S101); *see* Ex. 1003 ¶¶ 91, 189. When CPU 113 "determines that at least one of the touch signal or key operation signal has been input," CPU 113 "reads from the memory 112 the waveform data of the drive signal to be applied to the oscillatory actuator 115." Ex. 1005, 17:7–11, Fig. 5 (step S102); *see* Ex. 1003 ¶¶ 91, 189.

When CPU 113 reads the waveform data of the drive signal to be applied to the oscillatory actuator, CPU 113 "set[s] the mode and strength to . . . values representing selections made by user input to the user input features" according to algorithmic structure step (a). Ex. 1003 ¶ 189.

Next, CPU 113 "outputs the waveform data read from the memory 112" and "instructs the drive signal generation circuit 114 to generate a drive signal." Ex. 1005, 17:20–23, Fig. 5 (step S103); *see* Ex. 1003 ¶¶ 91, 189. In response to the instruction from CPU 113, "the drive signal generation circuit 114 generates a drive signal using the waveform data supplied from the CPU 113." Ex. 1005, 17:24–26, Fig. 5

(step S103); *see id.* at 14:14–16; Ex. 1003 ¶¶ 91, 189.  Then, "the drive signal generation circuit 114 applies a drive signal to the oscillatory actuator 115 in accordance with instructions from the CPU 113."  Ex. 1005, 14:16–19, 17:28–30, 17:32–36, Fig. 5 (step S105); *see* Ex. 1003 ¶¶ 91, 189.

When CPU 113 instructs drive signal generation circuit 114 to generate a drive signal so that drive signal generation circuit 114 applies a drive signal to the oscillatory actuator, CPU 113 "provide[s] a corresponding output to the power supply so that the power supply provides a corresponding output to the driving component" according to algorithmic structure step (b).  *See* Ex. 1003 ¶ 189.

We disagree with Patent Owner that the Petition "never identifies" drive signal generation circuit 114 as part of the "power supply" required by limitation 1c.  *See* Pet. 21–22; Sur-reply 8.  When assuming that § 112's means-plus-function provision applies to limitation 1f, the Petition sets forth algorithmic structure for limitation 1f.  Pet. 21–22.  Then, the Petition explains how "Fukumoto discloses an equivalent algorithm."  *Id.* at 22.

In particular, the Petition includes the following statement about CPU 113 and drive signal generation circuit 114: "Fukumoto's CPU provides a corresponding output to the power supply when it 'instructs the drive signal generation circuit 114 to generate a drive signal,' and in response, 'the drive signal generation circuit 114 generates a drive signal using the waveform data supplied from the CPU 113.'"  Pet. 22 (quoting Ex. 1005, 17:22–26).  Hence, the Petition indicates that Fukumoto's CPU provides a corresponding output to drive signal generation circuit 114 as part of the "power supply" required by limitation 1c, i.e., when CPU 113

"instructs the drive signal generation circuit 114 to generate a drive signal."
*Id.*

Additionally, during the oral hearing, Patent Owner's counsel agreed that the claimed "power supply" could be met by an element that is "part of the power supply, and that there's something else involved in the supply of power, some further upstream source of power, be it a battery or wall plug or something like that." Tr. 46:24–47:8 (arguing that the Petition lacks such a contention).

Further, as discussed above, Patent Owner references the Petition's statement about CPU 113 and drive signal generation circuit 114 quoted in the preceding paragraph and asserts that if "the Petition really contended that drive signal generation circuit 114 was part of the power supply and that instruction from the CPU to this circuit constituted providing an output to the power supply," then "there would have been no reason to include the second half of the sentence quoted above." Sur-reply 9 (quoting Pet. 22); *see supra* § III.D.2(g)(ii). We disagree.

The "second half of the sentence quoted above" addresses algorithmic structure step (b): "provide a corresponding output to the power supply so that the power supply provides a corresponding output to the driving component." *See* Pet. 22. According to that step, the "power supply" not only receives an output from the "control component," the "power supply" also provides an output to the "driving component." The "second half of the sentence quoted above" indicates that drive signal generation circuit 114 provides an output to the "driving component," i.e., provides an output to coil 121 in oscillatory actuator 115. *See id.* at 17–18, 22.

As Patent Owner notes, when addressing limitation 1c the Petition does not identify drive signal generation circuit 114 as part of the "power supply" required by limitation 1c. *See* Pet. 15–16; Sur-reply 8. But Petitioner does not contend that § 112's means-plus-function provision applies to limitation 1c. *See* Pet. 6–9, 15–16. When addressing limitation 1f, however, the Petition presents two alternative mappings for drive signal generation circuit 114 depending on whether § 112's means-plus-function provision applies to limitation 1f. *See* Pet. 20–22. When explaining how Fukumoto teaches limitation 1f if it is a means-plus-function limitation, the Petition identifies the unpatentability theory with adequate particularity, e.g., that the "power supply" required by limitation 1c includes drive signal generation circuit 114. *See* Pet. 21–22; 35 U.S.C. § 312(a)(3).

(h)    Conclusion About Obviousness/Nonobviousness

For the reasons discussed above, Fukumoto teaches claim 1's subject matter. *See supra* §§ III.D.2(a)–(g). Hence, Petitioner has shown by a preponderance of the evidence that claim 1 is unpatentable under § 103(a) because the claim would have been obvious over Fukumoto.

3.  DEPENDENT CLAIM 2

Claim 2 reads as follows (with bracketed letters added for reference purposes):[5]

2. [pre] The linear vibration module of claim 1 wherein the control component is one of:

[a] an variable oscillator circuit with additional control circuitry; and

[b.i] a control component that includes a microprocessor,

---

[5] We use the same reference letters that Petitioner uses to identify the claim language. *See* Pet. vii (Listing of Challenged Claims).

[b.ii] a control program, stored in an electronic memory within, or separate from, the microprocessor, the control program executed by the microprocessor to control supply of power from the power supply to the driving component to cause the moveable component to oscillate at a frequency and an amplitude specified by user input received from the user-input features.

Ex. 1001, 15:49–61.

Petitioner contends that Fukumoto teaches claim 2's subject matter because Fukumoto discloses a "microprocessor" according to limitation 2b.i and a "control program" according to limitation 2b.ii. *See* Pet. 23–24. Specifically, Petitioner asserts that Fukumoto's CPU 113 executes a program stored in memory for "vibration control processing." *Id.* at 23 (citing Ex. 1005, 14:2–13). Petitioner also asserts that an ordinarily skilled artisan would have understood that the program for "vibration control processing" would be "stored in an electronic memory within, or separate from, the microprocessor" according to limitation 2b.ii "so that CPU 113 could execute it." *Id.* at 23–24 (citing Ex. 1003 ¶ 193).

Additionally, Petitioner contends that Fukumoto teaches "control supply of power from the power supply to the driving component to cause the moveable component to oscillate at a frequency and an amplitude specified by user input received from the user-input features" according to limitation 2b.ii for the reasons Fukumoto teaches limitation 1f. Pet. 24 (citing Ex. 1003 ¶ 193).

Patent Owner makes no arguments specific to claim 2. *See, e.g.*, Resp. 18–27; Sur-reply 7–14.

For the reasons stated by Petitioner and supported by Dr. Wolfe's testimony, we agree with Petitioner that Fukumoto teaches claim 2's subject

matter. *See* Pet. 20–24; Reply 21–22; Ex. 1003 ¶¶ 90–91, 177–193. Hence, Petitioner has shown by a preponderance of the evidence that claim 2 is unpatentable under § 103(a) because the claim would have been obvious over Fukumoto.

### 4. DEPENDENT CLAIM 3

Claim 3 depends directly from claim 1 and further requires that "the control component receives output signals from sensors within the linear vibration module during operation of the linear vibration module and adjusts one or more operational control outputs of the control component according to the received output signals from the sensors." Ex. 1001, 15:62–67.

Petitioner contends that Fukumoto teaches claim 3's subject matter if § 112's means-plus-function provision does not apply to claim 3. *See* Pet. 24–27. Petitioner does not contend that Fukumoto teaches claim 3's subject matter if § 112's means-plus-function provision applies to claim 3. *See id.*

As discussed above, we determine that § 112's means-plus-function provision applies to claim 3. *Supra* § III.C.7(c). Because Petitioner does not contend that Fukumoto teaches claim 3's subject matter if § 112's means-plus-function provision applies to claim 3, Petitioner has not shown by a preponderance of the evidence that claim 3 is unpatentable under § 103(a) based on Fukumoto.

### 5. DEPENDENT CLAIM 7

Claim 7 depends directly from claim 1 and specifies that "the driving component comprises one or more electromagnetic coils that generate magnetic fields parallel to the directions in which the moveable component is driven by the driving component." Ex. 1001, 16:29–33.

Petitioner contends that Fukumoto teaches claim 7's subject matter because Fukumoto discloses "coil 121 used to drive movable weight 122." Pet. 27–28 (citing Ex. 1005, 14:57–60, Fig. 3). Further, Petitioner asserts that an ordinarily skilled artisan "would have recognized the magnetic fields are generated parallel to the direction of moveable weight 112's vibrational movement (i.e., so that moveable weight 112 moves up and down)." *Id.* at 28 (citing Ex. 1003 ¶¶ 198–200).

Patent Owner makes no arguments specific to claim 7. *See, e.g.*, Resp. 18–27; Sur-reply 7–14.

For the reasons stated by Petitioner and supported by Dr. Wolfe's testimony, we agree with Petitioner that Fukumoto teaches claim 7's subject matter. *See* Pet. 27–28; Ex. 1003 ¶¶ 198–200. Hence, Petitioner has shown by a preponderance of the evidence that claim 7 is unpatentable under § 103(a) because the claim would have been obvious over Fukumoto.

## 6. DEPENDENT CLAIM 8

Claim 8 reads as follows (with bracketed letters added for reference purposes):[6]

> 8. [a] The linear vibration module of claim 1 wherein the housing is a linear tube, capped at both ends by movable-component-repelling components selected from one of mechanical springs and magnets;
>
> [b] wherein the movable component is a magnet shaped to slide within the linear tube; and
>
> [c] wherein the driving component is an electromagnetic coil.

Ex. 1001, 16:34–40.

---

[6] We use the same reference letters that Petitioner uses to identify the claim language. *See* Pet. ix (Listing of Challenged Claims).

(a)    Petitioner's Contentions

Petitioner contends that Fukumoto teaches claim 8's subject matter for several related reasons.  *See* Pet. 29–31.  First, Petitioner asserts that Patent Owner argued in the Samsung litigation that a "linear tube" may have a rectangular cross-section.  *Id.* at 29 (citing Ex. 1022, 61).  Petitioner asserts that Fukumoto discloses a linear vibration module where "the housing is a linear tube" because oscillatory actuator 115 in Fukumoto's Figure 3 includes case 115a with a rectangular cross-section.  *Id.* (citing Ex. 1005, 14:26–44, Fig. 3).  To support its assertion, Petitioner presents an annotated and highlighted version of Figure 3 as reproduced below (*id.*):



Figure 3 illustrates oscillatory actuator 115 including case 115a, coil 121, movable weight 122, and spring 123.  Ex. 1005, 14:27–37, Fig. 3.  The above annotated and highlighted version of Figure 3 includes red highlighting over case 115a and the annotation "Case 115a (Housing)" with a line leading to highlighted case 115a.  *See* Pet. 29; Ex. 1003 ¶ 202.

Second, Petitioner asserts that oscillatory actuator 115 has "one end of case 115a capped by spring 123" and Fukumoto's Figure 83 shows an oscillatory actuator with both ends of the case (housing) capped by springs. Pet. 30; *see* Reply 23.  To support its assertion, Petitioner presents an

annotated and highlighted version of Figure 83 as reproduced below
(Pet. 30):



Figure 83 illustrates an electrostatic-type oscillatory actuator with case 811,
movable weight 813, electrode 812a arranged on the bottom of movable
weight 813, counter electrode 814a arranged on case 811 opposite
electrode 812a, electrode 812b arranged on the top of movable weight 813,
counter electrode 814b arranged on case 811 opposite electrode 812b,
spring 815a connected between case 811 and the bottom of movable
weight 813, and spring 815b connected between case 811 and the top of
movable weight 813.  *See* Ex. 1005, 13:22–24, 49:66–50:7, Fig. 83.  The
above annotated and highlighted version of Figure 83 includes:

- red highlighting over case 811;

- red highlighting over movable weight 813;

- the annotation "Movable weight 813 (movable
  component) reciprocates in two opposite directions
  within case (housing)" with a line leading to highlighted
  movable weight 813; and

- the annotation "Two supporting springs, one on either side of moving component" with lines leading to springs 815a and 815b.

*See* Pet. 30; Ex. 1003 ¶ 202.

Third, Petitioner asserts that an ordinarily skilled artisan would have been motivated to modify Figure 3's oscillatory actuator in view of Figure 83's oscillatory actuator to include springs on both the top and bottom of movable weight 122 in Figure 3 because "using multiple springs" would:

(1) "dampen the vibration forces without damaging other components (e.g., the screen)"; and

(2) "double the force of vibration created for greater effect while requiring less power."

Pet. 30 (citing Ex. 1003 ¶¶ 199, 202; Ex. 1005, 50:1–13, Fig. 83); *see* Reply 24 (citing Ex. 1003 ¶ 202; Ex. 1005, 50:1–13; Ex. 2010, 46:23–47:6).

Although Petitioner provides this motivation to modify Figure 3's oscillatory actuator in view of Figure 83's oscillatory actuator, Petitioner argues that it "is not required to provide a motivation to combine the express disclosures of a single reference." Reply 23 (citing *Gen. Elec. Co. v. Raytheon Techs. Corp.*, 983 F.3d 1334, 1351–52 (Fed. Cir. 2020)). Petitioner also argues that Fukumoto includes "express language" that "explicitly suggests" modifying Figure 3's oscillatory actuator in view of Figure 83's oscillatory actuator. *Id.* (citing Ex. 1005, 48:53–55, 49:65–50:1, 50:9–13).

Fourth, Petitioner asserts that "when the 'movable-component-repelling components' are mechanical springs," an ordinarily skilled artisan "would not have understood 'capped' to require the springs to act as end

caps." Pet. 30–31 (citing Ex. 1003 ¶ 203). Petitioner asserts that because "mechanical springs have open space," an ordinarily skilled artisan "would have understood that such springs would have been attached to a surface of the housing." *Id.* at 31 (citing Ex. 1003 ¶ 203).

Fifth, Petitioner asserts that oscillatory actuator 115 in Figure 3 includes movable weight 122 as a "movable component [that] is a magnet shaped to slide within the linear tube" according to limitation 8b. Pet. 31 (citing Ex. 1005, 14:20–37).

Sixth, Petitioner asserts that oscillatory actuator 115 in Figure 3 includes coil 121 as a "driving component [that] is an electromagnetic coil" according to limitation 8c. Pet. 31; *see id.* at 17–18 (citing Ex. 1003 ¶¶ 170–175; Ex. 1005, 14:57–60, Fig. 3).

(b)   Patent Owner's Contentions

Patent Owner contends that Petitioner fails to provide "an adequate motivation to modify" Figure 3's oscillatory actuator in view of Figure 83's oscillatory actuator to yield claim 8's subject matter. *See* Resp. 25–27; Sur-reply 11–14.

Regarding the rationale that "using multiple springs" would "dampen the vibration forces without damaging other components (e.g., the screen)," Patent Owner asserts that Figure 3's oscillatory actuator "already has structures between the weight 122 and the screen 103, including the spring 123, coil 121, and case 115a." Resp. 25–26 (citing Ex. 2008 ¶ 92). Patent Owner further asserts that Petitioner fails to explain:

(1)   "how the weight could damage the screen or other components in spite of these structures keeping them separate"; and

> (2) "how the addition of a second spring would make damage less likely."

*Id.* at 26 (citing Ex. 2008 ¶ 93).

Regarding the rationale that "using multiple springs" would "double the force of vibration created for greater effect while requiring less power," Patent Owner asserts that Petitioner fails to provide "any evidence or explanation for how increasing the force and effect of vibration would reduce the power required." Resp. 26. Patent Owner asserts that "there is no reason to expect that increasing forces will *decrease* power requirements" because "doubling the force on an object while keeping the distance and speed it moves the same is going to roughly double power consumption." *Id.* at 26–27 (emphasis by Patent Owner) (citing Ex. 2008 ¶ 94).

Regarding the rationale that "using multiple springs" would "double the force of vibration created for greater effect while requiring less power," Patent Owner asserts that Fukumoto attributes doubling the force in Figure 83's oscillatory actuator to "doubling the electrostatic force by doubling the number of electrodes," not doubling the number of springs. Resp. 27 (citing Ex. 1005, 50:4–13; Ex. 2008 ¶ 95). According to Patent Owner, "[d]oubling the number of springs without changing the force that drives the oscillations is not likely to increase the vibrations." *Id.* (citing Ex. 2008 ¶ 95).

Additionally, Patent Owner disputes that Petitioner "is not required to provide a motivation to combine the express disclosures of a single reference." Sur-reply 11–12. Regarding the *General Electric* decision cited by Petitioner, Patent Owner asserts that it stands for the proposition that "there is no need to show a motivation to combine elements in the way that a

prior art reference has already combined them, by including them within a single embodiment." *Id.* at 12 (emphasis omitted) (citing *Gen. Elec.*, 983 F.3d at 1352). According to Patent Owner, "the Federal Circuit has clearly stated that both a motivation to combine and reasonable expectation of success must be demonstrated, when seeking to combine multiple embodiments from the same reference." *Id.*

Patent Owner also disputes that Fukumoto includes "express language" that "explicitly suggests" modifying Figure 3's oscillatory actuator in view of Figure 83's oscillatory actuator. Sur-reply 13.

(c)   Analysis

We agree with Patent Owner that Petitioner fails to provide an "apparent reason" to modify Figure 3's oscillatory actuator in view of Figure 83's oscillatory actuator to yield claim 8's subject matter. *See* Pet. 29–30; Resp. 25–27; Reply 22–24; Sur-reply 11–14; Ex. 1003 ¶ 202; Ex. 2008 ¶¶ 92–95; *KSR*, 550 U.S. at 418.

Petitioner argues erroneously that it "is not required to provide a motivation to combine the express disclosures of a single reference." *See* Reply 23. Whether a proposed combination rests on "combining disclosures from multiple references, combining multiple embodiments from a single reference, or selecting from large lists of elements in a single reference, there must be a motivation to make the combination and a reasonable expectation that such a combination would be successful." *In re Stepan Co.*, 868 F.3d 1342, 1346 n.1 (Fed. Cir. 2017).

The *General Electric* decision cited by Petitioner does not hold otherwise. In *General Electric*, the Federal Circuit considered an obviousness challenge based on combining disclosures from multiple

references, i.e., a primary reference called Wendus and a secondary reference called Moxon. *See Gen. Elec.*, 983 F.3d at 1339–40, 1344–52. The Federal Circuit criticized the Board for dissecting an embodiment disclosed in the primary reference into a collection of "individual elements" and requiring the patent challenger to "re-do the work already done" regarding that embodiment in the primary reference. *Id.* at 1351–52. The Federal Circuit did not consider an obviousness challenge based on combining multiple embodiments from a single reference. *See id.* at 1344–52.

Regarding the rationale that "using multiple springs" would "dampen the vibration forces without damaging other components (e.g., the screen)," Petitioner fails to explain how movable weight 122 in oscillatory actuator 115 could damage touch panel 102 or display panel 103a when various structures separate those panels from movable weight 122. *See* Pet. 29–30; Ex. 1003 ¶ 202; Ex. 2008 ¶¶ 92–93.

Regarding the rationale that "using multiple springs" would "double the force of vibration created for greater effect while requiring less power," adding another spring like spring 123 to oscillatory actuator 115 in Figure 3 would "roughly double power consumption" because "the power required to move an object equals the force on the object times its speed." Ex. 2008 ¶ 94.

Further, as Patent Owner asserts, Fukumoto attributes doubling the force in Figure 83's oscillatory actuator to "doubling the electrostatic force by doubling the number of electrodes," not doubling the number of springs. *See* Ex. 1005, 49:10–50:13, Figs. 82–83; Ex. 2008 ¶ 95; Resp. 27. Specifically, Fukumoto's Figure 82 shows an electrostatic-type oscillatory

actuator similar to Figure 83's oscillatory actuator except that Figure 82's oscillatory actuator includes only one pair of counter electrodes (electrodes 802 and 804) and only one spring (spring 805). Ex. 1005, 49:10–48, Fig. 82. When comparing Figure 83's oscillatory actuator to Figure 82's oscillatory actuator, Fukumoto explains that Figure 83's oscillatory actuator includes "two pairs of counter electrodes." *Id.* at 50:4–7. Hence, when "one pair of counter electrodes are in a repelling state, the other pair of counter electrodes are in an attracting state." *Id.* at 50:7–9. Thus, "the electrostatic force for causing the movable weight 813 [in Figure 83] to reciprocate becomes double and a greater vibration can be generated" compared to the movable weight in Figure 82. *Id.* at 50:9–13.

Additionally, we disagree with Petitioner that Fukumoto includes "express language" that "explicitly suggests" modifying Figure 3's oscillatory actuator in view of Figure 83's oscillatory actuator. *See* Reply 23. In particular, Petitioner points to Fukumoto's disclosure that "the vibrator generator [in Figure 3] is not limited to a linear oscillatory actuator." Ex. 1005, 48:53–55 (cited by Reply 23). That disclosure says nothing about modifying springs in a linear oscillatory actuator.

Petitioner also points to Fukumoto's comparison of Figure 83's oscillatory actuator to Figure 82's oscillatory actuator. *See* Ex. 1005, 49:65–50:1, 50:9–13 (cited by Reply 23). That comparison has no relationship to Figure 3's oscillatory actuator, e.g., because Figure 3's oscillatory actuator generates vibrations using electromagnetic force produced by a coil instead of electrostatic force produced by counter electrodes. *See id.* at 13:19–24, 14:20–24, 14:56–60, 49:20–48, 50:1–13.

Because Petitioner fails to provide "an adequate motivation to modify" Figure 3's oscillatory actuator in view of Figure 83's oscillatory actuator to yield claim 8's subject matter, Petitioner has not shown by a preponderance of the evidence that claim 8 is unpatentable under § 103(a) based on Fukumoto.

### 7. DEPENDENT CLAIM 9

Claim 9 reads as follows:

> 9. The linear vibration module of claim 1
>
> wherein the housing is a linear tube, capped at both ends by movable-component-repelling components; and
>
> wherein the moveable component includes an electromagnetic-coil driving component and microprocessor.

Ex. 1001, 16:41–45.

Petitioner contends that Fukumoto teaches claim 9's subject matter for several related reasons. *See* Pet. 31–33; *see also id.* at 29–31.

For the limitation "wherein the housing is a linear tube, capped at both ends by movable-component-repelling components," Petitioner asserts that an ordinarily skilled artisan would have been motivated to modify Figure 3's oscillatory actuator in view of Figure 83's oscillatory actuator to include springs on both the top and bottom of movable weight 122 in Figure 3 for the reasons discussed for claim 8. *See* Pet. 30–31; Ex. 1003 ¶¶ 202, 208. For example, Dr. Wolfe presents the annotated and highlighted version of Fukumoto's Figure 83 reproduced above when discussing the motivation to modify Figure 3's oscillatory actuator for claim 8 and the motivation to modify Figure 3's oscillatory actuator for claim 9. Ex. 1003 ¶¶ 202, 208.

For the reasons Petitioner fails to provide "an adequate motivation to modify" Figure 3's oscillatory actuator in view of Figure 83's oscillatory

actuator to yield claim 8's subject matter, Petitioner also fails to provide "an adequate motivation to modify" Figure 3's oscillatory actuator in view of Figure 83's oscillatory actuator to yield claim 9's subject matter. *See* Pet. 29–31; Resp. 25–27; Reply 22–24; Sur-reply 11–14; Ex. 1003 ¶¶ 202, 208; Ex. 2008 ¶¶ 92–95. Hence, Petitioner has not shown by a preponderance of the evidence that claim 9 is unpatentable under § 103(a) based on Fukumoto.

### 8. DEPENDENT CLAIM 17

Claim 17 depends directly from claim 1 and specifies that "the control component controls supply of power from the power supply to the driving component to cause the moveable component to oscillate at a frequency and an amplitude that are independently specified by user input received from the user-input features." Ex. 1001, 17:19–24.

Petitioner contends that Fukumoto teaches claim 17's subject matter because Fukumoto discloses the following:

(1)  a user "touches a button or location of the touch panel";

(2)  the CPU "detects the touch location/button";

(3)  the CPU "reads the corresponding waveform data containing frequency and amplitude attributes from memory";

(4)  the CPU "generates a drive signal sent to the oscillator actuator to vibrate according to the specified waveform's amplitude and frequency"; and

(5)  the user "can also change only the amplitude of the drive signal in proportion to the value of the parameter and change the magnitude of the vibration."

Pet. 34–35 (citing Ex. 1003 ¶ 216; Ex. 1005, 13:54–14:25, 29:9–11, 29:15–18, 31:27–29).

Patent Owner makes no arguments specific to claim 17. *See, e.g.,* Resp. 18–27; Sur-reply 7–14.

We agree with Petitioner that Fukumoto teaches claim 17's subject matter. *See* Pet. 34–35; Ex. 1003 ¶¶ 91–92, 176–177, 216–217. Specifically, Fukumoto discloses assigning different frequency-amplitude pairings to different touch buttons and storing each pairing as waveform data in a table. *See, e.g.,* Ex. 1005, 14:2–4, 16:48–50, 28:60–29:44, Fig. 33; *see also* Ex. 1003 ¶¶ 91–92. Fukumoto's Figure 33 (reproduced below) depicts a table for storing waveform data:

FIG. 33



Figure 33 illustrates waveform data table 112a that stores "area data showing the area occupied by a touch button on the touch panel 102 using XY coordinates as well as waveform data of the drive signal to be applied to the oscillatory actuator 115 when that touch button is pressed." Ex. 1005, 29:1–8, Fig. 33; *see* Ex. 1003 ¶ 92.

Fukumoto explains that when a user presses a touch button, CPU 113 (1) "finds the XY coordinate data of a touched position based on the touch signal," (2) "refers to the waveform data table 112a," (3) "identifies the pressed touch button," (4) "reads from the waveform data table 112a the waveform data of the drive signal linked with the identified touch button,"

and (5) "outputs the read waveform data to" drive signal generation circuit 114. Ex. 1005, 29:19–29; *see id.* at 17:1–21, Fig. 5; Ex. 1003 ¶¶ 176, 216.

Fukumoto also discloses changing the frequency-amplitude pairing for a particular table entry based on user input, e.g., to "change the mode of vibration for reporting that a touch operation has been received according to the value of the parameter changed" by a user. *See* Ex. 1005, 30:48–31:54, Figs. 41–46. For instance, a user may manipulate a "knob" to adjust the value of a parameter and select one of the following:

(1)    a first frequency-amplitude pairing when the parameter's value ranges between 0 and 25;

(2)    a second frequency-amplitude pairing when the parameter's value ranges between 26 and 50;

(3)    a third frequency-amplitude pairing when the parameter's value ranges between 51 and 75; and

(4)    a fourth frequency-amplitude pairing when the parameter's value ranges between 76 and 100.

*Id.* at 30:48–31:11, Figs. 41–42. When changing a frequency-amplitude pairing, a user "can also change only the amplitude of the drive signal in proportion to the value of the parameter and change the magnitude of the vibration." *Id.* at 31:27–29.

Selecting a particular frequency-amplitude pairing from a plurality of discrete frequency-amplitude pairings and then "chang[ing] only the amplitude" teaches "independently" specifying "a frequency and an amplitude" according to claim 17. *See* Pet. 34–35; Ex. 1003 ¶¶ 216–217. Claim 17 does not require specifying "a frequency" value or "an amplitude" value from a continuous range of values. *See* Ex. 1001, 17:19–24.

Specifying "a frequency" value or "an amplitude" value from a plurality of discrete values suffices for claim 17.

For these reasons, we agree with Petitioner that Fukumoto teaches claim 17's subject matter. *See* Pet. 34–35; Ex. 1003 ¶¶ 91–92, 176–177, 216–217. Hence, Petitioner has shown by a preponderance of the evidence that claim 17 is unpatentable under § 103(a) because the claim would have been obvious over Fukumoto.

### E. Alleged Obviousness over Fukumoto and Either Grant or Barton: Claims 1–3, 7–9, and 17

Petitioner contends that claims 1–3, 7–9, and 17 are unpatentable under § 103(a) because the claims would have been obvious over Fukumoto and either Grant or Barton. *See* Pet. 35–45. Patent Owner disputes Petitioner's contentions. *See* Resp. 28–30.

We need not decide whether claims 1, 2, 7, and 17 are unpatentable under § 103(a) based on Fukumoto and either Grant or Barton because other challenges resolve the patentability of those claims based on the asserted references. *See supra* §§ III.D.2–III.D.3, III.D.5, III.D.8; *infra* §§ III.K.1–III.K.3, III.K.5. For instance, the challenge based on Fukumoto alone resolves the patentability of claims 1, 2, 7, and 17. *See supra* §§ III.D.2–III.D.3, III.D.5, III.D.8.

As for claim 3, Petitioner asserts that "Fukumoto discloses or suggests" claim 3's limitations. Pet. 37, 44; *see id.* at 24–27. Petitioner does not rely on Grant or Barton for teaching claim 3's limitations. *See id.* at 37–38, 44. Because Petitioner does not rely on Grant or Barton for teaching claim 3's limitations, Petitioner fails to show how Grant or Barton cures Fukumoto's infirmities with respect to claim 3 for the challenge based

on Fukumoto alone. *See id.* at 35–45; *supra* §§ III.D.4. Hence, Petitioner has not shown by a preponderance of the evidence that claim 3 is unpatentable under § 103(a) based on Fukumoto and either Grant or Barton.

Additionally, Petitioner does not rely on Grant or Barton for teaching the limitations in claims 8 and 9. *See* Pet. 37–38, 44. Because Petitioner does not rely on Grant or Barton for teaching the limitations in claims 8 and 9, Petitioner fails to show how Grant or Barton cures Fukumoto's infirmities with respect to claims 8 and 9 for the challenge based on Fukumoto alone. *See id.* at 35–45; *supra* §§ III.D.6–III.D.7. Hence, Petitioner has not shown by a preponderance of the evidence that claims 8 and 9 are unpatentable under § 103(a) based on Fukumoto and either Grant or Barton.

### F. *Alleged Obviousness over Fukumoto and Ueda: Claims 3–6*

Petitioner contends that claims 3–6 are unpatentable under § 103(a) because the claims would have been obvious over Fukumoto and Ueda. *See* Pet. 45–56; Reply 24–26. Patent Owner disputes Petitioner's contentions. *See* Resp. 30–31; Sur-reply 14–16.

Above, we provided an overview of Fukumoto. *See supra* § III.D.1. Below, we provide an overview of Ueda. Then, we consider the obviousness issues. For the reasons explained below, we disagree with Petitioner that claims 3–6 are unpatentable under § 103(a) because the claims would have been obvious over Fukumoto and Ueda.

#### 1. OVERVIEW OF UEDA (EXHIBIT 1008)

Ueda is a U.S. patent application publication titled "Control System for a Linear Vibration Motor," filed on July 15, 2003, and published on September 2, 2004. Ex. 1008, codes (12), (22), (43), (54). Ueda states that

the invention "relates to motor driving apparatuses and, more particularly, to a motor driving apparatus for driving a linear vibration motor having a mover and a spring member for supporting the mover." *Id.* ¶ 1.

Ueda identifies deficiencies in conventional motor driving apparatuses for linear vibration motors. *See* Ex. 1008 ¶¶ 6–20. For example, "the maximum output of the linear vibration motor is restricted by the voltage level of the DC voltage applied to the motor driving apparatus." *Id.* ¶ 17. Ueda endeavors to address those deficiencies by disclosing motor driving apparatuses for linear vibration motors that employ feedback control. *See, e.g.*, *id.* ¶¶ 42–44, 77–80, 90, 97–101, 138–141, 164–165, Figs. 2, 3(a), 4(a).

Ueda's Figure 4(a) (reproduced below) depicts a motor driving apparatus for a linear vibration motor that employs feedback control:



Fig.4 (a)

Figure 4(a) illustrates motor driving apparatus 104 receiving a DC voltage Vp from external power supply 10 and providing an AC voltage Vd to linear vibration motor 100. Ex. 1008 ¶¶ 139–140, 146, Fig. 4(a).

As Figure 4(a) shows, motor driving apparatus 104 includes the following components:

- motor driver 1a;
- driving frequency determining unit 2c;
- order output determining unit 3;
- output detector 4;
- position detector 5;
- resonance frequency determining unit 6; and
- driving voltage determining unit 7.

Ex. 1008 ¶¶ 141–143, 146, Fig. 4(a).

Output detector 4 detects "a motor output Omp from the linear vibration motor 100." Ex. 1008 ¶ 161, Fig. 4(a); *see id.* ¶ 141. Output detector 4 provides "an output detection signal Dop indicating the detected motor output" to driving voltage determining unit 7. *Id.* ¶¶ 141, 161, Fig. 4(a).

Position detector 5 detects "the position of the reciprocating mover of the linear vibration motor 100." Ex. 1008 ¶ 142, Fig. 4(a). Position detector 5 provides "a position detection signal Dposi indicating the detected mover position" to driving frequency determining unit 2c. *Id.* ¶¶ 142–143, Fig. 4(a).

Order output determining unit 3 determines "a target output as a motor output required of the linear vibration motor 100." Ex. 1008 ¶ 141. Order output determining unit 3 provides "an output order signal Oop

indicating the determined target output" to driving voltage determining unit 7. *Id.* ¶¶ 141, 149, 161, Fig. 4(a).

Resonance frequency determining unit 6 determines "a resonance frequency signal Dreso indicating the resonance frequency of the linear vibration motor 100." Ex. 1008 ¶ 142. Resonance frequency determining unit 6 provides the resonance frequency signal Dreso to driving frequency determining unit 2c. *Id.* ¶ 143, Fig. 4(a).

Driving frequency determining unit 2c determines "a driving frequency of the linear vibration motor 100" based on the position detection signal Dposi from position detector 5 and the resonance frequency signal Dreso from resonance frequency determining unit 6. Ex. 1008 ¶¶ 143, 159; *see id.* ¶¶ 152–153. Driving frequency determining unit 2c provides "a driving frequency signal Ifr indicating the determined driving frequency" to motor driver 1a. *Id.* ¶¶ 143, 159, Fig. 4(a).

Driving voltage determining unit 7 determines "an amplitude value of an AC voltage to be supplied as a driving voltage to the linear vibration motor 100," i.e., the amplitude value of the AC voltage Vd provided by motor driver 1a to linear vibration motor 100, based on the output detection signal Dop from output detector 4 and the output order signal Oop from order output determining unit 3. Ex. 1008 ¶¶ 141, 149, 162. Driving voltage determining unit 7 provides "a voltage amplitude signal Odv indicating the determined amplitude value" to motor driver 1a. *Id.* ¶¶ 141, 162, Fig. 4(a).

Motor driver 1a provides the AC voltage Vd having (1) "a frequency equal to the driving frequency determined by the driving frequency determining unit 2c" and (2) "the amplitude value determined by the driving

voltage determining unit 7" to linear vibration motor 100 based on "the driving frequency signal Ifr and the voltage amplitude signal Odv." Ex. 1008 ¶ 146, Fig. 4(a); *see id.* ¶ 163. Specifically, "the amplitude value of the AC voltage Vd is changed to a larger value when the detected output Dop is smaller than the order output Oop." *Id.* ¶ 162. Conversely, "the amplitude value of the AC voltage Vd is changed to a smaller value when the detected output Dop is larger than the order output Oop." *Id.*

## 2. DEPENDENT CLAIM 3

Claims 3 reads as follows:

> 3. The linear vibration module of claim 1 wherein the control component receives output signals from sensors within the linear vibration module during operation of the linear vibration module and adjusts one or more operational control outputs of the control component according to the received output signals from the sensors.

Ex. 1001, 15:62–67.

(a)    Petitioner's Contentions

Petitioner contends that the combined disclosures in Fukumoto and Ueda teach claim 3's limitations for several related reasons. *See* Pet. 46–51; Reply 24–26. In particular, regarding the functions recited in claims 3, Petitioner asserts that Ueda "discloses closed-loop feedback control for a linear vibration motor based on the output from multiple sensors." Pet. 46–47 (citing Ex. 1003 ¶ 240).

According to Petitioner, Ueda's motor driving apparatus 104 includes the following components for controlling linear vibration motor 100 and performing the functions recited in claim 3:

> (1)    "output detector 4 for detecting the motor output generated by the linear vibration motor 100" and

"outputting an output detection signal Dop indicating the detected motor output";

(2)     "position detector 5 for detecting the position of the reciprocating mover of the linear vibration motor 100" and "outputting a position detection signal Dposi indicating the detected mover position";

(3)     order output determining unit 3 outputting an output order signal Oop;

(4)     resonance frequency determining unit 6 outputting a resonance frequency signal Dreso;

(5)     driving frequency determining unit 2c that determines "a driving frequency of the linear vibration motor 100" based on the position detection signal Dposi from position detector 5 and the resonance frequency signal Dreso from resonance frequency determining unit 6;

(6)     driving voltage determining unit 7 that determines "an amplitude value of the driving voltage of the linear vibration motor 100" based on the output detection signal Dop from output detector 4 and the output order signal Oop from order output determining unit 3; and

(7)     motor driver 1a that receives a driving frequency signal Ifr from driving frequency determining unit 2c and a voltage amplitude signal Odv from driving voltage determining unit 7.

Pet. 47–49, 51–52 (citing Ex. 1003 ¶ 240; Ex. 1008 ¶¶ 140–143, 149, 156–162, 169–175, Fig. 4(a)); *see* Reply 25 n.2 (citing Ex. 1008 ¶ 152). For the "operational control outputs" required by claim 3, Petitioner identifies the (1) the "frequency" of the AC voltage Vd corresponding to the driving frequency signal Ifr from driving frequency determining unit 2c and (2) the "amplitude" of the AC voltage Vd corresponding to the voltage amplitude signal Odv from driving voltage determining unit 7. Pet. 49–50, 52.

Appx0086

Additionally, Petitioner contends that based on a comparison of the output detection signal Dop and the output order signal Oop by driving voltage determining unit 7, the amplitude value of the AC voltage Vd "is changed to a larger value when the detected output Dop is smaller than the order output Oop," and conversely "the amplitude value of the AC voltage Vd is changed to a smaller value when the detected output Dop is larger than the order output Oop." Pet. 47 (quoting Ex. 1008 ¶ 162) (citing Ex. 1003 ¶ 240). Petitioner also contends that:

(1)     when "the position detection signal Dposi indicates 'the detected position does not exceed a predetermined reference position, the driving frequency of the linear vibration motor 100 is set at the resonance frequency'"; and

(2)     when "the position detection signal Dposi exceeds the reference position 'the driving frequency of the linear vibration motor 100 is set at a frequency higher than the resonance frequency.'"

*Id.* at 49 (quoting Ex. 1008 ¶ 160) (citing Ex. 1003 ¶ 241).

Further, Petitioner asserts that Ueda teaches adjusting "one or more operational control outputs of the control component according to the received output signals from the sensors" according to claim 3 because Ueda discloses "adjusting amplitude based on Dop and adjusting frequency based on Dposi." Pet. 49–50 (citing Ex. 1003 ¶ 242).

Additionally, Petitioner contends that "Ueda teaches a processor programmed with" following algorithmic steps:

(1)     "convert the received output signal into an integer";

(2)     "compare that integer to a specific value"; and

(3)     "adjust one or more operational control outputs based on that comparison."

Pet. 50–51.

For the "convert" step (1), Petitioner asserts that "Ueda teaches converting Dop (the received output signal from output detector 4) into an amplitude value and converting Dposi (the received output signal from position detector 5) into a frequency." Pet. 50 (citing Ex. 1003 ¶ 246; Ex. 1008 ¶¶ 149, 152). Petitioner also asserts that an ordinarily skilled artisan "would have readily understood that Ueda converts the Dop and Dposi signals to integers" because "Ueda discloses that the 'magnitude' of Dop is used for comparison against another specific value (i.e., the 'magnitude' of Oop)." Reply 25 (citing Ex. 1008 ¶ 149). According to Petitioner, the "conversion, from the Dop signal to a 'magnitude' value is a conversion to an integer." Id. (citing Ex. 1003 ¶¶ 245–246).

For the "compare" step (2), Petitioner asserts that "Ueda compares each of those converted values against a specific value (amplitude [Dop] against Oop and frequency [Dposi] against Dreso)." Pet. 50 (citing Ex. 1003 ¶ 246; Ex. 1008 ¶¶ 149, 152–153); see Reply 25 (discussing a comparison of the output detection signal Dop from output detector 4 and the output order signal Oop from order output determining unit 3).

For the "adjust" step (3), Petitioner asserts that "Ueda adjusts driving voltage and frequency (operational control outputs) based on those comparisons." Pet. 50 (citing Ex. 1003 ¶ 246; Ex. 1008 ¶¶ 149, 152–153).

In the Reply, Petitioner argues that the proposed Fukumoto-Ueda system would "implement Ueda's algorithm in a general-purpose processor" and that an ordinarily skilled artisan would have understood that "the raw input from the sensors of Ueda must be converted to digital values to be

processed and compared." Reply 26 (citing Ex. 1003 ¶¶ 245, 340; Ex. 1047
¶¶ 16–17).

(b)    Patent Owner's Contentions

Patent Owner disputes that Ueda teaches algorithmic structure
according Petitioner's proposed algorithm for claim 3 that we adopt. *See*
Resp. 30–31; Sur-reply 14–16; *supra* § III.C.7(c). In particular, Patent
Owner disputes that Ueda teaches "convert[ing] the received output signal
into an integer." *See* Resp. 30–31; Sur-reply 14–16.

Patent Owner contends that Ueda "never mentions any integer, nor
suggests that any of the values relied on by [Petitioner] is an integer."
Resp. 30 (citing Ex. 2008 ¶ 109); *see* Sur-reply 15. Patent Owner contends
that Ueda "never mentions or suggests digital signals," "integers, digital
values, or processors." Sur-reply 15. According to Patent Owner, "Ueda's
specification contains the word 'voltage' 369 times" and "consistently reads
as an analog system, utilizing feedback control to control analog voltages."
*Id.* Patent Owner also contends that comparing "the magnitude of the output
signals Oop and Dop," as disclosed in Ueda, does not "require conversion to
a digital value, let alone to an integer." Sur-reply 15.

Additionally, Patent Owner contends that Petitioner provides no
evidence that an ordinarily skilled artisan would have been "motivated to
modify Ueda's teachings to utilize an integer value." Resp. 30–31 (citing
Pet. 50–51; Ex. 1003 ¶¶ 245–246; Ex. 2008 ¶ 109); *see* Sur-reply 16.

In the Sur-reply, Patent Owner asserts that Petitioner's argument in
the Reply about "implement[ing] Ueda's algorithm in a general-purpose
processor" is "a new argument." Sur-reply 15; *see id.* at 16; Reply 26.
Patent Owner asserts that Petitioner argued in the Petition that "Ueda itself

taught a processor programmed with the necessary steps, including conversion to an integer." *Id.* (citing Pet. 50–51).

(c)    Analysis

We agree with Patent Owner that Ueda does not teach "convert[ing] the received output signal into an integer." *See* Resp. 30–31; Sur-reply 14–16. As Petitioner admits, Ueda does not use the word "integer." *See* Ex. 2008 ¶¶ 109, 184; Reply 25. Instead, for "integer" conversion, Petitioner points to the comparison of "magnitude" values for Dop and Oop disclosed in Ueda's paragraph 149 and contends that the "conversion, from the Dop signal to a 'magnitude' value is a conversion to an integer." Reply 25 (citing Ex. 1003 ¶¶ 245–246; Ex. 1008 ¶ 149).

Ueda's paragraph 149 reads as follows:

> The driving voltage determining unit 7 receives the output order signal Oop from the order output determining unit 3 and the output detection signal Dop from the output detector 4, and determines an amplitude value of the driving voltage of the linear vibration motor 100, i.e., an amplitude value of the AC voltage Vd to be supplied from the motor driver 1a to the linear vibration motor 100, on the basis of a result of comparison between the magnitude of the order output indicated by the output order signal Oop and the magnitude of the detection output indicated by the output detection signal Dop.

Ex. 1008 ¶ 149.

Dr. Goossen testifies that the comparison of "magnitude" values for Dop and Oop disclosed in paragraph 149 involves analog signals, not integers or digital signals. Ex. 1048, 77:15–79:4, 79:20–81:1, 82:5–10. Dr. Goossen also testifies that such a comparison "would generally be done in some sort of hard-wired circuit like a comparator." *Id.* at 82:5–15.

Dr. Wolfe does not testify that the comparison of "magnitude" values for Dop and Oop disclosed in paragraph 149 involves integers. *See, e.g.*, Ex. 1003 ¶¶ 244–246, 340; Ex. 1047 ¶¶ 16–17. Instead, Dr. Wolfe testifies that (1) "Ueda teaches the additional limitations" in claim 3 and (2) "Ueda teaches a processor programmed with" the algorithmic steps required by claim 3. Ex. 1003 ¶¶ 245–246, 340. Specifically, for the "convert" step (1), Dr. Wolfe testifies that "Ueda teaches converting Dop (the received output signal from output detector 4) into an amplitude value and converting Dposi (the received output signal from position detector 5) into a frequency." *Id.* ¶ 246 (citing Ex. 1008 ¶¶ 149, 152). At best, Dr. Wolfe states that an ordinarily skilled artisan would have understood that "the raw sensor input from the 'output detector 4' and the 'position detector 5' of Ueda must be converted to digital values to be processed and compared" when "implement[ing] Ueda's algorithm in a general-purpose processor." Ex. 1047 ¶ 16.

As Patent Owner asserts, however, Ueda "consistently reads as an analog system, utilizing feedback control to control analog voltages." Ex. 1008 ¶¶ 140–168; *see id.* ¶¶ 58–76, 79–97, 100–121; Ex. 1048, 77:15–79:4, 79:20–81:1, 82:5–15; Ex. 2008 ¶¶ 109, 184; Sur-reply 15.

As for Petitioner's argument in the Reply about "implement[ing] Ueda's algorithm in a general-purpose processor," Petitioner did not in the Petition rely on Fukumoto's processor when asserting that the combined disclosures in the references teach claim 3's limitations under a means-plus-function interpretation. Pet. 50–51; *see* Ex. 1003 ¶¶ 245–246. Instead, Petitioner contended that "Ueda teaches a processor programmed with" the algorithmic steps required by claim 3. Pet. 50–51; *see* Ex. 1003 ¶¶ 245–246.

In the Reply, Petitioner changed its unpatentability theory. *See* Pet. 50–51;
Reply 26; Sur-reply 15–16; Ex. 1003 ¶¶ 245–246; Ex. 1047 ¶ 16.

Moreover, even if an ordinarily skilled artisan would have understood
that "the raw input from the sensors of Ueda must be converted to digital
values to be processed and compared" when "implement[ing] Ueda's
algorithm in a general-purpose processor," as Petitioner argues in the Reply,
converting to a "digital value" does not equate to converting to an "integer."
*See* Reply 26.

For the reasons discussed above, Petitioner has not shown by a
preponderance of the evidence that claim 3 is unpatentable under § 103(a)
based on Fukumoto and Ueda.

### 3. DEPENDENT CLAIMS 4–6

For purposes of this proceeding, we consider claim 4 as depending
from claim 3. *See* Tr. 18:4–22; *supra* § III.C.9. Claims 5 and 6 depend from
claim 4. Ex. 1001, 16:8–28. Hence, claims 4–6 incorporate all the
limitations of their respective base claims. 35 U.S.C. § 112 ¶ 4 (2006).

For the reasons discussed for claim 3, Petitioner has not shown by
a preponderance of the evidence that claims 4–6 are unpatentable under
§ 103(a) based on Fukumoto and Ueda. *See supra* § III.F.2(c).

### G. *Alleged Obviousness over Fukumoto,*<br>*Either Grant or Barton, and Ueda: Claims 3–6*

Petitioner contends that claims 3–6 are unpatentable under § 103(a)
because the claims would have been obvious over (1) Fukumoto, Grant, and
Ueda and (2) Fukumoto, Barton, and Ueda. *See* Pet. 45–56. Patent Owner
disputes Petitioner's contentions. *See* Resp. 30–32.

In the challenge based on Fukumoto and Grant, Petitioner relies on Grant for teaching limitation 1f and claim 17's limitations. *See* Pet. 35–39. Petitioner does not rely on Grant for teaching claim 3's limitations. *See id.*

In the challenge based on Fukumoto and Barton, Petitioner relies on Barton for teaching limitation 1f and claim 17's limitations. *See* Pet. 39–45. Petitioner does not rely on Barton for teaching claim 3's limitations. *See id.*

Because Petitioner does not rely on Grant or Barton for teaching claim 3's limitations, Petitioner fails to show how Grant or Barton cures the infirmities in Fukumoto and Ueda with respect to claim 3 for the challenge based on Fukumoto and Ueda. *See* Pet. 45–56. Hence, Petitioner has not shown by a preponderance of the evidence that claim 3 is unpatentable under § 103(a) based on (1) Fukumoto, Grant, and Ueda or (2) Fukumoto, Barton, and Ueda. For the same reason, Petitioner has not shown by a preponderance of the evidence that claims 4–6 are unpatentable under § 103(a) based on those combinations of references.

### H. Alleged Obviousness over Fukumoto and Fuller: Claim 8

Petitioner contends that claim 8 is unpatentable under § 103(a) because the claim would have been obvious over Fukumoto and Fuller. *See* Pet. 64–67; Reply 9. Patent Owner disputes Petitioner's contentions. *See* Resp. 36–40; Sur-reply 17–18.

Above, we provided an overview of Fukumoto. *See supra* § III.D.1. Below, we provide an overview of Fuller. Then, we consider the obviousness issues. For the reasons explained below, we agree with Petitioner that claim 8 is unpatentable under § 103(a) because the claim would have been obvious over Fukumoto and Fuller.

1. OVERVIEW OF FULLER (EXHIBIT 1010)

Fuller is a U.S. patent application publication titled "Linear Electromechanical Vibrator with Axially Movable Magnet," filed on July 3, 2006, and published on January 3, 2008. Ex. 1010, codes (12), (22), (43), (54). Fuller states that the invention "relates generally to linear electromagnetic vibrators, and, more particularly, to a non-rotary electromagnetic vibrator having a movable magnet that oscillates axially under the influence of an axial field coil." *Id.* ¶ 1.

Fuller identifies deficiencies in vibrators with miniature rotary motors used in mobile phones. Ex. 1010 ¶ 3. Specifically, those vibrators are "relatively expensive and complicated to manufacture because the motor requires assembly of many small parts." *Id.* Additionally, those vibrators are "energy inefficient," while "energy efficiency" is critical in mobile phones and other portable electronic devices. *Id.* According to Fuller, "there is a need for an inexpensive, simple and energy efficient miniature vibrator" that "could be widely used in portable electronic devices," such as mobile phones. *Id.*

Fuller endeavors to address that need by providing "an electromagnetic vibrator having a movable magnet." Ex. 1010 ¶ 5, code (57). The movable magnet is "magnetized in the axial direction" and travels in the axial direction, i.e., "along a linear or curved axial pathway." *Id.* ¶¶ 5–6. Two bumper magnets are "disposed axially in-line with the movable magnet" and "oriented such that they magnetically repel the movable magnet." *Id.* ¶ 5. When excited by a field coil, "the movable magnet will oscillate between the bumper magnets and create vibrations." *Id.* ¶ 6; *see id.* ¶ 25.

The electromagnetic vibrator with bumper magnets is "simple to construct, does not require a large number of parts, and does not require significant amounts of power to operate," and thus is "energy efficient." Ex. 1010 ¶¶ 5, 53, code (57). The electromagnetic vibrator may be "small in size" or "scaled to very small or very large sizes." *Id.* ¶¶ 5, 53. The electromagnetic vibrator may be used in "[v]irtually any application where a vibrator is required," including "a variety of different electronic devices," such as mobile phones and other communication devices. *Id.* ¶ 5; *see id.* ¶ 25, code (57).

Fuller's Figure 1 (reproduced below) is a perspective view of an electromagnetic vibrator:



**Fig. 1**

Figure 1 illustrates an electromagnetic vibrator including the following components:

- movable magnet 20 that travels in an axial direction 24 and has central hole 23;

- axial shaft 22 extending through central hole 23 in movable magnet 20;

Appx0095

- two bumper magnets 26a and 26b "fixedly disposed at opposite ends of the axial shaft 22," "magnetized in the axial direction (i.e. parallel with the shaft 22)," and "oriented such that they magnetically repel the movable magnet 20 (i.e., they are oppositely poled to the end surface of the moveable magnet which is closest to the bumper magnet 26a or 26b)"; and

- two field coils 28a and 28b with inner diameters "large enough to accommodate" movable magnet 20 and "oriented such that they apply push and pull forces" to movable magnet 20 when receiving alternating current.

Ex. 1010 ¶¶ 27, 35, Fig. 1. Figure 1 does not show "an optional tubular enclosure" for the electromagnetic vibrator. *Id.* ¶ 27.

Preferably, bumper magnets 26a and 26b are "high strength rare earth magnets." Ex. 1010 ¶ 30. But "the magnets can be made of any magnetic material or magnetizable material." *Id.* Field coils 28a and 28b may comprise "conventional copper wire windings." *Id.* ¶ 31. But "other metal or metal alloy windings may be employed." *Id.*

Fuller's Figure 2 (reproduced below) is a schematic cross-sectional view of a vibrator device with an electromagnetic vibrator:



Fig. 2

Figure 2 illustrates an electromagnetic vibrator according to Figure 1 in tubular enclosure 30 and tubular enclosure 30 attached to circuit board 34 with adhesive 36. Ex. 1010 ¶¶ 28, 34, Fig. 2. Preferably, tubular enclosure 30 has air holes 32 that "reduce viscous friction losses" by "allowing air to escape and enter the enclosure as the movable magnet 20 oscillates." *Id.* ¶ 28. Figure 2 also illustrates bumper magnet 26b having optional air vent 40 that "allow[s] air to escape and enter the enclosure as the movable magnet 20 oscillates." *Id.* ¶ 29, Fig. 2.

Fuller identifies "mechanical compression springs" as alternatives to the bumper magnets. Ex. 1010 ¶¶ 7, 25, code (57); *see id.* ¶¶ 22, 48, Fig. 8.

Appx0097

## 2. DIFFERENCES BETWEEN THE CLAIMED
## INVENTION AND THE PRIOR ART

Claim 8 reads as follows (with bracketed letters added for reference purposes):[7]

> 8. [a] The linear vibration module of claim 1 wherein the housing is a linear tube, capped at both ends by movable-component-repelling components selected from one of mechanical springs and magnets;
>
> [b] wherein the movable component is a magnet shaped to slide within the linear tube; and
>
> [c] wherein the driving component is an electromagnetic coil.

Ex. 1001, 16:34–40.

Petitioner contends that the combined disclosures in Fukumoto and Fuller teach claim 8's limitations for several related reasons. *See* Pet. 29, 64–66. Specifically, Petitioner asserts that Fukumoto discloses a linear vibration module where "the housing is a linear tube" because oscillatory actuator 115 in Fukumoto's Figure 3 includes case 115a with a rectangular cross-section. *Id.* at 29, 64 (citing Ex. 1005, 14:26–44, Fig. 3). Petitioner asserts that Fuller also discloses a linear vibration module where "the housing is a linear tube" because Fuller's Figure 2 illustrates an electromagnetic vibrator in a "tubular enclosure." *Id.* at 64–65 (citing Ex. 1010 ¶ 27, Figs. 1–2).

Further, Petitioner asserts that Fuller discloses "a linear tube, capped at both ends by movable-component-repelling components selected from one of mechanical springs and magnets" according to limitation 8a because

---

[7] We use the same reference letters that Petitioner uses to identify the claim language. *See* Pet. ix (Listing of Challenged Claims).

Fuller's electromagnetic vibrator includes bumper magnets 26a and 26b "fixedly disposed at opposite ends" of the tubular enclosure "such that they magnetically repel the movable magnet 20." Pet. 65–66 (quoting Ex. 1010 ¶ 27).

Additionally, Petitioner asserts that Fuller discloses limitations 8b and 8c because Fuller's electromagnetic vibrator includes:

(1)     movable magnet 20 as a "movable component [that] is a magnet shaped to slide within the linear tube" according to limitation 8b; and

(2)     field coils 28a and 28b as a "driving component [that] is an electromagnetic coil" according to limitation 8c.

Pet. 65 (citing Ex. 1010 ¶¶ 27, 35). Petitioner asserts that Fukumoto also discloses limitations 8b and 8c. *Id.* at 64 (citing Ex. 1003 ¶ 268); *see id.* at 17–18, 31 (citing Ex. 1003 ¶¶ 170–175; Ex. 1005, 14:57–60, Fig. 3); *supra* § III.D.6(a).

Patent Owner does not dispute that the combined disclosures in Fukumoto and Fuller teach claim 8's limitations. *See, e.g.*, Resp. 36–40; Sur-reply 17–18.

For the reasons stated by Petitioner and supported by Dr. Wolfe's testimony, we agree with Petitioner that the combined disclosures in Fukumoto and Fuller teach claim 8's limitations. *See* Pet. 64–66; Ex. 1003 ¶¶ 268–270.

### 3.  ALLEGED REASON TO COMBINE
#### THE TEACHINGS OF THE REFERENCES

(a)     Petitioner's Contentions

Petitioner contends that an ordinarily skilled artisan "would have been motivated to use Fuller's configuration with Fukumoto because doing so

would have amounted to nothing more than simple substitution of known components of a linear vibration actuator." Pet. 66 (citing Ex. 1003 ¶ 267). Petitioner also contends that "Fuller explicitly teaches that its motor may be scaled to any desired size." Reply 9 (citing Ex. 1010 ¶ 53).

Dr. Wolfe's testimony supports Petitioner's contentions. *See* Ex. 1003 ¶¶ 108, 267, 271. For instance, Dr. Wolfe testifies that an ordinarily skilled artisan "would have recognized that Fukumoto and Fuller are combinable because they are both directed to electromagnetic vibration generation in mobile devices using compact and energy efficient vibrators." *Id.* ¶ 267 (citing Ex. 1005, 14:38–15:4, 16:17–37, 50:48–59, Figs. 3, 16; Ex. 1010 ¶¶ 4–5, 26, 38, 53, Figs. 1–2); *see id.* ¶ 271. According to Dr. Wolfe:

> the proposed combination would have amounted to no more than applying a known technique (Fuller's vibrator driven by electromagnetic coils and using bumper magnets) to a known device ready for improvement (Fukumoto's mobile device including a linear oscillatory actuator driven by electromagnetic coils that uses a single spring) to yield predictable results (a mobile device with a smaller and more efficient vibration unit).

*Id.* ¶ 267.

Dr. Wolfe further testifies that an ordinarily skilled artisan "would also have been motivated to make this combination to reduce the size of the linear oscillatory actuator and efficiency, thus improving battery life of the mobile device." Ex. 1003 ¶ 267 (citing Ex. 1010 ¶¶ 4, 36, code (57)).

(b)    Patent Owner's Contentions

Patent Owner contends that Petitioner fails to establish "a motivation to combine Fukumoto and Fuller" because the proposed combination would not have involved a "simple substitution" as Petitioner contends. Resp. 36

(citing Pet. 66); *see id.* at 39; Sur-reply 17–18.  According to Patent Owner, the "designs of Fukomoto [sic] and Fuller are literally orthogonal" in different directions relative to a "screen" because:

(1)   the vibration direction in Fukumoto's design is "perpendicular to the front surface of the touch panel 102 and matches with the direction by which the user presses the touch panel 102 or any one of the operation keys"; and

(2)   the vibration direction in Fuller's design is "parallel to the screen, not perpendicular, resulting in a haptic sensation very different from that of pressing a button" because "the vibration will be equally transmitted" to the device's front, back, and sides instead of the device's screen.

Resp. 37–39 (citing Ex. 1005, 14:63–66, 15:7–16; Ex. 1010 ¶¶ 5; Ex. 2008 ¶¶ 127–128, 130).

Further, Patent Owner asserts that an ordinarily skilled artisan would not have been motivated to make the "simple substitution" that Petitioner proposes because incorporating Fuller's "tube-shaped structures into Fukumoto's PDA-type device would result in vibrations perpendicular to the direction necessary to provide the key-press haptic feedback required in Fukumoto."  Sur-reply 17; *see* Resp. 38–39.

Regarding scaling Fuller's electromagnetic vibrator to fit within Fukumoto's personal digital assistant (PDA), Patent Owner asserts that a "very small" version of Fuller's electromagnetic vibrator would produce correspondingly "very small" vibrations that would not provide Fukumoto's desired key-press haptic feedback.  Sur-reply 17–18.

Appx0101

(c)     Analysis

We agree with Petitioner that an ordinarily skilled artisan would have been motivated to use Fuller's configuration with Fukumoto.  *See* Pet. 66; 1003 ¶¶ 267, 271.  Fuller explains that an electromagnetic vibrator with bumper magnets is "simple to construct, does not require a large number of parts, and does not require significant amounts of power to operate," and thus is "energy efficient."  Ex. 1010 ¶¶ 5, 53, code (57); *see* Ex. 1003 ¶ 108. Fuller also explains that an electromagnetic vibrator with bumper magnets may be used in "[v]irtually any application where a vibrator is required," including "a variety of different electronic devices," such as mobile phones and other communication devices like Fukumoto's PDA.  Ex. 1010 ¶ 5; *see id.* ¶ 25, code (57); Ex. 1003 ¶ 108.

"There is a motivation to combine when a known technique 'has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way,' using the 'prior art elements according to their established functions.'"  *Intel Corp. v. PACT XPP Schweiz AG*, 61 F.4th 1373, 1380–81 (Fed. Cir. 2023) (citations omitted) (quoting *KSR*, 550 U.S. at 417; *Intel Corp. v. Qualcomm Inc.*, 21 F.4th 784, 799–800 (Fed. Cir. 2021)).  Consistent with this, Dr. Wolfe testifies that:

> the proposed combination would have amounted to no more than applying a known technique (Fuller's vibrator driven by electromagnetic coils and using bumper magnets) to a known device ready for improvement (Fukumoto's mobile device including a linear oscillatory actuator driven by electromagnetic coils that uses a single spring) to yield predictable results (a mobile device with a smaller and more efficient vibration unit).

Ex. 1003 ¶ 267.  We credit Dr. Wolfe's testimony.

Improved efficiency and, therefore, improved "battery life" would have prompted an ordinarily skilled artisan to combine Fuller's teachings with Fukumoto's teachings in the way Petitioner proposes. *See* Ex. 1003 ¶¶ 108, 267. An "implicit motivation to combine" may result from a desire to make a product or process "stronger, cheaper, cleaner, faster, lighter, smaller, more durable, or more efficient." *DyStar Textilfarben GmbH v. C.H. Patrick Co.*, 464 F.3d 1356, 1368 (Fed. Cir. 2006).

As for Patent Owner's contention that the "designs of Fukomoto [sic] and Fuller are literally orthogonal" in different directions relative to a "screen," claim 8 does not require a "linear vibration module" with a "screen" or specify a vibration direction relative to a "screen." Ex. 1001, 15:36–48, 16:34–40; *see* Resp. 37–39; Sur-reply 17. Rather, claim 8 requires a "linear vibration module" with a "housing [that] is a linear tube." Ex. 1001, 15:36–48, 16:34–40. Although Fukumoto's Figure 3 illustrates oscillatory actuator 115 with the vibration direction perpendicular to touch panel 102, Fukumoto also discloses that "[a]lternatively, the housing of the electronic device is made to vibrate." Ex. 1005, 14:45–48, code (57), Fig. 3. Fuller discloses a "housing [that] is a linear tube" and "made to vibrate" consistent with that disclosure in Fukumoto. Ex. 1010 ¶¶ 5, 27–28, 35, Fig. 2; *see* Ex. 1003 ¶¶ 108, 269–271.

Also, obviousness does not depend on "whether the features of a secondary reference may be bodily incorporated into the structure of the primary reference." *See In re Keller*, 642 F.2d 413, 425 (CCPA 1981). In both Fukumoto's oscillatory actuator 115 and Fuller's electromagnetic vibrator the movable magnet travels in the axial direction. *See* Ex. 1005, 14:27–60, Fig. 3; Ex. 1010 ¶¶ 5–6, 27, code (57), Figs. 1–2. Aligning

Fuller's axial direction with Fukumoto's axial direction to generate vibrations perpendicular to the front surface of Fukumoto's touch panel would not have exceeded the abilities of an ordinarily skilled artisan, who "would have had a bachelor's degree in electrical engineering, mechanical engineering, computer science, or a similar field and two years of experience related to electronic consumer product design." *See* Ex. 1003 ¶ 30; *supra* § III.B. A "person of ordinary skill is also a person of ordinary creativity, not an automaton," and would have been able to fit together the teachings of multiple references. *KSR*, 550 U.S. at 420–21.

As for Patent Owner's assertion that a "very small" version of Fuller's electromagnetic vibrator would produce correspondingly "very small" vibrations that would not provide Fukumoto's desired key-press haptic feedback, we disagree. *See* Sur-reply 17–18. Fuller explains that the electromagnetic vibrator may be used in "[v]irtually any application where a vibrator is required," including "a variety of different electronic devices," such as mobile phones and other communication devices, e.g., Fukumoto's PDA. Ex. 1010 ¶ 5; *see id.* ¶ 25, code (57); Ex. 1003 ¶ 108. A vibration strong enough for a mobile phone should suffice for Fukumoto's PDA. *See* Ex. 1003 ¶ 271.

### 4. Conclusion About Obviousness/Nonobviousness

For the reasons discussed above, the combined disclosures in Fukumoto and Fuller teach claim 8's limitations. *See supra* § III.H.2. Additionally, Petitioner provides a reason with rational underpinning as to why an ordinarily skilled artisan would have been motivated to combine Fuller's teachings with Fukumoto's teachings in the way Petitioner proposes and would have obtained a predictable result. *See supra* § III.H.3(c).

Hence, Petitioner has shown by a preponderance of the evidence that claim 8 is unpatentable under § 103(a) because the claim would have been obvious over Fukumoto and Fuller.

### I. *Alleged Obviousness over Fukumoto, Dong, and Ogusu: Claim 14*

Petitioner contends that claim 14 is unpatentable under § 103(a) because the claim would have been obvious over Fukumoto, Dong, and Ogusu. *See* Pet. 66–70; Reply 10–16. Patent Owner disputes Petitioner's contentions. *See* Resp. 41–46; Sur-reply 18–19.

Above, we provided an overview of Fukumoto. *See supra* § III.D.1. Below, we provide overviews of Dong and Ogusu. Then, we consider the obviousness issues. For the reasons explained below, we disagree with Petitioner that claim 14 is unpatentable under § 103(a) because the claim would have been obvious over Fukumoto, Dong, and Ogusu.

#### 1. OVERVIEW OF DONG (EXHIBIT 1011)

Dong is a Chinese patent application publication titled "Flat Linear Vibration Motor," filed on February 20, 2009, and published on July 22, 2009. Ex. 1011, codes (12), (22), (43), (54). Dong states that the invention "relates to a vibration motor, and in particular to a flat linear vibration motor used in portable consumer electronic products." *Id.* at 3.[8]

---

[8] For Exhibit 1011 (Dong), we follow Petitioner's practice and cite to the page numbers that Petitioner applied to the exhibit.

Dong's Figure 2 (reproduced below) is an exploded perspective view
of a flat linear vibration motor:



FIG. 2

Figure 2 illustrates flat linear vibration motor 10 including upper cover 11,
base 12, coil 13, a plurality of elastic supports 14, counterweight 15, and
permanent magnet 16. Ex. 1011, 5, Fig. 2. Counterweight 15 includes
through hole 153 used for positioning permanent magnet 16. *Id.* at 5.

Dong's Figure 5 (reproduced below) is a cross-sectional view of the flat linear vibration motor illustrated in Figure 2:



FIG. 5

Figure 5 illustrates flat linear vibration motor 10 with permanent magnet 16 positioned within through hole 153 in counterweight 15. Ex. 1011, 6, Fig. 5. Figure 5 also illustrates permanent magnet 16 magnetized such that the "magnetic poles of its one half (labeled 16a) are polarized opposite to magnetic poles of the other half (labeled 16b), and magnetic pole planes of the permanent magnet 16 are parallel to the bottom wall 122 of the base 12 (also parallel to the coil 13)." *Id.* at 6.

When an alternating current flows through coil 13, counterweight 15 and permanent magnet 16 move together "under the action of the magnetic field force." Ex. 1011, 6. Counterweight 15 and permanent magnet 16 move together from side to side in the housing formed by cover 11 and base 12 to produce "a vibration parallel to the bottom wall." *Id.* at 6, Figs. 5–6. Counterweight 15 "functions to strengthen the vibrating force, making the vibration stronger." *Id.* at 6. But counterweight 15 "may be omitted." *Id.*

Dong explains that when using counterweight 15 "it is preferable to use a material with a density of not less than 7.8 g/cm$^3$, such as nickel, tungsten and alloys thereof." Ex. 1011, 6.

107

2. OVERVIEW OF OGUSU (EXHIBIT 1015)

Ogusu is a Japanese patent application publication titled "Vibration Actuator," filed on January 12, 1995, and published on July 30, 1996. Ex. 1015, codes (12), (22), (43), (54). Ogusu states that the invention "relates to a moving magnet-type vibration actuator, and more particularly to a moving magnet-type vibration actuator having low loss and high efficiency." *Id.* ¶ 1; *see id.* ¶ 47.

Ogusu's Figure 1 (reproduced below) is a cross-sectional view of a vibration actuator:

[FIG. 1]



Figure 1 illustrates a vibration actuator including the following components:

- base part 1;

Appx0108

- frame 2a fixed at one end to base part 1;

- first coil 2b wound around frame 2a;

- frame 3a fixed at one end to base part 1;

- second coil 3b wound around frame 3a;

- spindle 4 mounted in hole 1c in base part 1;

- bearing 5 (not labeled in Figure 1) arranged around an end of spindle 4;

- holder 6 connected to bearing 5 and movable with bearing 5 in an axial direction along spindle 4;

- spring 7 to maintain holder 6 in a predetermined position when holder 6 does not vibrate;

- first yoke 8a "composed of a plate-shaped magnetic body" and mounted on holder 6 with one end part forming a core for first coil 2b and the other end part positioned opposite to a side surface of first coil 2b;

- second yoke 8b "composed of a plate-shaped magnetic body" and mounted on holder 6 with one end part forming a core for second coil 3b and the other end part positioned opposite to a side surface of second coil 3b;

- first magnet 9a arranged on first yoke 8a opposite to a side surface of first coil 2b; and

- second magnet 9b arranged on second yoke 8b opposite to a side surface of second coil 3b.

Ex. 1015 ¶¶ 24–29, Fig. 1. As shown by the broken lines representing magnetic flux in Figure 1, the vibration actuator forms two magnetic circuits as follows: (1) "the magnet opposing the first coil - the first coil - the first yoke" and (2) "the magnet opposing the second coil - the second coil - the second yoke." *Id.* ¶ 30, Fig. 1; *see id.* ¶¶ 16, 36.

When an alternating current flows through first coil 2b and second coil 3b, the movable elements (the holder, the bearing, the yokes, and the magnets) "generate vibration according to [the] current waveform." Ex. 1015 ¶ 32; *see id.* ¶¶ 37–41, 60, Figs. 4(a)–4(e). Because "the movable elements have magnets and a certain amount of weight, the base part 1 side also generates vibration in a direction opposite to that of the movable elements." *Id.* ¶ 32. The vibration actuator may generate "various sounds and vibrations" by changing the frequency and the amplitude of the alternating current or by "intermittently generating an electric current." *Id.* ¶ 36; *see id.* ¶¶ 11, 42, 50, 55, 60.

Ogusu explains that "loss is small and higher efficiency can be obtained compared to a conventional device" with Figure 1's vibration actuator since first yoke 8a and second yoke 8b each form a "magnetic loop having the shortest path." Ex. 1015 ¶ 47. Ogusu explains that "it is also possible to use various non-magnetic materials mixed with ferromagnetic powders as the material" for first yoke 8a and second yoke 8b. *Id.* ¶ 28.

Additionally, Ogusu discloses using Figure 1's vibration actuator as "vibration generation means for a pager." Ex. 1015 ¶ 2; *see id.* ¶¶ 33–35. Ogusu also discloses that "various vibrations can be switched at the user's choice by a selection in the pager's control unit." *Id.* ¶ 43.

### 3. WHETHER DONG QUALIFIES AS PRIOR ART FOR CLAIM 14

Petitioner contends that Dong qualifies as prior art for claim 14 because (1) Dong was published on July 22, 2009, and (2) claim 14 is "entitled to a priority date no earlier than January 6, 2012." Pet. 67.[9]

---

[9] The analysis for the benefit of priority proceeds on a claim-by-claim basis. *See Lucent Techs., Inc. v. Gateway, Inc.*, 543 F.3d 710, 718 (Fed. Cir. 2008);

Specifically, Petitioner asserts that Figures 24A, 24B, and 25 and the related descriptions in the '081 patent's specification constitute "the only potential written description support for claim 14" and that these disclosures "first appeared" in a January 6, 2012, continuation-in-part application for an ancestor patent. *Id.* (citing Ex. 1001, 13:52–14:38; Ex. 1003 ¶ 274; Ex. 1026).

Patent Owner does not dispute that Dong qualifies as prior art for claim 14. *See, e.g.*, Resp. 41–47; Sur-reply 18–19.

For the reasons stated by Petitioner and supported by Dr. Wolfe's testimony, we agree with Petitioner that Dong qualifies as prior art for claim 14. *See* Pet. 67; Ex. 1003 ¶ 274.

### 4. WHETHER PETITIONER HAS PROVEN UNPATENTABILITY BY A PREPONDERANCE OF THE EVIDENCE

Claim 14 depends directly from claim 1 and further requires "flux paths comprising a paramagnetic material that is shaped and positioned to reduce the reluctance of one or more magnetic circuits within the linear vibration module." Ex. 1001, 17:5–8.

(a)   Petitioner's Contentions

Petitioner contends that the combined disclosures in Fukumoto, Dong, and Ogusu teach claim 14's limitations for several related reasons. *See* Pet. 68–70; Reply 11–15. Specifically, Petitioner asserts that Dong discloses that:

(1)   counterweight 15 "can be composed of tungsten" that "was known as a paramagnetic material";

_____

*Waldemar Link, GmbH v. Osteonics Corp.*, 32 F.3d 556, 558 (Fed. Cir. 1994).

    (2)    counterweight 15 "circumscribes" magnet 16 in the linear vibration motor to arrange "paramagnetic materials at each end" of magnet 16; and

    (3)    counterweight 15 and magnet 16 move back and forth relative to coil 13 in the linear vibration motor.

Pet. 69 (citing Ex. 1003 ¶ 277; Ex. 1011, 6); Reply 11–12, 14–16 (citing Ex. 1003 ¶ 112; Ex. 1011, 6, Figs. 2, 6). Petitioner asserts that counterweight 15 forms a magnetic circuit when moving back and forth relative to coil 13 in the linear vibration motor. Reply 15 (citing Ex. 2010, 85:13–86:7).

To support its assertions, Petitioner presents an annotated and highlighted version of Dong's Figure 6 as reproduced below (Reply 12):



Figure 6 illustrates coil 13, counterweight 15, and permanent magnet 16 magnetized such that the "magnetic poles of its one half (labeled 16a) are polarized opposite to magnetic poles of the other half (labeled 16b)." Ex. 1011, 6, Fig. 6. The above annotated and highlighted version of Figure 6 includes:

    •   red highlighting over the part of counterweight 15 arranged adjacent to magnet half 16a in the axial direction;

- red highlighting over the part of counterweight 15 arranged adjacent to magnet half 16b in the axial direction; and

- the annotation "Tungsten counterweight" with lines leading to the highlighted parts of counterweight 15.

*See* Reply 12.

Petitioner asserts that an ordinarily skilled artisan would have understood that "adding a paramagnetic material such as tungsten to Fukumoto's vibration module (as taught in Dong) would reduce the reluctance of the magnetic circuits within" Fukumoto's vibration module. Pet. 69 (citing Ex. 1003 ¶ 276). According to Petitioner, an ordinarily skilled artisan "would have understood from Dong's configuration that this placement of paramagnetic materials would reduce magnetic reluctance." Reply 12–13 (citing Ex. 1003 ¶ 277; Ex. 2010, 82:24–83:12).

Additionally, Petitioner asserts that Ogusu's teachings "further support" the proposed combination of Dong's tungsten counterweight with Fukumoto's oscillatory actuator because Ogusu discloses that "a yoke made of ferromagnetic material or non-ferromagnetic materials mixed with ferromagnetic powders is positioned between the electromagnetic coil and permanent magnet to form a magnetic circuit." Pet. 69 (citing Ex. 1003 ¶ 279; Ex. 1015 ¶¶ 28–29, 38, Fig. 1).

Regarding a reason to combine the teachings of the references, Petitioner asserts that an ordinarily skilled artisan:

(1) would have been motivated to apply Dong's teaching to use a tungsten (paramagnetic material) counterweight to Fukumoto's oscillatory actuator to "reduce magnetic reluctance" and achieve "better efficiency of the magnetic circuit in the vibration module"; and

>     (2)     would have recognized that "non-magnetic materials
>             mixed with ferromagnetic powders, as disclosed in
>             Ogusu, would have weak magnetic attraction similar to
>             paramagnetic materials and would reduce the reluctance
>             of magnetic circuits in the same way."

Pet. 68–70 (citing Ex. 1001, 13:59–67; Ex. 1003 ¶¶ 276, 278–279; Ex. 1015
¶ 47); Reply 10–11.

Additionally, Petitioner contends that Ogusu teaches "the advantages
of reducing magnetic reluctance" because Ogusu discloses that "loss is small
and higher efficiency can be obtained compared to a conventional device"
with Figure 1's vibration actuator since first yoke 8a and second yoke 8b
each form a "magnetic loop having the shortest path." Reply 10 (quoting
Ex. 1015 ¶ 47). According to Petitioner, an ordinarily skilled artisan would
have recognized that first yoke 8a and second yoke 8b were "designed to
reduce magnetic reluctance," e.g., because they may consist of "non-
magnetic materials mixed with ferromagnetic powders." *Id.* (citing Ex. 1003
¶ 279).

Petitioner further asserts that an ordinarily skilled artisan would have
had a reasonable expectation of success when combining the teachings of
Fukumoto, Dong, and Ogusu because the proposed combination "would
have required only minor changes to Fukumoto's disclosed structure."
Pet. 69 (citing Ex. 1003 ¶ 278). Petitioner explains that those minor changes
involve placing "paramagnetic materials at each end" of Fukumoto's
movable magnet according to Dong's teachings. *See* Reply 11–12 (citing
Ex. 1003 ¶ 112; Ex. 1011, Fig. 6). Petitioner also asserts that "there is no
question of incorrect incorporation here because Dong teaches the very
placement of paramagnetic materials contemplated by the '081 patent, i.e.,

Appx0114

at the leading edges of the moving magnet." *Id.* at 16 (citing Ex. 1001, Fig. 24B; Ex. 1003 ¶ 112).

(b)    Patent Owner's Contentions

Patent Owner disputes that the combined disclosures in Fukumoto, Dong, and Ogusu teach claim 14's limitations. *See* Resp. 42; Sur-reply 18. In particular, Patent Owner contends that Petitioner "does not and cannot identify any mention of reluctance or paramagnetism in any of the three references." Resp. 42.

Patent Owner asserts that "Ogusu does not disclose paramagnetic materials." Resp. 43. Patent Owner asserts that Petitioner at best points to "Ogusu's disclosure to use ferromagnetic materials, potentially in conjunction with nonmagnetic materials, to form a 'yoke.'" *Id.* (emphasis omitted) (citing Pet. 67–70). According to Patent Owner, however, "a mix of ferromagnetic and nonmagnetic materials does not produce a paramagnetic material." *Id.* (citing Ex. 2008 ¶ 149).

Patent Owner asserts that "Dong does not refer to the reluctance of a magnetic circuit" and that Dong's counterweight 15 "is not part of Dong's magnetic circuit." Resp. 44 (citing Ex. 2008 ¶ 140); Sur-reply 18 (citing Ex. 2008 ¶¶ 140–141). According to Patent Owner, Dong "illustrates the magnetic field lines going through the magnet 16a and 16b, and specifically not going through the counterweight." Resp. 44 (citing Ex. 2008 ¶ 140). Patent Owner further asserts that Petitioner fails to show that Dong "discloses paramagnetic flux paths as claimed." *Id.*

Regarding a reason to combine the teachings of the references, Patent Owner asserts that there is "no evidence" that an ordinarily skilled artisan "would have had any reason to consider decreasing reluctance in order to

increase efficiency" other than "the *ipse dixit* of Dr. Wolfe." Resp. 42 (emphasis by Patent Owner); *see* Sur-reply 19. Patent Owner contends that "neither Ogusu or Dong shows the use of paramagnetic materials shaped and positioned to reduce reluctance of a magnetic circuit." Resp. 46. Therefore, according to Patent Owner, neither reference provides "any motivation to combine" its teachings with Fukumoto to achieve "reduced reluctance through the use of paramagnetic materials." *Id.*

Additionally, Patent Owner contends that "the Petition's entire discussion of paramagnetic materials, reluctance, and flux paths is based on the disclosure of the '081 patent itself." Resp. 42 (citing Pet. 67–68). According to Patent Owner, Petitioner uses "the challenged patent's own disclosures as a road map to the prior art" and relies on "impermissible hindsight." *Id.* at 42–43.

Patent Owner asserts that an ordinarily skilled artisan "reading Dong, even in conjunction with Ogusu and/or Fukumoto would not be motivated even to consider the reluctance or other magnetic properties of the counterweight." Resp. 44 (citing Ex. 2008 ¶ 140); *see* Sur-reply 19.

Further, Patent Owner asserts that Petitioner "fails to show how" an ordinarily skilled artisan would have incorporated "either Ogusu or Dong into Fukumoto's design, much less somehow combine all three references' different teachings." Resp. 45. Patent Owner asserts that "Ogusu's movable yoke could not be substituted for Fukumoto's fixed housing with any expectation for the combination working." *Id.* (citing Ex. 2008 ¶ 144).

Patent Owner asserts that Petitioner "fails to show that" an ordinarily skilled artisan "would find it straightforward" to "incorporate Dong's counterweights into Fukumoto." Resp. 45 (citing Ex. 2008 ¶ 145). Patent

Owner asserts that an ordinarily skilled artisan would have recognized that "incorrect incorporation of a paramagnetic mass into Fukumoto's design could in fact increase reluctance." *Id.* (citing Ex. 2008 ¶ 145).

Patent Owner also asserts that an ordinarily skilled artisan would have had "no expectation that combining Fukumoto with Dong would actually reduce reluctance, because neither Fukumoto nor Dong (unlike the '081 patent) includes any teaching of how to achieve reduced reluctance." Resp. 45–46 (emphasis omitted) (citing Ex. 2008 ¶ 145).

(c)     Analysis

The record supports Patent Owner's motivation-to-combine arguments, e.g., that Ogusu's teachings do not support combining Fukumoto and Dong. Petitioner relies on Ogusu's "magnetic loop having the shortest path" to provide increased efficiency. Pet. 69–70 (citing Ex. 1001, 13:59–67; Ex. 1003 ¶ 279; Ex. 1015 ¶ 47). Yet Ogusu does not relate its "shortest path" magnetic loop to a paramagnetic material, or to any particular material added for the purpose of reducing magnetic reluctance. *See* Ex. 1015 ¶¶ 28, 30, 47.

Ogusu teaches that its efficiency advantages accrue regardless of whether its yokes are made from ferromagnetic materials or non-magnetic materials mixed with ferromagnetic powders. Ex. 1015 ¶ 28. Ogusu's "shortest path" magnetic loop results from the particular "C-shape" of its yokes where "the magnet and yoke are integrated in each magnetic circuit, so no non-excitation holding force is exerted." *See id.* ¶¶ 13, 16, 18, 20, 22, 47, Fig. 1. Thus, Ogusu does not teach any efficiency gains resulting specifically from paramagnetic (or lower-magnetic) materials that would lead to using paramagnetic materials in Fukumoto's oscillatory actuator.

Although Petitioner asserts that "Dr. Goossen admitted that the ferromagnetic materials in Ogusu's yoke would decrease reluctance," that testimony relates to a property of ferromagnetic materials, not paramagnetic materials. *See* Reply 10 (citing Ex. 1048, 104:3–6). Additionally, that testimony does not indicate that paramagnetic materials used in other configurations different from Ogusu's integrated magnet-and-yoke configuration would reduce magnetic reluctance. Moreover, Petitioner relies on Dr. Goossen's testimony rather than Ogusu's disclosures. Dr. Goossen's testimony does not indicate that Ogusu teaches advantages of paramagnetic materials used in a linear vibration module, only that he is aware of the reluctance-reducing properties of ferromagnetic materials. *See, e.g.*, Ex. 1048, 104:3–6. Hence, Dr. Goossen's testimony does not support Petitioner's assertion that Ogusu's teachings "further support" the proposed combination of Dong's tungsten counterweight with Fukumoto's oscillatory actuator. *See* Pet. 69.

As for Petitioner's reliance on Dong to support the proposed combination of Dong's tungsten counterweight with Fukumoto's oscillatory actuator, Petitioner asserts that an ordinarily skilled artisan "would have understood from Dong's configuration that this placement of paramagnetic materials would reduce magnetic reluctance." Reply 12–13 (citing Ex. 1003 ¶ 277; Ex. 2010, 82:24–83:12). That Dong's placement of a tungsten counterweight relative to a permanent magnet and a coil "would reduce magnetic reluctance," as Petitioner asserts, does not indicate that Dong teaches any benefit from this arrangement other than providing more mass that "functions to strengthen the vibrating force." Ex. 1011, 6.

Insofar as Petitioner relies on an ordinarily skilled artisan's knowledge to support the proposed combination of Dong's tungsten counterweight with Fukumoto's oscillatory actuator, Petitioner evidences that knowledge with citations to the '081 patent. *See* Pet. 67–70; Reply 13–16. Petitioner does not cite the '081 patent as simply summarizing what was known in the prior art (i.e., that free air increases magnetic reluctance), but also for its novel disclosures (i.e., that introducing paramagnetic materials that "decrease the portion of magnetic field lines passing through free air" can improve the efficiency of a linear vibration module). *See* Pet. 67–68 (citing Ex. 1001, 13:1–16 (sic (14:1–16)), 13:52–67, Figs. 24A–24B).

Although Petitioner relies on Dr. Wolfe's testimony to establish an ordinarily skilled artisan's knowledge, Dr. Wolfe relies on the same novel disclosures in the '081 patent as Petitioner. *See* Ex. 1003 ¶¶ 275–279 (citing Ex. 1001, 13:1–16 (sic (14:1–16)), 13:52–67, Figs. 24A–24B). Hence, when stating that an ordinarily skilled artisan "would have been motivated to use paramagnetic materials in" Fukumoto "because decreasing reluctance would increase efficiency," Dr. Wolfe's only basis for concluding that efficiency would be increased is his citation to the '081 patent. *Id.* ¶¶ 275–276.

"To draw on hindsight knowledge of the patented invention, when the prior art does not contain or suggest that knowledge, is to use the invention as a template for its own reconstruction—an illogical and inappropriate process by which to determine patentability." *Sensonics, Inc. v. Aerosonic Corp.*, 81 F.3d 1566, 1570 (Fed. Cir. 1996). Hence, Petitioner has identified no adequate reason why an ordinarily skilled artisan would have been motivated to increase efficiency by combining Dong's tungsten

counterweight with Fukumoto's oscillatory actuator.  *See, e.g.*, Pet. 67–70;
Ex. 1003 ¶¶ 275–279.

Petitioner quotes the following statement in *ZyXEL Communications
Corp. v. UNM Rainforest Innovations*, 107 F.4th 1368, 1380 (Fed. Cir.
2024):  "A prior art reference does not need to explicitly articulate or express
<u>why</u> its teachings are beneficial so long as its teachings are beneficial and a
[person of ordinary skill] would recognize that their application was
beneficial."  Reply 13 (emphasis by the court).  Based on *ZyXEL*, Petitioner
argues that "regardless of whether Dong explicitly discloses the reluctance-
reducing properties of its design, [a person of ordinary skill] would have
understood the effect of Dong's paramagnetic counterweight on magnetic
reluctance."  *Id.* (citing Ex. 1048, 102:20–103:5; Ex. 2008 ¶ 140).

But the issue is not whether an ordinarily skilled artisan would have
recognized the effect of Dong's paramagnetic counterweight on magnetic
reluctance, which is supported by the record and not at issue.  Instead, the
issue is whether an ordinarily skilled artisan, aware of Dong's paramagnetic
counterweight, would have considered it beneficial to include that
counterweight in Fukumoto's oscillatory actuator to reduce the reluctance of
the magnetic circuit and increase efficiency.  As discussed above, the record
does not reflect that an ordinarily skilled artisan would have recognized the
advantages of using a paramagnetic material to reduce the reluctance of a
magnetic circuit and increase efficiency except by reading the '081 patent.

5. CONCLUSION ABOUT OBVIOUSNESS/NONOBVIOUSNESS

For the reasons discussed above, Petitioner has not identified an
adequate reason why an ordinarily skilled artisan would have been
motivated to combine the teachings in Fukumoto, Dong, and Ogusu to yield

claim 14's subject matter. *See supra* § III.I.4(c). Hence, Petitioner has not shown by a preponderance of the evidence that claim 14 is unpatentable under § 103(a) based on Fukumoto, Dong, and Ogusu.

### J. Alleged Obviousness over Fukumoto, Either Grant or Barton, Dong, and Ogusu: Claim 14

Petitioner contends that claim 14 is unpatentable under § 103(a) because the claim would have been obvious over (1) Fukumoto, Grant, Dong, and Ogusu and (2) Fukumoto, Barton, Dong, and Ogusu. *See* Pet. 66–70. Patent Owner disputes Petitioner's contentions. *See* Resp. 41–46.

In the challenge based on Fukumoto and Grant, Petitioner relies on Grant for teaching limitation 1f and claim 17's limitations. *See* Pet. 35–39. Petitioner does not rely on Grant for teaching claim 14's limitations. *See id.*

In the challenge based on Fukumoto and Barton, Petitioner relies on Barton for teaching limitation 1f and claim 17's limitations. *See* Pet. 39–45. Petitioner does not rely on Barton for teaching claim 14's limitations. *See id.*

Because Petitioner does not rely on Grant or Barton for teaching claim 14's limitations, Petitioner fails to show how Grant or Barton cures the infirmities in Fukumoto, Dong, and Ogusu with respect to claim 14 for the challenge based on Fukumoto, Dong, and Ogusu. *See* Pet. 66–70. Hence, Petitioner has not shown by a preponderance of the evidence that claim 14 is unpatentable under § 103(a) based on (1) Fukumoto, Grant, Dong, and Ogusu or (2) Fukumoto, Barton, Dong, and Ogusu.

### K. Alleged Obviousness over Ogusu and Fukumoto: Claims 1, 2, 7, 11, and 17

Petitioner contends that claims 1, 2, 7, 11, and 17 are unpatentable under § 103(a) because the claims would have been obvious over Ogusu and

Fukumoto. *See* Pet. 75–91; Reply 16–22. Patent Owner disputes Petitioner's contentions. *See* Resp. 52–59; Sur-reply 7–11.

Above, we provided overviews of Ogusu and Fukumoto. *See supra* §§ III.D.1, III.I.2. Below, we consider the obviousness issues. For the reasons explained below, we agree with Petitioner that claims 1, 2, 7, 11, and 17 are unpatentable under § 103(a) because the claims would have been obvious over Ogusu and Fukumoto.

### 1. INDEPENDENT CLAIM 1

(a)  Preamble 1pre

Claim 1 recites "[a] linear vibration module." Ex. 1001, 15:36.

Petitioner contends that Ogusu teaches claim 1's preamble because Ogusu discloses "a 'vibration actuator' using a moving magnet." Pet. 77–78 (citing Ex. 1003 ¶ 305; Ex. 1015 ¶¶ 1–2). Further, Petitioner asserts that "Ogusu's vibration actuator is linear in the same way as the '081 patent." *Id.* at 78 (citing Ex. 1001, 2:17–23; Ex. 1015 ¶¶ 31–32, Figs. 1, 4).

Patent Owner makes no arguments specific to claim 1's preamble. *See, e.g.*, Resp. 52–58; Sur-reply 7–11. Nonetheless, the burden remains on Petitioner to demonstrate unpatentability. *See Dynamic Drinkware*, 800 F.3d at 1378.

Generally, a preamble does not limit a claim. *Allen Eng'g*, 299 F.3d at 1346. We need not decide whether claim 1's preamble limits the claim because, for the reasons stated by Petitioner and supported by Dr. Wolfe's testimony, we agree with Petitioner that Ogusu teaches claim 1's preamble. *See* Pet. 77–78; Ex. 1003 ¶ 305.

(b)  Limitation 1a

Claim 1 recites "a housing." Ex. 1001, 15:37 (limitation 1a).

Petitioner contends that the combined disclosures in Ogusu and Fukumoto teach limitation 1a. *See* Pet. 78. Specifically, Petitioner asserts that "Ogusu's vibration actuator is used as a 'vibration generating means for pager[s].'" *Id.* (alteration by Petitioner) (quoting Ex. 1015 ¶ 2). Petitioner acknowledges that "Ogusu does not explicitly depict a housing for its vibration actuator." *Id.* But Petitioner asserts that an ordinarily skilled artisan "would have found it obvious and beneficial to enclose Ogusu's vibration actuator in a housing to protect the components of the vibration actuator during pager assembly." *Id.* (citing Ex. 1003 ¶ 307).

Further, Petitioner asserts that Fukumoto's "vibration actuator for use in portable electronic devices" includes case 115a that corresponds to the claimed "housing" and additionally includes main case 101 that corresponds to the claimed "housing" according to Patent Owner's infringement contentions in the Samsung litigation. Pet. 78 (citing Ex. 1005, 1:13–19, 1:45–50, 13:20–26, Figs. 1, 3; Ex. 1018, 1–5); *see* Ex. 1022, 7–9, 60–61.

Patent Owner makes no arguments specific to limitation 1a. *See, e.g.*, Resp. 52–58; Sur-reply 7–11.

For the reasons stated by Petitioner and supported by Dr. Wolfe's testimony, we agree with Petitioner that the combined disclosures in Ogusu and Fukumoto teach limitation 1a. *See* Pet. 78; Ex. 1003 ¶¶ 306–307.

(c)     Limitation 1b

Claim 1 recites "a moveable component." Ex. 1001, 15:38 (limitation 1b).

Petitioner contends that Ogusu teaches limitation 1b because Ogusu's vibration actuator includes bearing 5, holder 6, first yoke 8a, second yoke 8b, first magnet 9a, and second magnet 9b that collectively correspond

to the claimed "moveable component," i.e., a component that moves. Pet. 78–79.

Patent Owner makes no arguments specific to limitation 1b. *See, e.g.*, Resp. 52–58; Sur-reply 7–11.

For the reasons stated by Petitioner and supported by Dr. Wolfe's testimony, we agree with Petitioner that Ogusu teaches limitation 1b. *See* Pet. 78–79; Ex. 1003 ¶¶ 308–310.

(d)     Limitation 1c

Claim 1 recites "a power supply." Ex. 1001, 15:39 (limitation 1c).

Petitioner contends that Ogusu teaches limitation 1c because Ogusu discloses (1) "current in a predetermined direction" applied to "the first coil 2b and the second coil 3b" to create resultant movement and (2) "an input power supplied to the coil." Pet. 79–80 (citing Ex. 1015 ¶¶ 30–31, 57–58). Further, Petitioner asserts that an ordinarily skilled artisan would have recognized that "applying electrical current to the coils to create resultant movement requires a supply of electric power." *Id.* at 80 (citing Ex. 1003 ¶ 312).

Patent Owner does not dispute that Ogusu teaches a "power supply" according to limitation 1c. *See, e.g.*, Resp. 52–58; Sur-reply 7–11. Instead, as explained below, Patent Owner disputes that a "power supply" according to the combined disclosures in Ogusu and Fukumoto receives an output from a "control component" according to limitation 1f. Resp. 54–58; Sur-reply 7–11; *infra* § III.K.1(g)(ii).

For the reasons stated by Petitioner and supported by Dr. Wolfe's testimony, we agree with Petitioner that Ogusu teaches limitation 1c. *See* Pet. 79–80; Ex. 1003 ¶¶ 311–312.

(e)     Limitation 1d

Claim 1 recites "user-input features." Ex. 1001, 15:40 (limitation 1d).

Petitioner contends that Ogusu teaches limitation 1d and alternatively that the combined disclosures in Ogusu and Fukumoto teach limitation 1d. *See* Pet. 80–81. Specifically, Petitioner asserts that Ogusu discloses that "various vibrations can be switched by the selection of the pager control section by the user's selection." *Id.* at 80 (citing Ex. 1015 ¶ 43). Petitioner asserts that an ordinarily skilled artisan would have recognized that the "user's selection" teaches the claimed "user-input features." *Id.* (citing Ex. 1003 ¶ 313).

Further, Petitioner asserts that Fukumoto's PDA 10 includes a touch panel and push-button-type operation keys for a user to input operation instructions. Pet. 80 (citing Ex. 1005, 13:40–14:13, Figs. 1–2). Petitioner asserts that the touch panel and the operation keys correspond to the claimed "user-input features." *Id.*

Patent Owner makes no arguments specific to limitation 1d. *See, e.g.*, Resp. 52–58; Sur-reply 7–11.

For the reasons stated by Petitioner and supported by Dr. Wolfe's testimony, we agree with Petitioner that Ogusu teaches limitation 1d and alternatively that the combined disclosures in Ogusu and Fukumoto teach limitation 1d. *See* Pet. 80–81; Ex. 1003 ¶¶ 313–314.

(f)     Limitation 1e

Claim 1 recites "a driving component that drives the moveable component in each of two opposite directions within the housing." Ex. 1001, 15:41–42 (limitation 1e).

Petitioner contends that the combined disclosures in Ogusu and Fukumoto teach limitation 1e. *See* Pet. 81–82. Specifically, Petitioner asserts that Ogusu's vibration actuator includes first coil 2b and second coil 3b that drive the "movable component" (the holder, the bearing, the yokes, and the magnets) "in each of two opposite directions" when an alternating current flows through the coils. *Id.* at 81 (citing Ex. 1015 ¶¶ 31–32). According to Petitioner, first coil 2b and second coil 3b generate a force that drives the "movable component" according to a "waveform of the current," e.g., pushing in one direction and pulling in the opposite direction. *Id.* at 81–82 (citing Ex. 1003 ¶ 316; Ex. 1015, Figs. 4(a)–4(e)).

Further, Petitioner asserts that movement would occur "in each of two opposite directions within the housing" when combining Fukumoto's teachings with Ogusu's teachings. Pet. 82 (citing Ex. 1003 ¶¶ 317–319).

Patent Owner makes no arguments specific to limitation 1e. *See, e.g.*, Resp. 52–58; Sur-reply 7–11.

For the reasons stated by Petitioner and supported by Dr. Wolfe's testimony, we agree with Petitioner that the combined disclosures in Ogusu and Fukumoto teach limitation 1e. *See* Pet. 81–82; Ex. 1003 ¶¶ 316–319.

(g)     Limitation 1f

Claim 1 recites "a control component that controls supply of power from the power supply to the driving component to cause the moveable component to oscillate at a frequency and an amplitude specified by user input received from the user-input features." Ex. 1001, 15:44–48 (limitation 1f).

(i)    Petitioner's Contentions

Petitioner contends that the combined disclosures in Ogusu and Fukumoto teach limitation 1f. *See* Pet. 82–84. In particular, regarding the function recited in limitation 1f, Petitioner asserts that Ogusu discloses a "pager control section" permitting a user to make a selection to switch between "various vibrations." *Id.* at 83 (citing Ex. 1015 ¶ 43). According to Petitioner, Ogusu's "various vibrations" result from applying "different currents to the coils according to different waveforms" where the "different waveforms each have different amplitudes and different frequencies." *Id.* (citing Ex. 1003 ¶ 321; Ex. 1015 ¶¶ 17, 19, 32, 37–42, 55, Figs. 4(a)–4(e)). Petitioner also asserts that a user may select "a waveform of a specific amplitude and frequency" to "cause the moveable component to oscillate at a frequency and an amplitude specified by user input received from the user-input features" according to limitation 1f. *Id.* (citing Ex. 1003 ¶ 321; Ex. 1015 ¶ 11, code (57)).

To show representative user-selected waveforms, Petitioner presents an annotated version of Ogusu's Figure 4 as reproduced below (Pet. 89):



Figure 4 illustrates example current waveforms identified as waveforms (a) through (e) that a signal generator may supply to a vibration actuator's coils.

Ex. 1015 ¶¶ 32, 37–41, 61, Fig. 4. The above annotated version of Figure 4 includes the following annotations:

- the red annotation "Higher frequency" next to waveform (b);

- the red annotation "Lower frequency" next to waveform (d); and

- the red annotation "Beat type frequency" next to waveform (e).

*See* Pet. 89; Ex. 1003 ¶ 333.

Regarding hardware structure according to limitation 1f, Petitioner asserts that Fukumoto discloses a processor, i.e., CPU 113. Pet. 84; *see id.* at 22 (citing Ex. 1005, 14:57–60). Petitioner also asserts that an ordinarily skilled artisan "would have understood that Ogusu uses a processor to choose among the various possible waveforms and to control the supply of power from the power supply to the coils to achieve those waveforms." *Id.* at 84 (citing Ex. 1003 ¶¶ 322–323).

Regarding algorithmic structure according to limitation 1f, Petitioner asserts that Fukumoto discloses the necessary structure for the reasons discussed in the challenge based on Fukumoto alone. Pet. 84; *see id.* at 21–23. According to Petitioner, an ordinarily skilled artisan "would have found it obvious to use an algorithm such as that disclosed in Fukumoto to supply power according to the desired waveform in Ogusu." *Id.* at 84 (citing Ex. 1003 ¶¶ 322–323).

(ii)   Patent Owner's Contentions

Patent Owner disputes that the combined disclosures in Ogusu and Fukumoto teach limitation 1f because Patent Owner disagrees that Fukumoto discloses algorithmic structure according to limitation 1f. *See*

Resp. 54–58; Sur-reply 7–11. Patent Owner makes essentially the same arguments regarding algorithmic structure for the challenge based on Ogusu and Fukumoto as for the challenge based on Fukumoto alone. *Compare* Resp. 54–58, *with id.* at 21–25; *see* Sur-reply 7–11.

(iii) <u>Analysis</u>

For (1) the reasons stated by Petitioner and supported by Dr. Wolfe's testimony and (2) the reasons discussed above for the challenge based on Fukumoto alone, we agree with Petitioner that the combined disclosures in Ogusu and Fukumoto teach limitation 1f. *See* Pet. 21–23, 82–84; Ex. 1003 ¶¶ 90–91, 116, 179–191, 320–325; *supra* § III.D.2(g)(iii). For the reasons discussed above for the challenge based on Fukumoto alone, we disagree with Patent Owner regarding Fukumoto's alleged failure to disclose algorithmic structure according to limitation 1f. *See* Resp. 54–58; Sur-reply 7–11; *supra* § III.D.2(g)(iii).

(h) <u>Alleged Reason to Combine the Teachings of the References</u>

Petitioner asserts that an ordinarily skilled artisan would have recognized that "Ogusu lacks certain implementation details that were well known as shown in Fukumoto" and "would have been motivated to apply those implementation details to Ogusu." Pet. 77 (citing Ex. 1003 ¶ 304); *see id.* at 78, 80, 86–87, 91. As an example, Petitioner asserts that an ordinarily skilled artisan "would have been motivated to incorporate user input features such as Fukumoto's into Ogusu's pager to allow the user to make selections in Ogusu's 'pager control section.'" *Id.* at 80 (citing Ex. 1003 ¶ 314).

Further, Petitioner asserts that incorporating Fukumoto's implementation details into Ogusu's pager would have amounted to "no more than applying":

> (1)   "a known technique (Fukumoto's CPU-controlled PDA
> vibration generation process) to a known device ready for
> improvement (Ogusu's pager control section vibration
> selection and generation process in a pager) to yield
> predictable results (a CPU-managed vibration generation
> process in Ogusu's pager providing a desired vibration
> output with a specific amplitude and frequency
> corresponding to a user input)"; and

> (2)   "a known technique (Fukumoto's process for converting
> a user input to a drive signal) to a known device ready for
> improvement (Ogusu's pager including its vibration
> actuator) to yield predictable results (a vibration actuator
> providing the desired vibration output with a specific
> amplitude and frequency corresponding to a user input)."

Pet. 86–87, 91 (citing Ex. 1003 ¶¶ 328, 336).

Dr. Wolfe's testimony supports Petitioner's assertions. *See* Ex. 1003
¶¶ 304, 307, 314, 328, 336.

Patent Owner makes no arguments against combining Fukumoto's
teachings with Ogusu's teachings. *See, e.g.*, Resp. 52–59; Sur-reply 7–11.

For the reasons stated by Petitioner and supported by Dr. Wolfe's
testimony, we agree with Petitioner that an ordinarily skilled artisan would
have had a reason to combine Fukumoto's teachings with Ogusu's teachings
in the way Petitioner proposes, i.e., to provide implementation details. *See*
Pet. 77–78, 80, 86–87, 91; Ex. 1003 ¶¶ 304, 307, 314, 328, 336. For the
reasons stated by Petitioner and supported by Dr. Wolfe's testimony, we also
agree with Petitioner that an ordinarily skilled artisan would have obtained
predictable results when combining Fukumoto's teachings with Ogusu's
teachings. *See* Pet. 86–87, 91; Ex. 1003 ¶¶ 328, 336.

(i)     Conclusion About Obviousness/Nonobviousness

For the reasons discussed above, the combined disclosures in Ogusu and Fukumoto teach claim 1's subject matter. *See supra* §§ III.K.1(a)–(g). Additionally, Petitioner provides a reason with rational underpinning as to why an ordinarily skilled artisan would have been motivated to combine Fukumoto's teachings with Ogusu's teachings in the way Petitioner proposes and would have obtained predictable results. *See supra* § III.K.1(h). Hence, Petitioner has shown by a preponderance of the evidence that claim 1 is unpatentable under § 103(a) because the claim would have been obvious over Ogusu and Fukumoto.

2. DEPENDENT CLAIM 2

Claim 2 reads as follows (with bracketed letters added for reference purposes):[10]

2. [pre] The linear vibration module of claim 1 wherein the control component is one of:

[a] an variable oscillator circuit with additional control circuitry; and

[b.i] a control component that includes a microprocessor,

[b.ii] a control program, stored in an electronic memory within, or separate from, the microprocessor, the control program executed by the microprocessor to control supply of power from the power supply to the driving component to cause the moveable component to oscillate at a frequency and an amplitude specified by user input received from the user-input features.

Ex. 1001, 15:49–61.

---

[10] We use the same reference letters that Petitioner uses to identify the claim language. *See* Pet. vii (Listing of Challenged Claims).

Petitioner contends that the combined disclosures in Ogusu and Fukumoto teach claim 2's limitations. *See* Pet. 84–87. Specifically, Petitioner asserts that Fukumoto discloses limitation 2b.i and limitation 2b.ii because a user's input in Fukumoto produces a CPU-driven sequence of events causing oscillatory actuator 115 to vibrate at a particular amplitude and frequency. *Id.* at 84–86 (citing Ex. 1005, Figs. 2, 5); *see id.* at 20–21.

Further, Petitioner asserts that applying Fukumoto's implementation details to Ogusu would have amounted to:

> no more than applying a known technique (Fukumoto's CPU-controlled PDA vibration generation process) to a known device ready for improvement (Ogusu's pager control section vibration selection and generation process in a pager) to yield predictable results (a CPU-managed vibration generation process in Ogusu's pager providing a desired vibration output with a specific amplitude and frequency corresponding to a user input).

Pet. 86–87 (citing Ex. 1003 ¶ 328).

Patent Owner makes no arguments specific to claim 2. *See, e.g.*, Resp. 52–59; Sur-reply 7–14.

For the reasons stated by Petitioner and supported by Dr. Wolfe's testimony, we agree with Petitioner that the combined disclosures in Ogusu and Fukumoto teach claim 2's limitations. *See* Pet. 84–87; Ex. 1003 ¶¶ 326–329. For the reasons discussed above, we agree with Petitioner that an ordinarily skilled artisan would have been motivated to combine Fukumoto's teachings with Ogusu's teachings in the way Petitioner proposes and would have obtained predictable results. *See supra* § III.K.1(h). Hence, Petitioner has shown by a preponderance of the evidence that claim 2 is

unpatentable under § 103(a) because the claim would have been obvious over Ogusu and Fukumoto.

### 3. DEPENDENT CLAIM 7

Claim 7 depends directly from claim 1 and specifies that "the driving component comprises one or more electromagnetic coils that generate magnetic fields parallel to the directions in which the moveable component is driven by the driving component." Ex. 1001, 16:29–33.

Petitioner contends that Ogusu teaches claim 7's limitations because Ogusu's vibration actuator includes first coil 2b and second coil 3b that drive the "movable component" (the holder, the bearing, the yokes, and the magnets) due to "magnetic fields [that are] parallel to the directions in which the moveable component is driven by the driving component." Pet. 87 (citing Ex. 1003 ¶¶ 330–331; Ex. 1015 ¶¶ 31–32).

Patent Owner makes no arguments specific to claim 7. *See, e.g.*, Resp. 52–59; Sur-reply 7–14.

For the reasons stated by Petitioner and supported by Dr. Wolfe's testimony, we agree with Petitioner that Ogusu teaches claim 7's limitations. *See* Pet. 87; Ex. 1003 ¶¶ 330–331. For the reasons discussed above, we agree with Petitioner that an ordinarily skilled artisan would have been motivated to combine Fukumoto's teachings with Ogusu's teachings in the way Petitioner proposes and would have obtained predictable results. *See supra* § III.K.1(h). Hence, Petitioner has shown by a preponderance of the evidence that claim 7 is unpatentable under § 103(a) because the claim would have been obvious over Ogusu and Fukumoto.

#### 4. DEPENDENT CLAIM 11

Claim 11 depends directly from claim 1 and specifies that "the linear vibration module further includes two or more driving components, each, when activated, driving the moveable component to linearly oscillate with an amplitude particular to the activated driving component." Ex. 1001, 16:50–54.

Petitioner contends that Ogusu teaches claim 11's limitations because Ogusu's vibration actuator includes first coil 2b and second coil 3b that drive the "movable component" (the holder, the bearing, the yokes, and the magnets) and cause it to linearly oscillate. Pet. 87–88 (citing Ex. 1015 ¶¶ 31–32, Fig. 1). Further, Petitioner asserts that an ordinarily skilled artisan "would have understood and found it obvious that Ogusu's vibration actuator applies electric current in a particular waveform with respective amplitude to each of the first and second coil, causing the movable element to vibrate according to that amplitude." *Id.* at 88 (citing Ex. 1003 ¶ 332; Ex. 1015 ¶¶ 36–37).

Patent Owner makes no arguments specific to claim 11. *See, e.g.*, Resp. 52–59; Sur-reply 7–14.

For the reasons stated by Petitioner and supported by Dr. Wolfe's testimony, we agree with Petitioner that Ogusu teaches claim 11's limitations. *See* Pet. 87–88; Ex. 1003 ¶ 332. For the reasons discussed above, we agree with Petitioner that an ordinarily skilled artisan would have been motivated to combine Fukumoto's teachings with Ogusu's teachings in the way Petitioner proposes and would have obtained predictable results. *See supra* § III.K.1(h). Hence, Petitioner has shown by a preponderance of

the evidence that claim 11 is unpatentable under § 103(a) because the claim would have been obvious over Ogusu and Fukumoto.

### 5. DEPENDENT CLAIM 17

Claim 17 depends directly from claim 1 and specifies that "the control component controls supply of power from the power supply to the driving component to cause the moveable component to oscillate at a frequency and an amplitude that are independently specified by user input received from the user-input features." Ex. 1001, 17:19–24.

Petitioner contends that "Ogusu alone or in combination with Fukumoto" teaches claim 17's limitations. *See* Pet. 90–91. Specifically, Petitioner asserts that a user of Ogusu's vibration actuator "selects a vibration in the pager control section, and that vibration corresponds to a waveform with a specific amplitude and frequency which is then applied to the coils." *Id.* at 90 (citing Ex. 1015 ¶¶ 32, 55). To support its assertion, Petitioner presents an annotated version of Ogusu's Figure 4 as reproduced below:



Figure 4 illustrates example current waveforms identified as waveforms (a) through (e) that a signal generator may supply to a vibration actuator's coils.

Ex. 1015 ¶¶ 32, 37–41, 61, Fig. 4. The above annotated version of Figure 4 includes the following annotations:

- the red annotation "Changing amplitude" next to waveform (a);

- the red annotation "Changing amplitude" next to waveform (e); and

- the blue annotation "Consistent uniform and beat frequencies" beneath waveform (e).

*See* Pet. 91; Ex. 1003 ¶ 335.

Additionally, Petitioner contends that "Fukumoto correlates a user input to a desired waveform, converts that waveform to a drive signal, and applies that drive signal to its oscillatory actuator." Pet. 91.

Further, Petitioner asserts that applying Fukumoto's implementation details to Ogusu would have amounted to:

no more than applying a known technique (Fukumoto's process for converting a user input to a drive signal) to a known device ready for improvement (Ogusu's pager including its vibration actuator) to yield predictable results (a vibration actuator providing the desired vibration output with a specific amplitude and frequency corresponding to a user input).

Pet. 91 (citing Ex. 1003 ¶ 336).

Patent Owner makes no arguments specific to claim 17. *See, e.g.*, Resp. 52–59; Sur-reply 7–14.

For (1) the reasons stated by Petitioner and supported by Dr. Wolfe's testimony and (2) the reasons discussed above for the challenge based on Fukumoto alone, we agree with Petitioner that the combined disclosures in Ogusu and Fukumoto teach claim 17's limitations. *See* Pet. 90–91; Ex. 1003 ¶¶ 335–337; *supra* § III.D.8. For the reasons discussed above, we agree with Petitioner that an ordinarily skilled artisan would have been motivated

to combine Fukumoto's teachings with Ogusu's teachings in the way Petitioner proposes and would have obtained predictable results. *See supra* § III.K.1(h). Hence, Petitioner has shown by a preponderance of the evidence that claim 17 is unpatentable under § 103(a) because the claim would have been obvious over Ogusu and Fukumoto.

<div align="center">

*L. Alleged Obviousness over Ogusu,*
*Fukumoto, Either Grant or Barton, and Ueda: Claims 3–6*

</div>

Petitioner contends that claims 3–6 are unpatentable under § 103(a) because the claims would have been obvious over (1) Ogusu, Fukumoto, and Ueda, (2) Ogusu, Fukumoto, Grant, and Ueda, and (3) Ogusu, Fukumoto, Barton, and Ueda. *See* Pet. 91–92. Patent Owner disputes Petitioner's contentions. *See* Resp. 60–62.

Petitioner does not rely on Ogusu, Grant, or Barton for teaching claim 3's limitations. *See* Pet. 35–45, 75–92. Petitioner fails to show how Ogusu, Grant, and Barton individually or collectively cure the infirmities in Fukumoto and Ueda with respect to claim 3 for the challenge based on Fukumoto and Ueda. *See id.*; *supra* § III.F.2(c).

Hence, Petitioner has not shown by a preponderance of the evidence that claim 3 is unpatentable under § 103(a) based on (1) Ogusu, Fukumoto, and Ueda, (2) Ogusu, Fukumoto, Grant, and Ueda, or (3) Ogusu, Fukumoto, Barton, and Ueda. For the same reason, Petitioner has not shown by a preponderance of the evidence that claims 4–6 are unpatentable under § 103(a) based on those combinations of references.

<div align="center">

*M. Petitioner's Other Patentability Challenges:*
*Claims 1–9, 11, 14, and 17*

</div>

As noted above, Petitioner presents several challenges to the patentability of claims 1–9, 11, 14, and 17 under § 103(a) based on various

<div align="center">

137

</div>

combinations of multiple references. *See supra* § II.G. The patentability challenges discussed above, however, resolve the patentability of claims 1–9, 11, 14, and 17 based on the asserted references. *See supra* §§ III.D–III.L. Hence, we need not reach the other patentability challenges. *See SAS Inst. Inc. v. Iancu*, 138 S. Ct. 1348, 1359 (2018) (holding that a petitioner "is entitled to a final written decision addressing all of the claims it has challenged"); *Bos. Sci. Scimed, Inc. v. Cook Grp. Inc.*, 809 F. App'x 984, 990 (Fed. Cir. 2020) (agreeing that the Board "need not address issues that are not necessary to the resolution of the proceeding").

## IV. CONCLUSION

Based on the evidence presented with the Petition, the evidence introduced during the trial, and the parties' respective arguments, Petitioner has shown by a preponderance of the evidence that:

(1)   claims 1, 2, 7, and 17 are unpatentable under § 103(a) based on Fukumoto;

(2)   claims 1, 2, 7, 11, and 17 are unpatentable under § 103(a) based on Ogusu and Fukumoto; and

(3)   claim 8 is unpatentable under § 103(a) based on Fukumoto and Fuller.[11]

---

[11] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding after the issuance of this Final Written Decision, we draw Patent Owner's attention to the April 2019 Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding. *See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. §§ 42.8(a)(3), (b)(2).

Petitioner has not shown by a preponderance of the evidence that:

(1)    claim 3 is unpatentable under § 103(a) based on either
       (i) Fukumoto, (ii) Fukumoto and Grant, or (iii) Fukumoto
       and Barton;

(2)    claims 3–6 are unpatentable under § 103(a) based on
       either (i) Fukumoto and Ueda, (ii) Fukumoto, Grant, and
       Ueda, (iii) Fukumoto, Barton, and Ueda, (iv) Ogusu,
       Fukumoto, and Ueda, (v) Ogusu, Fukumoto, Grant, and
       Ueda, or (vi) Ogusu, Fukumoto, Barton, and Ueda;

(3)    claim 9 is unpatentable under § 103(a) based on either
       (i) Fukumoto, (ii) Fukumoto and Grant, or (iii) Fukumoto
       and Barton; and

(4)    claim 14 is unpatentable under § 103(a) based on either
       (i) Fukumoto, Dong, and Ogusu, (ii) Fukumoto, Grant,
       Dong, and Ogusu, or (iii) Fukumoto, Barton, Dong, and
       Ogusu.

In summary:

| Claims | 35 U.S.C. § | Reference(s)/ Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1–3, 7–9, 15, 17 | 103(a) | Fukumoto[12] | 1, 2, 7, 17 | 3, 8, 9 |
| 1–3, 7–9, 15, 17 | 103(a) | Fukumoto, Grant[13] | | 3, 8, 9 |

---

[12] We do not address the patentability of claim 15 because Patent Owner statutorily disclaimed claim 15 during this proceeding. *See* Paper 27, 1; Ex. 2015.

[13] In view of our determination that claims 1, 2, 7, and 17 are unpatentable based on other challenges, we do not reach this challenge to those claims. *See supra* §§ III.D.2–III.D.3, III.D.5, III.D.8, III.E, III.K.1–III.K.3, III.K.5. We do not address the patentability of claim 15 because Patent Owner statutorily disclaimed claim 15 during this proceeding. *See* Paper 27, 1; Ex. 2015.

| Claims | 35 U.S.C. § | Reference(s)/ Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1–3, 7–9, 15, 17 | 103(a) | Fukumoto, Barton[14] | | 3, 8, 9 |
| 3–6 | 103(a) | Fukumoto, Ueda | | 3–6 |
| 3–6 | 103(a) | Fukumoto, Grant, Ueda | | 3–6 |
| 3–6 | 103(a) | Fukumoto, Barton, Ueda | | 3–6 |
| 7, 8 | 103(a) | Fukumoto, Erixon[15] | | |
| 7, 8 | 103(a) | Fukumoto, Grant, Erixon[16] | | |
| 7, 8 | 103(a) | Fukumoto, Barton, Erixon[17] | | |
| 8 | 103(a) | Fukumoto, Fuller | 8 | |

---

[14] In view of our determination that claims 1, 2, 7, and 17 are unpatentable based on other challenges, we do not reach this challenge to those claims. *See supra* §§ III.D.2–III.D.3, III.D.5, III.D.8, III.E, III.K.1–III.K.3, III.K.5. We do not address the patentability of claim 15 because Patent Owner statutorily disclaimed claim 15 during this proceeding. *See* Paper 27, 1; Ex. 2015.

[15] In view of our determination that claims 7 and 8 are unpatentable based on other challenges, we do not reach this challenge to those claims. *See supra* §§ III.D.5, III.H, III.K.3. III.M.

[16] In view of our determination that claims 7 and 8 are unpatentable based on other challenges, we do not reach this challenge to those claims. *See supra* §§ III.D.5, III.H, III.K.3. III.M.

[17] In view of our determination that claims 7 and 8 are unpatentable based on other challenges, we do not reach this challenge to those claims. *See supra* §§ III.D.5, III.H, III.K.3. III.M.

| Claims | 35 U.S.C. § | Reference(s)/ Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 8 | 103(a) | Fukumoto, Grant, Fuller[18] | | |
| 8 | 103(a) | Fukumoto, Barton, Fuller[19] | | |
| 14 | 103(a) | Fukumoto, Dong, Ogusu | | 14 |
| 14 | 103(a) | Fukumoto, Grant, Dong, Ogusu | | 14 |
| 14 | 103(a) | Fukumoto, Barton, Dong, Ogusu | | 14 |
| 15 | 103(a) | Fukumoto, Saiki[20] | | |
| 15 | 103(a) | Fukumoto, Grant, Saiki[21] | | |

[18] In view of our determination that claim 8 is unpatentable based on another challenge, we do not reach this challenge to claim 8. *See supra* §§ III.H, III.M.

[19] In view of our determination that claim 8 is unpatentable based on another challenge, we do not reach this challenge to claim 8. *See supra* §§ III.H, III.M.

[20] We do not address the patentability of claim 15 because Patent Owner statutorily disclaimed claim 15 during this proceeding. *See* Paper 27, 1; Ex. 2015.

[21] We do not address the patentability of claim 15 because Patent Owner statutorily disclaimed claim 15 during this proceeding. *See* Paper 27, 1; Ex. 2015.

| Claims | 35 U.S.C. § | Reference(s)/ Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 15 | 103(a) | Fukumoto, Barton, Saiki[22] | | |
| 16 | 103(a) | Fukumoto, Saiki, Masahiko[23] | | |
| 16 | 103(a) | Fukumoto, Grant, Saiki, Masahiko[24] | | |
| 16 | 103(a) | Fukumoto, Barton, Saiki, Masahiko[25] | | |
| 1, 2, 7, 11, 15, 17 | 103(a) | Ogusu, Fukumoto[26] | 1, 2, 7, 11, 17 | |

---

[22] We do not address the patentability of claim 15 because Patent Owner statutorily disclaimed claim 15 during this proceeding. *See* Paper 27, 1; Ex. 2015.

[23] We do not address the patentability of claim 16 because Patent Owner statutorily disclaimed claim 16 during this proceeding. *See* Paper 27, 1; Ex. 2015.

[24] We do not address the patentability of claim 16 because Patent Owner statutorily disclaimed claim 16 during this proceeding. *See* Paper 27, 1; Ex. 2015.

[25] We do not address the patentability of claim 16 because Patent Owner statutorily disclaimed claim 16 during this proceeding. *See* Paper 27, 1; Ex. 2015.

[26] We do not address the patentability of claim 15 because Patent Owner statutorily disclaimed claim 15 during this proceeding. *See* Paper 27, 1; Ex. 2015.

| Claims | 35 U.S.C. § | Reference(s)/ Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1, 2, 7, 11, 15, 17 | 103(a) | Ogusu, Fukumoto, Grant[27] | | |
| 1, 2, 7, 11, 15, 17 | 103(a) | Ogusu, Fukumoto, Barton[28] | | |
| 3–6 | 103(a) | Ogusu, Fukumoto, Ueda | | 3–6 |
| 3–6 | 103(a) | Ogusu, Fukumoto, Grant, Ueda | | 3–6 |
| 3–6 | 103(a) | Ogusu, Fukumoto, Barton, Ueda | | 3–6 |
| 7, 8 | 103(a) | Ogusu, Fukumoto, Erixon[29] | | |

[27] In view of our determination that claims 1, 2, 7, 11, and 17 are unpatentable based on other challenges, we do not reach this challenge to those claims. *See supra* §§ III.D.2–III.D.3, III.D.5, III.D.8, III.K.1–III.K.5. We do not address the patentability of claim 15 because Patent Owner statutorily disclaimed claim 15 during this proceeding. *See* Paper 27, 1; Ex. 2015.

[28] In view of our determination that claims 1, 2, 7, 11, and 17 are unpatentable based on other challenges, we do not reach this challenge to those claims. *See supra* §§ III.D.2–III.D.3, III.D.5, III.D.8, III.K.1–III.K.5. We do not address the patentability of claim 15 because Patent Owner statutorily disclaimed claim 15 during this proceeding. *See* Paper 27, 1; Ex. 2015.

[29] In view of our determination that claims 7 and 8 are unpatentable based on other challenges, we do not reach this challenge to those claims. *See supra* §§ III.D.5, III.H, III.K.3. III.M.

143

| Claims | 35 U.S.C. § | Reference(s)/ Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 7, 8 | 103(a) | Ogusu, Fukumoto, Grant, Erixon[30] | | |
| 7, 8 | 103(a) | Ogusu, Fukumoto, Barton, Erixon[31] | | |
| **Overall Outcome** | | | 1, 2, 7, 8, 11, 17 | 3–6, 9, 14 |

## V. ORDER

Accordingly, it is

ORDERED that claims 1, 2, 7, 8, 11, and 17 in the '081 patent are determined to be unpatentable;

ORDERED that claims 3–6, 9, and 14 in the '081 patent are not determined to be unpatentable; and

FURTHER ORDERED that, because this is a Final Written Decision, the parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

---

[30] In view of our determination that claims 7 and 8 are unpatentable based on other challenges, we do not reach this challenge to those claims. *See supra* §§ III.D.5, III.H, III.K.3. III.M.

[31] In view of our determination that claims 7 and 8 are unpatentable based on other challenges, we do not reach this challenge to those claims. *See supra* §§ III.D.5, III.H, III.K.3. III.M.

For PETITIONER:

Ali R. Sharifahmadian
Jin-Suk Park
Jeffrey A. Miller
ARNOLD & PORTER KAYE SCHOLER LLP
ali.sharifahmadian@arnoldporter.com
jin.park@arnoldporter.com
jeffrey.miller@apks.com


For PATENT OWNER:

Reza Mirzaie
Qi (Peter) Tong
Kristopher R. Davis
Neil A. Rubin
Paul A. Kroeger
Christian W. Conkle
RUSS AUGUST & KABAT
rmirzaie@raklaw.com
ptong@raklaw.com
kdavis@raklaw.com
nrubin@raklaw.com
pkroeger@raklaw.com
cconkle@raklaw.com

Appx0145

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

SAMSUNG ELECTRONICS CO., LTD., AND SAMSUNG
ELECTRONICS AMERICA, INC.,
Petitioner,

v.

RESONANT SYSTEMS, INC.,
Patent Owner.

_____

IPR2023-00993
Patent 9,941,830 B2

_____

Before JAMES J. MAYBERRY, STEVEN M. AMUNDSON, and
MICHAEL T. CYGAN, *Administrative Patent Judges*.

CYGAN, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining Some Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

# I. INTRODUCTION

## A. *Background and Summary*

Samsung Electronics Co., Ltd, and Samsung Electronics America, Inc. (collectively, "Petitioner") filed a Petition requesting an *inter partes* review of claims 1–9, 11, 14–17, 19, and 20 of U.S. Patent No. 9,941,830 B2 (Ex. 1001, "the '830 patent"). Paper 3 ("Pet."). Resonant Systems, Inc. ("Patent Owner") filed a Preliminary Response to the Petition. Paper 11. The Petition is supported by a declaration from Dr. Andrew Wolfe. Ex. 1003 ("Wolfe Declaration"). With our authorization, Petitioner filed a Reply to the Preliminary Response and a *Sotera* stipulation. Paper 14; Ex. 1044. Under that same authorization, Patent Owner filed a Sur-reply. Paper 15. We instituted *inter partes* review on all asserted claims and grounds. Paper 18 (Inst. Dec.).

Patent Owner filed a Response, accompanied by a declaration of Dr. Keith W. Goossen. Paper 28 ("PO Resp."); Ex. 2008 ("Goossen Decl."). Petitioner filed a Reply, accompanied by a Supplemental Declaration of Dr. Andrew Wolfe, and a transcription of a deposition of Dr. Goossen. Paper 37 ("Pet. Reply"); Ex. 1047 ("Wolfe Decl."); Ex. 1048 ("Goossen Dep."). Patent Owner filed a Sur-reply. Paper 41 ("PO Sur-reply"). We held an Oral Hearing with the parties on October 10, 2024, and a transcript was entered into the record. Paper 47 ("Tr.").

We have jurisdiction under 35 U.S.C. § 6. We issue this Final Written Decision under 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73. For the reasons explained below, Petitioner has shown by a preponderance of the evidence that claims 1, 2, 7, 8, 11, 15–17, and 20 of the '830 patent are unpatentable, and has not shown by a preponderance of the evidence that claims 3–6, 9, 14, and 19 of the '830 patent are unpatentable.

### B.     Real Parties in Interest

Petitioner identifies Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc. as real parties-in-interest. Pet. 95. Patent Owner identifies Resonant Systems, Inc. as a real party-in-interest. Paper 6, first unpaginated page.

### C.     Related Matters

The parties represent that the '830 patent is involved in *Resonant Systems, Inc. v. Samsung Electronics Co., Ltd., et al.*, EDTX, case number 2:22-cv-00423; *Resonant Systems, Inc. v. Sony Group Corporation, et al.*, case number EDTX 2:22-cv-00424; *Resonant Systems, Inc. d/b/a RevelHMI v. Apple, Inc.*, WDTX, case number 7:23-cv-00077. *Id.*; Pet. 96.

Petitioner also challenged claims 1–20 of the '830 patent in IPR2023-01025.[1] Paper 4, 2.

### D.     The '830 Patent

The '830 patent is titled "Linear Vibration Modules and Linear-Resonant Vibration Modules." Ex. 1001, code (54). The '830 patent issued from Application No. 15/181,249, filed on June 13, 2016, and claims priority, via continuation applications and a continuation-in-part application, to Provisional Application No. 61/179,109, filed on May 18, 2009. *Id.* at codes (21), (22), (60), (63).

The '830 patent relates to linear-resonant vibration modules providing vibrational forces from the linear oscillation of a weight or member, produced by rapidly alternating the polarity of driving electromagnets. Ex. 1001, 3:11–19. Feedback control is used to maintain the module at or near its resonant frequency. *Id.* at 3:19–21. Vibrational amplitude and frequency

---

[1] Trial was not instituted in IPR2023-01025. IPR2023-01025, Paper 16.

combinations can be produced throughout a large region of amplitude/frequency space. *Id.* at 3:22–25.

### E. Illustrative Claim

Claim 1 is illustrative, and recites as follows:[2]

[1pre] A vibration module comprising

[1a] a housing;

[1b] a moveable component;

[1c] a power supply;

[1d] user-input features;

[1e] a driving component that drives the moveable component to oscillate within the housing; and

[1f] a control component that controls supply of power from the power supply to the driving component to cause the moveable component to oscillate at a frequency and an amplitude specified by one or more stored values.

### F. Evidence

Petitioner relies on the following patent document evidence.

| Name | Patent Document | Exhibit |
|---|---|---|
| Fukumoto | US 7,292,227 B2 | 1005 |
| Grant | US 2006/0284849 A1 | 1006 |
| Barton | US 2006/0248183 A1 | 1007 |
| Ueda | US 2004/0169480 A1 | 1008 |
| Erixon | US 2008/0174187 A1 | 1009 |
| Fuller | US 2008/0001484 A1 | 1010 |
| Saiki | US 7,006,641 B1 | 1013 |
| Masahiko | US 8,917,486 B2 | 1014 |
| Dong | CN 101488697 | 1011 |
| Ogusu | JP H8–196053 | 1015 |

---

[2] Bracketed numbering added as per the Petition.

*G.      Prior Art and Asserted Grounds*

Petitioner asserts that claims 1–9, 11, 14–17, 19, and 20 would have

been unpatentable on the following grounds:

| Claim(s) Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 1–3, 7–9, 15, 17, 20 | 103(a) | Fukumoto |
| 1–3, 7–9, 15, 17, 20 | 103(a) | Fukumoto, Grant |
| 1–3, 7–9, 15, 17, 20 | 103(a) | Fukumoto, Barton |
| 3–6 | 103(a) | Fukumoto, Ueda |
| 3–6 | 103(a) | Fukumoto, Grant, Ueda |
| 3–6 | 103(a) | Fukumoto, Barton, Ueda |
| 7, 8 | 103(a) | Fukumoto, Erixon |
| 7, 8 | 103(a) | Fukumoto, Grant, Erixon |
| 7, 8 | 103(a) | Fukumoto, Barton, Erixon |
| 8 | 103(a) | Fukumoto, Fuller |
| 8 | 103(a) | Fukumoto, Grant, Fuller |
| 8 | 103(a) | Fukumoto, Barton, Fuller |
| 14, 19 | 103(a) | Fukumoto, Dong, Ogusu |
| 14, 19 | 103(a) | Fukumoto, Grant, Dong, Ogusu |
| 14, 19 | 103(a) | Fukumoto, Barton, Dong, Ogusu |
| 15, 20 | 103(a) | Fukumoto, Saiki |
| 15, 20 | 103(a) | Fukumoto, Grant, Saiki |
| 15, 20 | 103(a) | Fukumoto, Barton, Saiki |
| 16 | 103(a) | Fukumoto, Saiki, Masahiko |
| 16 | 103(a) | Fukumoto, Grant, Saiki, Masahiko |
| 16 | 103(a) | Fukumoto, Barton, Saiki, Masahiko |
| 1, 2, 7, 11, 15, 17, 20 | 103(a) | Ogusu, Fukumoto |
| 1, 2, 7, 11, 15, 17, 20 | 103(a) | Ogusu, Fukumoto, Grant |
| 1, 2, 7, 11, 15, 17, 20 | 103(a) | Ogusu, Fukumoto, Barton |
| 3–6 | 103(a) | Ogusu, Fukumoto, Ueda |
| 3–6 | 103(a) | Ogusu, Fukumoto, Grant, Ueda |
| 3–6 | 103(a) | Ogusu, Fukumoto, Barton, Ueda |
| 7, 8 | 103(a) | Ogusu, Fukumoto, Erixon |

| Claim(s) Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 7, 8 | 103(a) | Ogusu, Fukumoto, Grant, Erixon |
| 7, 8 | 103(a) | Ogusu, Fukumoto, Barton, Erixon |

Petitioner asserts that the pre-AIA patentability scheme applies to the '830 patent. *See* Pet. 2, 6 n.2 ("Petitioners address the earliest priority date"). We note that the '830 patent issued from an application that was examined under the first-inventor-to-file provisions of the AIA. Ex. 1002, 104. However, even were the '830 patent given an effective filing date of its actual filing date, each prior-art reference would still antedate the '830 patent under the AIA prior-art scheme. Therefore, our determination would not be affected by which statutory scheme is applied. Consequently, we apply the pre-AIA patentability prior art statute in this proceeding.

## II. ANALYSIS

### A.  *Legal Standards*

A claim is unpatentable under 35 U.S.C. § 103(a) if the differences between the claimed subject matter and the prior art are such that the subject matter, as a whole, "would have been obvious at the time the invention was made to a person having ordinary skill in the art [to which said subject matter pertains]." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level

of ordinary skill in the art; and (4) objective evidence of non-obviousness.[3] *See Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

## B.    *Level of Ordinary Skill in the Art*

Petitioner asserts that a person of ordinary skill in the art ["POSITA"] at the critical time "would have had a bachelor's degree in electrical engineering, mechanical engineering, computer science, or a similar field and two years of experience related to electronic consumer product design [and the] POSITA could have also obtained similar knowledge and experience through other means."  Pet. 6 (citing Ex. 1003 ¶ 31).  Patent Owner states that it would require experience with electro-mechanical control systems rather than electronic consumer product design.  PO Resp. 3. Because Petitioner provides for "similar knowledge and experience through other means," we do not discern any meaningful distinction.  Thus, we adopt Petitioner's proposed level of ordinary skill, as it appears to be consistent with the specification of the '830 patent and the prior art of record.

## C.    *Claim Construction*

In an *inter partes* review, we construe a patent claim "using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. § 282(b)."  37 C.F.R. § 42.100(b).  Under this standard, the words of a claim generally are given their "ordinary and customary meaning," which is the meaning the term would have to a person of ordinary skill at the time of the invention, in the context of the entire patent including the specification.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (en banc).

---

[3] Neither party presents evidence or arguments regarding objective evidence of non-obviousness.

Here, Petitioner asserts that limitations [1b], [1e], and [1f] reciting "component" should be construed under 35 U.S.C. § 112, paragraph 6. Pet. 7–8. Patent Owner agrees that "driving component" and "control component" are means-plus-function terms, but argues that "moveable component" is not. PO Resp. 7.

Determining whether a limitation that does not use the term "means" invokes § 112, paragraph 6, involves a three-part inquiry: (1) there is a generic placeholder that substitutes for the term "means"; (2) the generic placeholder is modified by functional language; and (3) the limitation does not include the structure, material, or acts necessary to perform the function in question without need to resort to other portions of the specification or extrinsic evidence for an adequate understanding of the structure. *See Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1349 (Fed. Cir. 2015); *Tri-Med, Inc. v. Stryker Corp.*, 514 F.3d 1256, 1259–60 (Fed. Cir. 2008); *Rodime PLC v. Seagate Tech., Inc.*, 174 F.3d 1294, 1303–04 (Fed. Cir. 2015) (the court must "determine whether the claim nevertheless recites sufficient structure for performing the . . . function to take it outside the bounds of" § 112, paragraph 6).

In our Institution Decision, we determined that Petitioner's assertion that a "component" should be interpreted under 35 U.S.C. § 112, paragraph 6, "fell short of the full, three-part inquiry," and that it did not explain why any of the disputed limitations lack sufficient structure to perform the function. Inst. Dec. 8–9. We now review the construction arguments on the basis of the full record, which both parties have addressed in their briefing, and are not bound by our determination made on the prior incomplete record for purposes of institution.

### 1.    Limitation [1b]

With respect to limitation [1b], a "moveable component," Petitioner argues that it should be construed as a means (component) having a function (moveable) that corresponds to a structure (a moving weight).  Pet. 7. Petitioner argues that "essentially any physical component can perform the function of being moved," references different types of structure as the moving components in the '830 patent, and concludes that therefore the term has no definite structure.  Pet. Reply 2 (citing Ex. 1001, Figs. 4A–4G, 14, 15–17).  Patent Owner argues for a non-means-plus-function construction of a component that "is capable of being moved."  PO Resp. 7–8 (citing Ex. 2008 ¶ 55).  Patent Owner argues, and Petitioner agrees, that "there is likely no material difference between" the parties' proffered constructions such that construction is necessary.  *Id.* at 8; Pet. Reply 7.  We agree, because Petitioner has shown, and Patent Owner does not contest, that the prior art teaches such a component under either construction.  *Infra* § II(D)(2)(a). Because Petitioner's assertions and our determination would be unaffected by its proposed construction, we need not construe this term.  *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) (noting that "we need only construe terms 'that are in controversy, and only to the extent necessary to resolve the controversy'" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))).

### 2.    Limitation [1e]

With respect to limitation [1e], a "driving component that drives the moveable component to oscillate within the housing," Petitioner argues that it should be construed as a means (component) having a function (driving the moveable component to oscillate within the housing) that corresponds to

Appx0154

a disclosed structure (one or more electromagnetic coils). Pet. 8. Patent Owner agrees that the driving component is in means-plus-function form, lacking specific structure to perform the claimed function. PO Resp. 8–9. Patent Owner argues that the correct construction is "[o]ne or more **coils or electromagnets**." *Id.* at 8.

We agree that limitation [1e] sets forth a "driving component" defined solely by its function such that it is a substitute for a "means." We determine that the corresponding structure may be one or more coils, as argued by both parties. *See* Ex. 1001, Figs. 4A–4G (coil 420); Fig. 6 (coil 626); Fig. 13 (first coil 1302 and second coil 1304); Pet 7; PO Resp. 8. Petitioner's assertions in each ground are based upon a teaching of electromagnetic coil oscillation. *Id.* at 14, 17 (citing Ex. 1005, 14:32–37, 14:57–60), 76 (citing Ex. 1015 ¶¶ 23–32). Because our determination would be unaffected by Patent Owner's alternate electromagnet (non-coil) embodiment, we need not further construe this term. *See Nidec Motor Corp.*, 868 F.3d at 1017.

### 3. *Limitation [1f]*

Limitation [1f] recites, a "control component that controls supply of power from the power supply to the driving component to cause the moveable component to oscillate at a frequency and an amplitude specified by one or more stored values." Petitioner argues that it should be construed as a means (component) having a function (to control supply of power from the power supply to the driving component to cause the moveable component to oscillate at a frequency and an amplitude specified by one or

more stored values). Pet. 7–8.[4] Petitioner asserts that the corresponding structure in the '830 patent is a "Processor and H Bridge Switch, where [the] processor is programmed with an algorithm to perform the following steps: (1) set the mode and strength to default values or values represented by selections made by user input to the user input features, (2) provide a corresponding output to the power supply, and (3) provide a corresponding output to the H-bridge switch." *Id.* at 8 (citing Ex. 1001, 7:20–34, 8:20–30, Fig. 7A, Fig. 7C).

Patent Owner agrees that the control component is a means-plus-function term for which the corresponding structure may be a processor (but not an H Bridge switch) programmed with an algorithm identical to that proposed by Petitioner except for the corresponding output being provided to the driving component rather than to an H-bridge switch. PO Resp. 10, 12–14.

We agree with Patent Owner that the corresponding structure includes a "processor," "CPU," or "microprocessor." PO Resp. 10. For example, the specification discloses that a linear-resonant vibration module may include "a central processing unit ('CPU'), generally a small, low-powered microprocessor." Ex. 1001, 6:13–15. The specification also discloses that "a processor or microcontroller within a linear-resonant vibration module allows for a very large number of different processor-controlled vibration patterns and modes to be exhibited by the linear-resonant vibration module." *Id.* at 10:66–11:3.

---

[4] Petitioner alternately asserts that limitation [1f] may be given a non-means-plus-function interpretation, but does not explain why limitation [1f] should be given that construction. Pet. 18–21.

We further agree that the processor's algorithm comprises a first step, "set the mode and strength to [default values or] values representing selections made by user input to the user input features." *See* PO Resp. 10; Ex. 2008 ¶¶ 63–64. Specifically, the '830 patent includes as Figures 7A–7C "control-flow diagrams" or algorithms that "illustrate the control program, executed by the CPU, that controls operation of an LRVM." Ex. 1001, 3:49–54, 6:52–54, Figs. 7A–7C. This first algorithmic step is supported by step 702 of Figure 7A, in which the program sets several variables to default values, including the mode variable indicating "the current operational mode of the device," and the strength variable indicating "the current user-selected strength of operation." Ex. 1001, 6:50–64.

We further agree that the processor's algorithm comprises a second step, "provide a corresponding output to the power supply so that the power supply provides a corresponding output to the driving component." *See* PO Resp. 10; Ex. 2008 ¶¶ 63–64. This second algorithmic step is supported by steps 760 and 762 of Figure 7C, which describe that

> when a change in the user controls has occurred[, i]n step 760, the variables mode and strength are set to the currently selected mode and vibrational strength, represented by the current states of control features in the user interface. Next, in step 762, the routine "control" computes an output value p corresponding to the currently selected strength, stored in the variable strength, and outputs the value p to the power supply so that the power supply outputs an appropriate current to the coil.

Ex. 1001, 8:20–30. Therefore, we agree with Patent Owner's two-step description of the corresponding structure to the function recited by the processor in limitation [1f], and, we adopt these algorithm steps as the algorithmic structure required by limitation 1f.

Patent Owner also argues that the claimed structure would also include an oscillator and microcontroller without additional special programming is disclosed in the '830 specification, but acknowledges that we need not determine this to resolve any ground of unpatentability asserted in the Petition. *Id.* at 10–12. We further note that whereas Patent Owner uses the term "representing," Petitioner uses the term "represented by"; Patent Owner acknowledges that this does not provide any relevant difference. *Id.* at 14. Because our determination would be unaffected by Patent Owner's alternate oscillator embodiment, and we discern no meaningful distinction between "representing" and "represented by," we need not further construe this term. *See Nidec Motor Corp.*, 868 F.3d at 1017.

With respect to the H-bridge switch, Patent Owner states that the Petition does not explain why the H-bridge switch corresponds to any portion of the control component term's claimed function, and therefore we need not resolve whether the corresponding structure must include an H-bridge switch. PO Resp. 15–16; *but see id.* at 24–25 (arguing nonobviousness under Petitioner's construction). We agree. Petitioner's contentions for its Fukumoto-based grounds and its Ogusu-based grounds admit that neither Fukumoto nor Ogusu teaches an H-bridge switch, and instead argue that H-bridge switches were well-known alternatives to oscillator circuits for converting power into a desired waveform. Pet. 22 (citing Ex. 1003 ¶¶ 175–183), 84 (citing Ex. 1003 ¶¶ 319–321). We further note that the '830 patent describes the H-bridge switch as "but one example of various different types of electrical and electromechanical switches that can be used to rapidly alternate the direction of current within the coil of an LRVM." Ex. 1001, 6:1–5. This description indicates that the corresponding

structure is not limited to an H-bridge switch, but includes other known switches having the same function. We additionally note that other proceedings on the same and related patents have construed claim 1 and not required an H-bridge switch as part of the corresponding structure. *See* Ex. 1054, 15–16; Ex. 1055, 19 n.10, 20 (corresponding structure of "control component" includes "input the control value to an H-bridge switch circuit" but finding it "not necessary on this record to determine if the 'control component' structure also requires an H-bridge switch"), Ex. 1056, 20 n.11, 21 (same).

### 4. *Claim 3*

Claim 3 recites:

> 3. The vibration module of claim 1 wherein the control component receives output signals from sensors within the vibration module during operation of the vibration module and adjusts one or more operational control outputs of the control component according to the received output signals from the sensors.

Both parties contend that claim 3 fails to recite sufficient structure for the language modifying "control component" for essentially the same reasons discussed for limitation 1[f]. Pet. 7–8; Pet. Reply 1–2; PO Resp. 16. For essentially the same reasons discussed with respect to limitation 1[f], we agree, and determine that the control component in claim 3 is a means-plus-function limitation.

For claim 3, Petitioner identifies the language following the initial recitation of "control component" as the claimed function. Pet. 8. Petitioner identifies the corresponding structure described in the '830 patent's specification as follows: "Claim 1 structure with the processor further programmed with an algorithm to perform the following steps: (1) convert

the received output signal into an integer, (2) compare that integer to a specific value, (3) adjust one or more operational control outputs based on that comparison." *Id.* (citing Ex. 1001, 7:24–29, 7:42–8:19, Figs. 7A–7B). Petitioner contends that the Specification "does not disclose receiving 'the value' of an output signal" but instead "discloses receiving the output signal itself, followed by converting the output signal to an integer suitable for comparison." Pet. Reply 6–7 (citing Ex. 1001, 7:43–46).

Patent Owner identifies the corresponding structure described in the '830 patent's specification in the same way for claim 3 as for limitation 1f, i.e., an "oscillator circuit; microcontroller with internal or external memory; processor; CPU; microprocessor; and equivalents thereof." PO Resp. 16. Patent Owner argues that where "the corresponding structure is a processor, CPU, or microprocessor, the processor/CPU/microprocessor is programmed with an algorithm" comprising the following steps: "(a) receive the value of an output signal; (b) compare that value to a different value, which could be a previous value; and (c) adjust one or more operational control outputs based on that comparison." PO Resp. 16 (emphases omitted) (citing Ex. 2012, 35–36 (citing Ex. 1001, 7:13–18, 7:32–8:9, Figs. 7A–7B)). Patent Owner notes that the parties agree that the algorithm includes at least the following step: "adjust one or more operational control outputs based on that comparison." *Id.* at 17. Patent Owner contends that any required algorithm must contain either Petitioner's proposed steps (1) and (2), or Patent Owner's proposed steps (a) and (b). *Id.*

35 U.S.C. § 112(f) requires "descriptive text" in the patent disclosure such that a POSITA would "know and understand what structure corresponds to the means limitation." *Bosch Auto. Serv. Sols., LLC v. Matal*, 878 F.3d 1027, 1039 (Fed. Cir. 2017). Both parties cite to the same Figures,

IPR2023-00993
Patent 9,941,830 B2

Figures 7A and 7B, and their accompanying description in the '830 patent as providing that descriptive text. Pet. 8 (citing Ex. 1001, 7:24–29, 7:42–8:19, Figs. 7A–7B); PO Resp. 16 (citing Ex. 2012, 35–36 (citing Ex. 1001, 7:13–18, 7:32–8:9, Figs. 7A–7B)). Both parties agree that Petitioner's proposed algorithm represents structure corresponding to the claimed function. Pet. 8; PO Resp. 17 ("Patent Owner agrees that Petitioner's algorithm would be sufficient to perform the claimed function"). Consequently, we adopt Petitioner's proposed algorithm as the algorithmic structure required by claim 3.

### 5.   *Claim 4*

Claim 4 recites:

> 4.    The vibration module of claim 1 wherein the control component adjusts the one or more operational control outputs of the control component according to the received output signals from the sensors in order that subsequent operation of the vibration module produces desired outputs from the one or more sensors corresponding to one or more operational control parameters.

#### a)    *"control component"*

Both parties contend that claim 4 should be construed as means-plus-function and having the same structure each party asserted with respect to claim 3. *See* Pet. 7–8; Pet. Reply 1–2; PO Resp. 6–7, 16–17; PO Sur-reply 6.

We agree with the parties that § 112's means-plus-function provision applies to claim 4 for the same reasons expressed for claim 3, and for those reasons, further determine that Patent Owner's corresponding structure is the correct construction of claim 4.

*b)* *Antecedent basis issues*

Although claim 4 depends directly from claim 1, Petitioner asserts that claim 1 lacks an antecedent basis for the following terms in claim 4: "the one or more operational control outputs of the control component," "the sensors," and "the one or more sensors." Pet. 9, 51. Petitioner asserts that claim 4 should be construed as depending from claim 3, or that no antecedent should be present in the "operational control outputs" or "sensors." *Id.* at 9, 51. However, Petitioner asserts that we need not resolve this matter to resolve the patentability issues because its obviousness assertions apply to either interpretation. *Id.* at 8.

Patent Owner contends that claim 4 "contains a clear typographical error" and "should be interpreted as depending from claim 3." PO Resp. 17–18. Patent Owner explains that claim 3 "introduces limitations of 'sensors' and 'one or more operational control outputs of the control component'" and claim 4 "then refers to 'the sensors' and 'the one or more operational control outputs.'" *Id.* at 17. Patent Owner contends that the "natural conclusion is that these terms in claim 4 are meant to refer to the corresponding terms in claim 3." *Id.* at 18. Patent Owner, like Petitioner, contends that we need not resolve this construction, because it would not affect the outcome of the obviousness dispute. *Id.*

During the oral hearing, Petitioner's counsel agreed that we may consider claim 4 as depending from claim 3 for purposes of this proceeding. Tr. 18:4–22. Hence, for purposes of this proceeding, we consider claim 4 as depending from claim 3. We note that two district courts have resolved the same antecedent-basis issue in the same claim or in a similar claim by modifying claim dependency this way. *See* Ex. 1053, 50; Ex. 1054, 22.

### D. Obviousness over Fukumoto

Petitioner asserts that claims 1–3, 7–9, 15, 17, and 20 are unpatentable under 35 U.S.C. § 103(a) as obvious over Fukumoto. *See* Pet. 9–35; Pet. Reply 16–22. Patent Owner disputes Petitioner's contentions. *See* PO Resp. 18–27; PO Sur-reply 7–14. For the reasons explained below, we agree with Petitioner that claims 1, 2, 7, 15, 17, and 20 are unpatentable under § 103(a) because the claims would have been obvious over Fukumoto but disagree that claims 3, 8, and 9 are unpatentable based on Fukumoto.

### 1. Fukumoto

Fukumoto is titled "Electronic Device, Vibration Generator, Vibration-Type Reporting Method, and Report Control Method." Ex. 1005, code (54). Fukumoto relates to an electronic device having a touch-based user interface having vibrational feedback. *Id.* at 1:51–63. Fukumoto addresses a concern that touch input interfaces may insufficiently indicate whether such input has been accepted due to drawbacks of audio and visual feedback. *Id.* at 1:13–41. Fukumoto uses a vibration generator imparting vibration to a housing of an electronic device. *Id.* at 4:31–47.

### 2. Claim 1 over Fukumoto

We begin our analysis of Petitioner's obviousness contentions with Petitioner's assertions as to claim 1.

#### a) Limitations [1pre]–[1b], [1d]–1[e]

Claim 1 recites, "[1pre] A vibration module comprising [1a] a housing; [1b] a moveable component; . . . [1d] user-input features; [1e] a driving component that drives the moveable component to oscillate within the housing."

Relying on Figure 3 of Fukumoto, Petitioner asserts that limitation [1pre] is taught by Fukumoto's electronic device causing generation of vibration. Pet. 12–13 (citing Ex. 1005, Abstr.).

Petitioner asserts that limitation [1a] is taught by Fukumoto's case 115a. *Id.* at 13 (citing Ex. 1005, 15:56–59; Ex. 1003 ¶ 161).

Petitioner asserts that limitation [1b] is taught by Fukumoto's movable magnetic weight 122. *Id.* at 14 (citing Ex. 1005, 14:32–37; Ex. 1003 ¶¶ 162–164).

Petitioner asserts that limitation [1d] is taught by Fukumoto's touch panel, which permits a user to input operation instructions to its PDA (Personal Digital Assistant) device. *Id.* at 16–17 (citing Ex. 1005, Figs. 1–2, 13:40–14:13, 30:48–53, 31:27–29; Ex. 1003 ¶¶ 166–168).

Petitioner asserts that limitation [1e] is taught by Fukumoto's drive signal applied to coil 121, which causes movable magnetic weight 122 to reciprocate in the vertical direction. *Id.* at 17–18 (citing Ex. 1005, Fig. 3, 14:57–60; Ex. 1003 ¶¶ 169–171).

Patent Owner does not contest these assertions. *See* PO Resp. 18–25. Based on the complete trial record, we agree that the above-identified teachings of Fukumoto teach or suggest claim 1's preamble and limitations [1a]–[1b] and [1d]–[1e].

> *b)* *Limitations [1c], [1f]*

Limitation [1c] recites "a power supply." Petitioner asserts that limitation [1c] is taught by Fukumoto's AC current in the form of a drive signal, for which a person having ordinary skill in the art would recognize as being supplied by a power supply. Pet. 15–16 (citing Ex. 1005, 14:57–60, 16:44–50; Ex. 1003 ¶ 165).

Limitation [1f] recites, "a control component that controls supply of power from the power supply to the driving component to cause the moveable component to oscillate at a frequency and an amplitude specified by one or more stored values." Petitioner asserts that, if limitation [1f] is construed as a means-plus-function claim, the corresponding structure for the function includes a processor and an H-bridge switch. *Id.* at 21–22.[5] Petitioner asserts that Fukumoto teaches processor 113, and that an H-bridge switch would have been obvious to one having ordinary skill in the art at the critical time because an H-bridge switch was a well-known component for converting input power into the desired waveform. *Id.* at 22 (citing Ex. 1003 ¶¶ 175–183). Dr. Wolfe testifies that Fukumoto's circuitry is an equivalent to an H-bridge switch. Ex. 1003 ¶¶ 183–184.

Petitioner further asserts that Fukumoto teaches an equivalent algorithm, in that Fukumoto's CPU reads the user-selected waveform data from memory 112 to apply a corresponding drive signal to coil 121. Pet. 21–22 (citing Ex. 1005, 17:7–11, 17:20–26, 14:57–60; Ex. 1003 ¶ 183). Petitioner asserts that the CPU instructs the power supply when it "instructs the drive signal generation circuit 114 to generate a drive signal," and in response, "the drive signal generation circuit 114 generates a drive signal using the waveform data supplied from the CPU 113." *Id.* at 22–23 (citing Ex. 1005, 17:20–26). Petitioner argues that a person having ordinary skill in the art would have found it obvious that "Fukumoto's power conversion from the battery into the desired waveform is equivalent to the '830 patent's

---

[5] Because we determine that limitation [1f] is construed as a means-plus-function claim, we do not address Petitioner's assertions based on a non-means-plus-function construction. *Supra* at § II(C)(3); *see* Pet. 18–21.

algorithm step of providing an output to an H-bridge switch." *Id.* at 23 (citing Ex. 1003 ¶ 183).

Patent Owner argues that Petitioner has not shown Fukumoto to teach the claimed control component; specifically, the algorithmic structure of "provide a corresponding output to the power supply so that the power supply provides a corresponding output to the driving component." PO Resp. 21–23.[6] Patent Owner argues that Petitioner does not explain what the structure of the power supply would be, and whether it can accept an output from a processor or other component. *Id.* at 21. Patent Owner further argues that Petitioner does not explain how any power supply is involved when Fukumoto's processor 113 instructs the drive signal generation circuit 114 to generate a drive signal in step S103. *Id.* at 23. Patent Owner argues that therefore, Petitioner has not shown Fukumoto to teach a control component that provides an output to the power supply as required by limitation [1f]. *Id.* at 22 (citing Ex. 2008 ¶ 83).

We are persuaded by Petitioner that Fukumoto teaches "provide a corresponding output to the power supply so that the power supply provides a corresponding output to the driving component" as required by our construction of limitation [1f].[7] *See supra* § II(C)(3). We agree with Petitioner that when CPU 113 instructs drive signal generation circuit 114 to generate a drive signal so that drive signal generation circuit 114 applies a

---

[6] Patent Owner argues that other corresponding structures could exist (oscillator circuits or microcontrollers). PO Resp. 19–20. Petitioner does not assert unpatentability based upon these structures. Therefore, our analysis is limited to the corresponding structure at issue in this proceeding.
[7] Because we do not adopt Petitioner's "H-bridge" construction for limitation [1f], we need not address Patent Owner's arguments premised on that construction. PO Resp. 23–24.

Appx0166

drive signal to the oscillatory actuator, CPU 113 "provide[s] a corresponding output to the power supply so that the power supply provides a corresponding output to the driving component" according to algorithmic structure step (b). *See* Pet. 22–23; Ex. 1003 ¶ 189. The Petition indicates that Fukumoto's CPU provides a corresponding output to drive signal generation circuit 114 as part of the "power supply" required by limitation 1c, i.e., when CPU 113 "instructs the drive signal generation circuit 114 to generate a drive signal." Pet. 22. The Petition further indicates that Fukumoto's power supply (drive signal generation circuit 114) then provides a corresponding output in the form of a drive signal to the driving component (coil 121). *Id.* at 22–23.

Patent Owner's argument that Petitioner relies upon a battery having no inputs as Fukumoto's power source are unavailing. Patent Owner further argues that Petitioner uses a battery as an example of a power supply, and that Petitioner has not established that a battery could accept an output from a processor. PO Resp. 21–22 (citing Pet. 22–23; Ex. 2008 ¶ 80). Petitioner uses a battery only as an example of a power supply. *See* Pet. 22 ("to convert power supplied from, e.g., the battery in the electronic device to the AC drive signal"), 23 ("to convert power supplied from, for example, the battery in the electronic device to the AC drive signal"); Tr. 47:11–13 (Patent Owner's counsel stating, "All that's pointed to [in the Petition] is the fact that there's drive power or small power, so there must be some power supply. Later on they take the example of a battery."). Petitioner clearly indicates that Fukumoto teaches a power supply due to the "'small power' [that] is supplied to the coil using a power supply," not merely the battery of its device. Pet. 16; *see* PO Resp. 20 (acknowledging that for the power supply, Petitioner relies upon the element that generates the drive power that

powers the drive signal applied to the coil). Petitioner relies upon the "small power" of Fukumoto's device as controlled through the drive signal generation circuit as the power supply, not merely Fukumoto's battery.[8]

Moreover, we determine that the claimed "power supply" need not be limited to an originating source of power such as a battery. During oral argument, Patent Owner agreed that the claimed "power supply" could be met by an element that is "part of the power supply, and that there's something else involved in the supply of power, some further upstream source of power, be it a battery or wall plug or something like that." Tr. 46:24–47:8 (arguing that such an interpretation was not in the Petition). Therefore, we are persuaded by Petitioner that drive signal generation circuit 114, which is controlled by the CPU 113 and supplies power to the driving element, teaches the claimed power supply as set forth in limitations [1c] and [1f].

We further agree with Petitioner's uncontested assertion that Fukumoto teaches the remaining algorithmic structure of limitation [1f], "set the mode and strength to [default values] or values representing selections made by user input to the user input features." *See supra* at § II(C)(3). Specifically, CPU 113 "determines whether a touch signal has been input from the touch panel 102 and whether a key operation signal has been input from the key input unit 111." Ex. 1005, 17:1–4, Fig. 5 (step S101); *see* Ex. 1003 ¶¶ 91, 189. When CPU 113 "determines that at least one of the touch signal or key operation signal has been input," CPU 113 "reads from the memory 112 the waveform data of the drive signal to be applied to the

---

[8] Thus, we need not address the parties' arguments concerning whether such a prior art battery may have control inputs. PO Resp. 21–23; Pet. Reply 19–20.

oscillatory actuator 115." Ex. 1005, 17:7–11, Fig. 5 (step S102); *see* Ex. 1003 ¶¶ 91, 189.

### c) Determination

Based on the foregoing and on the complete trial record, we determine that Petitioner has shown, by a preponderance of the evidence, that claim 1 would have been obvious over the teachings of Fukumoto.

### 3. Claims 2, 3, 7–9, 15, 17, and 20 over Fukumoto

Petitioner provides a detailed analysis of the limitations of claims 2, 3, 7–9, 15, 17, and 20, and points to teachings in Fukumoto as meeting each limitation. Pet. 23–35.

### a) Claim 2

Claim 2 reads as follows (with bracketed letters added for reference purposes):[9]

> 2. [pre] The vibration module of claim 1 wherein the control component is one of:
>
> [a] an variable oscillator circuit with additional control circuitry; and
>
> [b.i] a control component that includes a microprocessor,
>
> [b.ii] a control program, stored in an electronic memory within, or separate from, the microprocessor, the control program executed by the microprocessor to control supply of power from the power supply to the driving component to cause the moveable component to oscillate at a frequency and an amplitude specified by user input received from the user-input features.

Petitioner contends that Fukumoto teaches claim 2's subject matter because Fukumoto discloses a "microprocessor" according to limitation 2b.i and a "control program" according to limitation 2b.ii. *See* Pet. 23–24.

_____

[9] We use the same reference letters that Petitioner uses to identify the claim language. *See* Pet. vii (Listing of Challenged Claims).

Specifically, Petitioner asserts that Fukumoto's CPU 113 executes a program stored in memory 112 for "vibration control processing." *Id.* at 23 (citing Ex. 1005, 14:2–13). Petitioner also asserts that an ordinarily skilled artisan would have understood that the program for "vibration control processing" would be "stored in an electronic memory within, or separate from, the microprocessor" according to limitation 2b.ii "so that CPU 113 could execute it." *Id.* at 23–24 (citing Ex. 1003 ¶ 193).

Additionally, Petitioner contends that Fukumoto teaches "control supply of power from the power supply to the driving component to cause the moveable component to oscillate at a frequency and an amplitude specified by user input received from the user-input features" according to limitation 2b.ii for the reasons Fukumoto teaches limitation 1f. Pet. 24 (citing Ex. 1003 ¶ 193).

Patent Owner makes no arguments specific to claim 2. *See, e.g.*, PO Resp. 27.

For the reasons stated by Petitioner and supported by Dr. Wolfe's testimony, we agree with Petitioner that Fukumoto teaches claim 2's subject matter. Hence, Petitioner has shown by a preponderance of the evidence that claim 2 is unpatentable under § 103(a) because the claim would have been obvious over Fukumoto.

*b)* *Claim 3*

Claim 3 depends directly from claim 1 and further requires that "the control component receives output signals from sensors within the vibration module during operation of the vibration module and adjusts one or more operational control outputs of the control component according to the received output signals from the sensors."

Petitioner contends that Fukumoto teaches claim 3's subject matter if § 112's means-plus-function provision does not apply to claim 3. *See* Pet. 24 n.12. Petitioner does not contend that Fukumoto teaches claim 3's subject matter if § 112's means-plus-function provision applies to claim 3. *See id.*

As discussed above, we determine that § 112's means-plus-function provision applies to claim 3. *Supra* at § II(C)(4). Because Petitioner does not contend that Fukumoto teaches claim 3's subject matter if § 112's means-plus-function provision applies to claim 3, Petitioner has not shown by a preponderance of the evidence that claim 3 is unpatentable under § 103(a) based on Fukumoto.

Additionally, in the challenges that combine Grant or Barton with Fukumoto, Petitioner does not rely on Grant or Barton for teaching claim 3's limitations and, therefore, fails to show how Grant or Barton cures the infirmities in Fukumoto with respect to claim 3. *See* Pet. 35–45. Petitioner has not shown by a preponderance of the evidence that claim 3 is unpatentable under § 103(a) based on either Fukumoto and Grant or Fukumoto and Barton.

c)   *Claim 7*

Claim 7 depends directly from claim 1 and specifies that "the driving component comprises one or more electromagnetic coils that generate magnetic fields parallel to the directions in which the moveable component is driven by the driving component." Ex. 1001, 16:29–33.

Petitioner contends that Fukumoto teaches claim 7's subject matter because Fukumoto discloses "coil 121 used to drive movable weight 122." Pet. 27–28 (citing Ex. 1005, 14:57–60, Fig. 3). Further, Petitioner asserts that an ordinarily skilled artisan "would have recognized the magnetic fields

are generated parallel to the direction of moveable weight 112's vibrational movement (i.e., so that moveable weight 112 moves up and down)." *Id.* at 28 (citing Ex. 1003 ¶¶ 198–200).

Patent Owner makes no arguments specific to claim 7. PO Resp. 27; PO Sur-reply 7–14.

For the reasons stated by Petitioner and supported by Dr. Wolfe's testimony, we agree with Petitioner that Fukumoto teaches claim 7's subject matter. Hence, Petitioner has shown by a preponderance of the evidence that claim 7 is unpatentable under § 103(a) because the claim would have been obvious over Fukumoto.

<div align="right">

*d)*    *Claim 8*

</div>

Claim 8 reads as follows:

> 8. The vibration module of claim 1 wherein the housing is a tube, capped at both ends by movable-component-repelling components selected from one of mechanical springs and magnets;
>
> wherein the movable component is a magnet shaped to slide within the tube; and
>
> wherein the driving component is an electromagnetic coil.

Petitioner asserts that Fukumoto's case 115a teaches the claimed tube, referencing Patent Owner's purported statement "in district court that a 'tube' can have a rectangular cross-section." Pet. 29 (citing Ex. 1005, Fig. 3, 14:26–44; Ex. 1028, 61). Petitioner asserts that oscillatory actuator 115 in Figure 3 includes movable weight 122 as a "movable component [that] is a magnet shaped to slide within the tube," and also includes coil 121 as a "driving component [that] is an electromagnetic coil." Pet. 31 (citing Ex. 1005, 14:20–37, Fig. 3; Ex. 1003 ¶ 198).

Petitioner asserts that oscillatory actuator 115 has "one end of case 115a capped by spring 123" in Figure 3, but it would have been obvious to have both ends of the case capped by springs because Fukumoto's Figure 83 shows an oscillatory actuator with both ends of the case (housing) capped by springs. *Id.* at 29–30. Petitioner asserts that an ordinarily skilled artisan would have been motivated to modify Figure 3's oscillatory actuator in view of Figure 83's oscillatory actuator to include springs on both the top and bottom of movable weight 122 in Figure 3 because "using multiple springs" would "dampen the vibration forces without damaging other components (e.g., the screen)" and "double the force of vibration created for greater effect while requiring less power." *Id.* at 30 (citing Ex. 1003 ¶ 197; Ex. 1005, 50:1–13, Fig. 83).

Although Petitioner provides this motivation to modify Figure 3's oscillatory actuator in view of Figure 83's oscillatory actuator, Petitioner argues that it "is not required to provide a motivation to combine the express disclosures of a single reference." Pet. Reply 23 (citing *Gen. Elec. Co. v. Raytheon Techs. Corp.*, 983 F.3d 1334, 1351–52 (Fed. Cir. 2020)). Petitioner also argues that Fukumoto includes "express language" that "explicitly suggests" modifying Figure 3's oscillatory actuator in view of Figure 83's oscillatory actuator. *Id.* (citing Ex. 1005, 48:53–55, 49:65–50:1, 50:9–13).

Patent Owner argues that Petitioner has not shown adequate motivation to modify Fukumoto's Figure 3 embodiment based on its Figure 83 embodiment. PO Resp. 25. As an initial matter, Patent Owner disputes that Petitioner "is not required to provide a motivation to combine the express disclosures of a single reference." PO Sur-reply 11–12. Regarding the *General Electric* decision cited by Petitioner, Patent Owner asserts that it

stands for the proposition that "there is no need to show a motivation to combine elements in the way that a prior art reference has already combined them, by including them within a single embodiment." *Id.* at 12 (emphasis omitted) (citing *Gen. Elec.*, 983 F.3d at 1352). According to Patent Owner, "the Federal Circuit has clearly stated that both a motivation to combine and reasonable expectation of success must be demonstrated, when seeking to combine multiple embodiments from the same reference." *Id.*

We agree with Patent Owner that a showing of motivation is required. Whether a proposed combination rests on "combining disclosures from multiple references, combining multiple embodiments from a single reference, or selecting from large lists of elements in a single reference, there must be a motivation to make the combination and a reasonable expectation that such a combination would be successful." *In re Stepan Co.*, 868 F.3d 1342, 1346 n.1 (Fed. Cir. 2017).

The *General Electric* decision cited by Petitioner does not hold otherwise. In *General Electric*, the Federal Circuit considered an obviousness challenge based on combining disclosures from multiple references. *See Gen. Elec.*, 983 F.3d at 1339–40, 1344–52. The Federal Circuit criticized the Board for dissecting an embodiment disclosed in the primary reference into a collection of "individual elements" and requiring the patent challenger to "re-do the work already done" regarding that embodiment in the primary reference. *Id.* at 1351–52. The Federal Circuit did not consider an obviousness challenge based on combining multiple embodiments from a single reference. *See id.* at 1344–52. Therefore, we do not agree with Petitioner that no motivation to combine the Figure 3 and Figure 83 embodiments of Fukumoto need be shown.

Patent Owner disputes both rationales proffered by Petitioner. Regarding Petitioner's rationale that "using multiple springs" would "dampen the vibration forces without damaging other components (e.g., the screen)," Patent Owner asserts that Figure 3's oscillatory actuator "already has structures between the weight 122 and the screen 103, including the spring 123, coil 121, and case 115a." PO Resp. 25–26 (citing Ex. 2008 ¶ 92). Patent Owner further asserts that Petitioner fails to explain "how the weight could damage the screen or other components in spite of these structures keeping them separate," and "how the addition of a second spring would make damage less likely." *Id.* at 26 (citing Ex. 2008 ¶ 93).

We agree with Patent Owner that Petitioner has not adequately supported this rationale. Petitioner fails to explain how movable weight 122 in oscillatory actuator 115 could damage touch panel 102 or display panel 103a when various structures separate those panels from movable weight 122. *See* Pet. 29–30; Ex. 1003 ¶ 202; Ex. 2008 ¶¶ 92–93. Consequently, we do not determine that this provides a reason to combine the Figure 3 and Figure 83 embodiments.

Regarding Petitioner's rationale that "using multiple springs" would "double the force of vibration created for greater effect while requiring less power," Patent Owner argues that Petitioner fails to provide "any evidence or explanation for how increasing the force and effect of vibration would reduce the power required." PO Resp. 26. Patent Owner argues that "there is no reason to expect that increasing forces will *decrease* power requirements" because "doubling the force on an object while keeping the distance and speed it moves the same is going to roughly double power consumption." *Id.* at 26–27 (citing Ex. 2008 ¶ 94). Patent Owner further argues that Fukumoto attributes doubling the force in Figure 83's oscillatory

actuator to "doubling the electrostatic force by doubling the number of electrodes," not doubling the number of springs. PO Resp. 27 (citing Ex. 1005, 50:4–13; Ex. 2008 ¶ 95). According to Patent Owner, "[d]oubling the number of springs without changing the force that drives the oscillations is not likely to increase the vibrations." *Id.* (citing Ex. 1005, 50:4–13; Ex. 2008 ¶ 95).

We agree that Petitioner has not adequately supported this rationale. As Patent Owner asserts, Fukumoto attributes doubling the force in Figure 83's oscillatory actuator not only to the vibration, but also to the electrostatic force. *See* Ex. 1005, 49:10–50:13, Figs. 82–83; Ex. 2008 ¶ 95; PO Resp. 27. For Figure 83, the number of driving electrodes are doubled, resulting in "the electrostatic force for causing the movable weight 813 to reciprocate becomes double and a greater vibration can be generated." Ex. 1005, 50: 4–13. Petitioner and its declarant do not address the effect of electrostatic force, focusing solely on the number of springs. Ex. 1003 ¶ 202. Because Petitioner's purported advantage results, at least in part, from additional features not included in its combination (i.e., additional driving electrodes), we are not persuaded by Petitioner's rationale for adding an additional spring.

Additionally, we disagree with Petitioner that Fukumoto includes "express language" that "explicitly suggests" modifying Figure 3's oscillatory actuator in view of Figure 83's oscillatory actuator. *See* Pet. Reply 23. In particular, Petitioner points to Fukumoto's disclosure that "the vibrator generator [in Figure 3] is not limited to a linear oscillatory actuator." Ex. 1005, 48:53–55 (cited by Reply 23). That disclosure says nothing about modifying springs in a linear oscillatory actuator.

Petitioner also points to Fukumoto's comparison of Figure 83's oscillatory actuator to Figure 82's oscillatory actuator. *See* Ex. 1005, 49:65–50:1, 50:9–13 (cited by Reply 23). That comparison has no relationship to Figure 3's oscillatory actuator, e.g., because Figure 3's oscillatory actuator generates vibrations using electromagnetic force produced by a coil instead of electrostatic force produced by counter electrodes. *See id.* at 13:19–24, 14:20–24, 14:56–60, 49:20–48, 50:1–13.

Because Petitioner fails to provide "an adequate motivation to modify" Figure 3's oscillatory actuator in view of Figure 83's oscillatory actuator to yield claim 8's subject matter, Petitioner has not shown by a preponderance of the evidence that claim 8 is unpatentable under § 103(a) based on Fukumoto.

<div align="right">

*e) Claim 9*

</div>

Claim 9 depends from claim 1, and further recites, "wherein the housing is a tube, capped at both ends by movable-component-repelling components; and wherein the moveable component includes an electromagnetic-coil driving component and microprocessor."

With respect to claim 9, Petitioner also relies on the same asserted combination of Fukumoto's Figures 3 and 83. Pet. 31 ("Fukumoto discloses or suggests . . . 'the housing is a tube, capped at both ends by movable-component-repelling components," citing Pet. "VII.A.6" (its assertions for claim 8)). Petitioner does not present further reasons to combine Fukumoto's Figure 3 and Figure 83 embodiments. For the reasons expressed in our analysis of Petitioner's claim 8 assertions, we determine that Petitioner has not shown by a preponderance of the evidence that claim 9 is unpatentable under § 103(a) based on Fukumoto.

*f)    Claims 15 and 20*

Claim 15 depends from claim 1, and further recites, "wherein the control component drives simultaneous oscillation of the moveable component at two or more frequencies to generate complex vibration modes."  Claim 20 is an independent claim that contains every limitation of claim 1 and every limitation of claim 15, and no additional limitations.

Petitioner asserts that the additional limitations of claim 15 are taught by Fukumoto, pointing to Fukumoto's Figure 51 representing a combination of a vibrational waveform and an audio waveform.  Pet. 33–34 (citing Ex. 1005, 18:15–17, 34:38–35:9).  Petitioner asserts that a person having ordinary skill in the art would recognize the combined waveform would drive Fukumoto's moveable component at the different frequencies.  *Id.* at 34 (citing Ex. 1003 ¶ 209).  Patent Owner does not specifically contest these assertions.  PO Resp. 27–28.

We are persuaded that the additional limitations of claim 15, appearing also in claim 20, are taught by Fukumoto's combined vibrational and audio waveform in the manner described by Petitioner.  Consequently, we determine that Petitioner has shown by a preponderance of the evidence that claims 15 and 20 would have been obvious over the teachings of Fukumoto.

*g)    Claim 17*

Claim 17 depends from claim 1, and further recites, "wherein the control component controls supply of power from the power supply to the driving component to cause the moveable component to oscillate at a frequency and an amplitude that are independently specified by user input received from the user input features."

Petitioner asserts that Fukumoto teaches this limitation, stating

Specifically, a user touches a button or location of the touch panel, the CPU detects the touch location/button, reads the corresponding waveform data containing frequency and amplitude attributes from memory, and generates a drive signal sent to the oscillator actuator to vibrate according to the specified waveform's amplitude and frequency.

Pet. 34–35 (citing Ex. 1005, Fig. 5, 13:54–14:25; 29:9–11 ("[T]he waveform of the drive signal linked with each touch button differs in amplitude or shape"), 29:15–18 ("The above-mentioned waveform data table 112a stores the frequency data, amplitude data, and the like required for generating these drive signals as the waveform data."); Ex. 1003 ¶ 211. Patent Owner does not specifically contest these assertions. PO Resp. 27.

We are persuaded that the additional limitations of claim 17 are taught by Fukumoto's user-selected frequency and amplitude data used to generate a drive signal in the manner described by Petitioner. Consequently, we determine that Petitioner has shown by a preponderance of the evidence that claim 17 would have been obvious over the teachings of Fukumoto.

*h)* *Determination*

In view of the foregoing, we determine that Petitioner has shown by a preponderance of the evidence claims 2, 7, 15, 17, and 20 would have been obvious in view of the teachings of Fukumoto. We further determine that Petitioner has not shown by a preponderance of the evidence that claims 3, 8, and 9 would have been obvious in view of the teachings of Fukumoto.

*4.* *Claims 3–6 over Fukumoto and Ueda*

Petitioner asserts that the combined teachings of Fukumoto and Ueda made obvious claims 3–6. Pet. 45–56. Patent Owner argues against the combination for the same reasons as for claim 1, which we have found unavailing. *Supra* § II(D)(2); PO Resp. 30. Patent Owner further argues

that Petitioner's construction of "control component" requires the use of integer values that are not taught by Fukumoto or Ueda. PO Resp. 31 (citing Ex. 2008 ¶ 109; Pet. 50–51; Ex. 1003 ¶¶ 241–242; Ex. 2008 ¶ 109). However, Patent Owner does not dispute that Ueda discloses algorithmic structure according to claims 3 and 4 under Patent Owner's proposed means-plus-function construction for these claims. *See* PO Resp. 30–31; PO Sur-reply 14–16; Tr. 52:11–19; *supra* § II(C)(4).

a) *Ueda*

Ueda is a U.S. patent application publication titled "Control System for a Linear Vibration Motor," filed on July 15, 2003, and published on September 2, 2004. Ex. 1008, codes (12), (22), (43), (54). Ueda states that the invention "relates to motor driving apparatuses and, more particularly, to a motor driving apparatus for driving a linear vibration motor having a mover and a spring member for supporting the mover." *Id.* ¶ 1.

Ueda's motor driver 1a provides the AC voltage Vd having (1) "a frequency equal to the driving frequency determined by the driving frequency determining unit 2c" and (2) "the amplitude value determined by the driving voltage determining unit 7" to linear vibration motor 100 based on "the driving frequency signal Ifr and the voltage amplitude signal Odv." Ex. 1008 ¶ 146, Fig. 4(a); *see id.* ¶ 163. Specifically, "the amplitude value of the AC voltage Vd is changed to a larger value when the detected output Dop is smaller than the order output Oop." *Id.* ¶ 162. Conversely, "the amplitude value of the AC voltage Vd is changed to a smaller value when the detected output Dop is larger than the order output Oop." *Id.*

*b)    Claim 3*

Claim 3 reads as follows:

> 3.   The vibration module of claim 1 wherein the control component receives output signals from sensors within the vibration module during operation of the vibration module and adjusts one or more operational control outputs of the control component according to the received output signals from the sensors.

Petitioner asserts that the additional elements of claim 3 are taught by Ueda in the following manner:

> First, Ueda teaches converting Dop (the received output signal from output detector 4) into an amplitude value and converting Dposi (the received output signal from position detector 5) into a frequency. Ueda, [0149], [0152]; Wolfe, ¶¶ 241–242. Second, Ueda compares each of those converted values against a specific value (amplitude against Oop and frequency against Dreso). Ueda, [0149], [0152]–[0153]; Wolfe, ¶ 242. Finally, Ueda adjusts driving voltage and frequency (operational control outputs) based on those comparisons. Ueda, [0149], [0152]–[0153]; Wolfe, ¶ 242.

Pet. 50 (citing Ex. 1008 ¶¶ 149, 152–153; Ex. 1003 ¶¶ 241–242).  Petitioner further asserts that a person having ordinary skill in the art would have been motivated to use Ueda's feedback control with Fukumoto's linear oscillatory oscillator to provide more reliable delivery of vibrations at the desired frequency and amplitude.  *Id.* at 50–51 (citing Ex. 1003 ¶ 242).

Patent Owner contends that Ueda "never mentions any integer, nor suggests that any of the values relied on by [Petitioner] is an integer."  PO Resp. 30–31 (citing Ex. 2008 ¶ 109); *see* PO Sur-reply 15.  Patent Owner contends that Ueda "never mentions or suggests digital signals" or "integers," but instead, "consistently reads as an analog system, utilizing feedback control to control analog voltages."  PO Resp. 31; PO Sur-reply 15.

Patent Owner also contends that comparing "the magnitude of the output signals Oop and Dop," as disclosed in Ueda, does not "require conversion to a digital value, let alone to an integer." PO Sur-reply 15.

We agree with Patent Owner that Ueda does not teach "convert[ing] the received output signal into an integer." *See* PO Resp. 30–31; PO Sur-reply 14–16. As Petitioner admits, Ueda does not use the word "integer." *See* Ex. 2008 ¶¶ 109, 184; Pet. Reply 25. Because Petitioner's construction, which we have adopted here, requires conversion to an integer, Petitioner's failure to explain how such an integer is taught renders its reasoning unpersuasive.

In its Reply, Petitioner proposes two add-on explanations to supply the explanation lacking in the Petition. First, Petitioner argues that Ueda's conversion from its Dop signal to another specific "magnitude" value would have been understood to be a conversion to an integer. Pet. Reply 25. Petitioner points to Dr. Goossen's statement at deposition agreeing that "values can encompass both integers and non-integers" and that a magnitude value "could happen to fall upon an integer value." *Id.* (citing Ex. 1048, 75:24–76:7, 84:10–12).

However, Dr. Goossen stated that Ueda does not compare values by converting Dop and Oop into digital signals. Ex. 1048, 80:7–81:1. Patent Owner points out that "Ueda consistently reads as an analog system, utilizing feedback control to control analog voltages." PO Sur-reply 41. Dr. Goossen testifies that the comparison of "magnitude" values for Dop and Oop disclosed in paragraph 149 involves analog signals, not integers or digital signals. Ex. 1048, 77:15–79:4, 79:20–81:1, 82:5–10. Dr. Goossen also testifies that such a comparison "would generally be done in some sort of hard-wired circuit like a comparator." *Id.* at 82:5–15. Nor does

Petitioner's declarant, Dr. Wolfe, ever state that Ueda describes conversion of its received output signals to integers. *See* Ex. 1003 ¶¶ 241–242. Consequently, Petitioner has not persuasively shown that Ueda teaches, to a person having ordinary skill in the art, conversion of signals into integers.

In Petitioner's second Reply argument, digital conversion would occur when Ueda's algorithm is implemented in Fukumoto's general-purpose processor. Pet. Reply 26. Dr. Wolfe states that such implementation requires Ueda's raw sensor input to be converted to digital values to be processed and compared. Ex. 1047 ¶ 16.

However, Petitioner did not in the Petition rely on Fukumoto's processor when asserting that the combined disclosures in the references teach claim 3's limitations under a `means-plus-function interpretation`. Pet. 50–51; *see* Ex. 1003 ¶¶ 241–242. Instead, Petitioner contended that "Ueda teaches a processor programmed with" the algorithmic steps required by claim 3. Pet. 50–51; *see* Ex. 1003 ¶¶ 241–241. In the Reply, Petitioner changed its unpatentability theory. As noted by Dr. Wolfe, Petitioner's new theory requires a new, additional obviousness rationale. Ex. 1047 ¶ 17 (stating that such conversion would result in either an integer or a fraction, and the choice of an integer would be one of a finite number of identified, predictable solutions).

A new theory of unpatentability presented in a Reply may be acceptable where it merely expands on its prior assertions in response to arguments made by the Patent Owner, but not where the Reply makes a "meaningfully distinct contention" or amounts to "an entirely new theory of *prima facie* obviousness absent from the petition." *Rembrandt Diagnostics, LP v. Alere, Inc.*, 76 F.4th 1376, 1383–84 (Fed. Cir. 2023). Here,

Petitioner's Reply is not merely expanding upon its theory in the Petition that Ueda teaches a processor programmed with the algorithmic steps. Instead, Petitioner relies on modifying Ueda with Fukumoto in a manner not specified in the Petition, and requiring a new rationale for why such a modification would teach an integer rather than another (e.g., fractional) value. Pet. Reply 26; Ex. 1047 ¶ 17. This is a meaningfully distinct contention from that set forth in the Petition and addressed by Patent Owner.

Even were Petitioner's Reply argument based on combination with Fukumoto to be considered, Petitioner merely states that the input must be converted to digital values, which as its declarant Dr. Wolfe points out, may be non-integers such as fractions. Pet. Reply 26; Ex. 1047 ¶¶ 16–17.

For the reasons discussed above, Petitioner has not shown by a preponderance of the evidence that claim 3 is unpatentable under § 103(a) based on Fukumoto and Ueda.

<center>*c)* *Claims 4–6*</center>

For purposes of this proceeding, we consider claim 4 as depending from claim 3. *See* Tr. 18:4–22; *supra* § II.C.5. Claims 5 and 6 depend from claim 4. Ex. 1001, 16:28–48. Hence, claims 4–6 incorporate all the limitations of their respective base claims. 35 U.S.C. § 112, 4th paragraph.

For the reasons discussed for claim 3, Petitioner has not shown by a preponderance of the evidence that claims 4–6 are unpatentable under § 103(a) based on Fukumoto and Ueda. See supra § II.D.4(b).

<center>*d)* *Determination*</center>

In view of the foregoing, we determine that Petitioner has not shown by a preponderance of the evidence claims 3–6 would have been obvious in view of the combined teachings of Fukumoto and Ueda.

*5.     Claim 8 over Fukumoto and Fuller*

Petitioner asserts that claim 8 would have been obvious over

Fukumoto and Fuller.  Pet. 64.  Patent Owner contests this assertion for the

reasons set forth with respect to claim 1, and additionally, that motivation to

combine Fukumoto and Fuller has not been established.  PO Resp. 36–40.

*a)     Fuller*

Fuller is a U.S. patent application publication titled "Linear

Electromechanical Vibrator with Axially Movable Magnet," filed on July 3,

2006, and published on January 3, 2008.  Ex. 1010, codes (12), (22), (43),

(54).  Fuller states that the invention "relates generally to linear

electromagnetic vibrators, and, more particularly, to a non-rotary

electromagnetic vibrator having a movable magnet that oscillates axially

under the influence of an axial field coil."  *Id.* ¶ 1.

Fuller's Figure 1 (reproduced below) is a perspective view of an

electromagnetic vibrator:



Fig. 1

Figure 1 illustrates an electromagnetic vibrator including the following

components:

- movable magnet 20 that travels in an axial direction 24 and has central hole 23;

- axial shaft 22 extending through central hole 23 in movable magnet 20;

- two bumper magnets 26a and 26b "fixedly disposed at opposite ends of the axial shaft 22," "magnetized in the axial direction (i.e. parallel with the shaft 22)," and "oriented such that they magnetically repel the movable magnet 20 (i.e., they are oppositely poled to the end surface of the moveable magnet which is closest to the bumper magnet 26a or 26b)"; and

- two field coils 28a and 28b with inner diameters "large enough to accommodate" movable magnet 20 and "oriented such that they apply push and pull forces" to movable magnet 20 when receiving alternating current.

Ex. 1010 ¶¶ 27, 35, Fig. 1. Figure 1 does not show "an optional tubular enclosure" for the electromagnetic vibrator. *Id.* ¶ 27.

Fuller's Figure 2 (reproduced below) is a schematic cross-sectional view of a vibrator device with an electromagnetic vibrator:



Fig. 2

Figure 2 illustrates an electromagnetic vibrator according to Figure 1 in tubular enclosure 30 and tubular enclosure 30 attached to circuit board 34 with adhesive 36. Ex. 1010 ¶¶ 28, 34, Fig. 2. Preferably, tubular enclosure 30 has air holes 32 that "reduce viscous friction losses" by "allowing air to escape and enter the enclosure as the movable magnet 20 oscillates." *Id.* ¶ 28. Figure 2 also illustrates bumper magnet 26b having optional air vent 40 that "allow[s] air to escape and enter the enclosure as the movable magnet 20 oscillates." *Id.* ¶ 29, Fig. 2.

*b)*     *Claim 8*

Petitioner asserts that Fuller teaches a tubular enclosure, shown in Figure 2, a moveable magnet 20 shaped to slide within the enclosure, and electromagnetic coils 28a, 28b driving the movable component. Pet. 64–65 (citing Ex. 1010 ¶¶ 27, 35, Figs. 1–2). Petitioner further asserts that Fukumoto teaches magnet bumpers 26 at each end of the tube that repel the moveable magnet. *Id.* at 65 (citing Ex. 1010 ¶¶ 27, 35). Petitioner asserts that a person having ordinary skill in the art "would have found it obvious to apply the teachings of Fuller's electromagnetic vibrator for use in a cell phone to Fukumoto's mobile device" because "they are both directed to electromagnetic vibration generation in mobile device" and "because doing so would have amounted to nothing more than simple substitution of known components of a linear vibration actuator." Pet. 66 (citing Ex. 1005, Figs. 3, 16, 14:38–15:4, 16:17–37, 50:48–59; Ex. 1010, Abstr., Figs. 1–2 ¶¶ 4–5, 26, 38, 53; Ex. 1003 ¶ 268).

Patent Owner argues that an ordinarily skilled artisan would not have been motivated to make the "simple substitution" that Petitioner proposes because incorporating Fuller's "tube-shaped structures into Fukumoto's PDA-type device would result in vibrations perpendicular to the direction

necessary to provide the key-press haptic feedback required in Fukumoto."
PO Resp. 38–39; PO Sur-reply 17. Patent Owner distinguishes Fukumoto's
vibration perpendicular to its touch panel and transmitted to its screen from
Fuller's vibration parallel to its screen and transmitted to the axial sides of
its device. PO Resp. 37–38 (citing Ex. 1005, 14:63–66; Ex. 1010 ¶ 5; Ex.
2008 ¶ 127).

Patent Owner argues that the direction of vibration is important
because Fukumoto requires screen-perpendicular vibration to "create the
key-press haptic sensation desired in Fukumoto." *Id.* at 38 (citing Ex. 2008
¶ 128). Patent Owner further argues that fitting Fuller's tube-shaped
vibrator into Fukumoto to create screen-perpendicular vibrations would
either substantially increase the thickness of Fukumoto or require an
inventive redesign to redirect Fuller's vibrational forces. *Id.* at 39 (citing Ex.
2008 ¶ 129).

In its Reply, Petitioner points to Fuller's teaching that its motor may
be "scaled to very small or very large sizes." Pet. Reply 9 (citing Ex. 1010
¶ 53). Petitioner further argued that Dr. Goossen did not "determine the
relative sizes of the Fukumoto PDA [Personal Digital Assistant] and the
Fuller motor." *Id.* at 9–10 (citing Ex. 1048, 89:21–23, 111:17–19).

In its Sur-reply, Patent Owner argues that a "very small" version of
Fuller's motor would produce correspondingly "very small" vibrations that
would not produce Fukumoto's desired key-press haptic feedback. PO Sur-
reply 17–18.

We are persuaded by Petitioner's reasoning, which is supported by the
record. Fuller's vibrator is designed for use in "cellular telephones and
portable electronics," having the advantages of being an "inexpensive,

simple, and energy efficient miniature vibrator" Ex. 1003 ¶ 105 (citing Ex. 1010 ¶¶ 2–4). Because Fuller's "miniature vibrator" was purposed for use in cell phones and portable electronics, we do not agree that its use in a PDA such as Fukumoto's would produce insufficient vibration even in a screen-parallel vibrational mode.

> We credit Dr. Wolfe's testimony that
>
> the proposed combination would have amounted to no more than applying a known technique (Fuller's vibrator driven by electromagnetic coils and using bumper magnets) to a known device ready for improvement (Fukumoto's mobile device including a linear oscillatory actuator driven by electromagnetic coils that uses a single spring) to yield predictable results (a mobile device with a smaller and more efficient vibration unit).

Ex. 1003 ¶ 264. Moreover, Fukumoto teaches that "[a]lternatively [to vibration towards the screen surface], the housing of the electronic device is made to vibrate." Ex. 1010, code (57). Fuller's housing-parallel vibration direction also vibrates the housing of a device. Ex. 1010 ¶ 5. Although Fukumoto's Figure 3 embodiment does show vibration towards the screen, Petitioner does not rely on that direction of vibrational motion for teaching claim 1 because claim 1 does not require any particular vibration direction.

In view of the foregoing, the record does not reflect that vibrational direction considerations would deter a person having ordinary skill in the art from applying Fuller's vibrator as an alternative to Fukumoto's vibrator. Rather, the record reflects similarities between Fuller's vibrator and Fukumoto's vibrator that support Petitioner's assertion that use of Fuller's vibrator in Fukumoto's device would have amounted to simple substitution of known components of a linear vibration actuator. "There is a motivation to combine when a known technique 'has been used to improve one device, and a person of ordinary skill in the art would recognize that it would

improve similar devices in the same way,' using the 'prior art elements according to their established functions.'" *Intel Corp. v. PACT XPP Schweiz AG*, 61 F.4th 1373, 1380–81 (Fed. Cir. 2023) (citations omitted) (quoting *KSR*, 550 U.S. at 417; *Intel Corp. v. Qualcomm Inc.*, 21 F.4th 784, 799–800 (Fed. Cir. 2021)). Consequently, we determine that Petitioner has persuasively shown motivation to combine Fuller and Fukumoto to teach the elements of claim 8, and has shown, by a preponderance of the evidence, that claim 8 would have been obvious over the teachings of Fukumoto and Fuller.

### 6. *Claims 7 and 8 over Fukumoto and Erixon*

Petitioner provides a detailed analysis of the limitations of claims 7 and 8 and points to teachings in Fukumoto and Erixon as meeting each limitation. Pet. 56–64. Further, Petitioner provides a reason to combine Fukumoto and Erixon, and an explanation why a skilled person would reasonably expect success in such a combination. *Id.* at 59–60, 63–64. Patent Owner contests these assertions for the reasons set forth with respect to claim 1, and additionally, that motivation to combine Fukumoto and Erixon has not been established. PO Resp. 32–35.

Because we have determined that Fukumoto alone causes claim 7 to be unpatentable (*supra* § II(D)(3)(c)), and Fukumoto in view of Fuller causes claim 8 to be unpatentable, we need not further determine the dispute over claims 7 and 8 based upon the combined teachings of Fukumoto and Erixon.

### 7. *Claims 14 and 19 over Fukumoto, Dong, and Ogusu*

Petitioner provides a detailed analysis of the limitations of claims 14 and 19 and points to teachings in Fukumoto, Dong, and Ogusu as meeting each limitation. Pet. 66–70. Further, Petitioner provides a reason to

combine Fukumoto, Dong, and Ogusu, and an explanation why a skilled person would reasonably expect success in such a combination. *Id.* at 69. Patent Owner contends that Petitioner's assertions are unpersuasive because of the reasons set forth with respect to claim 1, and because the combined references have not been shown to teach "flux paths comprising a paramagnetic material that is shaped and positioned to reduce the reluctance of one or more magnetic circuits within the vibration module." PO Resp. 41 (citing Ex. 2008 ¶ 137).

<p align="center">a)   *Dong*</p>

Dong is a Chinese patent application publication titled "Flat Linear Vibration Motor," filed on February 20, 2009, and published on July 22, 2009. Ex. 1011, codes (12), (22), (43), (54). Dong states that the invention "relates to a vibration motor, and in particular to a flat linear vibration motor used in portable consumer electronic products." *Id.* at 3. Petitioner's reliance on Dong is based upon an assertion that Dong, published on July 22, 2009, is prior art to claims 14 and 19 because those claims are entitled to a priority date no earlier than January 6, 2012. Petitioner asserts that the subject matter of claims 14 and 19 first appeared, in the priority chain of applications to which the '830 patent claims the benefit, in the January 6, 2012, non-provisional application (Exhibit 1026), which was a continuation-in-part of a prior application. *Id.* at 67 (citing Ex. 1003 ¶ 271 ("Figures 24A, 24B, and 25 as well as their associated description (*'830 Pat.* 14:3–14:58) appear to be the only potential written description support . . . these figures and associated description were not present in the May 18, 2009 provisional (Ex. 1029) or May 18, 2010 non-provisional (Ex. 1028).")). Patent Owner does not comment on this assertion. Based on the complete trial record, we

acknowledge Dr. Wolfe's testimony, and determine that Dong has been shown to be prior art to claims 14 and 19.

Dong's Figure 5 (reproduced below) is a cross-sectional view of a flat linear vibration motor:



FIG. 5

Figure 5 illustrates flat linear vibration motor 10 with permanent magnet 16 positioned within through hole 153 in counterweight 15. Ex. 1011, 6, Fig. 5. Figure 5 also illustrates permanent magnet 16 magnetized such that the "magnetic poles of its one half (labeled 16a) are polarized opposite to magnetic poles of the other half (labeled 16b), and magnetic pole planes of the permanent magnet 16 are parallel to the bottom wall 122 of the base 12 (also parallel to the coil 13)." *Id.* at 6.

> b) *Ogusu*

Ogusu is a Japanese patent application publication titled "Vibration Actuator," filed on January 12, 1995, and published on July 30, 1996. Ex. 1015, codes (12), (22), (43), (54). Ogusu states that the invention "relates to a moving magnet-type vibration actuator, and more particularly to a moving magnet-type vibration actuator having low loss and high efficiency." *Id.* ¶ 1; *see id.* ¶ 47. Ogusu's Figure 1 (reproduced below) is a cross-sectional view of a vibration actuator:

[FIG. 1]



Figure 1 illustrates a vibration actuator including base part 1, frame 2a fixed at one end to base part 1, first coil 2b wound around frame 2a, frame 3a fixed at one end to base part 1, second coil 3b wound around frame 3a, spindle 4 mounted in hole 1c in base part 1, bearing 5 (not labeled in Figure 1) arranged around an end of spindle 4, holder 6 connected to bearing 5 and movable with bearing 5 in an axial direction along spindle 4, spring 7 to maintain holder 6 in a predetermined position when holder 6 does not vibrate, first yoke 8a "composed of a plate-shaped magnetic body" and mounted on holder 6 with one end part forming a core for first coil 2b and the other end part positioned opposite to a side surface of first coil 2b, second yoke 8b "composed of a plate-shaped magnetic body" and mounted on holder 6 with one end part forming a core for second coil 3b and the other

end part positioned opposite to a side surface of second coil 3b, first magnet 9a arranged on first yoke 8a opposite to a side surface of first coil 2b; and second magnet 9b arranged on second yoke 8b opposite to a side surface of second coil 3b. Ex. 1015 ¶¶ 24–29, Fig. 1. As shown by the broken lines representing magnetic flux in Figure 1, the vibration actuator forms two magnetic circuits as follows: (1) "the magnet opposing the first coil - the first coil - the first yoke" and (2) "the magnet opposing the second coil - the second coil - the second yoke." *Id.* ¶ 30, Fig. 1; *see id.* ¶¶ 16, 36.

<div align="right">

*c)*     *Claim 14*

</div>

Petitioner asserts that claim 14 is taught by a combination in which paramagnetic materials would be incorporated into Fukumoto's vibration actuator to reduce the reluctance of a magnetic circuit based on the teachings of Dong and Ogusu. Pet. 68. Petitioner asserts that a person having ordinary skill would have recognized numerous ways in which paramagnetic materials could be configured in Fukumoto's actuator to decrease reluctance, which would result in greater vibrational force using less power; i.e., increased efficiency. *Id.* at 68–69 (citing Ex. 1003 ¶¶ 272–273).

Petitioner asserts that Dong teaches a paramagnetic tungsten counterweight, and that a person having ordinary skill in the art would have understood that "adding a paramagnetic material (e.g., tungsten) to Fukumoto's vibration module (as taught in Dong) would reduce reluctance of the magnetic circuits in Fukumoto's vibration actuator." Pet. 69 (citing Ex. 1003 ¶ 274). Petitioner asserts that such a modification would have resulted in increased efficiency and only required minor changes to Fukumoto's structure. *Id.* (citing Ex. 1003 ¶ 275).

Petitioner relies upon Ogusu to "further support the modification" of Fukumoto with Dong's paramagnetic material. Pet. 69. Petitioner asserts

that Ogusu uses a mixture of ferromagnetic and non-ferromagnetic materials that would reduce the reluctance of magnetic circuits in the same way as a paramagnetic material because both "have weak magnetic attraction." *Id.* at 69–70 (citing Ex. 1003 ¶ 276). In support of that assertion, Petitioner points to the '830 patent, which states, "[p]aramagnetic materials . . . reduce the reluctance of a magnetic circuit and can therefore allow a magnetic field to more efficiently perform more work." *Id.* at 69–70 (citing Ex. 1001, 14:10–19). Petitioner also points to Ogusu's teachings that each of its yokes form "the magnetic loop having the shortest path" as supporting the incorporation of known paramagnetic materials into Fukumoto's actuator to reduce the reluctance and thereby improve efficiency. *Id.* at 70 (citing Ex. 1003 ¶¶ 276–277).

Patent Owner contends that the combination does not teach "flux paths comprising a paramagnetic material that is shaped and positioned to reduce the reluctance of one or more magnetic circuits within the vibration module." PO Resp. 41 (citing Ex. 2008 ¶ 137). Patent Owner first argues that any teachings of magnetic properties in the Petition is based upon Ogusu, which is relevant only to ferromagnetic materials in conjunction with nonmagnetic materials to form a "yoke." *Id.* at 43 (citing Pet. 3, 67–70). Patent Owner argues that this disclosure does not teach the use of paramagnetic materials. *Id.* (citing Ex. 2008 ¶ 149). Patent Owner highlights Dr. Goossen's testimony, allegedly confirmed by Dr. Wolfe, that paramagnetic materials are characterized by temporary magnetization as compared to the permanent magnetization of ferromagnetic materials. *Id.* at 41–42 (citing Ex. 2008 ¶ 138; Ex. 2010, 77:17–78:3). According to Patent Owner, however, "a mix of ferromagnetic and nonmagnetic materials does

not produce a paramagnetic material." *Id.* at 43 (citing Ex. 2008 ¶ 149). Patent Owner argues that because Ogusu does not relate to paramagnetic materials, Ogusu cannot provide any motivation for a person having ordinary skill in the art to incorporate paramagnetic materials as asserted by Petitioner. *Id.*

The record supports Patent Owner's position that Ogusu does not provide teachings that would support combining Fukumoto and Dong. Petitioner relies on Ogusu's "magnetic loop having the shortest path" to provide an increase in efficiency. Pet. 70 (citing Ex. 1003 ¶¶ 276–277). Yet Ogusu does not relate its "shortest path loop" to a paramagnetic material, or to the presence of any particular material added for the purpose of reducing magnetic reluctance. Ogusu teaches that its efficiency advantages accrue *regardless of whether its yokes are ferromagnetic or a mixture of ferromagnetic and non-ferromagnetic materials. Id.* ¶ 28. Instead, Ogusu's "shortest path" results from its particular "C-shape" of its yokes in which "the magnet and yoke are integrated in each magnetic circuit, so that no non-excitation holding force is exerted." *See* Ex. 1015, Fig. 1, ¶¶ 13, 16, 18, 20, 22, 47. Thus, Ogusu does not teach any efficiency gains resulting specifically from paramagnetic (or lower-magnetic) materials that would lead towards incorporation of paramagnetic materials in a vibrating oscillator.

Petitioner states that "Dr. Goossen admitted that the ferromagnetic materials in Ogusu's yoke would decrease reluctance," but this merely relates to a property of ferromagnetic materials. Pet. Reply 10 (citing Ex. 1048, 104:3–6). Also, this statement does not indicate that paramagnetic materials used in other configurations different from the integrated magnet and yoke configurations of Ogusu would decrease reluctance. Moreover,

Petitioner here relies on Dr. Goossen's statements rather than the disclosure of Ogusu. Dr. Goossen's statements do not indicate that Ogusu teaches advantages of paramagnetic materials used in a vibrating oscillator, only that Dr. Goossen is aware of reluctance-reducing properties of ferromagnetic materials. Thus, Dr. Goossen's statements do not support Petitioner's assertion that Ogusu teaches reluctance-reducing advantages of paramagnetic materials.

Similarly, Petitioner's reliance on Dr. Goossen's testimony and Dr. Wolfe's testimony for the well-known properties of paramagnetic materials and their usefulness in magnetic circuits is an expression of the knowledge in the art, and not for interpreting Ogusu, which does not mention paramagnetic materials. Pet. Reply 11 (citing Ex. 1003 ¶ 274; Ex. 2008 ¶ 138; Ex. 1048, 100:2-25, 102:15–103:5). Petitioner confirms that it is the knowledge in the prior art, not any teaching of Ogusu, that would motivate a person having ordinary skill in the art to incorporate Dong's tungsten into Fukumoto to reduce magnetic reluctance. Pet. Reply 11–12 ("In light of POSITAs' understanding of the benefits of reducing magnetic reluctance and the option of using paramagnetic materials to achieve that goal, POSITAs would have been motivated to incorporate at least Dong's tungsten components into the Fukumoto motor to reduce magnetic reluctance."). Consequently, we agree with Patent Owner that Ogusu does not provide a person having ordinary skill in the art with any identifiable reason to combine a paramagnetic counterweight (as in Dong) with Fukumoto's vibrating oscillator.

With respect to the Petition's reliance on Dong for a reason to combine Dong with Fukumoto, Patent Owner argues that although Dong teaches the use of a paramagnetic (tungsten) counterweight, Dong does not

teach that the paramagnetic counterweight is used as part of a magnetic circuit. PO Resp. 44 (citing Ex. 2008 ¶ 140 (noting that Dong's magnetic field lines do not reach the counterweight)). Patent Owner relies upon Dr. Goossen's testimony that a person having ordinary skill in the art would recognize that the physical motion of the counterweight does not create magnetic fields, and that the lack of fields illustrated in the counterweight does not support Petitioner's assertion that the counterweight "directs current paths to create magnetic forces." *Id.* (citing Ex. 1003 ¶ 109; Ex. 2008 ¶¶ 140–141).

Patent Owner further argues that a person having ordinary skill in the art would not know how to combine the paramagnetic counterweight of Dong with the device of Fukumoto to reduce reluctance in the claimed manner. PO Resp. 45–46. Patent Owner argues that a person having ordinary skill in the art would recognize that incorporation of a paramagnetic mass into Fukumoto's design would require a careful analysis, and if done incorrectly, could increase reluctance rather than reduce it. *Id.* at 45 (citing Ex. 2008 ¶ 145). Patent Owner argues that neither Fukumoto nor Dong teaches how to achieve reduced reluctance. *Id.* at 45–46 (citing Ex. 2008 ¶ 145). Patent Owner argues that Ogusu's teachings are not helpful because they do not address paramagnetic materials. *Id.* at 46.

The record supports Patent Owner's arguments. Petitioner asserts that "POSITAs would have understood from Dong's configuration that this placement of paramagnetic materials would reduce magnetic reluctance." Pet. Reply 13 (citing Ex. 1003 ¶ 274; Ex. 2010, 82:24-83:12). However, this merely indicates that Dong's counterweight would have reluctance-reducing properties, not that Dong indicates that its configuration of paramagnetic materials above and below an oscillating magnet would be

beneficial for any other purpose than providing a counterweight that in Dong's viewpoint "functions to strengthen the vibrating force." Ex. 1011, 6. As with Ogusu, any reason to apply Dong's tungsten counterweight to reduce magnetic reluctance is found in the alleged knowledge in the prior art, not in Dong.

To the extent that the Petition relies on knowledge in the art, it relies on the '830 patent itself. *Id.* Petitioner is not relying on the '830 patent for summaries of what was known in the prior art (i.e., that free air increases magnetic reluctance), but for the inventive properties of the '830 patent (i.e., that introducing paramagnetic materials that decrease the portion of magnetic lines passing through free air provide a more efficient linear vibration module). *Id.* at 67–68 (citing Ex. 1001, 14:7–10, 14:13–35). Although Petitioner relies on the testimony of Dr. Wolfe that the knowledge in the art supports adding paramagnetic materials shaped to lower reluctance in a magnetic circuit, Dr. Wolfe in turn relies on the same disclosures of the '830 patent. Ex. 1003 ¶¶ 272–273 (citing Ex. 1001, 14:7–10, 14:13–35). Although Dr. Wolfe states that "a POSITA would have been motivated to use paramagnetic materials in [Fukumoto] because decreasing reluctance would increase efficiency," Dr. Wolfe's only basis for concluding that efficiency would be increased is his citation to the '830 patent. *Id.* ¶¶ 272–275. Clearly, it is improper to determine that the '830 patent claims would have been obvious because of the teachings of only the '830 patent itself. *See Graham*, 383 U.S. at 36 ("resist the temptation to read into the prior art the teachings of the invention in issue").

Consequently, Petitioner has identified no reason why a person having ordinary skill in the art would have expected an increase in efficiency by

adding Dong's counterweights to Fukumoto except that improperly taken from the '830 patent itself.

Moreover, Petitioner's citation to *ZyXEL* is inapposite. Pet. Reply 13 (citing *ZyXEL Comms. Corp. v. UNM Rainforest Innovations*, 104 F.4th 1368, 2024 WL 3489577 (Fed. Cir. 2024)). Petitioner argues that *ZyXEL* requires only that "a [person of ordinary skill in the art] recognize" that application of reference's teachings are beneficial to provide sufficient motivation. *Id.* (citing *ZyXEL*, 104 F.4th at 1380). Petitioner argues that under *ZyXEL*, "regardless of whether Dong explicitly discloses the reluctance-reducing properties of its design, POSITAs would have understood the effect of Dong's paramagnetic counterweight on magnetic reluctance." *Id.*

However, the question is not whether one would have recognized the effect of Dong's counterweight on reluctance, which is supported by the record and not at issue. The issue is whether a person having ordinary skill in the art, aware of Dong's paramagnetic counterweight, would have found it beneficial to apply the counterweight to vary Fukumoto's magnetic reluctance so as to increase Fukumoto's efficiency. As discussed above, the record does not reflect that a person of ordinary skill in the art would have recognized the efficiency-gaining advantages of using a paramagnetic material to vary Fukumoto's reluctance, except by reading the '830 patent.

It should be emphasized here that Petitioner is not asserting that a person of ordinary skill in the art would have modified Fukumoto with Dong's tungsten counterweight to achieve the advantages of a counterweight (e.g., added mass that strengthens the vibration), and in doing so, also varied the magnetic reluctance in a beneficial way because of the undisputed properties of tungsten. *See* Ex. 1011, 6 ("The counterweight 15 functions to

strengthen the vibrating force, making the vibration stronger"). And any such assertion would have required an explanation of why fashioning tungsten to perform a counterweight in Fukumoto would have caused the tungsten to also be "shaped and positioned to reduce the reluctance" of Fukumoto. Absent comparison to the inventive Figure 24B of the '830 patent and its accompanying description, Petitioner has not explained why a person of ordinary skill in the art would recognize Dong's configuration of Figures 5–7 to be shaped and positioned so as to reduce reluctance rather than to strengthen the vibrating force such that it would advantageously be applied to reduce reluctance of other oscillating vibrators such as in Fukumoto.

In view of the foregoing, we determine that Petitioner has not shown by a preponderance of the evidence that claims 14 and 19 are unpatentable under § 103(a) based upon Fukumoto, Dong, and Ogusu.

### 8.    *Claims 15 and 20 over Fukumoto and Saiki*

Petitioner provides a detailed analysis of the limitations of claims 15 and 20 and points to teachings in Fukumoto and Saiki as meeting each limitation. Pet. 70–72. Further, Petitioner provides a reason to combine Fukumoto and Saiki, and an explanation why a skilled person would reasonably expect success in such a combination. *Id.* at 71–72. Patent Owner does not provide any additional reasons why Petitioner's assertions are unpersuasive.

Because we have determined that Fukumoto alone causes claims 15 and 20 to be unpatentable (*supra* § II(D)(3)(f)), we need not further determine the dispute over claims 15 and 20 based upon the combined teachings of Fukumoto and Saiki.

9.     *Claim 16 over Fukumoto, Saiki, and Masahiko*

Petitioner provides a detailed analysis of the limitations of claim 16, points to teachings in Fukumoto, Saiki, and Masahiko as meeting each limitation, provides a reason to combine Fukumoto, Saiki, and Masahiko, and provides an explanation why a person skilled in the art would reasonably expect success in such a combination. Pet. 72–75. Patent Owner argues that the combined teachings of Fukumoto, Saiki, and Masahiko do not teach "a primary oscillation frequency modulated by a modulating oscillation frequency." PO Resp. 48–51.

a)     *Saiki*

Saiki is titled "Driving Circuit, Electro-Mechanical-Acoustic Transducer, and Portable Terminal Apparatus." Ex. 1013, code (54). Saiki relates to a driving circuit for driving a vibrator at a resonance frequency in which at least two signals of different frequencies are included in a frequency range including the resonance frequency. *Id.* at code (57). In one embodiment, the signal provided to the vibrator may be "a synthesized signal obtained by adding together the first signal and the second signal while shifting a phase of the first signal and a phase of the second signal from each other." *Id.* at 2:27–32.

b)     *Masahiko*

Masahiko is titled "Vibration Generating Apparatus." Ex. 1014, code (54). Masahiko relates to a vibration generating apparatus which "utilizes a beat vibration, so it is possible to provide a vibration generating apparatus which is high in yield, low in cost, and able to exhibit a vibration tactile haptic effects even if there are variations in the natural frequency of the mechanical vibrator." *Id.* at 4:41–46. The beat vibration is generated by a drive voltage frequency that "a non-resonant frequency out of a damped

natural frequency 'f_d' of the mechanical vibrator." *Id.* at 2:6–8. The drive voltage is controlled by a forced vibration control unit to stop application of the drive voltage, "in a beat wave defining an amplitude of the beat vibration, at a second valley part after a first peak part from the side of the drive start." *Id.* at 2:8–12.

Petitioner's reliance on Masahiko is based upon an assertion that Masahiko, filed on July 6, 2011, is prior art to claim 16 because it is entitled to a priority date no earlier than January 6, 2012. *Id.* at 72. Petitioner asserts that the subject matter of claim 16 first appeared, in the priority chain of applications to which the '830 patent claims the benefit, in the January 6, 2012 non-provisional application (Exhibit 1026), which was a continuation-in-part of a prior application. *Id.* (citing Ex. 1003 ¶ 287 ("Figures 22B and 23 and the description at 13:34–59 appear to be the only possible written description support . . . th[ese] figures and associated description were not present in the May 18, 2009 provisional (Ex. 1029) or May 18, 2010 non-provisional (Ex. 1028).")). Patent Owner does not comment on this assertion. PO Resp. 48–51. Based upon the complete trial record, we determine that Masahiko has been shown to be prior art to claim 16.

c)    *Claim 16*

Claim 16 depends from claim 15, and further recites, "wherein the complex vibration modes include: a primary oscillation frequency modulated by a modulating oscillation frequency; a beat frequency; and an aperiodic oscillation waveform."

Petitioner asserts that Masahiko teaches a beat frequency. Pet. 73 (citing Ex. 1014, 12:55–56, Fig. 5; Ex. 1003 ¶ 293). Petitioner asserts that Masahiko teaches an aperiodic oscillation waveform by its "changing 'period spikes' in the total energy of a system driven by a pure sine wave

that eventually reaches steady state, but other bipolar, square-based waves used as drive signals continue to change the excitation and dampening phases to change in a non-repetitive, gradual manner." *Id.* (citing Ex. 1014, Fig. 6, 14:26–53, Figs. 15–16, 22:56–23:59; Ex. 1003 ¶ 296). Petitioner asserts that Masahiko's particular beat and aperiodic waveforms would allow for more abrupt start and stop of the vibrations felt by a user of a mobile device. *Id.* (citing Ex. 1014, 2:13–47, 4:40–46, 10:7–10, 12:55–61; Ex. 1003 ¶ 288). Petitioner asserts that only minor software modifications would be needed to provide for the complex vibration waveforms, such that a person having ordinary skill in the art would have a reasonable expectation of success. *Id.* at 75 (citing Ex. 1003 ¶ 289). Petitioner further asserts,

> the proposed combination would have amounted to no more than applying a known technique (Masahiko's beat frequency and aperiodic oscillation) to a known device ready for improvement (the Fukumoto-Saiki combination's mobile device including a linear oscillatory actuator) to yield predictable results (a linear oscillatory actuator that generates a beat wave frequency to stop voltage application—and thereby vibration generation—abruptly, as well as an aperiodic waveform).

*Id.* at 74 (citing Ex. 1003 ¶ 288).

Patent Owner does not specifically contest Petitioner's assertions against Masahiko. We determine that these assertions are supported by the record.

Petitioner asserts that Saiki teaches a primary oscillation frequency P1 and a modulating oscillation frequency P2. Pet. 73 (citing Ex. 1013, Figs. 17A–B). Petitioner asserts that a person having ordinary skill in the art "would have understood that P1 is modulated by P2 because P1 is in reverse phase with P2." *Id.* (citing Ex. 1013, 15:24–37; Ex. 1003 ¶ 292). Petitioner asserts that applying Saiki's complex vibration modes in Fukumoto's mobile

device would have been recognized as advantageous by a person having ordinary skill in the art because it would allow for greater flexibility and variety of available vibration waveforms. *Id.* at 71–72. Petitioner asserts that a person having ordinary skill in the art

> would have recognized that the proposed combination would have amounted to no more than applying a known technique (Saiki's frequency signal synthesis) to a known device ready for improvement (Fukumoto's mobile device including its linear oscillatory actuator and drive signal generation circuit) to yield predictable results (creating additional vibration output options).

Pet. 71 (citing Ex. 1003 ¶ 281).

Patent Owner argues that the claimed "modulated by" term would have been understood by one having ordinary skill in the art, in light of the specification of the '830 patent, to refer to "one signal that is mixed or multiplied by another signal, as in amplitude modulation (AM), frequency modulation (FM), phase modulation (PM), etc." PO Resp. 49 (citing Ex. 1008 ¶ 158, Ex. 1001, 13:41–46 "modulation produces 'low-frequency pulses of high-frequency vibration.'"). Patent Owner argues that Saiki teaches that P1 and P2 are being added, which is not the same as modulating because "modulating would produce multiple tones which are the sum and difference of the two multiplied signals." *Id.* at 49–50 (citing Ex. 2008 ¶ 158 (citing Ex. 1013, 14:47–57)). Patent Owner further argues that Saiki's purpose of maintaining a large vibration force is different from the '830 patent's purpose of producing "interesting vibrational modes" such as "low-frequency pulses of high-frequency vibration." *Id.* (citing Ex. 1001, 13:27, 13:41–46, Fig. 22B; Ex. 1013, 15:21–23).

Responding to Patent Owner's argument, Petitioner asserts that the '830 patent describes more types of frequency modulation than the single

one relied upon by Patent Owner. Pet. Reply 26–27 (citing Ex. 1001, 13:20–59). Petitioner further argues that although Patent Owner states that the '830 produces "interesting" vibrational modes, Patent Owner does not explain why Saiki's modes would not have been considered "interesting." *Id.* at 27. Petitioner further relies on Dr. Wolfe's testimony that the combined signal of Figure 17A of Saiki is "remarkably similar" to the "interesting" waveform of Figure 22B of the '830 patent. *Id.* at 27–28 (citing Ex. 1047 ¶ 5). Petitioner further asserts that Dr. Goossen's examples of "frequency modulation (FM)" and "phase modulation (PM)" do not mix or multiply signals. *Id.* at 28 (citing Ex. 1047 ¶ 10).

In its Sur-reply, Patent Owner points to two dictionary definitions relied upon by Dr. Wolfe in his supplemental declaration. PO Sur-reply 19–21. In one definition, "modulation" is defined as "the variation of some characteristic of a carrier"; in another, as "[t]o vary the amplitude, frequency, or some other characteristic of a signal or power source." *Id.* at 19–20 (citing Ex. 1049, 4; Ex. 1050, 4). Patent Owner argues that simply adding two frequencies does not satisfy these definitions. *Id.*

We are persuaded by Petitioner's assertions that Saiki teaches "a primary oscillation frequency modulated by a modulating oscillation frequency." The dictionaries that Dr. Wolfe relies upon define modulation of a signal as varying some characteristic of that signal. Ex. 1049, 4; Ex. 1050, 4; *see* Ex. 1047 ¶¶ 7–8. We agree with Petitioner that the record reflects that a characteristic of a signal may be varied by adding a second value, such as a second signal, thereto. Dr. Goossen states that in the context of the '830 patent, "modulation refers to mixing or multiplying one signal with another." Ex. 2008 ¶ 158. Dr. Goossen states that such mixing or multiplying may result in "tones which are the sum and difference" of the

signals. *Id.* Dr. Goossen's testimony that modulating may be "mixing" signals resulting in a mixed signal that is the "sum and difference" of the original signals further supports Petitioner's application of Saiki's use of two signals that are "obtained by adding together the first signal and the second signal while shifting a phase of the first signal and a phase of the second signal from each other." Ex. 1013, 2:27–32. Because the record reflects a meaning of "modulated by" that includes a signal that is varied by or mixed with a second signal, we find that Saiki teaches a signal that is modulated by a second signal.

In view of the foregoing, we determine that Petitioner has proven, by a preponderance of the evidence, that each element of claim 16 has been taught or suggested by Fukumoto in view of Masahiko.

### E. Obviousness over Fukumoto-Grant, and Fukumoto-Barton

Petitioner further asserts that each of the above-discussed asserted grounds would further have been obvious with the addition of either Grant or Barton. Pet. 35–45. We need not consider these further assertions with respect to claims 1, 2, 7, 8, 15–17, and 20, because we find Petitioner's assertions persuasive on the Fukumoto-based grounds.

With respect to claims 3–6, 9, 14, and 19, Petitioner does not assert that either Grant or Barton provides any teachings pertinent to the limitations added by those claims. Pet. 36 (relying on Grant for its "user-programmed haptic codes"), 37 (relying solely on Fukumoto for the additional limitations of claim 9), 44 (relying on Barton for its "user-programmed vibration patterns" and on Fukumoto for the additional limitations of claim 9), 66–67 (claims 14 and 19). Consequently, for the same reasons as expressed in the discussion of the Fukumoto-based grounds, we determine that Petitioner has not shown by a preponderance of evidence that claim 9 would have been

obvious over Fukumoto and either Grant or Barton, or that claims 14 and 19 would have been obvious over Fukumoto, Dong, Ogusu, and either Grant or Barton.

     F.    *Obviousness over Ogusu and Fukumoto (and either Grant or Barton)*

     1.    *Claims 1, 2, 7, 11, 15, 17, and 20*

Petitioner further asserts that its Fukumoto-based (by itself or with either Grant or Barton) assertions for claims 1, 2, 7, 11, 15, 17, and 20 would have been obvious with the addition of Ogusu. Pet. 75. Of these asserted claims, only claim 11 has not been found obvious over the Fukumoto-based grounds, and we need only address claim 11 in the Ogusu-Fukumoto ground. As an initial matter, the Ogusu-Fukumoto combination is based solely upon Ogusu for non-means-plus-function construction, and upon Ogusu in combination with Fukumoto for means-plus-function construction, to teach limitation [1f]. Pet. 82. Because we apply a means-plus-function construction for that limitation, we address only the Ogusu-Fukumoto combination for limitation [1f].

Petitioner asserts that Ogusu teaches the claim preamble, to the extent limiting, through Ogusu's use of a movable magnet as the claimed "vibration actuator" that is contained in the same overall module as its controller. Pet. 77–78 (citing Ex. 1015 ¶¶ 1–2, 31–32; Ex. 1003 ¶ 302). Petitioner asserts that Ogusu and Fukumoto teach limitation [1a] by modifying Ogusu's pager to including a housing for its vibration actuator such as taught by Fukumoto's case 115a. *Id.* at 78 (citing Ex. 1005, 1:13–19, 1:45–50, 13:20–26). Petitioner asserts that Ogusu teaches limitation [1b] through its movable element comprising holder 6, bearing 5, yokes 8a, 8b, and magnets 9a, 9b. *Id.* at 78–79 (citing Ex. 1015, Fig. 1).

Petitioner asserts that Ogusu teaches limitation [1c] through its input power supplied to the coil that requires a supply of electric power. *Id.* at 79–80 (citing Ex. 1015 ¶¶ 30–31, 57–58; Ex. 1003 ¶ 308). Petitioner asserts that Ogusu teaches limitation [1d] through Ogusu's user selection of the pager's vibrations in view of Fukumoto's touch panel and push button keys that permit a user to input operation instructions. *Id.* at 80 (citing Ex. 1003 ¶¶ 309–311; Ex. 1015 ¶ 43; Ex. 1005, 13:40–14:13, Fig. 12). Petitioner asserts that the combination teaches limitation [1e] through Ogusu's first and second coils 2b, 3b that drive the movable element in each of two opposite directions as the result of applied current and through Fukumoto's housing. *Id.* at 81 (citing Ex. 1015 ¶¶ 31–32; Ex. 1003 ¶¶ 312–315).

Petitioner asserts that Ogusu teaches the function of limitation [1f] through its pager control section from which a user selects between waveforms having different amplitudes and frequencies. *Id.* at 83–84 (citing Ex. 1015 ¶¶ 17, 19, 32, 37–42, 55; Ex. 1003 ¶¶ 310, 317–318). Petitioner asserts that Fukumoto teaches the corresponding structure. *Id.* at 85 (citing its Fukumoto discussion of limitation [1f]).

Petitioner asserts that it would have been obvious to one having ordinary skill in the art to combine the teachings of Ogusu and Fukumoto because "they are both directed to linear vibration generation in mobile devices" and would have recognized Ogusu lacks certain implementation details that were well known as shown in Fukumoto. *Id.* at 77 (citing Ex. 1003 ¶ 301; Ex. 1015 ¶¶ 1–2; Ex. 1005, Abstr., 37:5–12, Fig. 81).

Patent Owner argues that the Petitioner has not shown either Ogusu or Fukumoto to teach limitations [1c] and [1f]. PO Resp. 52–58. Patent Owner

argues that Petitioner has not shown claim 11 to have been obvious for the reasons as the references fail to render claim 1 obvious. *Id.* at 60.

We determine that Petitioner has shown each limitation of claims 1 and 11 to be taught by the combination of Ogusu and Fukumoto. Petitioner's uncontested assertions against claim 1's preamble and limitations [1a], [1b], [1d], [1e], and 11 are supported by the record. We further are persuaded by Petitioner's reasons to combine Ogusu and Fukumoto, and that such would have occurred with a reasonable expectation of success.

Petitioner's reliance on Ogusu for limitation [1c] is of similar nature as its reliance on Fukumoto; i.e., that both require a power supply to send power to the coil. *See supra* § II(D)(2)(b) ("Fukumoto's AC current in the form of a drive signal, for which a person having ordinary skill in the art would recognize as being supplied by a power supply"). Petitioner relies solely on Fukumoto for limitation [1f]. Because we have determined that Fukumoto teaches limitations [1c] and [1f], we find Patent Owner's arguments unavailing.

Consequently, we determine that Petitioner has shown, by a preponderance of the evidence, that claims 1 and 11 would have been obvious over Ogusu and Fukumoto.

### 2. Claims 3–6

Petitioner asserts that claims 3–6 would have been obvious over Ogusu and Fukumoto, Ogusu and Fukumoto and Grant, or Ogusu and Fukumoto and Barton. Pet. 92. Petitioner asserts that such obviousness is premised upon "the same analysis" presented in the non-Ogusu combinations. *Id.* As discussed for the means-plus-function analyses of those combinations, Petitioner did not, in its Petition, show that claim 3 (or

its dependent claims 4–6) would have been obvious by a preponderance of the evidence. *See* §§ II(D)(3), II(D)(4), II(E). Consequently, Petitioner has not shown by a preponderance of the evidence that claims 3–6 would have been obvious over Ogusu and Fukumoto, Ogusu and Fukumoto and Grant, or Ogusu and Fukumoto and Barton.

### 3. *Claims 7 and 8*

Petitioner asserts that claims 7 and 8 would have been obvious over Erixon in combination with Ogusu and Fukumoto, Ogusu and Fukumoto and Grant, or Ogusu and Fukumoto and Barton. Pet. 93. We do not reach this challenge to claims 7 and 8 because we have determined those claims are unpatentable based upon other challenges. *See* §§ II(D)(3)(c), II(D)(5).

## III. CONCLUSION

Based on the evidence presented with the Petition, the evidence introduced during the trial, and the parties' respective arguments, Petitioner has shown by a preponderance of the evidence that:

(1) claims 1, 2, 7, 15, 17, and 20 are unpatentable under § 103(a) based on Fukumoto alone;

(2) claims 1 and 11 are unpatentable under § 103(a) based on Ogusu and Fukumoto;

(4) claim 8 is unpatentable under § 103(a) based on Fukumoto and Fuller; and

(5) claim 16 is unpatentable under § 103(a) based on Fukumoto, Saiki, and Masahiko.[10]

---

[10] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding after the issuance of this Final Written Decision, we draw Patent Owner's attention to the April 2019 Notice Regarding Options for Amendments by Patent Owner Through

Petitioner has not shown by a preponderance of the evidence that claims 3–6 are unpatentable under § 103(a) based upon Fukumoto, Fukumoto and Grant, Fukumoto and Barton, Ogusu and Fukumoto, Ogusu and Fukumoto and Grant, or Ogusu and Fukumoto and Barton. Petitioner has not shown by a preponderance of the evidence that claim 9 is unpatentable under § 103(a) based upon Fukumoto, Fukumoto and Grant, or Fukumoto and Barton. Petitioner has not shown by a preponderance of the evidence that claims 14 and 19 are unpatentable under § 103(a) based upon Fukumoto, Dong, and Ogusu, with or without either Grant or Barton.

| Claim(s) | 35 U.S.C. § | Reference(s)/Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1–3, 7–9, 15, 17, 20 | 103(a) | Fukumoto | 1, 2, 7, 15, 17, 20 | 3, 8, 9 |
| 1–3, 7–9, 15, 17, 20 | 103(a) | Fukumoto, Grant[11] | | 3, 9 |
| 1–3, 7–9, 15, 17, 20 | 103(a) | Fukumoto, Barton[12] | | 3, 9 |
| 3–6 | 103(a) | Fukumoto, Ueda | | 3–6 |
| 3–6 | 103(a) | Fukumoto, Grant, Ueda | | 3–6 |
| 3–6 | 103(a) | Fukumoto, Barton, | | 3–6 |

---

Reissue or Reexamination During a Pending AIA Trial Proceeding. *See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. §§ 42.8(a)(3), (b)(2).

[11] We do not reach this challenge for claims 1, 2, 7, 8, 15, 17, and 20 because we have determined those claims are unpatentable based upon other challenges.

[12] We do not reach this challenge for claims 1, 2, 7, 8, 15, 17, and 20 because we have determined those claims are unpatentable based upon other challenges.

| Claim(s) | 35 U.S.C. § | Reference(s)/Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| | | Ueda | | |
| 7–8 | 103(a) | Fukumoto, Erixon[13] | | |
| 7–8 | 103(a) | Fukumoto, Grant, Erixon[14] | | |
| 7–8 | 103(a) | Fukumoto, Barton, Erixon[15] | | |
| 8 | 103(a) | Fukumoto, Fuller | 8 | |
| 8 | 103(a) | Fukumoto, Grant, Fuller[16] | | |
| 8 | 103(a) | Fukumoto, Barton, Fuller[17] | | |
| 14, 19 | 103(a) | Fukumoto, Dong, Ogusu | | 14, 19 |
| 14, 19 | 103(a) | Fukumoto, Grant, Dong, Ogusu | | 14, 19 |
| 14, 19 | 103(a) | Fukumoto, Barton, Dong, Ogusu | | 14, 19 |
| 15, 20 | 103(a) | Fukumoto, Saiki[18] | | |
| 15, 20 | 103(a) | Fukumoto, Grant, Saiki[19] | | |

---

[13] We do not reach this challenge to claims 7–8 because we have determined those claims are unpatentable based upon other challenges.

[14] We do not reach this challenge to claims 7–8 because we have determined those claims are unpatentable based upon other challenges.

[15] We do not reach this challenge to claims 3–6 because we have determined those claims are unpatentable based upon other challenges.

[16] We do not reach this challenge to claim 8 because we have determined that claim is unpatentable based upon other challenges.

[17] We do not reach this challenge to claim 8 because we have determined that claim is unpatentable based upon other challenges.

[18] We do not reach this challenge to claims 15 and 20 because we have determined those claims are unpatentable based upon other challenges.

[19] We do not reach this challenge to claims 15 and 20 because we have determined those claims are unpatentable based upon other challenges.

| Claim(s) | 35 U.S.C. § | Reference(s)/Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 15, 20 | 103(a) | Fukumoto, Barton, Saiki[20] | | |
| 16 | 103(a) | Fukumoto, Saiki, Masahiko | 16 | |
| 16 | 103(a) | Fukumoto, Grant, Saiki, Masahiko[21] | | |
| 16 | 103(a) | Fukumoto, Barton, Saiki, Masahiko[22] | | |
| 1, 2, 7, 11, 15, 17, 20 | 103(a) | Ogusu, Fukumoto[23] | 1, 11 | |
| 1, 2, 7, 11, 15, 17, 20 | 103(a) | Ogusu, Fukumoto, Grant[24] | | |
| 1, 2, 7, 11, 15, 17, 20 | 103(a) | Ogusu, Fukumoto, Barton[25] | | |
| 3–6 | 103(a) | Ogusu, Fukumoto, Ueda | | 3–6 |
| 3–6 | 103(a) | Ogusu, Fukumoto, Grant, Ueda | | 3–6 |

---

[20] We do not reach this challenge to claims 15 and 20 because we have determined those claims are unpatentable based upon other challenges.

[21] We do not reach this challenge to claim 16 because we have determined that claim is unpatentable based upon other challenges.

[22] We do not reach this challenge to claim 16 because we have determined that claim is unpatentable based upon other challenges.

[23] We do not reach this challenge to claims 2, 7, 15, 17, and 20 because we have determined those claims are unpatentable based upon other challenges.

[24] We do not reach this challenge to claims 1, 2, 7, 11, 15, 17, and 20 because we have determined those claims are unpatentable based upon other challenges.

[25] We do not reach this challenge to claims 1, 2, 7, 11, 15, 17, and 20 because we have determined those claims are unpatentable based upon other challenges.

| Claim(s) | 35 U.S.C. § | Reference(s)/Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 3–6 | 103(a) | Ogusu, Fukumoto, Barton, Ueda | | 3–6 |
| 7, 8 | 103(a) | Ogusu, Fukumoto, Erixon [26] | | |
| 7, 8 | 103(a) | Ogusu, Fukumoto, Grant, Erixon [27] | | |
| 7, 8 | 103(a) | Ogusu, Fukumoto, Barton, Erixon [28] | | |
| **Overall Outcome** | | | 1, 2, 7, 8, 11, 15–17, 20 | 3–6, 9, 14, 19 |

## IV.     ORDER

For the foregoing reasons, it is:

ORDERED that claims 1, 2, 7, 8, 11, 15–17, and 20 in the '830 patent are determined to be unpatentable;

ORDERED that claims 3–6, 9, 14, and 19 in the '830 patent are determined not to be unpatentable; and

FURTHER ORDERED that because this is a Final Written Decision, the parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

---

[26] We do not reach this challenge to claims 7 and 8 because we have determined those claims are unpatentable based upon other challenges.
[27] We do not reach this challenge to claims 7 and 8 because we have determined those claims are unpatentable based upon other challenges.
[28] We do not reach this challenge to claims 7 and 8 because we have determined those claims are unpatentable based upon other challenges.

For PETITIONER:

Ali R. Sharifahmadian
Jin-Suk Park
Jeffrey A. Miller
ARNOLD & PORTER KAYE SCHOLER LLP
ali.sharifahmadian@arnoldporter.com
jin.park@arnoldporter.com
jmillerptab@apks.com


For PATENT OWNER:

Reza Mirzaie
Qi (Peter) Tong
Kristopher R. Davis
Neil A. Rubin
RUSS AUGUST & KABAT
rmirzaie@raklaw.com
ptong@raklaw.com
kdavis@raklaw.com
nrubin@raklaw.com



US009369081B2

(12) **United States Patent**
Elenga et al.

(10) Patent No.: **US 9,369,081 B2**
(45) Date of Patent: **Jun. 14, 2016**

(54) **LINEAR VIBRATION MODULES AND LINEAR-RESONANT VIBRATION MODULES**

(71) Applicant: **Resonant Systems, Inc.,** Seattle, WA (US)

(72) Inventors: **Robin Elenga,** Seattle, WA (US); **Brian Marc Pepin,** Oakland, CA (US); **Glen Tompkins,** Woodinville, WA (US)

(73) Assignee: **Resonant Systems, Inc.,** Seattle, WA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **14/469,210**

(22) Filed: **Aug. 26, 2014**

(65) **Prior Publication Data**
US 2014/0361714 A1    Dec. 11, 2014

**Related U.S. Application Data**

(63) Continuation of application No. 13/345,607, filed on Jan. 6, 2012, now Pat. No. 8,860,337, which is a continuation-in-part of application No. 12/782,697, filed on May 18, 2010, now Pat. No. 8,093,767.

(60) Provisional application No. 61/179,109, filed on May 18, 2009.

(51) **Int. Cl.**
*H02K 33/00*    (2006.01)
*H02P 25/02*    (2016.01)
*H02K 33/16*    (2006.01)

(52) **U.S. Cl.**
CPC .............. *H02P 25/027* (2013.01); *H02K 33/16* (2013.01)

(58) **Field of Classification Search**
CPC ............. H02P 25/027; F15B 2211/327; F15B 2211/85; F15B 2211/6346
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 1,120,414 | A | 12/1914 | Schoolfield et al. |
| 3,728,654 | A | 4/1973 | Tada |
| 4,549,535 | A | 10/1985 | Wing |
| 4,692,999 | A | 9/1987 | Frandsen |
| 5,017,819 | A | 5/1991 | Patt et al. |
| 5,187,398 | A | 2/1993 | Stuart et al. |
| 5,231,336 | A | 7/1993 | van Namen |
| 5,231,337 | A | 7/1993 | van Namen |
| 5,424,592 | A | 6/1995 | Bluen et al. |
| 5,896,076 | A | 4/1999 | van Namen |
| 5,955,799 | A | 9/1999 | Amaya et al. |
| 5,973,422 | A | 10/1999 | Clamme |

(Continued)

FOREIGN PATENT DOCUMENTS

EP    1 376 833 A1    1/2004

*Primary Examiner* — Karen Masih
(74) *Attorney, Agent, or Firm* — Olympic Patent Works PLLC

(57) **ABSTRACT**

The current application is directed to various types of linear vibrational modules, including linear-resonant vibration modules, that can be incorporated in a wide variety of appliances, devices, and systems to provide vibrational forces. The vibrational forces are produced by linear oscillation of a weight or member, in turn produced by rapidly alternating the polarity of one or more driving electromagnets. Feedback control is used to maintain the vibrational frequency of linear-resonant vibration module at or near the resonant frequency for the linear-resonant vibration module. Both linear vibration modules and linear-resonant vibration modules can be designed to produce vibrational amplitude/frequency combinations throughout a large region of amplitude/frequency space.

**18 Claims, 20 Drawing Sheets**



Exhibit 1001 - Page 1 of 31

Appx0217

Samsung et al. v. Resonant Sys.
IPR2023-00992 - Exhibit 1001

(56)  **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,323,568 | B1 | 11/2001 | Zabar |
| 6,326,706 | B1 | 12/2001 | Zhang |
| 7,449,803 | B2 | 11/2008 | Sahyoun |
| 7,474,018 | B2 | 1/2009 | Shimizu et al. |
| 7,768,160 | B1 | 8/2010 | Sahyoun |
| 7,768,168 | B2 | 8/2010 | Aschoff et al. |
| 7,771,348 | B2 | 8/2010 | Madsen et al. |
| 7,859,144 | B1 | 12/2010 | Sahyoun |

| | | | |
|---|---|---|---|
| 2004/0055598 | A1 | 3/2004 | Crowder et al. |
| 2005/0231045 | A1 | 10/2005 | Oba et al. |
| 2005/0275508 | A1 | 12/2005 | Orr et al. |
| 2006/0138875 | A1 | 6/2006 | Kim et al. |
| 2006/0208600 | A1 | 9/2006 | Sahyoun |
| 2011/0144426 | A1 | 6/2011 | Blenk et al. |
| 2011/0248817 | A1 | 10/2011 | Houston et al. |
| 2012/0212895 | A1 | 8/2012 | Cohen et al. |
| 2014/0343804 | A1 * | 11/2014 | Brooks .................. E02F 9/221 701/50 |

* cited by examiner

Exhibit 1001 - Page 2 of 31

**Appx0218**



FIG. 1A

--Prior Art--



FIG. 1B

--Prior Art--

Exhibit 1001 - Page 3 of 31

Appx0219



FIG. 2A

--Prior Art--

FIG. 2B

--Prior Art--

Exhibit 1001 - Page 4 of 31

Appx0220



FIG. 3

--Prior Art--

Exhibit 1001 - Page 5 of 31　　Appx0221



FIG. 4A

FIG. 4B

FIG. 4C

FIG. 4D

Exhibit 1001 - Page 6 of 31     Appx0222



FIG. 4E



FIG. 4F



FIG. 4G

Exhibit 1001 - Page 7 of 31     **Appx0223**



FIG. 5A



FIG. 5B

Exhibit 1001 - Page 8 of 31    **Appx0224**



FIG. 6

Exhibit 1001 - Page 9 of 31

Appx0225



FIG. 7A

Exhibit 1001 - Page 10 of 31     **Appx0226**



FIG. 7B

Exhibit 1001 - Page 11 of 31     **Appx0227**



FIG. 7C

Exhibit 1001 - Page 12 of 31

Appx0228



vibrational
force

frequency

802

FIG. 8

Exhibit 1001 - Page 13 of 31



FIG. 9

Exhibit 1001 - Page 14 of 31

Appx0230



**FIG. 10**



**FIG. 11**



**FIG. 12**

Exhibit 1001 - Page 15 of 31

**Appx0231**



FIG. 13



FIG. 14



FIG. 15

Exhibit 1001 - Page 16 of 31          Appx0232



**FIG. 16**



**FIG. 17**



**FIG. 18**

Exhibit 1001 - Page 17 of 31    Appx0233



FIG. 19

Exhibit 1001 - Page 18 of 31

Appx0234



FIG. 20

Exhibit 1001 - Page 19 of 31



FIG. 21

Exhibit 1001 - Page 20 of 31

Appx0236



FIG. 22A          FIG. 22B



FIG. 23

Exhibit 1001 - Page 21 of 31          Appx0237



FIG. 24A

FIG. 24B

FIG. 25

Exhibit 1001 - Page 22 of 31    Appx0238

# LINEAR VIBRATION MODULES AND LINEAR-RESONANT VIBRATION MODULES

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of application Ser. No. 13/345,607, filed Jan. 6, 2012, which is a continuation-in-part of U.S. Pat. No. 8,093,767, issued Jan. 10, 2012, which claims the benefit of Provisional Patent Application No. 61/179,109, filed May 18, 2009.

## TECHNICAL FIELD

The current application is related to vibration-generating devices and, in particular, to vibration modules that can be incorporated into a wide variety of different types of electromechanical devices and systems to produce vibrations of selected amplitudes and frequencies over a wide range of amplitude/frequency space.

## BACKGROUND

Vibration-inducing motors and mechanisms have been used for many years in a wide variety of different consumer appliances, toys, and other devices and systems. Examples include vibration signals generated by pagers, vibration-driven appliances, such as hair-trimming appliances, electric toothbrushes, electric toy football games, and many other appliances, devices, and systems. The most common electromechanical system used for generating vibrations is an intentionally unbalanced electric motor.

FIGS. 1A-B illustrate an unbalanced electric motor typically used for generating vibrations in a wide variety of different devices. As shown in FIG. 1A, a small, relatively low-power electric motor 102 rotates a cylindrical shaft 104 onto which a weight 106 is asymmetrically or mounted. FIG. 1B shows the weight asymmetrically mounted to the shaft, looking down at the weight and shaft in the direction of the axis of the shaft. As shown in FIG. 1B, the weight 106 is mounted off-center on the electric-motor shaft 104. FIGS. 2A-B illustrate the vibrational motion produced by the unbalanced electric motor shown in FIGS. 1A-B. As shown in FIGS. 2A-B, the asymmetrically-mounted weight creates an elliptical oscillation of the end of the shaft, normal to the shaft, when the shaft is rotated at relatively high speed by the electric motor. FIG. 2A shows displacement of the weight and shaft from the stationary shaft axis as the shaft is rotated, looking down on the weight and shaft along the shaft axis, as in FIG. 1B. In FIG. 2A, a small mark 202 is provided at the periphery of the disk-shaped end the of electric-motor shaft to illustrate rotation of the shaft. When the shaft rotates at high speed, a point 204 on the edge of the weight traces an ellipsoid 206 and the center of the shaft 208 traces a narrower and smaller ellipsoid 210. Were the shaft balanced, the center of the shaft would remain at a position 212 in the center of the diagram during rotation, but the presence of the asymmetrically-mounted weight attached to the shaft, as well as other geometric and weight-distribution characteristics of the electric motor, shaft, and unbalanced weight together create forces that move the end of the shaft along the elliptical path 210 when the shaft is rotated at relatively high speed. The movement can be characterized, as shown in FIG. 2B, by a major axis 220 and minor axis 222 of vibration, with the direction of the major axis of vibration equal to the direction of the major axis of the ellipsoids, shown in FIG. 2A, and the length of the major axis corresponding to the amplitude of

vibration in this direction. In many applications, in which a linear oscillation is desired, designers seek to force the major-axis-amplitude/minor-axis-amplitude ratio to be as large as possible, but, because the vibration is produced by a rotational force, it is generally not possible to achieve linear oscillation. In many cases, the path traced by the shaft center may be close to circular. The frequency of vibration of the unbalanced electric motor is equal to the rotational frequency of the electric-motor shaft, and is therefore constrained by the rate at which the motor can rotate the shaft. At low rotational speeds, little vibration is produced.

While effective in producing vibrations, there are many problems associated with the unbalanced-electric-motor vibration-generating units, such as that shown in FIG. 1A, commonly used in the various devices, systems, and applications discussed above. First, unbalancing the shaft of an electric motor not only produces useful vibrations that can be harnessed for various applications, but also produces destructive, unbalanced forces within the motor that contribute to rapid deterioration of motor parts. Enormous care and effort is undertaken to precisely balance rotating parts of motors, vehicles, and other types of machinery, and the consequences of unbalanced rotating parts are well known to anyone familiar with automobiles, machine tools, and other such devices and systems. The useful lifetimes of many devices and appliances, particularly hand-held devices and appliances, that employ unbalanced electric motors for generating vibrations may range from a few tens of hours to a few thousands of hours of use, after which the vibrational amplitude produced by the devices declines precipitously as the electric motor and other parts deteriorate.

A second problem with unbalanced electric motors is that they are relatively inefficient at producing vibrational motion. A far greater amount of power is consumed by an unbalanced electrical motor to produce a given vibrational force than the theoretical minimum power required to produce the given vibrational force. As a result, many hand-held devices that employ unbalanced electric motors for generating vibrations quickly consume batteries during use.

A third problem with unbalanced electric motors, discussed above, is that they generally produce elliptical vibrational modes. Although such modes may be useful in particular applications, many applications can better use a linear oscillation, with greater directional concentration of vibrational forces. Linear oscillation cannot generally be produced by unbalanced electric motors.

A fourth, and perhaps most fundamental, problem associated with using unbalanced electric motors to generate vibrations is that only a very limited portion of the total vibrational-force/frequency space is accessible to unbalanced electric motors. FIG. 3 shows a graph of vibrational force with respect to frequency for various types of unbalanced electric motors. The graph is shown as a continuous hypothetical curve, although, of course, actual data would be discrete. As shown in FIG. 3, for relatively low-power electric motors used in hand-held appliances, only a fairly narrow range of frequencies centered about 80 Hz (302 in FIG. 3) generate a significant vibrational force. Moreover, the vibrational force is relatively modest. The bulk of energy consumed by an unbalanced electric motor is used to spin the shaft and unbalanced weight and to overcome frictional and inertial forces within the motor. Only a relatively small portion of the consumed energy is translated into desired vibrational forces.

Because of the above-discussed disadvantages with the commonly employed unbalanced-electric-motor vibration-generation units, designers, manufacturers, and, ultimately, users of a wide variety of different vibration-based devices,

Exhibit 1001 - Page 23 of 31

**3**

appliances, and systems continue to seek more efficient and capable vibration-generating units for incorporation into many consumer appliances, devices, and systems.

SUMMARY

The current application is directed to various types of linear vibrational modules, including linear-resonant vibration modules, that can be incorporated in a wide variety of appliances, devices, and systems to provide vibrational forces. The vibrational forces are produced by linear oscillation of a weight or member, in turn produced by rapidly alternating the polarity of one or more driving electromagnets. Feedback control is used to maintain the vibrational frequency of linear-resonant vibration module at or near the resonant frequency for the linear-resonant vibration module. Both linear vibration modules and linear-resonant vibration modules can be designed to produce vibrational amplitude/frequency combinations throughout a large region of amplitude/frequency space.

BRIEF DESCRIPTION OF THE DRAWINGS

FIGS. **1**A-B illustrate an unbalanced electric motor typically used for generating vibrations in a wide variety of different devices.

FIGS. **2**A-B illustrate the vibrational motion produced by the unbalanced electric motor shown in FIGS. **1**A-B.

FIG. **3** shows a graph of vibrational force with respect to frequency for various types of unbalanced electric motors.

FIGS. **4**A-G illustrate one particular LRVM, and operation of the particular LRVM, that represents one implementation of the linear-resonant vibration module to which current application is directed.

FIGS. **5**A-B illustrate an H-bridge switch that can be used, in various embodiments of the current application, to change the direction of current applied to the coil that drives linear oscillation within a linear-resonance vibration module ("LRVM").

FIG. **6** provides a block diagram of the LRVM, illustrated in FIGS. **4**A-G, that represents one implementation of the linear-resonant vibration module to which current application is directed.

FIGS. **7**A-C provide control-flow diagrams that illustrate the control program, executed by the CPU, that controls operation of an LRVM that represents one implementation of the linear-resonant vibration module to which current application is directed.

FIG. **8** represents the range of frequencies and vibrational forces that can be achieved by different implementations of LRVM and LRVM control programs that represent embodiments of the current application.

FIG. **9** shows a plot of the amplitude/frequency space and regions in that space that can be operationally achieved by unbalanced electrical motors and by LRVMs that represent embodiments of the current application.

FIGS. **10**-**17** show a variety of different alternative implementations of LRVMs that represent different embodiments of the current application.

FIG. **18** illustrates an enhancement of an implementation of the linear-resonant vibration module to which current application is directed shown in FIG. **16**.

FIG. **19** illustrates plots of amplitude versus frequency for a high-Q and a low-Q vibration device.

FIG. **20** illustrates portions of amplitude/frequency space accessible to various types of vibration modules.

**4**

FIG. **21** illustrates the dependence between frequency and amplitude in a low-Q linear vibration module as well as a modified dependence that can be obtained by control circuitry.

FIGS. **22**A-**23** illustrate interesting vibrational modes produced by driving a linear-resonant vibration module simultaneously at two different frequencies.

FIGS. **24**A-**25** illustrate incorporation of paramagnetic flux paths into a linear vibration module.

DETAILED DESCRIPTION

The current application is directed to various linear vibration modules ("LRMs"), including various types of linear-resonant vibration modules ("LRVMs"), that can be used within a wide variety of different types of appliances, devices, and systems, to generate vibrational forces. The LVMs and LRVMs that represent embodiments of the current application are linear in the sense that the vibrational forces are produced by a linear oscillation of a weight or component within the LVM or LRVM, rather than as a by-product of an unbalanced rotation, as in the case of currently employed unbalanced electric motors. The linear nature of the LRVM vibration-inducing motion allows the problems associated with unbalanced-electric-motor vibrators, discussed above, to be effectively addressed. An oscillating linear motion does not produce destructive forces that quickly degrade and wear out an unbalanced electric motor. A linearly oscillating mechanism is characterized by parameters that can be straightforwardly varied in order to produce vibrations of a desired amplitude and frequency over a very broad region of amplitude/frequency space. In many implementations of LRVMs and LVMs, the vibration amplitude and vibration frequency can be independently controlled by a user through user-input features, including buttons, sliders, and other types of user-input features. Combining a linearly oscillating vibration-inducing mechanism with feedback control, so that the frequency of vibration falls close to the resonant frequency of the LRVM, results in optimal power consumption with respect to the amplitude and frequency of vibration produced by the LRVM. Clearly, linear oscillation within a LRVM translates into highly direction vibrational forces produced by an appliance or device that incorporates the LRVM.

FIGS. **4**A-G illustrate one particular LRVM, and operation of the particular LRVM, that represents one implementation of the linear-resonant vibration module to which current application is directed. FIGS. **4**A-G all use the same illustration conventions, next discussed with reference to FIG. **4**A. The LRVM includes a cylindrical housing **402** within which a solid, cylindrical mass **404**, or weight, can move linearly along the inner, hollow, cylindrically shaped chamber **406** within the cylindrical housing or tube **402**. The weight is a magnet, in the described an implementation of the linear-resonant vibration module to which current application is directed, with polarity indicated by the "+" sign **410** on the right-hand end and the "−" sign **412** on the left-hand end of the weight **404**. The cylindrical chamber **406** is capped by two magnetic disks **414** and **416** with polarities indicated by the "+" sign **418** and the "−" sign **419**. The disk-like magnets **414** and **418** are magnetically oriented opposite from the magnetic orientation of the weight **404**, so that when the weight moves to either the extreme left or extreme right sides of the cylindrical chamber, the weight is repelled by one of the disk-like magnets at the left or right ends of the cylindrical chamber. In other words, the disk-like magnets act much like springs, to facilitate deceleration and reversal of direction of motion of the weight and to minimize or prevent mechanical-

Exhibit 1001 - Page 24 of 31

**Appx0240**

5

impact forces of the weight and the end caps that close off the cylindrical chamber. Finally, a coil of conductive wire **420** girdles the cylindrical housing, or tube **402** at approximately the mid-point of the cylindrical housing.

FIGS. **4**B-G illustrate operation of the LRVM shown in FIG. **4**A. When an electric current is applied to the coil **420** in a first direction **422**, a corresponding magnetic force **424** is generated in a direction parallel to the axis of the cylindrical chamber, which accelerates the weight **404** in the direction of the magnetic force **424**. When the weight reaches a point at or close to the corresponding disk-like magnet **414**, as shown in FIG. **4**C, a magnetic force due to the repulsion of the disk-like magnet **414** and the weight **404**, **426**, is generated in the opposite direction, decelerating the weight and reversing its direction. As the weight reverses direction, as shown in FIG. **4**D, current is applied in an opposite direction **430** to the coil **420**, producing a magnetic force **432** in an opposite direction from the direction of the magnetic force shown in FIG. **4**B, which accelerates the weight **404** in a direction opposite to the direction in which the weight is accelerated in FIG. **4**B. As shown in FIG. **4**E, the weight then moves rightward until, as shown in FIG. **4**F, the weight is decelerated, stopped, and then accelerated in the opposite direction by repulsion of the disk-like magnet **416**. An electrical current is then applied to the coil **420** in the same direction **434** as in FIG. **4**B, again accelerating the solid cylindrical mass in the same direction as in FIG. **4**B. Thus, by a combination of a magnetic field with rapidly reversing polarity, generated by alternating the direction of current applied to the coil, and by the repulsive forces between the weight magnet and the disk-like magnets at each end of the hollow, cylindrical chamber, the weight linearly oscillates back and forth within the cylindrical housing **402**, imparting a directional force at the ends of the cylindrical chamber with each reversal in direction.

Clearly, the amplitude of the vibration and vibrational forces produced are related to the length of the hollow chamber in which the weight oscillates, the current applied to the coil, the mass of the weight, the acceleration of the weight produced by the coil, and the mass of the entire LRVM. All of these parameters are essentially design parameters for the LRVM, and thus the LRVM can be designed to produce a wide variety of different amplitudes.

The frequency of the oscillation of the solid, cylindrical mass is determined by the frequency at which the direction of the current applied to the coil is changed. FIGS. **5**A-B illustrate an H-bridge switch that can be used, in various embodiments of the current application, to change the direction of current applied to the coil that drives linear oscillation within an LRVM. FIGS. **5**A-B both use the same illustration conventions, described next with respect to FIG. **5**A. The H-bridge switch receives, as input, a directional signal d **502** and direct-current ("DC") power **504**. The direction-control signal d **502** controls four switches **506-509**, shown as transistors in FIG. **5**A. When the input control signal d **502** is high, or "1," as shown in FIG. **5**A, switches **508** and **509** are closed and switches **506** and **507** are open, and therefore current flows, as indicated by curved arrows, such as curved arrow **510**, from the power-source input **504** to ground **512** in a leftward direction through the coil **514**. When the input-control signal d is low, or "0," as shown in FIG. **5**B, the direction of the current through the coil is reversed. The H-bridge switch, shown in FIGS. **5**A-B, is but one example of various different types of electrical and electromechanical switches that can be used to rapidly alternate the direction of current within the coil of an LRVM.

FIG. **6** provides a block diagram of the LRVM, illustrated in FIGS. **4**A-G, that represents one implementation of the

6

linear-resonant vibration module to which current application is directed. The LRVM, in addition to the cylindrical housing, coil, and internal components shown in FIG. **4**A, includes a power supply, a user interface, generally comprising electromechanical buttons or switches, the H-bridge switch, discussed above with reference to FIGS. **5**A-B, a central processing unit ("CPU"), generally a small, low-powered microprocessor, and one or more electromechanical sensors. All of these components are packaged together as an LRVM within a vibration-based appliance, device, or system.

As shown in FIG. **6**, the LRVM **600** is controlled by a control program executed by the CPU microprocessor **602**. The microprocessor may contain sufficient on-board memory to store the control program and other values needed during execution of the control program, or, alternatively, may be coupled to a low-powered memory chip **604** or flash memory for storing the control program. The CPU receives inputs from the user controls **606** that together comprise a user interface. These controls may include any of various dials, pushbuttons, switches, or other electromechanical-control devices. As one example, the user controls may include a dial to select a strength of vibration, which corresponds to the current applied to the coil, a switch to select one of various different operational modes, and a power button. The user controls generate signals input to the CPU **608-610**. A power supply **612** provides power, as needed, to user controls **614**, to the CPU **616** and optional, associated memory, to the H-bridge switch **618**, and, when needed, to one or more sensors **632**. The voltage and current supplied by the power supply to the various components may vary, depending on the operational characteristics and requirements of the components. The H-bridge switch **620** receives a control-signal input d **622** from the CPU. The power supply **612** receives a control input **624** from the CPU to control the current supplied to the H-bridge switch **618** for transfer to the coil **626**. The CPU receives input **630** from one or more electromechanical sensors **632** that generate a signal corresponding to the strength of vibration currently being produced by the linearly oscillating mass **634**. Sensors may include one or more of accelerometers, piezoelectric devices, pressure-sensing devices, or other types of sensors that can generate signals corresponding to the strength of desired vibrational forces.

FIGS. **7**A-C provide control-flow diagrams that illustrate the control program, executed by the CPU, that controls operation of an LRVM that represents one implementation of the linear-resonant vibration module to which current application is directed. FIG. **7**A provides a control-flow diagram for the high-level control program. The program begins execution, in step **702**, upon a power-on event invoked by a user through a power button or other user control. In step **702**, various local variables are set to default values, including the variables: (1) mode, which indicates the current operational mode of the device; (2) strength, a numerical value corresponding to the current user-selected strength of operation, corresponding to the electrical current applied to the coil; (3) lvl0, a previously sensed vibrational strength; (4) lvl1, a currently sensed vibrational strength; (5) freq, the current frequency at which the direction of current is alternated in the coil; (6) d, the control output to the H-bridge switch; and (7) inc., a Boolean value that indicates that the frequency is currently being increased. Next, in step **704**, the control program waits for a next event. The remaining steps represent a continuously executing loop, or event handler, in which each event that occurs is appropriately handled by the control program. In certain implementations of the control program, events may be initiated by interrupt-like mechanisms and stacked for execution while, in more primitive implementa-

Exhibit 1001 - Page 25 of 31

**Appx0241**

7

tions, certain events that overlap in time may be ignored or
dropped. In the implementation illustrated in FIGS. 7A-C,
two timers are used, one for controlling the change in direc-
tion of the current applied to the coil, at a currently established
frequency, and the other for controlling a monitoring interval
at which the control program monitors the vibrational force
currently produced. Rather than using a formal timer mecha-
nism, certain implementations may simply employ counted
loops or other simple programming techniques for periodi-
cally carrying out tasks. When an event occurs, the control
program begins a series of tasks, the first of which is repre-
sented by the conditional step 706, to determine what event
has occurred and appropriately handle that event. When the
frequency timer has expired, as determined in step 706, the
value of the output signal d is flipped, in step 708, and output
to the H-bridge switch, with the frequency timer being reset to
trigger a next frequency-related event. The frequency-timer
interval is determined by the current value of the variable freq.
Otherwise, when the event is a monitor timer expiration
event, as determined in step 710, then a routine "monitor" is
called in step 712. Otherwise, when the event corresponds to
a change in the user input through the user interface, as
determined in step 714, the routine "control" is called in step
716. Otherwise, when the event is a power-down event, as
determined in step 718, resulting from deactivation of a
power button by the user, then the control program appropri-
ately powers down the device, in step 720, and the control
program terminates in step 722. Any other of various types of
events that may occur are handled by a default event handler
724. These events may include various error conditions that
arise during operation of the device.

FIG. 7B provides a control-flow diagram for the routine
"monitor," called in step 712 of FIG. 7A. In step 730, the
routine "monitor" converts the sensor input to an integer
representing the current vibrational force produced by the
LRVM and stores the integer value in the variable lvl1. Next,
in step 732, the routine "monitor" determines whether or not
the LRVM is currently operating in the default mode. In the
default mode, the LRVM uses continuous feedback control to
optimize the vibrational force produced by the LRVM by
continuously seeking to operate the LRVM at a frequency as
close as possible to the resonant frequency for the LRVM.
Other, more complex operational modes may be handled by
various more complex routines, represented by step 734 in
FIG. 7B. More complex vibrational modes may systemati-
cally and/or periodically alter the frequency or produce vari-
ous complex, multi-component vibrational modes useful in
certain applications, appliances, devices, and systems. These
more complex modes are application dependent, and are not
further described in the control-flow diagrams. In the case
that the operational mode is the default mode, in which the
control program seeks to optimize the vibrational force gen-
erated by the device, in step 736, the routine "monitor" deter-
mines whether the local variable inc is set to TRUE. If so, the
control program is currently increasing the frequency at
which the device operates in order to obtain the resonance
frequency. When lvl1 is greater than lvl0, as determined in
step 738, then the vibrational force has been recently
increased by increasing the frequency, and so the routine
"monitor" increases the frequency again, in step 740, and
correspondingly resets the frequency timer. Otherwise, when
lvl1 is less than lvl0, as determined in step 742, then the
control program has increased the frequency past the reso-
nance frequency, and therefore, in step 744, the control pro-
gram decreases the frequency, sets the variable inc to FALSE,
and correspondingly resets the frequency timer. In similar
fashion, when the variable inc is initially FALSE, as deter-

8

mined in step 736, and when lvl1 is greater than lvl0, as
determined in step 746, the routine "monitor" decreases the
value stored in the variable freq, in step 748 and resets the
frequency timer. Otherwise, when lvl1 is less than lvl0, as
determined in step 750, then the routine "monitor" increases
the value stored in the variable freq, sets the variable inc to
TRUE, and resets the frequency timer in step 752. Finally, the
value in lvl1 is transferred to lvl 0 and the monitor timer is
reset, in step 754.

FIG. 7C provides a control-flow diagram for the routine
"control," called in step 716 in FIG. 7A. This routine is
invoked when a change in the user controls has occurred. In
step 760, the variables mode and strength are set to the cur-
rently selected mode and vibrational strength, represented by
the current states of control features in the user interface.
Next, in step 762, the routine "control" computes an output
value p corresponding to the currently selected strength,
stored in the variable strength, and outputs the value p to the
power supply so that the power supply outputs an appropriate
current to the coil. Finally, in step 764, the routine "control"
computes a new monitor timer interval and resets the monitor
timer accordingly.

The control program described with reference to FIGS.
7A-C is one example of many different implementations of
the control program that can be carried out, depending on
requirements of the LRVM, the parameters and characteris-
tics inherent in a particular LRVM, the types of control inputs
received from a particular user interface, the nature of the
power supply, and the types of operational modes that are
implemented for the LRVM.

FIG. 8 represents the range of frequencies and vibrational
forces that can be achieved by different implementations of
LRVM and LRVM control programs that represent embodi-
ments of the current application. FIG. 8 has the same axes as
the graph shown in FIG. 3. However, unlike FIG. 3, FIG. 8
includes many different curves, such as curve 802, each rep-
resenting the vibrational forces and frequencies that can be
obtained from a particular LRVM implementation. Again, the
LRVMs that represent embodiments of the current applica-
tion generally have a resonant frequency that is characteristic
of the geometry and weights of various components of the
LRVM, and each LRVM is naturally operated at a frequency
close to this resonant frequency in order to achieve maximum
vibrational force. Thus, rather than being restricted, over all
possible implementations, to a relatively narrow range of
frequencies and vibrational forces, as in the case of unbal-
anced electrical motors, LRVMs that represent embodiments
of the current application can be designed and implemented
to produce desired vibrational forces over a wide range of
vibrational frequencies, and desired vibrational frequencies
over a wide range of desired vibrational forces. The contrast
is perhaps best seen in FIG. 9. FIG. 9 shows a plot of the
amplitude/frequency space and regions in that space that can
be operationally achieved by unbalanced electrical motors
and by LRVMs that represent embodiments of the current
application. Unbalanced electric motors can be implemented
to produce amplitude/frequency combinations roughly
within the cross-hatched square region 902 within amplitude/
frequency space. By contrast, LRVMs can be designed and
implemented to produce amplitude/frequency combinations
underlying curve 904. Thus, LRVMs can achieve much
higher operational frequencies and much lower operational
frequencies than can be practically obtained by unbalanced
electric motors, and can produce much higher amplitudes and
vibrational forces than can be achieved by relatively low-
powered unbalanced electrical motors used in hand-held
appliances and other commonly encountered devices and sys-

Exhibit 1001 - Page 26 of 31

**Appx0242**

9
10

tems. Furthermore, when larger vibrational forces are needed, balanced electrical motors are generally impractical or infeasible, due to the destructive forces produced within the electrical motors. In general, a single implemented LVM or LVRM can access a much larger region of amplitude/frequency space than currently available vibration modules, which generally operate at fixed amplitudes and/or fixed frequencies, as further discussed below.

FIGS. 10-17 show a variety of different alternative implementations of LRVMs that represent different embodiments of the current application. FIG. 10 provides a schematic illustration of an LRVM similar to that discussed above with reference to FIG. 4A. Note that, in place of the end magnets 1002 and 1004, mechanical springs may alternatively be used. These may be traditional helical springs made from metal or springs made from a compressible and durable material or mechanical device that seeks to restore its initial shape when depressed or compressed. Note that the weight and chamber may be cylindrical, in cross section, as discussed above with reference to FIG. 4A, or may have other shapes, including rectangular or hexagonal cross-sections.

FIG. 11 shows a similar implementation in which the control unit and power supply are incorporated into the moving mass 1102. In this implementation, the relative masses of the moving mass 1102 and remaining components of the LRVM is maximized, thus maximizing the vibrational forces produced at a given level of power consumption.

FIG. 12 shows yet an alternative LRVM an implementation of the linear-resonant vibration module to which current application is directed. In this alternative implementation, additional coils 1202 and 1204 are incorporated in the moving mass, and a centering magnet or coil 1206 is positioned in a fixed location on the housing so that, when the direction of the current applied to the coils 1202 and 1204 is alternated, an oscillating rotational force is generated to cause the movable weight to oscillate both in a plane perpendicular to the axis of the chamber as well as linearly oscillating the direction of the chamber.

FIG. 13 illustrates an embodiment in which multiple electromagnetic coils are employed. In FIG. 13, two coils 1302 and 1304 are placed in two different positions on the housing. The first coil 1302 may be used to drive linear oscillation of the moving mass 1306, while the second coil may be activated in order to shorten the length of the chamber within which the moving mass linearly oscillates, essentially serving as a second repelling magnet. In this implementation of the LRVM, the moving mass may linearly oscillate with at least two different amplitudes, depending on whether or not the second coil 1304 is activated to repel the moving mass. Additionally more complex patterns of current reversal in the two coils can be employed to produce complex multi-component vibrational modes of the moving mass.

When the housing is fully enclosed, air within the chamber serves to dampen oscillation of the moving mass. This dampening may be minimized by providing channels, on the sides of the moving mass, to allow air to pass from one side of the moving mass to the other, by channels through the moving mass, or by providing openings in the housing to allow air to be forced from the housing and drawn into the housing. Additionally, different fluids or liquids may be employed within the chamber to change the dampening effect produced by displacement of the fluids and gasses as the moving mass linearly oscillates.

FIG. 14 illustrates an alternative LRVM an implementation of the linear-resonant vibration module to which current application is directed in which a plunger linearly oscillates to produce a vibration. The plunger 1402 is slideably contained within a moveable-component track orthogonal to a long axis of the main housing 1404 of the LRVM that includes the power supply, microcontroller, and other control components. The plunger is girdled by, or includes, a driving magnet 1406 that is attracted to, and seeks to be positioned in alignment with, a centering magnet 1408 mounted within the housing. Applying current to one of two driving coils 1412 and 1414 forces the driving magnet away from the equilibrium position shown in FIG. 14. By rapidly switching the direction of current applied to the driving coils, the microcontroller can control the plunger to linearly oscillate in an up-and-down fashion, as indicated by arrow 1420.

FIG. 15 shows yet another LRVM an implementation of the linear-resonant vibration module to which current application is directed. In this an implementation of the linear-resonant vibration module to which current application is directed, a spring-like member 1502 is clamped at one end 1504 to the housing. Driving magnets 1506 and 1508 are fixed to the spring-like member 1502, and when current is rapidly reversed in a coil 1510, the spring-like member 1502 is induced to vibrate at a relatively high frequency.

FIG. 16 shows an alternative an implementation of the linear-resonant vibration module to which current application is directed similar to the embodiment shown in FIG. 15. In this embodiment, the spring member 1602 is extended to provide an external massage arm 1604 that extends out from the housing to provide a linearly oscillating massage-foot member 1606 for massaging human skin or some other substrate, depending on the application.

FIG. 17 shows a mechanical vibration adjustment feature that can be added to either of the embodiments shown in FIGS. 15 and 16. An adjustment screw 1702 can be manipulated to alter the position of a movable spring clamp 1704 that acts as a movable clamping point for the spring-like member 1706. Moving the movable spring clamp 1704 leftward, in FIG. 17, shortens the length of the spring-like member and thus tends to increase the resonant frequency at a particular power-consumption level. Conversely, moving the movable spring clamp rightward, in FIG. 17, lengthens the spring-like member and decreases the vibrational frequency.

FIG. 18 illustrates an enhancement of an implementation of the linear-resonant vibration module to which current application is directed shown in FIG. 16. In this embodiment, the massage foot is enhanced to include elastomer bristles 1802-1805 to transfer the linear oscillation of the massage foot to human skin or another substrate. The elastomeric bristles, or pad or brush comprising numerous elastomeric bristles, allow transmission of vibration to a surface even at low operational powers, when a rigid or even semi-compliant massage foot would instead simply stop moving for inability to overcome frictional forces.

As discussed above with reference to FIG. 6, including a processor or microcontroller within a linear-resonant vibration module allows for a very large number of different processor-controlled vibration patterns and modes to be exhibited by the linear-resonant vibration module. As discussed above, processor control along with a linear-resonant-vibration-module architecture allows the processor-controlled device to access a much larger portion of a total amplitude/frequency space than can be accessed by currently available unbalanced-electric-motor vibration devices. Thus, processor-controlled linear-resonant vibration modules provide a large increase in functionality with respect to currently available vibration modules. There is, however, a relatively large gap in functionality between processor-controlled linear-resonance vibration modules and currently available unbal-

Exhibit 1001 - Page 27 of 31

**Appx0243**

11

anced-electric-motor vibration modules that can be bridged by linear vibration modules that lack processor or microprocessor control.

When discussing vibration modules, electric motors, and other oscillating devices, it is common to use the phrase "Q factor," or "quality factor," to refer to a quality or characteristic of an oscillating device. The Q factor refers to the level of dampening of an oscillator or, in other words, a ratio of the energy stored in the oscillator or resonator to the energy needed to be supplied to the oscillator or resonator during each oscillation cycle in order to maintain a constant oscillation amplitude. FIG. 19 illustrates plots of amplitude versus frequency for a high-Q and a low-Q vibration device. The curve 1902 for a high-Q device generally has a narrower and taller amplitude peak about a resonant frequency 1904 or, in certain eases, several relatively tall, narrow peaks about several resonant frequencies, while a low-Q device exhibits a much broader, but lower-amplitude amplitude-versus-frequency curve 1906. A linear-resonant vibration module, when controlled to vibrate at a resonant frequency, as described above, generally operates as a high-Q device. However, when controlled by user input or programmatically to vibrate at non-resonant frequencies, the linear-resonant vibration module may instead operate as a low-Q device. Linear vibration modules and other types of vibration modules that lack feedback control generally do not operate at resonant frequencies for extended periods of time, and thus tend to be low-Q devices.

Unbalanced-electric-motor vibration modules and even currently available resonating motors generally operate at either a fixed amplitude or a fixed frequency. For example, unbalanced-electric-motor vibration modules are generally operated at high revolutions per minute ("RPM") to create any vibration, and once operating at a given speed have a relatively fixed amplitude determined by the geometry of the unbalanced weight and rotor shaft. Other types of vibration modules that are currently available include resonating motors, such as the vibration modules found in certain electric toothbrushes, but these resonating motors operate only at a fixed frequency. In both cases, only a very limited portion of the amplitude/frequency space can be accessed by essentially fixed-amplitude or fixed-frequency vibration modules.

Alternative, lower-cost linear-vibration modules can be designed and manufactured by replacing the processor or microcontroller (602 in FIG. 6) of the above-described linear-resonant vibration module with a simpler oscillator circuit with additional control circuitry. The H switch (620 in FIG. 6) can be controlled by an oscillating current input rather than digital outputs from a microprocessor. Replacing the CPU or microprocessor with an oscillator and additional simple control circuitry produces a less functional, generally lower-Q, but also more economical linear vibration module that, although lacking the extremely broad range of vibration patterns and modes available to processor or microprocessor-controlled vibration modules, can nonetheless access a much larger portion of the amplitude/frequency space than can be accessed by currently available fixed-amplitude or fixed-frequency vibration modules.

In one example implementation of an oscillator-controlled linear vibration module, a variable-frequency oscillator circuit can be controlled by user input to drive the H switch or other H-switch-like circuit to operate the linear vibration module at different frequencies. A user is provided an input feature that allows the user to directly adjust the frequency of the variable oscillator and thus the vibrational frequency produced by the linear vibration module. The user is additionally provided with an input feature to allow the user to control the

12

current or duty cycle used to drive the linear vibration module and to thus increase and decrease the amplitude of vibration produced by the linear vibration module. Thus, a user can control both the frequency of vibration and the amplitude of vibration.

FIG. 20 illustrates portions of amplitude/frequency space accessible to various types of vibration modules. In FIG. 20, frequency is plotted with respect to a horizontal axis 2002 and amplitude is plotted with respect to a vertical axis 2004. The plane indexed by these axes represents the amplitude/frequency space, portions of which can be accessed by a given type of vibration module. The above-described unbalanced-electric-motor vibrators are essentially constant-amplitude devices, and can thus access some range of frequencies at a fixed amplitude, represented by line segment 2006 in FIG. 20. Different unbalanced-electric-motor vibrators may have different fixed amplitudes, but, for a given device, the portion of amplitude/frequency space that they can access can generally be represented by a line segment or high-aspect-ratio rectangle oriented orthogonally to the amplitude axis. The resonant-motor vibration devices, which each operates at a fixed frequency, can generally access a range of amplitudes at the fixed frequency, as represented by line segment 2008 in FIG. 20. By contrast, a linear vibration module user-input-controlled variable frequency and variable amplitude can access a two-dimensional subspace within the amplitude/frequency space, such as the region 2010 within elliptical boundary 2012 in FIG. 20. Clearly, a linear vibration module with user-controlled variable amplitude and variable frequency can provide a much broader range of amplitude/frequency combinations than currently available vibration modules. A processor or microcontroller-controlled linear-resonant vibration module, as discussed above with reference to FIGS. 4A-18, can access an even larger region of amplitude/frequency space that includes region 2010 with a subspace.

In certain low-Q linear vibration modules that lack microprocessor or microcontroller control, for any given frequency of operation, the amplitude tends to increase with decreasing frequency of operation. FIG. 21 illustrates the dependence between frequency and amplitude in a low-Q linear vibration module as well as a modified dependence that can be obtained by control circuitry. In FIG. 21, solid curve 2102 represents the dependence of amplitude on frequency for a low-Q linear vibration module without additional control circuitry. As the frequency decreases, the amplitude begins to steeply and non-linearly increase. In certain applications, a constant or relatively constant amplitude is desired over a broad range of frequencies. A low-Q linear vibration module without microprocessor or microcontroller control can obtain a more constant amplitude over a broader range of frequencies by adjusting the current or duty cycle downward at lower frequencies. For example, as shown by dashed curve 2104 in FIG. 21, the control circuitry can be implemented to detect when user-input-controlled operational frequency of a linear vibration module is below a threshold frequency 2106, at which point control circuitry can lower the driving current or duty cycle to decrease the vibrational amplitude when the linear vibration module is operating at frequencies below the threshold frequency. Thus, dashed curve 2104 is the sum of a lowered-current low-frequency curve and a higher-current high-frequency curve, with the curves joined at the threshold frequency. Alternatively, control circuitry can be implemented to continuously adjust the current or duty cycle lower as the frequency of operation is lowered by user input in order to even further flatten the amplitude-versus-frequency curve for the linear vibration module. In either case, a user may override these automatic adjustments by increasing the

Exhibit 1001 - Page 28 of 31

**Appx0244**

13

amplitude at lower operational frequencies via user input to an amplitude-control user-input feature.

Returning to microprocessor-controlled or microcontroller-controlled linear vibration modules, it should be noted that processor or microprocessor control allows for an essentially limitless number of different vibrational behaviors and modes to be configured by software or firmware design, by user input, or by a combination of software or firmware design and user input. Rather simple enhancements can produce interesting enhanced vibrational behavior. As one example, a microprocessor-controlled or microcontroller-controlled linear vibration module can be programmed to drive the device simultaneously at two different frequencies. FIGS. 22A-23 illustrate interesting vibrational modes produced by driving a linear-resonant vibration module simultaneously at two different frequencies. FIG. 22A shows a vibration mode of a linear vibration module driven at a frequency of 25 Hz. In a one-second duration of time, plotted with respect to horizontal axis 2202, 25 cycles, each including a positive and negative amplitude peak, such as positive amplitude peak 2204 and negative amplitude peak 2206, occur. At a constant 25 Hz frequency of operation, the positive peaks and negative peaks are evenly spaced. FIG. 22B illustrates a vibration mode of the linear vibration module driven at a primary operational frequency of 25 Hz with an added modulating 1 Hz operational frequency. Driving the linear vibration module by both a primary and a modulating frequency produces low-frequency pulses of high-frequency vibration. FIG. 23 illustrates a different complex vibrational mode in which two driving frequencies combine to produce a lower-frequency beat-wave form. The vibrational mode illustrated in FIG. 23 is produced by a primary driving frequency of 25 Hz, as in FIG. 22A, with a second driving frequency of 20 Hz. By varying the number, relative amplitudes, and frequencies of two or more driving signals, a microprocessor-controlled or microcontroller-controlled linear-resonance vibration module can be controlled to produce any number of complex vibrational patterns and modes, including periodic modes, modes with multiple different periods, various modulated vibration modes, and even fully aperiodic vibration modes that do not repeat time.

In a linear-resonant vibration module, discussed above, by maintaining device operation at a resonant frequency, the linear-resonant vibration module is a relatively high-Q device, and generally operates more efficiently to produce a given vibration amplitude than a low-Q device, such as a linear vibration module lacking microprocessor or microcontroller control and operating at a frequency/amplitude setting that does not correspond to a natural vibration mode of the device. There are, in addition, many other ways to increase the energy efficiency of a linear vibration module.

FIGS. 24A-25 illustrate incorporation of paramagnetic flux paths into a linear vibration module. In free air, magnetic field lines radiate outwards in arcs from the north pole to the south pole of a magnet, completing a magnetic circuit. Free air can be considered to be analogous to a resistor in an electric circuit and increases the resistance, or magnetic reluctance, of a magnetic circuit and reduces and the flux of the magnetic field. A magnetic field seeks out the path of least resistance, and changes direction, when necessary, to maximize flux between the two magnetic poles. When introduced into a magnetic field, paramagnetic materials provide a lower-resistance path for magnetic flux, providing that they have adequate permeability and size to avoid saturation. Paramagnetic materials of appropriate permeability and size reduce the reluctance of a magnetic circuit and can therefore allow a magnetic field to more efficiently perform more work.

14

FIG. 24A shows a linear vibration module without paramagnetic flux paths. On the left-hand side of FIG. 24A, the magnetic field lines 2402 of the moving magnet are shown. A significant portion of the magnetic field lines can be seen to pass through air. FIG. 24B shows a linear vibration module with added paramagnetic flux paths. These include flux paths around the stator coils 2410-2411 as well as flux-path disks 2414-2415 at the ends of the cylindrical magnet 2416 within the linear vibration module. As can be seen by comparing FIG. 24B to FIG. 24A, only tiny portions of the flux lines in FIG. 24B pass through free air, in contrast to the relatively large portions of flux lines that pass through free air in FIG. 24A. Thus, addition of paramagnetic flux paths to a linear vibration module in order to decrease the portion of magnetic field lines passing through free air provides a more efficient linear vibration module.

FIG. 25 illustrates flux-path magnetic stops incorporated within a linear vibration module to which the current application is directed. During operation of the linear vibration module, and without the influence of any external force on the piston, the mid-plane of the shuttle magnet 2502 oscillates about the fixed mid-plane of the centering magnet 2504. When the device encounters a resisting normal force on the end of the piston, the shuttle magnet biases into the motor and oscillates about a datum offset from the fixed mid-plane of the centering magnet. When the resisting force is greater than the electromagnetic force generated by the motor, the piston assembly continues to be driven into the bore until the flux disc 2506 is in line with the return lip 2508 of the flux path. In this position, the air gap of the magnetic circuit is reduced due to the proximity of the flux disc to the return lip. Maximum magnetic flux flow is achieved between these two components in a radial direction. Additional external axial force is required to force the piston assembly to move beyond this limit, effectively producing a magnetic stop. This effect also prevents the piston from being ejected from the motor at high power and low frequency settings at which the piston carries significant momentum.

Although the present invention has been described in terms of particular embodiments, it is not intended that the invention be limited to these embodiments. Modifications will be apparent to those skilled in the art. For example, as discussed above, LRVMs can be designed to produce desired vibrational amplitudes and frequencies over a wide region of amplitude/frequency space by varying various different design parameters and characteristics, including the amplitude of a moving mass that linearly oscillates within the LRVM, altering the dimensions of the LRVM and internal components of the LRVM, altering the weight of the moving mass and other components of the LRVM, changing the ratio of the moving mass to the ratio of the remaining components of the LRVM, increasing or decreasing the number of turns in the coil or coils used to drive linear oscillation, increasing or decreasing the current supply to the coils, altering the dampening produced by displacement of fluid or gas by the moving mass within the LRVM as well as by various additional frictional forces, altering the strength of the end-cap magnets or mechanical springs used to facilitate reversal of direction of the moving mass, and by changing any of various additional parameters and characteristics. Any of various different microprocessors and other microcontrollers can be used in alternative embodiments of the LRVM, as well as different power supplies, current-switching devices, and other components. The control program executed by the LRVM can be implemented in many different ways by varying any of many different design parameters, including programming language, control structures, data structures, modular organiza-

Exhibit 1001 - Page 29 of 31

15

tion, and other such design parameters. The components of the LRVM, including the housing, moving mass, fixed magnets, and electromagnets, can be fashioned from many different types of materials, from polymers and plastics to metals and alloys in various composite materials. LRVMs may contain one, two, or more electromagnets and/or pexulanent magnets in order to produce linear oscillation of a moving mass or spring-like mass, and various different control programs can be implemented to produce many different types of single-component and multi-component vibrational modes, some of which may regularly or erratically change, over time, to produce a wide variety of different types of vibrational characteristics. An additional housing made from a material with a relatively large magnetic permeability can be added to various embodiments of the current application to concentrate and increase the linear magnetic forces produced by the various coils.

The foregoing description, for purposes of explanation, used specific nomenclature to provide a thorough understanding of the invention. However, it will be apparent to one skilled in the art that the specific details are not required in order to practice the invention. The foregoing descriptions of specific embodiments of the present invention are presented for purpose of illustration and description. They are not intended to be exhaustive or to limit the invention to the precise forms disclosed. Many modifications and variations are possible in view of the above teachings. The embodiments are shown and described in order to best explain the principles of the invention and its practical applications, to thereby enable others skilled in the art to best utilize the invention and various embodiments with various modifications as are suited to the particular use contemplated. It is intended that the scope of the invention be defined by the following claims and their equivalents.

The invention claimed is:

1. A linear vibration module comprising:
a housing;
a moveable component;
a power supply;
user-input features;
a driving component that drives the moveable component in each of two opposite directions within the housing; and
a control component that controls supply of power from the power supply to the driving component to cause the moveable component to oscillate at a frequency and an amplitude specified by user input received from the user-input features.

2. The linear vibration module of claim 1 wherein the control component is one of:
an variable oscillator circuit with additional control circuitry; and
a control component that includes
a microprocessor,
a control program, stored in an electronic memory within, or separate from, the microprocessor, the control program executed by the microprocessor to control supply of power from the power supply to the driving component to cause the moveable component to oscillate at a frequency and an amplitude specified by user input received from the user-input features.

3. The linear vibration module of claim 1 wherein the control component receives output signals from sensors within the linear vibration module during operation of the linear vibration module and adjusts one or more operational control outputs of the control component according to the received output signals from the sensors.

16

4. The linear vibration module of claim 1 wherein the control component adjusts the one or more operational control outputs of the control component according to the received output signals from the sensors in order that subsequent operation of the linear vibration module produces desired outputs from the one or more sensors corresponding to one or more operational control parameters.

5. The linear vibration module of claim 4
wherein the one or more operational control parameters is a strength of vibration produced by the linear oscillation of the moveable component; and
wherein the one or more operational control outputs is a frequency at which the control component drives the moveable component to linearly oscillate, the control component dynamically adjusting the power supplied to the driving component to produce linear oscillation of the movable component at a resonant frequency for the linear vibration module.

6. The linear vibration module of claim 4
wherein the one or more operational control parameters include both a strength of vibration produced by the linear oscillation of the moveable component and a current operational mode; and
wherein the one or more operational control outputs is a control output that determines a current supplied by the power supply to the driving component and a frequency at which the control component drives the moveable component to linearly oscillate.

7. The linear vibration module of claim 1 wherein the driving component comprises one or more electromagnetic coils that generate magnetic fields parallel to the directions in which the moveable component is driven by the driving component.

8. The linear vibration module of claim 1
wherein the housing is a linear tube, capped at both ends by movable-component-repelling components selected from one of mechanical springs and magnets;
wherein the movable component is a magnet shaped to slide within the linear tube; and
wherein the driving component is an electromagnetic coil.

9. The linear vibration module of claim 1
wherein the housing is a linear tube, capped at both ends by movable-component-repelling components; and
wherein the moveable component includes an electromagnetic-coil driving component and microprocessor.

10. The linear vibration module of claim 1 further including rotational driving components that induce rotational motion of the movable component in addition to translational motion induced by the driving component.

11. The linear vibration module of claim 1 wherein the linear vibration module further includes two or more driving components, each, when activated, driving the moveable component to linearly oscillate with an amplitude particular to the activated driving component.

12. The linear vibration module of claim 1
wherein housing includes a power supply, the microprocessor, and a moveable-component track orthogonal to a long axis of the housing;
wherein the moveable component is a plunger that moves a first direction and a second direction opposite from the first direction within the moveable-component-track; and
wherein the driving component comprising two electromagnetic driving coils and a centering magnet.

13. The linear vibration module of claim 1
wherein the moveable component is a clamped mechanical arm to which two magnets are attached; and

Exhibit 1001 - Page 30 of 31

**Appx0246**

wherein the driving component comprising an electromagnetic coil that, when opposite currents are applied at a particular frequency to the electromagnetic coil, causes the mechanical arm to vibrate.

**14**. The linear vibration module of claim **1** further including flux paths comprising a paramagnetic material that is shaped and positioned to reduce the reluctance of one or more magnetic circuits within the linear vibration module.

**15**. The linear vibration module of claim **1** wherein the control component drives simultaneous oscillation of the moveable component at two or more frequencies to generate complex vibration modes.

**16**. The linear vibration module of claim **15** wherein the complex vibration modes include:

a primary oscillation frequency modulated by a modulating oscillation frequency;

a beat frequency; and

an aperiodic oscillation waveform.

**17**. The linear vibration module of claim **1** wherein the control component controls supply of power from the power supply to the driving component to cause the moveable component to oscillate at a frequency and an amplitude that are independently specified by user input received from the user-input features.

**18**. The linear vibration module of claim **1** further including elastomeric bristles used to transfer vibration from the linear vibration module to a surface.

\*   \*   \*   \*   \*

Exhibit 1001 - Page 31 of 31

**Appx0247**



US009941830B2

(12) **United States Patent**
Elenga et al.

(10) Patent No.: **US 9,941,830 B2**
(45) Date of Patent: **Apr. 10, 2018**

(54) **LINEAR VIBRATION MODULES AND LINEAR-RESONANT VIBRATION MODULES**

(71) Applicant: **Resonant Systems, Inc.,** Seattle, WA (US)

(72) Inventors: **Robin Elenga,** Seattle, WA (US); **Brian Marc Pepin,** Oakland, CA (US); **Glen Tompkins,** Woodinville, WA (US)

(73) Assignee: **Resonant Systems, Inc.,** Seattle, WA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **15/181,249**

(22) Filed: **Jun. 13, 2016**

(65) **Prior Publication Data**
US 2016/0301346 A1    Oct. 13, 2016

**Related U.S. Application Data**

(63) Continuation of application No. 14/469,210, filed on Aug. 26, 2014, now Pat. No. 9,369,081, which is a continuation of application No. 13/345,607, filed on Jan. 6, 2012, now Pat. No. 8,860,337, which is a continuation-in-part of application No. 12/782,697, filed on May 18, 2010, now Pat. No. 8,093,767.

(60) Provisional application No. 61/179,109, filed on May 18, 2009.

(51) **Int. Cl.**
*H02K 33/00*    (2006.01)
*H02P 25/032*    (2016.01)
*H02K 33/16*    (2006.01)

(52) **U.S. Cl.**
CPC ........... *H02P 25/032* (2016.02); *H02K 33/16* (2013.01)

(58) **Field of Classification Search**
CPC ...... H02P 25/032; H02K 7/1876; B06B 1/166
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 1,120,414 A | 12/1914 | Schoolfield et al. |
| 3,728,654 A | 4/1973 | Tada |
| 4,549,535 A | 10/1985 | Wing |
| 4,692,999 A | 9/1987 | Frandsen |
| 5,017,819 A | 5/1991 | Patt et al. |
| 5,187,398 A | 2/1993 | Stuart et al. |
| 5,231,336 A | 7/1993 | van Namen |

(Continued)

FOREIGN PATENT DOCUMENTS

EP    1 376 833 A1    1/2004

*Primary Examiner* — Karen Masih
(74) *Attorney, Agent, or Firm* — Olympic Patent Works PLLC

(57) **ABSTRACT**

The current application is directed to various types of linear vibrational modules, including linear-resonant vibration modules that can be incorporated in a wide variety of appliances, devices, and systems to provide vibrational forces. The vibrational forces are produced by linear oscillation of a weight or member, in turn produced by rapidly alternating the polarity of one or more driving electromagnets. Feedback control is used to maintain the vibrational frequency of linear-resonant vibration module at or near the resonant frequency for the linear-resonant vibration module. Both linear vibration modules and linear-resonant vibration modules can be designed to produce vibrational amplitude/frequency combinations throughout a large region of amplitude/frequency space.

**20 Claims, 20 Drawing Sheets**



Exhibit 1001 - Page 1 of 31

**Appx0248**

Samsung et al. v. Resonant Sys.
IPR2023-00993 - Exhibit 1001

(56)                    **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,231,337 | A | 7/1993 | van Namen |
| 5,424,592 | A | 6/1995 | Bluen et al. |
| 5,896,076 | A | 4/1999 | van Narnen |
| 5,955,799 | A | 9/1999 | Amaya et al. |
| 5,973,422 | A | 10/1999 | Clamme |
| 6,323,568 | B1 | 11/2001 | Zabar |
| 6,326,706 | B1 | 12/2001 | Zhang |
| 7,449,803 | B2 | 11/2008 | Sahyoun |
| 7,474,018 | B2 | 1/2009 | Shimizu et al. |
| 7,768,160 | B1 | 8/2010 | Sahyoun |
| 7,768,168 | B2 | 8/2010 | Aschoff et al. |
| 7,771,348 | B2 | 8/2010 | Madsen et al. |
| 7,859,144 | B1 | 12/2010 | Sahyoun |
| 2004/0055598 | A1 | 3/2004 | Crowder et al. |
| 2005/0231045 | A1 | 10/2005 | Oba et al. |
| 2005/0275508 | A1 | 12/2005 | Orr et al. |
| 2006/0138875 | A1 | 6/2006 | Kim et al. |
| 2006/0208600 | A1 | 9/2006 | Sahyoun |
| 2007/0261185 | A1* | 11/2007 | Guney .............. A46B 15/0002 15/22.1 |
| 2011/0144426 | A1* | 6/2011 | Blenk .................... A61H 23/02 600/38 |
| 2011/0248817 | A1* | 10/2011 | Houston ................. A63F 13/06 340/4.2 |
| 2012/0212895 | A1 | 8/2012 | Cohen et al. |

* cited by examiner

Exhibit 1001 - Page 2 of 31

**Appx0249**



FIG. 1A
--Prior Art--

FIG. 1B
--Prior Art--

Exhibit 1001 - Page 3 of 31

**Appx0250**



FIG. 2A

--Prior Art--



FIG. 2B

--Prior Art--

Exhibit 1001 - Page 4 of 31



FIG. 3
--Prior Art--

Exhibit 1001 - Page 5 of 31

Appx0252



FIG. 4A

FIG. 4B

FIG. 4C

FIG. 4D

Exhibit 1001 - Page 6 of 31



FIG. 4E



FIG. 4F



FIG. 4G

Exhibit 1001 - Page 7 of 31                    Appx0254



FIG. 5A



FIG. 5B

Exhibit 1001 - Page 8 of 31

Appx0255



FIG. 6

Exhibit 1001 - Page 9 of 31                    Appx0256



FIG. 7A

Exhibit 1001 - Page 10 of 31      Appx0257



FIG. 7B

Exhibit 1001 - Page 11 of 31



FIG. 7C

Exhibit 1001 - Page 12 of 31     Appx0259



FIG. 8

Exhibit 1001 - Page 13 of 31



FIG. 9

Exhibit 1001 - Page 14 of 31

**Appx0261**



FIG. 10



FIG. 11



FIG. 12

Exhibit 1001 - Page 15 of 31



FIG. 13



FIG. 14



FIG. 15

Exhibit 1001 - Page 16 of 31

**Appx0263**



FIG. 16



FIG. 17



FIG. 18

Exhibit 1001 - Page 17 of 31

**Appx0264**



FIG. 19

Exhibit 1001 - Page 18 of 31

**Appx0265**



FIG. 20

Exhibit 1001 - Page 19 of 31



FIG. 21

Exhibit 1001 - Page 20 of 31



FIG. 22A



FIG. 22B



FIG. 23



FIG. 24A

FIG. 24B

FIG. 25

Exhibit 1001 - Page 22 of 31          Appx0269

1

# LINEAR VIBRATION MODULES AND LINEAR-RESONANT VIBRATION MODULES

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of application Ser. No. 14/469,210, filed Aug. 26, 2014, which is a continuation of U.S. Pat. No. 8,860,337, issued Oct. 14, 2014, which is a continuation-in-part of U.S. Pat. No. 8,093,767, issued Jan. 10, 2012, which claims the benefit of Provisional Patent Application No. 61/179,109, filed May 18, 2009.

## TECHNICAL FIELD

The current application is related to vibration-generating devices and, in particular, to vibration modules that can be incorporated into a wide variety of different types of electromechanical devices and systems to produce vibrations of selected amplitudes and frequencies over a wide range of amplitude/frequency space.

## BACKGROUND

Vibration-inducing motors and mechanisms have been used for many years in a wide variety of different consumer appliances, toys, and other devices and systems. Examples include vibration signals generated by pagers, vibration-driven appliances, such as hair-trimming appliances, electric toothbrushes, electric toy football games, and many other appliances, devices, and systems. The most common electromechanical system used for generating vibrations is an intentionally unbalanced electric motor.

FIGS. 1A-B illustrate an unbalanced electric motor typically used for generating vibrations in a wide variety of different devices. As shown in FIG. 1A, a small, relatively low-power electric motor 102 rotates a cylindrical shaft 104 onto which a weight 106 is asymmetrically or mounted. FIG. 1B shows the weight asymmetrically mounted to the shaft, looking down at the weight and shaft in the direction of the axis of the shaft. As shown in FIG. 1B, the weight 106 is mounted off-center on the electric-motor shaft 104. FIGS. 2A-B illustrate the vibrational motion produced by the unbalanced electric motor shown in FIGS. 1A-B. As shown in FIGS. 2A-B, the asymmetrically-mounted weight creates an elliptical oscillation of the end of the shaft, normal to the shaft axis, when the shaft is rotated at relatively high speed by the electric motor. FIG. 2A shows displacement of the weight and shaft from the stationary shaft axis as the shaft is rotated, looking down on the weight and shaft along the shaft axis, as in FIG. 1B. In FIG. 2A, a small mark 202 is provided at the periphery of the disk-shaped end the of electric-motor shaft to illustrate rotation of the shaft. When the shaft rotates at high speed, a point 204 on the edge of the weight traces an ellipsoid 206 and the center of the shaft 208 traces a narrower and smaller ellipsoid 210. Were the shaft balanced, the center of the shaft would remain at a position 212 in the center of the diagram during rotation, but the presence of the asymmetrically-mounted weight attached to the shaft, as well as other geometric and weight-distribution characteristics of the electric motor, shaft, and unbalanced weight together create forces that move the end of the shaft along the elliptical path 210 when the shaft is rotated at relatively high speed. The movement can be characterized, as shown in FIG. 2B, by a major axis 220 and minor axis 222 of vibration, with the direction of the major axis of vibration equal to the direction of the major axis of the ellipsoids,

2

shown in FIG. 2A, and the length of the major axis corresponding to the amplitude of vibration in this direction. In many applications, in which a linear oscillation is desired, designers seek to force the major-axis-amplitude/minor-axis-amplitude ratio to be as large as possible, but, because the vibration is produced by a rotational force, it is generally not possible to achieve linear oscillation. In many cases, the path traced by the shaft center may be close to circular. The frequency of vibration of the unbalanced electric motor is equal to the rotational frequency of the electric-motor shaft, and is therefore constrained by the rate at which the motor can rotate the shaft. At low rotational speeds, little vibration is produced.

While effective in producing vibrations, there are many problems associated with the unbalanced-electric-motor vibration-generating units, such as that shown in FIG. 1A, commonly used in the various devices, systems, and applications discussed above. First, unbalancing the shaft of an electric motor not only produces useful vibrations that can be harnessed for various applications, but also produces destructive, unbalanced forces within the motor that contribute to rapid deterioration of motor parts. Enormous care and effort is undertaken to precisely balance rotating parts of motors, vehicles, and other types of machinery, and the consequences of unbalanced rotating parts are well known to anyone familiar with automobiles, machine tools, and other such devices and systems. The useful lifetimes of many devices and appliances, particularly hand-held devices and appliances, that employ unbalanced electric motors for generating vibrations may range from a few tens of hours to a few thousands of hours of use, after which the vibrational amplitude produced by the devices declines precipitously as the electric motor and other parts deteriorate.

A second problem with unbalanced electric motors is that they are relatively inefficient at producing vibrational motion. A far greater amount of power is consumed by an unbalanced electrical motor to produce a given vibrational force than the theoretical minimum power required to produce the given vibrational force. As a result, many hand-held devices that employ unbalanced electric motors for generating vibrations quickly consume batteries during use.

A third problem with unbalanced electric motors, discussed above, is that they generally produce elliptical vibrational modes. Although such modes may be useful in particular applications, many applications can better use a linear oscillation, with greater directional concentration of vibrational forces. Linear oscillation cannot generally be produced by unbalanced electric motors.

A fourth, and perhaps most fundamental, problem associated with using unbalanced electric motors to generate vibrations is that only a very limited portion of the total vibrational-force/frequency space is accessible to unbalanced electric motors. FIG. 3 shows a graph of vibrational force with respect to frequency for various types of unbalanced electric motors. The graph is shown as a continuous hypothetical curve, although, of course, actual data would be discrete. As shown in FIG. 3, for relatively low-power electric motors used in hand-held appliances, only a fairly narrow range of frequencies centered about 80 Hz (302 in FIG. 3) generate a significant vibrational force. Moreover, the vibrational force is relatively modest. The bulk of energy consumed by an unbalanced electric motor is used to spin the shaft and unbalanced weight and to overcome frictional and inertial forces within the motor. Only a relatively small portion of the consumed energy is translated into desired vibrational forces.

Exhibit 1001 - Page 23 of 31

**Appx0270**

3

Because of the above-discussed disadvantages with the commonly employed unbalanced-electric-motor vibration-generation units, designers, manufacturers, and, ultimately, users of a wide variety of different vibration-based devices, appliances, and systems continue to seek more efficient and capable vibration-generating units for incorporation into many consumer appliances, devices, and systems.

SUMMARY

The current application is directed to various types of linear vibrational modules, including linear-resonant vibration modules, that can be incorporated in a wide variety of appliances, devices, and systems to provide vibrational forces. The vibrational forces are produced by linear oscillation of a weight or member, in turn produced by rapidly alternating the polarity of one or more driving electromagnets. Feedback control is used to maintain the vibrational frequency of linear-resonant vibration module at or near the resonant frequency for the linear-resonant vibration module. Both linear vibration modules and linear-resonant vibration modules can be designed to produce vibrational amplitude/frequency combinations throughout a large region of amplitude/frequency space.

BRIEF DESCRIPTION OF THE DRAWINGS

FIGS. **1**A-B illustrate an unbalanced electric motor typically used for generating vibrations in a wide variety of different devices.

FIGS. **2**A-B illustrate the vibrational motion produced by the unbalanced electric motor shown in FIGS. **1**A-B.

FIG. **3** shows a graph of vibrational force with respect to frequency for various types of unbalanced electric motors.

FIGS. **4**A-G illustrate one particular LRVM, and operation of the particular LRVM, that represents one implementation of the linear-resonant vibration module to which current application is directed.

FIGS. **5**A-B illustrate an H-bridge switch that can be used, in various embodiments of the current application, to change the direction of current applied to the coil that drives linear oscillation within a linear-resonance vibration module ("LRVM").

FIG. **6** provides a block diagram of the LRVM, illustrated in FIGS. **4**A-G, that represents one implementation of the linear-resonant vibration module to which current application is directed.

FIGS. **7**A-C provide control-flow diagrams that illustrate the control program, executed by the CPU, that controls operation of an LRVM that represents one implementation of the linear-resonant vibration module to which current application is directed.

FIG. **8** represents the range of frequencies and vibrational forces that can be achieved by different implementations of LRVM and LRVM control programs that represent embodiments of the current application.

FIG. **9** shows a plot of the amplitude/frequency space and regions in that space that can be operationally achieved by unbalanced electrical motors and by LRVMs that represent embodiments of the current application.

FIGS. **10**-**17** show a variety of different alternative implementations of LRVMs that represent different embodiments of the current application.

FIG. **18** illustrates an enhancement of an implementation of the linear-resonant vibration module to which current application is directed shown in FIG. **16**.

4

FIG. **19** illustrates plots of amplitude versus frequency for a high-Q and a low-Q vibration device.

FIG. **20** illustrates portions of amplitude/frequency space accessible to various types of vibration modules.

FIG. **21** illustrates the dependence between frequency and amplitude in a low-Q linear vibration module as well as a modified dependence that can be obtained by control circuitry.

FIGS. **22**A-**23** illustrate interesting vibrational modes produced by driving a linear-resonant vibration module simultaneously at two different frequencies.

FIGS. **24**A-**25** illustrate incorporation of paramagnetic flux paths into a linear vibration module.

DETAILED DESCRIPTION

The current application is directed to various linear vibration modules ("LRMs"), including various types of linear-resonant vibration modules ("LRVMs"), that can be used within a wide variety of different types of appliances, devices, and systems, to generate vibrational forces. The LVMs and LRVMs that represent embodiments of the current application are linear in the sense that the vibrational forces are produced by a linear oscillation of a weight or component within the LVM or LRVM, rather than as a by-product of an unbalanced rotation, as in the case of currently employed unbalanced electric motors. The linear nature of the LRVM vibration-inducing motion allows the problems associated with unbalanced-electric-motor vibrators, discussed above, to be effectively addressed. An oscillating linear motion does not produce destructive forces that quickly degrade and wear out an unbalanced electric motor. A linearly oscillating mechanism is characterized by parameters that can be straightforwardly varied in order to produce vibrations of a desired amplitude and frequency over a very broad region of amplitude/frequency space. In many implementations of LRVMs and LVMs, the vibration amplitude and vibration frequency can be independently controlled by a user through user-input features, including buttons, sliders, and other types of user-input features. Combining a linearly oscillating vibration-inducing mechanism with feedback control, so that the frequency of vibration falls close to the resonant frequency of the LRVM, results in optimal power consumption with respect to the amplitude and frequency of vibration produced by the LRVM. Clearly, linear oscillation within a LRVM translates into highly direction vibrational forces produced by an appliance or device that incorporates the LRVM.

FIGS. **4**A-G illustrate one particular LRVM, and operation of the particular LRVM, that represents one implementation of the linear-resonant vibration module to which current application is directed. FIGS. **4**A-G all use the same illustration conventions, next discussed with reference to FIG. **4**A. The LRVM includes a cylindrical housing **402** within which a solid, cylindrical mass **404**, or weight, can move linearly along the inner, hollow, cylindrically shaped chamber **406** within the cylindrical housing or tube **402**. The weight is a magnet, in the described an implementation of the linear-resonant vibration module to which current application is directed, with polarity indicated by the "+" sign **410** on the right-hand end and the "−" sign **412** on the left-hand end of the weight **404**. The cylindrical chamber **406** is capped by two magnetic disks **414** and **416** with polarities indicated by the "+" sign **418** and the "−" sign **419**. The disk-like magnets **414** and **418** are magnetically oriented opposite from the magnetic orientation of the weight **404**, so that when the weight moves to either the extreme left or

Exhibit 1001 - Page 24 of 31

**Appx0271**

5

extreme right sides of the cylindrical chamber, the weight is repelled by one of the disk-like magnets at the left or right ends of the cylindrical chamber. In other words, the disk-like magnets act much like springs, to facilitate deceleration and reversal of direction of motion of the weight and to minimize or prevent mechanical-impact forces of the weight and the end caps that close off the cylindrical chamber. Finally, a coil of conductive wire **420** girdles the cylindrical housing, or tube **402** at approximately the mid-point of the cylindrical housing.

FIGS. **4**B-G illustrate operation of the LRVM shown in FIG. **4**A. When an electric current is applied to the coil **420** in a first direction **422**, a corresponding magnetic force **424** is generated in a direction parallel to the axis of the cylindrical chamber, which accelerates the weight **404** in the direction of the magnetic force **424**. When the weight reaches a point at or close to the corresponding disk-like magnet **414**, as shown in FIG. **4**C, a magnetic force due to the repulsion of the disk-like magnet **414** and the weight **404**, **426**, is generated in the opposite direction, decelerating the weight and reversing its direction. As the weight reverses direction, as shown in FIG. **4**D, current is applied in an opposite direction **430** to the coil **420**, producing a magnetic force **432** in an opposite direction from the direction of the magnetic force **424** in FIG. **4**B, which accelerates the weight **404** in a direction opposite to the direction in which the weight is accelerated in FIG. **4**B. As shown in FIG. **4**E, the weight then moves rightward until, as shown in FIG. **4**F, the weight is decelerated, stopped, and then accelerated in the opposite direction by repulsion of the disk-like magnet **416**. An electrical current is then applied to the coil **420** in the same direction **434** as in FIG. **4**B, again accelerating the solid cylindrical mass in the same direction as in FIG. **4**B. Thus, by a combination of a magnetic field with rapidly reversing polarity, generated by alternating the direction of current applied to the coil, and by the repulsive forces between the weight magnet and the disk-like magnets at each end of the hollow, cylindrical chamber, the weight linearly oscillates back and forth within the cylindrical housing **402**, imparting a directional force at the ends of the cylindrical chamber with each reversal in direction.

Clearly, the amplitude of the vibration and vibrational forces produced are related to the length of the hollow chamber in which the weight oscillates, the current applied to the coil, the mass of the weight, the acceleration of the weight produced by the coil, and the mass of the entire LRVM. All of these parameters are essentially design parameters for the LRVM, and thus the LRVM can be designed to produce a wide variety of different amplitudes.

The frequency of the oscillation of the solid, cylindrical mass is determined by the frequency at which the direction of the current applied to the coil is changed. FIGS. **5**A-B illustrate an H-bridge switch that can be used, in various embodiments of the current application, to change the direction of current applied to the coil that drives linear oscillation within an LRVM. FIGS. **5**A-B both use the same illustration conventions, described next with respect to FIG. **5**A. The H-bridge switch receives, as input, a directional signal d **502** and direct-current ("DC") power **504**. The direction-control signal d **502** controls four switches **506**-**509**, shown as transistors in FIG. **5**A. When the input control signal d **502** is high, or "1," as shown in FIG. **5**A, switches **508** and **509** are closed and switches **506** and **507** are open, and therefore current flows, as indicated by curved arrows, such as curved arrow **510**, from the power-source input **504** to ground **512** in a leftward direction through the coil **514**. When the input-control signal d is low, or "0," as shown in

6

FIG. **5**B, the direction of the current through the coil is reversed. The H-bridge switch, shown in FIGS. **5**A-B, is but one example of various different types of electrical and electromechanical switches that can be used to rapidly alternate the direction of current within the coil of an LRVM.

FIG. **6** provides a block diagram of the LRVM, illustrated in FIGS. **4**A-G, that represents one implementation of the linear-resonant vibration module to which current application is directed. The LRVM, in addition to the cylindrical housing, coil, and internal components shown in FIG. **4**A, includes a power supply, a user interface, generally comprising electromechanical buttons or switches, the H-bridge switch, discussed above with reference to FIGS. **5**A-B, a central processing unit ("CPU"), generally a small, low-powered microprocessor, and one or more electromechanical sensors. All of these components are packaged together as an LRVM within a vibration-based appliance, device, or system.

As shown in FIG. **6**, the LRVM **600** is controlled by a control program executed by the CPU microprocessor **602**. The microprocessor may contain sufficient on-board memory to store the control program and other values needed during execution of the control program, or, alternatively, may be coupled to a low-powered memory chip **604** or flash memory for storing the control program. The CPU receives inputs from the user controls **606** that together comprise a user interface. These controls may include any of various dials, pushbuttons, switches, or other electromechanical-control devices. As one example, the user controls may include a dial to select a strength of vibration, which corresponds to the current applied to the coil, a switch to select one of various different operational modes, and a power button. The user controls generate signals input to the CPU **608**-**610**. A power supply **612** provides power, as needed, to user controls **614**, to the CPU **616** and optional, associated memory, to the H-bridge switch **618**, and, when needed, to one or more sensors **632**. The voltage and current supplied by the power supply to the various components may vary, depending on the operational characteristics and requirements of the components. The H-bridge switch **620** receives a control-signal input d **622** from the CPU. The power supply **612** receives a control input **624** from the CPU to control the current supplied to the H-bridge switch **618** for transfer to the coil **626**. The CPU receives input **630** from one or more electromechanical sensors **632** that generate a signal corresponding to the strength of vibration currently being produced by the linearly oscillating mass **634**. Sensors may include one or more accelerometers, piezoelectric devices, pressure-sensing devices, or other types of sensors that can generate signals corresponding to the strength of desired vibrational forces.

FIGS. **7**A-C provide control-flow diagrams that illustrate the control program, executed by the CPU, that controls operation of an LRVM that represents one implementation of the linear-resonant vibration module to which current application is directed. FIG. **7**A provides a control-flow diagram for the high-level control program. The program begins execution, in step **702**, upon a power-on event invoked by a user through a power button or other user control. In step **702**, various local variables are set to default values, including the variables: (1) mode, which indicates the current operational mode of the device; (2) strength, a numerical value corresponding to the current user-selected strength of operation, corresponding to the electrical current applied to the coil; (3) lvl0, a previously sensed vibrational strength; (4) lvl1, a currently sensed vibrational strength; (5) freq, the current frequency at which the direction of current

Exhibit 1001 - Page 25 of 31

**Appx0272**

7

8

is alternated in the coil; (6) d, the control output to the H-bridge switch; and (7) inc, a Boolean value that indicates that the frequency is currently being increased. Next, in step **704**, the control program waits for a next event. The remaining steps represent a continuously executing loop, or event handler, in which each event that occurs is appropriately handled by the control program. In certain implementations of the control program, events may be initiated by interrupt-like mechanisms and stacked for execution while, in more primitive implementations, certain events that overlap in time may be ignored or dropped. In the implementation illustrated in FIGS. **7A-C**, two timers are used, one for controlling the change in direction of the current applied to the coil, at a currently established frequency, and the other for controlling a monitoring interval at which the control program monitors the vibrational force currently produced. Rather than using a formal timer mechanism, certain implementations may simply employ counted loops or other simple programming techniques for periodically carrying out tasks. When an event occurs, the control program begins a series of tasks, the first of which is represented by the conditional step **706**, to determine what event has occurred and appropriately handle that event. When the frequency timer has expired, as determined in step **706**, the value of the output signal d is flipped, in step **708**, and output to the H-bridge switch, with the frequency timer being reset to trigger a next frequency-related event. The frequency-timer interval is determined by the current value of the variable freq. Otherwise, when the event is a monitor timer expiration event, as determined in step **710**, then a routine "monitor" is called in step **712**. Otherwise, when the event corresponds to a change in the user input through the user interface, as determined in step **714**, the routine "control" is called in step **716**. Otherwise, when the event is a power-down event, as determined in step **718**, resulting from deactivation of a power button by the user, then the control program appropriately powers down the device, in step **720**, and the control program terminates in step **722**. Any other of various types of events that may occur are handled by a default event handler **724**. These events may include various error conditions that arise during operation of the device.

FIG. **7B** provides a control-flow diagram for the routine "monitor," called in step **712** of FIG. **7A**. In step **730**, the routine "monitor" converts the sensor input to an integer representing the current vibrational force produced by the LRVM and stores the integer value in the variable lvl1. Next, in step **732**, the routine "monitor" determines whether or not the LRVM is currently operating in the default mode. In the default mode, the LRVM uses continuous feedback control to optimize the vibrational force produced by the LRVM by continuously seeking to operate the LRVM at a frequency as close as possible to the resonant frequency for the LRVM. Other, more complex operational modes may be handled by various more complex routines, represented by step **734** in FIG. **7B**. More complex vibrational modes may systematically and/or periodically alter the frequency or produce various complex, multi-component vibrational modes useful in certain applications, appliances, devices, and systems. These more complex modes are application dependent, and are not further described in the control-flow diagrams. In the case that the operational mode is the default mode, in which the control program seeks to optimize the vibrational force generated by the device, in step **736**, the routine "monitor" determines whether the local variable Inc is set to TRUE. If so, then the control program is currently increasing the frequency at which the device operates in order to obtain the resonance frequency. When lvl1 is greater than lvl0, as determined in step **738**, then the vibrational force has been recently increased by increasing the frequency, and so the routine "monitor" increases the frequency again, in step **740**, and correspondingly resets the frequency timer. Otherwise, when lvl1 is less than lvl0, as determined in step **742**, then the control program has increased the frequency past the resonance frequency, and therefore, in step **744**, the control program decreases the frequency, sets the variable inc to FALSE, and correspondingly resets the frequency timer. In similar fashion, when the variable inc is initially FALSE, as determined in step **736**, and when lvl1 is greater than lvl0, as determined in step **746**, the routine "monitor" decreases the value stored in the variable freq, in step **748** and resets the frequency timer. Otherwise, when lvl1 is less than lvl0, as determined in step **750**, then the routine "monitor" increases the value stored in the variable freq, sets the variable inc to TRUE, and resets the frequency timer in step **752**. Finally, the value in lvl1 is transferred to lvl0 and the monitor timer is reset, in step **754**.

FIG. **7C** provides a control-flow diagram for the routine "control," called in step **716** in FIG. **7A**. This routine is invoked when a change in the user controls has occurred. In step **760**, the variables mode and strength are set to the currently selected mode and vibrational strength, represented by the current states of control features in the user interface. Next, in step **762**, the routine "control" computes an output value p corresponding to the currently selected strength, stored in the variable strength, and outputs the value p to the power supply so that the power supply outputs an appropriate current to the coil. Finally, in step **764**, the routine "control" computes a new monitor timer interval and resets the monitor timer accordingly.

The control program described with reference to FIGS. **7A-C** is one example of many different implementations of the control program that can be carried out, depending on requirements of the LRVM, the parameters and characteristics inherent in a particular LRVM, the types of control inputs received from a particular user interface, the nature of the power supply, and the types of operational modes that are implemented for the LRVM.

FIG. **8** represents the range of frequencies and vibrational forces that can be achieved by different implementations of LRVM and LRVM control programs that represent embodiments of the current application. FIG. **8** has the same axes as the graph shown in FIG. **3**. However, unlike FIG. **3**, FIG. **8** includes many different curves, such as curve **802**, each representing the vibrational forces and frequencies that can be obtained from a particular LRVM implementation. Again, the LRVMs that represent embodiments of the current application generally have a resonant frequency that is characteristic of the geometry and weights of various components of the LRVM, and each LRVM is naturally operated at a frequency close to this resonant frequency in order to achieve maximum vibrational force. Thus, rather than being restricted, over all possible implementations, to a relatively narrow range of frequencies and vibrational forces, as in the case of unbalanced electrical motors, LRVMs that represent embodiments of the current application can be designed and implemented to produce desired vibrational forces over a wide range of vibrational frequencies, and desired vibrational frequencies over a wide range of desired vibrational forces. The contrast is perhaps best seen in FIG. **9**. FIG. **9** shows a plot of the amplitude/frequency space and regions in that space that can be operationally achieved by unbalanced electrical motors and by LRVMs that represent embodiments of the current application. Unbalanced electric motors can be implemented to produce amplitude/frequency

Exhibit 1001 - Page 26 of 31

Appx0273

9

combinations roughly within the cross-hatched square region **902** within amplitude/frequency space. By contrast, LRVMs can be designed and implemented to produce amplitude/frequency combinations underlying curve **904**. Thus, LRVMs can achieve much higher operational frequencies and much lower operational frequencies than can be practically obtained by unbalanced electric motors, and can produce much higher amplitudes and vibrational forces than can be achieved by relatively low-powered unbalanced electrical motors used in hand-held appliances and other commonly encountered devices and systems. Furthermore, when larger vibrational forces are needed, balanced electrical motors are generally impractical or infeasible, due to the destructive forces produced within the electrical motors. In general, a single implemented LVM or LVRM can access a much larger region of amplitude/frequency space than currently available vibration modules, which generally operate at fixed amplitudes and/or fixed frequencies, as further discussed below.

FIGS. **10-17** show a variety of different alternative implementations of LRVMs that represent different embodiments of the current application. FIG. **10** provides a schematic illustration of an LRVM similar to that discussed above with reference to FIG. **4A**. Note that, in place of the end magnets **1002** and **1004**, mechanical springs may alternatively be used. These may be traditional helical springs made from metal or springs made from a compressible and durable material or mechanical device that seeks to restore its initial shape when depressed or compressed. Note that the weight and chamber may be cylindrical, in cross section, as discussed above with reference to FIG. **4A**, or may have other shapes, including rectangular or hexagonal cross-sections.

FIG. **11** shows a similar implementation in which the control unit and power supply are incorporated into the moving mass **1102**. In this implementation, the relative masses of the moving mass **1102** and remaining components of the LRVM is maximized, thus maximizing the vibrational forces produced at a given level of power consumption.

FIG. **12** shows yet another alternative LRVM an implementation of the linear-resonant vibration module to which current application is directed. In this alternative implementation, additional coils **1202** and **1204** are incorporated in the moving mass, and a centering magnet or coil **1206** is positioned in a fixed location on the housing so that, when the direction of the current applied to the coils **1202** and **1204** is alternated, an oscillating rotational force is generated to cause the movable weight to oscillate both in a plane perpendicular to the axis of the chamber as well as linearly oscillating the direction of the chamber.

FIG. **13** illustrates an embodiment in which multiple electromagnetic coils are employed. In FIG. **13**, two coils **1302** and **1304** are placed in two different positions on the housing. The first coil **1302** may be used to drive linear oscillation of the moving mass **1306**, while the second coil may be activated in order to shorten the length of the chamber within which the moving mass linearly oscillates, essentially serving as a second repelling magnet. In this implementation of the LRVM, the moving mass may linearly oscillate with at least two different amplitudes, depending on whether or not the second coil **1304** is activated to repel the moving mass. Additionally more complex patterns of current reversal in the two coils can be employed to produce complex multi-component vibrational modes of the moving mass.

When the housing is fully enclosed, air within the chamber serves to dampen oscillation of the moving mass. This dampening may be minimized by providing channels, on the

10

sides of the moving mass, to allow air to pass from one side of the moving mass to the other, by channels through the moving mass, or by providing openings in the housing to allow air to be forced from the housing and drawn into the housing. Additionally, different fluids or liquids may be employed within the chamber to change the dampening effect produced by displacement of the fluids and gasses as the moving mass linearly oscillates.

FIG. **14** illustrates an alternative LRVM an implementation of the linear-resonant vibration module to which current application is directed in which a plunger linearly oscillates to produce a vibration. The plunger **1402** is slideably contained within a moveable-component track orthogonal to a long axis of the main housing **1404** of the LRVM that includes the power supply, microcontroller, and other control components. The plunger is girdled by, or includes, a driving magnet **1406** that is attracted to, and seeks to be positioned in alignment with, a centering magnet **1408** mounted within the housing. Applying current to one of two driving coils **1412** and **1414** forces the driving magnet away from the equilibrium position shown in FIG. **14**. By rapidly switching the direction of current applied to the driving coils, the microcontroller can control the plunger to linearly oscillate in an up-and-down fashion, as indicated by arrow **1420**.

FIG. **15** shows yet another LRVM an implementation of the linear-resonant vibration module to which current application is directed. In this an implementation of the linear-resonant vibration module to which current application is directed, a spring-like member **1502** is clamped at one end **1504** to the housing. Driving magnets **1506** and **1508** are fixed to the spring-like member **1502**, and when current is rapidly reversed in a coil **1510**, the spring-like member **1502** is induced to vibrate at a relatively high frequency.

FIG. **16** shows an alternative an implementation of the linear-resonant vibration module to which current application is directed similar to the embodiment shown in FIG. **15**. In this embodiment, the spring member **1602** is extended to provide an external massage arm **1604** that extends out from the housing to provide a linearly oscillating massage-foot member **1606** for massaging human skin or some other substrate, depending on the application.

FIG. **17** shows a mechanical vibration adjustment feature that can be added to either of the embodiments shown in FIGS. **15** and **16**. An adjustment screw **1702** can be manipulated to alter the position of a movable spring clamp **1704** that acts as a movable clamping point for the spring-like member **1706**. Moving the movable spring clamp **1704** leftward, in FIG. **17**, shortens the length of the spring-like member and thus tends to increase the resonant frequency at a particular power-consumption level. Conversely, moving the movable spring clamp rightward, in FIG. **17**, lengthens the spring-like member and decreases the vibrational frequency.

FIG. **18** illustrates an enhancement of an implementation of the linear-resonant vibration module to which current application is directed shown in FIG. **16**. In this embodiment, the massage foot is enhanced to include elastomer bristles **1802-1805** to transfer the linear oscillation of the massage foot to human skin or another substrate. The elastomeric bristles, or pad or brush comprising numerous elastomeric bristles, allow transmission of vibration to a surface even at low operational powers, when a rigid or even semi-compliant massage foot would instead simply stop moving for inability to overcome frictional forces.

As discussed above with reference to FIG. **6**, including a processor or microcontroller within a linear-resonant vibra-

Exhibit 1001 - Page 27 of 31

**Appx0274**

tion module allows for a very large number of different processor-controlled vibration patterns and modes to be exhibited by the linear-resonant vibration module. As discussed above, processor control along with a linear-resonant-vibration-module architecture allows the processor-controlled device to access a much larger portion of a total amplitude/frequency space than can be accessed by currently available unbalanced-electric-motor vibration devices. Thus, processor-controlled linear-resonant vibration modules provide a large increase in functionality with respect to currently available vibration modules. There is, however, a relatively large gap in functionality between processor-controlled linear-resonance vibration modules and currently available unbalanced-electric-motor vibration modules that can be bridged by linear vibration modules that lack processor or microprocessor control.

When discussing vibration modules, electric motors, and other oscillating devices, it is common to use the phrase "Q factor," or "quality factor," to refer to a quality or characteristic of an oscillating device. The Q factor refers to the level of dampening of an oscillator or, in other words, a ratio of the energy stored in the oscillator or resonator to the energy needed to be supplied to the oscillator or resonator during each oscillation cycle in order to maintain a constant oscillation amplitude. FIG. **19** illustrates plots of amplitude versus frequency for a high-Q and a low-Q vibration device. The curve **1902** for a high-Q device generally has a narrower and taller amplitude peak about a resonant frequency **1904** or, in certain cases, several relatively tall, narrow peaks about several resonant frequencies, while a low-Q device exhibits a much broader, but lower-amplitude amplitude-versus-frequency curve **1906**. A linear-resonant vibration module, when controlled to vibrate at a resonant frequency, as described above, generally operates as a high-Q device. However, when controlled by user input or programmatically to vibrate at non-resonant frequencies, the linear-resonant vibration module may instead operate as a low-Q device. Linear vibration modules and other types of vibration modules that lack feedback control generally do not operate at resonant frequencies for extended periods of time, and thus tend to be low-Q devices.

Unbalanced-electric-motor vibration modules and even currently available resonating motors generally operate at either a fixed amplitude or a fixed frequency. For example, unbalanced-electric-motor vibration modules are generally operated at high revolutions per minute ("RPM") to create any vibration, and once operating at a given speed have a relatively fixed amplitude determined by the geometry of the unbalanced weight and rotor shaft. Other types of vibration modules that are currently available include resonating motors, such as the vibration modules found in certain electric toothbrushes, but these resonating motors operate only at a fixed frequency. In both cases, only a very limited portion of the amplitude/frequency space can be accessed by essentially fixed-amplitude or fixed-frequency vibration modules.

Alternative, lower-cost linear-vibration modules can be designed and manufactured by replacing the processor or microcontroller (**602** in FIG. **6**) of the above-described linear-resonant vibration module with a simpler oscillator circuit with additional control circuitry. The H switch (**620** in FIG. **6**) can be controlled by an oscillating current input rather than digital outputs from a microprocessor. Replacing the CPU or microprocessor with an oscillator and additional simple control circuitry produces a less functional, generally lower-Q, but also more economical linear vibration module that, although lacking the extremely broad range of vibration patterns and modes available to processor or microprocessor-controlled vibration modules, can nonetheless access a much larger portion of the amplitude/frequency space than can be accessed by currently available fixed-amplitude or fixed-frequency vibration modules.

In one example implementation of an oscillator-controlled linear vibration module, a variable-frequency oscillator circuit can be controlled by user input to drive the H switch or other H-switch-like circuit to operate the linear vibration module at different frequencies. A user is provided an input feature that allows the user to directly adjust the frequency of the variable oscillator and thus the vibrational frequency produced by the linear vibration module. The user is additionally provided with an input feature to allow the user to control the current or duty cycle used to drive the linear vibration module and to thus increase and decrease the amplitude of vibration produced by the linear vibration module. Thus, a user can control both the frequency of vibration and the amplitude of vibration.

FIG. **20** illustrates portions of amplitude/frequency space accessible to various types of vibration modules. In FIG. **20**, frequency is plotted with respect to a horizontal axis **2002** and amplitude is plotted with respect to a vertical axis **2004**. The plane indexed by these axes represents the amplitude/frequency space, portions of which can be accessed by a given type of vibration module. The above-described unbalanced-electric-motor vibrators are essentially constant-amplitude devices, and can thus access some range of frequencies at a fixed amplitude, represented by line segment **2006** in FIG. **20**. Different unbalanced-electric-motor vibrators may have different fixed amplitudes, but, for a given device, the portion of amplitude/frequency space that they can access can generally represented by a line segment or high-aspect-ratio rectangle oriented orthogonally to the amplitude axis. The resonant-motor vibration devices, which each operates at a fixed frequency, can generally access a range of amplitudes at the fixed frequency, as represented by line segment **2008** in FIG. **20**. By contrast, a linear vibration module user-input-controlled variable frequency and variable amplitude can access a two-dimensional subspace within the amplitude/frequency space, such as the region **2010** within elliptical boundary **2012** in FIG. **20**. Clearly, a linear vibration module with user-controlled variable amplitude and variable frequency can provide a much broader range of amplitude/frequency combinations than currently available vibration modules. A processor or microcontroller-controlled linear-resonant vibration module, as discussed above with reference to FIGS. **4A-18**, can access an even larger region of amplitude/frequency space that includes region **2010** with a subspace.

In certain low-Q linear vibration modules that lack microprocessor or microcontroller control, for any given frequency of operation, the amplitude tends to increase with decreasing frequency of operation. FIG. **21** illustrates the dependence between frequency and amplitude in a low-Q linear vibration module as well as a modified dependence that can be obtained by control circuitry. In FIG. **21**, solid curve **2102** represents the dependence of amplitude on frequency for a low-Q linear vibration module without additional control circuitry. As the frequency decreases, the amplitude begins to steeply and non-linearly increase. In certain applications, a constant or relatively constant amplitude is desired over a broad range of frequencies. A low-Q linear vibration module without microprocessor or microcontroller control can obtain a more constant amplitude over a broader range of frequencies by adjusting the current or duty cycle downward at lower frequencies. For example, as

shown by dashed curve **2104** in FIG. **21**, the control circuitry can be implemented to detect when user-input-controlled operational frequency of a linear vibration module is below a threshold frequency **2106**, at which point control circuitry can lower the driving current or duty cycle to decrease the vibrational amplitude when the linear vibration module is operating at frequencies below the threshold frequency. Thus, dashed curve **2104** is the sum of a lowered-current low-frequency curve and a higher-current high-frequency curve, with the curves joined at the threshold frequency. Alternatively, control circuitry can be implemented to continuously adjust the current or duty cycle lower as the frequency of operation is lowered by user input in order to even further flatten the amplitude-versus-frequency curve for the linear vibration module. In either case, a user may override these automatic adjustments by increasing the amplitude at lower operational frequencies via user input to an amplitude-control user-input feature.

Returning to microprocessor-controlled or microcontroller-controlled linear vibration modules, it should be noted that processor or microprocessor control allows for an essentially limitless number of different vibrational behaviors and modes to be configured by software or firmware design, by user input, or by a combination of software or firmware design and user input. Rather simple enhancements can produce interesting enhanced vibrational behavior. As one example, a microprocessor-controlled or microcontroller-controlled linear vibration module can be programmed to drive the device simultaneously at two different frequencies. FIGS. **22A-23** illustrate interesting vibrational modes produced by driving a linear-resonant vibration module simultaneously at two different frequencies. FIG. **22A** shows a vibration mode of a linear vibration module driven at a frequency of 25 Hz. In a one-second duration of time, plotted with respect to horizontal axis **2202**, 25 cycles, each including a positive and negative amplitude peak, such as positive amplitude peak **2204** and negative amplitude peak **2206**, occur. At a constant 25 Hz frequency of operation, the positive peaks and negative peaks are evenly spaced. FIG. **22B** illustrates a vibration mode of the linear vibration module driven at a primary operational frequency of 25 Hz with an added modulating 1 Hz operational frequency. Driving the linear vibration module by both a primary and a modulating frequency produces low-frequency pulses of high-frequency vibration. FIG. **23** illustrates a different complex vibrational mode in which two driving frequencies combine to produce a lower-frequency beat-wave form. The vibrational mode illustrated in FIG. **23** is produced by a primary driving frequency of 25 Hz, as in FIG. **22A**, with a second driving frequency of 20 Hz. By varying the number, relative amplitudes, and frequencies of two or more driving signals, a microprocessor-controlled or microcontroller-controlled linear-resonance vibration module can be controlled to produce any number of complex vibrational patterns and modes, including periodic modes, modes with multiple different periods, various modulated vibration modes, and even fully aperiodic vibration modes that do not repeat time.

In a linear-resonant vibration module, discussed above, by maintaining device operation at a resonant frequency, the linear-resonant vibration module is a relatively high-Q device, and generally operates more efficiently to produce a given vibration amplitude than a low-Q device, such as a linear vibration module lacking microprocessor or microcontroller control and operating at a frequency/amplitude setting that does not correspond to a natural vibration mode

of the device. There are, in addition, many other ways to increase the energy efficiency of a linear vibration module.

FIGS. **24A-25** illustrate incorporation of paramagnetic flux paths into a linear vibration module. In free air, magnetic field lines radiate outwards in arcs from the north pole to the south, pole of a magnet, completing a magnetic circuit. Free air can be considered to be analogous to a resistor in an electric circuit and increases the resistance, or magnetic reluctance, of a magnetic circuit and reduces and the flux of the magnetic field. A magnetic field seeks out the path of least resistance, and changes direction, when necessary, to maximize flux between the two magnetic poles. When introduced into a magnetic field, paramagnetic materials provide a lower-resistance path for magnetic flux, providing that they have adequate permeability and size to avoid saturation. Paramagnetic materials of appropriate permeability and size reduce the reluctance of a magnetic circuit and can therefore allow a magnetic field to more efficiently perform more work.

FIG. **24A** shows a linear vibration module without paramagnetic flux paths. On the left-hand side of FIG. **24A**, the magnetic field lines **2402** of the moving magnet are shown. A significant portion of the magnetic field lines can be seen to pass through air. FIG. **24B** shows a linear vibration module with added paramagnetic flux paths. These include flux paths around the stator coils **2410-2411** as well as flux-path disks **2414-2415** at the ends of the cylindrical magnet **2416** within the linear vibration module. As can be seen by comparing FIG. **24B** to FIG. **24A**, only tiny portions of the flux lines in FIG. **24B** pass through free air, in contrast to the relatively large portions of flux lines that pass through free air in FIG. **24A**. Thus, addition of paramagnetic flux paths to a linear vibration module in order to decrease the portion of magnetic field lines passing through free air provides a more efficient linear vibration module.

FIG. **25** illustrates flux-path magnetic stops incorporated within a linear vibration module to which the current application is directed. During operation of the linear vibration module, and without the influence of any external force on the piston, the mid-plane of the shuttle magnet **2502** oscillates about the fixed mid-plane of the centering magnet **2504**. When the device encounters a resisting normal force on the end of the piston, the shuttle magnet biases into the motor and oscillates about a datum offset from the fixed mid-plane of the centering magnet. When the resisting force is greater than the electromagnetic force generated by the motor, the piston assembly continues to be driven into the bore until the flux disc **2506** is in line with the return lip **2508** of the flux path. In this position, the air gap of the magnetic circuit is reduced due to the proximity of the flux disc to the return lip. Maximum magnetic flux flow is achieved between these two components in a radial direction. Additional external axial force is required to force the piston assembly to move beyond this limit, effectively producing a magnetic stop. This effect also prevents the piston from being ejected from the motor at high power and low frequency settings at which the piston carries significant momentum.

Although the present invention has been described in terms of particular embodiments, it is not intended that the invention be limited to these embodiments. Modifications will be apparent to those skilled in the art. For example, as discussed above, LRVMs can be designed to produce desired vibrational amplitudes and frequencies over a wide region of amplitude/frequency space by varying various different design parameters and characteristics, including the amplitude of a moving mass that linearly oscillates within

Exhibit 1001 - Page 29 of 31

**Appx0276**

15

the LRVM, altering the dimensions of the LRVM and internal components of the LRVM, altering the weight of the moving mass and other components of the LRVM, changing the ratio of the moving mass to the ratio of the remaining components of the LRVM, increasing or decreasing the number of turns in the coil or coils used to drive linear oscillation, increasing or decreasing the current supply to the coils, altering the dampening produced by displacement of fluid or gas by the moving mass within the LRVM as well as by various additional frictional forces, altering the strength of the end-cap magnets or mechanical springs used to facilitate reversal of direction of the moving mass, and by changing any of various additional parameters and characteristics. Any of various different microprocessors and other microcontrollers can be used in alternative embodiments of the LRVM, as well as different power supplies, current-switching devices, and other components. The control program executed by the LRVM can be implemented in many different ways by varying any of many different design parameters, including programming language, control structures, data structures, modular organization, and other such design parameters. The components of the LRVM, including the housing, moving mass, fixed magnets, and electromagnets, can be fashioned from many different types of materials, from polymers and plastics to metals and alloys in various composite materials. LRVMs may contain one, two, or more electromagnets and/or permanent magnets in order to produce linear oscillation of a moving mass or spring-like mass, and various different control programs can be implemented to produce many different types of single-component and multi-component vibrational modes, some of which may regularly or erratically change, over time, to produce a wide variety of different types of vibrational characteristics. An additional housing made from a material with a relatively large magnetic permeability can be added to various embodiments of the current application to concentrate and increase the linear magnetic forces produced by the various coils.

The foregoing description, for purposes of explanation, used specific nomenclature to provide a thorough understanding of the invention. However, it will be apparent to one skilled in the art that the specific details are not required in order to practice the invention. The foregoing descriptions of specific embodiments of the present invention are presented for purpose of illustration and description. They are not intended to be exhaustive or to limit the invention to the precise forms disclosed. Many modifications and variations are possible in view of the above teachings. The embodiments are shown and described in order to best explain the principles of the invention and its practical applications, to thereby enable others skilled in the art to best utilize the invention and various embodiments with various modifications as are suited to the particular use contemplated. It is intended that the scope of the invention be defined by the following claims and their equivalents:

The invention claimed is:

**1**. A vibration module comprising:
a housing;
a moveable component;
a power supply;
user-input features;
a driving component that drives the moveable component to oscillate within the housing; and
a control component that controls supply of power from the power supply to the driving component to cause the moveable component to oscillate at a frequency and an amplitude specified by one or more stored values.

16

**2**. The vibration module of claim **1** wherein the control component is one of:
an variable oscillator circuit with additional control circuitry; and
a control component that includes
a microprocessor,
a control program, stored in an electronic memory within, or separate from, the microprocessor, the control program executed by the microprocessor to control supply of power from the power supply to the driving component to cause the moveable component to oscillate at a frequency and an amplitude specified by the one or more stored values.

**3**. The vibration module of claim **1** wherein the control component receives output signals from sensors within the vibration module during operation of the vibration module and adjusts one or more operational control outputs of the control component according to the received output signals from the sensors.

**4**. The vibration module of claim **1** wherein the control component adjusts the one or more operational control outputs of the control component according to the received output signals from the sensors in order that subsequent operation of the vibration module produces desired outputs from the one or more sensors corresponding to one or more operational control parameters.

**5**. The vibration module of claim **4** wherein the one or more operational control parameters is a strength of vibration produced by the oscillation of the moveable component; and
wherein the one or more operational control outputs is a frequency at which the control component drives the moveable component to oscillate, the control component dynamically adjusting the power supplied to the driving component to produce oscillation of the moveable component at a resonant frequency for the vibration module.

**6**. The vibration module of claim **4**
wherein the one or more operational control parameters include both a strength of vibration produced by the oscillation of the moveable component and a current operational mode; and
wherein the one or more operational control outputs is a control output that determines a current supplied by the power supply to the driving component and a frequency at which the control component drives the moveable component to oscillate.

**7**. The vibration module of claim **1** wherein the driving component comprises one or more electromagnetic coils that generate magnetic fields parallel to the directions in which the moveable component is driven by the driving component.

**8**. The vibration module of claim **1**
wherein the housing is a tube, capped at both ends by movable-component-repelling components selected from one of mechanical springs and magnets;
wherein the movable component is a magnet shaped to slide within the tube; and
wherein the driving component is an electromagnetic coil.

**9**. The vibration module of claim **1**
wherein the housing is a tube, capped at both ends by movable-component-repelling components; and
wherein the moveable component includes an electromagnetic-coil driving component and microprocessor.

**10**. The vibration module of claim **1** further including rotational driving components that induce rotational motion

Exhibit 1001 - Page 30 of 31

Appx0277

of the movable component in addition to translational motion induced by the driving component.

**11**. The vibration module of claim **1** wherein the vibration module further includes two or more driving components, each, when activated, driving the moveable component to oscillate with an amplitude particular to the activated driving component.

**12**. The vibration module of claim **1**
   wherein housing includes a power supply, the micropro-
      cessor, and a moveable-component track orthogonal to
      a long axis of the housing;
   wherein the moveable component is a plunger that moves
      a first direction and a second direction opposite from
      the first direction within the moveable-component-
      track; and
   wherein the driving component comprising two electro-
      magnetic driving coils and a centering magnet.

**13**. The vibration module of claim **1**
   wherein the moveable component is a clamped mechani-
      cal arm to which two magnets are attached; and
   wherein the driving component comprising an electro-
      magnetic coil that, when opposite currents are applied
      at a particular frequency to the electromagnetic coil,
      causes the mechanical arm to vibrate.

**14**. The vibration module of claim **1** further including flux paths comprising a paramagnetic material that is shaped and positioned to reduce the reluctance of one or more magnetic circuits within the vibration module.

**15**. The vibration module of claim **1** wherein the control component drives simultaneous oscillation of the moveable component at two or more frequencies to generate complex vibration modes.

**16**. The vibration module of claim **15** wherein the complex vibration modes include:
   a primary oscillation frequency modulated by a modulat-
      ing oscillation frequency;
   a beat frequency; and
   an aperiodic oscillation waveform.

**17**. The vibration module of claim **1** wherein the control component controls supply of power from the power supply to the driving component to cause the moveable component to oscillate at a frequency and an amplitude that are inde-pendently specified by user input received from the user-input features.

**18**. The vibration module of claim **1** further including elastomeric bristles used to transfer vibration from the vibration module to a surface.

**19**. A vibration module comprising:
   a housing;
   a moveable component;
   a power supply;
   user-input features;
   a driving component that drives the moveable component
      to oscillate within the housing;
   a control component that controls supply of power from
      the power supply to the driving component to cause the
      moveable component to oscillate at a frequency and an
      amplitude specified by one or more stored values; and
   flux paths comprising a paramagnetic material that is
      shaped and positioned to reduce the reluctance of one
      or more magnetic circuits within the vibration module.

**20**. A vibration module comprising:
   a housing;
   a moveable component;
   a power supply;
   user-input features;
   a driving component that drives the moveable component
      to oscillate within the housing; and
   a control component that controls supply of power from
      the power supply to the driving component to cause the
      moveable component to oscillate at a frequency and an
      amplitude specified by one or more stored values,
      wherein the control component drives simultaneous
         oscillation of the moveable component at two or
         more frequencies to generate complex vibration
         modes.

\* \* \* \* \*

Exhibit 1001 - Page 31 of 31

**U.S. DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**

April 28, 2025
(Date)

**THIS IS TO CERTIFY** that the attached document is a list of the papers that comprise the record before the Patent Trial and Appeal Board (PTAB) for the *Inter Partes Review* proceeding identified below.

**SAMSUNG ELECTRONICS CO., LTD. and**
**SAMSUNG ELECTRONICS AMERICA, INC.,**
**Petitioner,**

v.

**RESONANT SYSTEMS, INC.,**
**Patent Owner.**

**Case:  IPR2023-00992**
**Patent No. 9,369,081 B2**
By authority of the

**DIRECTOR OF THE UNITED STATES**
**PATENT AND TRADEMARK OFFICE**

*Macia L. Fletcher*

*Certifying Officer*



**Prosecution History ~ IPR2023-00992**

| Date | Document |
|---|---|
| 6/14/2023 | Petition for Inter Partes Review |
| 6/14/2023 | Petitioner's Power of Attorney (Samsung Electronics Co., Ltd.) |
| 6/14/2023 | Petitioner's Power of Attorney (Samsung Electronics America, Inc.) |
| 7/14/2023 | Notice of Filing Date Accorded to Petition and Time for Filing Patent Owner's Preliminary Response |
| 8/25/2023 | Patent Owner's Mandatory Notice |
| 8/25/2023 | Patent Owner's Power of Attorney |
| 9/28/2023 | Petitioner's Updated Power of Attorney (Samsung Electronics, America, Inc.) |
| 9/28/2023 | Petitioner's Updated Power of Attorney (Samsung Electronics Co., Ltd.) |
| 9/28/2023 | Petitioners' Updated Mandatory Notice |
| 10/16/2023 | Patent Owner's Preliminary Response |
| 10/30/2023 | Petitioners' Updated Mandatory Notices |
| 11/3/2023 | Order - Conduct of the Proceeding |
| 11/13/2023 | Petitioners' Preliminary Reply to Patent Owner's Preliminary Response |
| 11/20/2023 | Patent Owner's Preliminary Sur-Reply |
| 11/29/2023 | Patent Owner's Corrected Preliminary Sur-Reply |
| 1/10/2024 | Decision - Institution of Inter Partes Review |
| 1/10/2024 | Scheduling Order |
| 1/22/2024 | Motion for Pro Hac Vice Admission - Kroeger |
| 1/22/2024 | Motion for Pro Hac Vice Admission - Conkle |
| 2/7/2024 | Decision - Pro Hac Vice Admission - Kroeger and Conkle |
| 3/11/2024 | Patent Owner's Updated Power of Attorney |
| 3/11/2024 | Patent Owner's Updated Mandatory Notices |
| 3/14/2024 | Notice of Deposition - Wolfe, Ph.D. |
| 3/25/2024 | Joint Stipulation to Modify Due Dates 1 and 2 |
| 4/12/2024 | Joint Stipulation to Modify Due Dates 1 and 2 |
| 4/15/2024 | Patent Owner's Response |
| 5/22/2024 | Patent Owner's Submission of Statutory Disclaimer as Exhibit 2015 |
| 5/30/2024 | Petitioners' Updated Mandatory Notices |
| 6/4/2024 | Petitioners' Motion for Withdrawal of Counsel |
| 6/7/2024 | Order - Petitioners' Motion to Withdraw Counsel |
| 6/13/2024 | Petitioners' Motion for Withdrawal of Counsel |
| 6/13/2024 | Petitioner's Power of Attorney (Samsung Electronics Co., Ltd.) |
| 6/13/2024 | Petitioner's Power of Attorney (Samsung Electronics America, Inc.) |
| 6/18/2024 | Joint Stipulation to Modify Due Dates 2 and 3 |
| 6/18/2024 | Notice of Deposition - Goossen |
| 7/10/2024 | Order - Petitioners' Motion to Withdraw Counsel |
| 8/2/2024 | Petitioners' Reply to Patent Owner's Response |
| 8/8/2024 | Notice of Deposition - Wolfe, Ph.D. |
| 8/29/2024 | Petitioners' Request for Oral Argument |
| 8/29/2024 | Patent Owner's Sur-Reply |
| 8/29/2024 | Patent Owner's Request for Oral Argument |

**Prosecution History ~ IPR2023-00992**

| Date | Document |
|---|---|
| 9/16/2024 | Order - Requests for Oral Argument |
| 9/17/2024 | Petitioners' Updated Exhibit List |
| 10/8/2024 | Petitioners' Updated Exhibit List |
| 10/8/2024 | Patent Owner's Updated Exhibit List |
| 10/22/2024 | Oral Hearing Transcript |
| 1/8/2025 | Final Written Decision |

**U.S. DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**

April 28, 2025
(Date)

**THIS IS TO CERTIFY** that the attached document is a list of the papers that comprise the record before the Patent Trial and Appeal Board (PTAB) for the *Inter Partes Review* proceeding identified below.

**SAMSUNG ELECTRONICS CO., LTD., and**
**SAMSUNG ELECTRONICS AMERICA, INC.,**
**Petitioner,**

**v.**

**RESONANT SYSTEMS, INC.,**
**Patent Owner.**

**Case:  IPR2023-00993**
**Patent No. 9,941,830 B2**
By authority of the

**DIRECTOR OF THE UNITED STATES**
**PATENT AND TRADEMARK OFFICE**

*Macia L. Fletcher*

*Certifying Officer*



**Prosecution History ~ IPR2023-00993**

| Date | Document |
|------|----------|
| 6/14/2023 | Petition for Inter Partes Review |
| 6/14/2023 | Petitioner's Power of Attorney (Samsung Electronics Co., Ltd.) |
| 6/14/2023 | Petitioner's Power of Attorney (Samsung Electronics, America, Inc.) |
| 6/14/2023 | Petitioners' Notice of Multiple Petitions |
| 7/14/2023 | Notice of Filing Date Accorded to Petition and Time for Filing Patent Owner's Preliminary Response |
| 8/25/2023 | Patent Owner's Mandatory Notice |
| 8/25/2023 | Patent Owner's Power of Attorney |
| 9/28/2023 | Petitioner's Updated Power of Attorney (Samsung Electronics America, Inc.) |
| 9/28/2023 | Petitioner's Updated Power of Attorney (Samsung Electronics Co., Ltd.) |
| 9/28/2023 | Petitioners' Updated Mandatory Notice |
| 10/16/2023 | Patent Owner's Preliminary Response |
| 10/30/2023 | Petitioners' Updated Mandatory Notices |
| 11/3/2023 | Order - Conduct of Proceeding |
| 11/13/2023 | Petitioners' Preliminary Reply to Patent Owner's Preliminary Response |
| 11/20/2023 | Patent Owner's Preliminary Sur-Reply |
| 11/29/2023 | Patent Owner's Corrected Preliminary Sur-Reply |
| 1/10/2024 | Decision - Institution of Inter Partes Review |
| 1/10/2024 | Scheduling Order |
| 1/22/2024 | Motion for Pro Hac Vice Admission - Conkle |
| 1/22/2024 | Motion for Pro Hac Vice Admission - Kroeger |
| 1/23/2024 | Corrected Motion for Pro Hac Vice Admission - Conkle |
| 2/7/2024 | Decision - Pro Hac Vice Admission - Kroeger and Conkle |
| 3/11/2024 | Patent Owner's Updated Mandatory Notices |
| 3/11/2024 | Patent Owner's Updated Power of Attorney |
| 3/14/2024 | Notice of Deposition - Wolfe, Ph.D. |
| 3/25/2024 | Joint Stipulation to Modify Due Dates 1 and 2 |
| 4/12/2024 | Joint Stipulation to Modify Due Dates 1 and 2 |
| 4/15/2024 | Patent Owner's Response |
| 5/30/2024 | Petitioners' Updated Mandatory Notices |
| 6/4/2024 | Petitioners' Motion for Withdrawal of Counsel |
| 6/7/2024 | Order - Petitioners' Motion to Withdraw Counsel |
| 6/13/2024 | Petitioners' Motion for Withdrawal of Counsel |
| 6/13/2024 | Petitioner's Power of Attorney (Samsung Electronics Co., Ltd.) |
| 6/13/2024 | Petitioner's Power of Attorney (Samsung Electronics America, Inc., Ltd.) |
| 6/18/2024 | Joint Stipulation to Modify Due Dates 2 and 3 |
| 6/18/2024 | Notice of Deposition - Goossen |
| 7/10/2024 | Order - Petitioners' Motion to Withdraw Counsel |
| 8/2/2024 | Petitioners' Reply to Patent Owner's Response |
| 8/8/2024 | Notice of Deposition - Ph.D. |
| 8/29/2024 | Petitioners' Request for Oral Argument |
| 8/29/2024 | Patent Owner's Sur-Reply |

**Prosecution History ~ IPR2023-00993**

| Date | Document |
|------|----------|
| 8/29/2024 | Patent Owner's Request for Oral Argument |
| 9/16/2024 | Order - Requests for Oral Argument |
| 9/17/2024 | Petitioners' Updated Exhibit List |
| 10/8/2024 | Petitioners' Updated Exhibit List |
| 10/8/2024 | Patent Owner's Updated Exhibit List |
| 10/22/2024 | Oral Hearing Transcript |
| 1/8/2025 | Final Written Decision |

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served on June 27, 2025, to all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system.

*/s/ Jeffrey A. Miller*
Jeffrey A. Miller